Steven C. Moore, Esq., Colorado Bar #009863
Walter R. Echo-Hawk, Esq., Colorado Bar #005216
K. Jerome Gottschalk, Esq., New Mexico Bar #3799
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302-6296
smoore@narf.org


Damon Williams, Esq., Kansas Bar #20943
Amelia C. Holmes, Esq.  Kansas Bar #20346
Kickapoo Tribal Legal Department
**KICKAPOO TRIBE IN KANSAS**
Post Office Box 110
1107 Goldfinch Road
Horton, Kansas 66439
holmesameliac@yahoo.com

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

_____

|  |  |  |
|---|---|---|
| **KICKAPOO TRIBE OF INDIANS OF THE KICKAPOO RESERVATION IN KANSAS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 06-2248 CM-DJW** |
| **v.** | ) | |
| | ) | |
| **ARLEN LANCASTER, et al.** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____)

# MEMORANDUM IN SUPPORT OF PLAINTIFF'S
# FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iv

I. INTRODUCTION ...................................................... 2

II. SUMMARY OF UNDISPUTED MATERIAL FACTS ........................... 2

    A.) Factual Background Leading up to the 1994 Upper Delaware River and Tributaries ("UDT") Agreement .................................................... 2

    B.) The "Agreement and Environmental Impact Statement for the Development of the Upper Delaware and Tributaries Watershed" Was Executed by the Local Sponsors, the State of Kansas and the Federal Soil Conservation Service in the Spring of 1994 ........... 7

    C.) The Key Contractual Provisions of the UDT Agreement and Environmental Impact Statement ("EIS") .................................................... 8

    D.) Post-Agreement Implementation Steps and Nemaha Brown Board Efforts to Thwart the Agreement .................................................... 12

    E.) Post Agreement Correspondence Reaffirms The Original Intentions Of The Parties Concerning Nemaha Brown's Condemnation Obligation, And The Detrimental Reliance By The Tribe And The United States On The Promise By Nemaha Brown To Exercise Its Condemnation Authority If Needed .................................................... 16

III. STATEMENT OF THE ISSUES .................................................... 20

IV. ARGUMENT .................................................... 21

    A. Applicable Summary Judgment Standard .................................................... 21

    B. The Federal PL-566 Small Watersheds Program Requires That As A "Local Sponsor" The Nemaha Brown Watershed Board Possess Condemnation Authority Under State Law, And Use It If Necessary To Acquire Land Rights Necessary For Works Of Improvement Under A Project Funded By The Soil Conservation Service [Now Natural Resource Conservation Service] .................................................... 22

    C. The UDT Agreement of 1994 Is Capable of Only One Interpretation – That Federal Law Required and All Parties Thereto Understood the Exercise of Nemaha Brown's Eminent Domain Authority over Fee Lands Within the Plum Creek Project Boundaries Would Be Necessary in the Event the Landowners Would Not Willingly Sell or Exchange Lands to the Kickapoo Tribe .................................................... 27

D.  The Nemaha Brown Board's Continuing Breach Of Its Contractual Obligation To The Tribe And The Other Parties To The 1994 Agreement Can Only Be Remedied By Ordering It To Specifically Perform ...............................................................................31

    1.    The Nemaha Brown Board's Non-Performance Of Its Condemnation Authority To Acquire The Plum Creek Reservoir Project Lands Is A Continuing Breach Of Contract .............................................................................................32

    2.    Specific Performance Is Required In This Case As Damages Are An Inadequate Remedy For The Continuing Breach Of Definite Terms Of The Agreement Involving Interests In Specific Tracts Of Land For The Plum Creek Project ...........................................................................................................36

E.  By Virtue Of Promises Made And Reliance Thereon by the Tribe and the United States, The Nemaha Brown Board Of Directors Is Estopped From Asserting That They Do Not Have An Obligation Under The 1994 Agreement To Condemn Lands Necessary For The Plum Creek Reservoir Project ..........................................................................39

F.  The Conduct Of The Of The Nemaha Brown Watershed Board Is *Ultra Vires* Its Obligations Under Federal And State Law And The 1994 UDT Watershed Agreement, And The Board Should Be Ordered To Perform Those Obligations ...............................41

    1.  The Nemaha Brown Board and its Members are Authorized under the Kansas Watershed District Act and the Federal PL-566 Small Watersheds Program to Condemn Fee Lands to Construct Works of Improvement Needed to Conserve, Develop, Utilize or Dispose of Water.  The 1994 Agreement Between The Board, The Tribe And Other Parties Was Executed Pursuant To These Authorities, Wherein The Board Promised To Take Certain Actions Under Its State Delegated Authority ..........................................................................................................42

    2.  The Standard For Setting Aside *Ultra Vires* Conduct By Government Officials In Kansas Focuses On The Actions Of Those Members Who At Bottom Use Public Power To Oppress Or Subvert Private Rights.  The Board's Refusal To Perform Its Obligations Under The UDT Agreement Is Unlawful And Is Thus *Ultra Vires* Their Duties Under Kansas Law ........................................................44

    3.  The Nemaha Brown Boards' Failure To Perform Under The UDT Agreement Meets The Standard For Conduct Which Is *Ultra Vires* its Duties Under Kansas And Federal Law.   The Appropriate Remedy is To Compel The Board To Perform ..............................................................................................................45

V.  CONCLUSION.................................................................................................................47

## TABLE OF AUTHORITIES

**Cases**

Atkinson Trading Co. v. Shirley,
532 U.S. 645 (2001)...................................................................................................... 24

B & E Investments, Inc. v. City of Wichita,
2006 WL 1816328 (Kan. App. 2006) ............................................................................ 38

Barton v. Turkey Creek Watershed Joint District Number 32 of Dickinson and Marion Counties,
200 Kan. 489, 438 P.2d 732 (1968).............................................................................. 44

Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation,
492 U.S. 408 (1989)...................................................................................................... 24

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)...................................................................................................... 20

Comstock & Davis, Inc. v. City of Eden Prairie,
557 N.W.2d 213 (Minn. Ct. App. 1997)....................................................................... 43

DeBauge Bros., Inc. v. Whisitt,
212 Kan. 758, 512 P.2d 487 (Kan. 1973) ..................................................................... 34

DP-TEK, Inc. v. AT & T Global Information Solutions Co.,
891 F. Supp. 1510 (D. Kan. 1995), aff'd, 100 F.3d 828 (10th Cir. 1996).................... 20

Drainage District Number 3 of Sedgwick County v. Riverside Drainage District,
104 Kan. 233, 178 P. 433 (1919).................................................................................. 44

Dusenberry v. Jones,
359 F. Supp. 712 (D. Kan. 1972).................................................................................. 34

EDO Corp. v. Beech Aircraft Corp.,
911 F.2d 1447 (10th Cir. 1990) .................................................................................... 39

Eudora Dev. Co. Of Kansas v. City of Eudora,
276 Kan. 626, 78 P.3d 437 (2003)................................................................................ 44

Franconia Associates v. United States,
536 U.S. 129 (2002)...................................................................................................... 31

Glasscock v. Wilson Constructors, Inc.,
627 F.2d 1065 (10th Cir. 1980) ............................................................ 39

Greiner v. Greiner,
131 Kan. 760, 293 P. 759 ...................................................................... 39

Henry v. Scurry,
142 P.2d 717 (Kan. 1943) ...................................................................... 35

Hochard v. Deiter,
219 Kan. 738 (1976) .............................................................................. 34

Huser v. Duck Creek Watershed Joint District Number 59,
234 Kan. 1, 668 P.2d 172 (Kan. 1983) .................................................. 41

Linden v. Board of Park Commissioners of Wichita,
178 Kan. 333, 285 P.2d 1070 (1955) .................................................... 44

Marker v. Preferred Fire Ins. Co.,
211 Kan. 427, 506 P.2d 1163 (1973) ............................................... 38, 39

Michigan Mun. Liability and Property Pool v. Muskegon County Bd. of County Road Com'rs,
235 Mich. App. 183, 597 N.W.2d 187 (1999) ...................................... 43

Mohr v. State Bank of Stanley,
770 P.2d 466 (Kan. 1989) ...................................................................... 39

Montana v. United States,
450 U.S. 544 (1981) ............................................................................... 24

Mullins v. City of El Dorado,
200 Kan. 336, 436 P.2d 837 (1968) ...................................................... 44

Murphy v. Fairmount Twp.,
89 Kan. 760, 133 P. 169 (1913) ............................................................ 44

Northwest Arkansas Masonry, Inc. v. Summit Specialty Products, Inc.,
31 P.3d 982 (Kan. App. 2001) .............................................................. 31

Pacific Fire Protection Dist. v. Mosley,
939 S.W.2d 467 (Mo. Ct. App. E.D. 1996) .......................................... 43

Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.,
250 Kan. 722, 830 P.2d 35 (1992) ........................................................ 38

Schulenberg v. City of Reading,
196 Kan. 43, 410 P.2d 324 (1966) ....................................................... 44

Shanks v. Pearson,
66 Kan. 168, 71 P. 252 (1903) ............................................................ 44

Southwestern College v. Hawley,
144 Kan. 652, 62 P.2d 850 .................................................................. 39

Symns v. Graves,
65 Kan. 628, 70 P. 591 (1902) ............................................................ 44

Templeton v. Kansas Parole Bd.,
6 P.3d 910 (Kan. App. 2000) .............................................................. 39

Walsh v. Schlecht,
429 U.S. 401 (1977) ............................................................................. 25

Weber v. Tillman,
913 P.2d 84 (Kan. 1996) ..................................................................... 25

## Statutes & Administrative Codes

16 U.S.C. §§ 1001-1008 ................................................................. passim

16 U.S.C. § 1002 ........................................................................... 21, 23

16 U.S.C. § 1004 ........................................................................... 21, 25

16 U.S.C. §§ 1001 .............................................................................. 21

42 U.S.C. § 300j ................................................................................. 14

7 C.F.R. § 622.10 ............................................................................... 22

Kan. Stat. Ann. § 24-1201 ............................................................... 3, 41

Kan. Stat. Ann. § 24-1201(a) ........................................................... 3, 41

Kan. Stat. Ann. § 24-1209 ............................................................... 3, 41

Kan. Stat. Ann. § 24-1213 ................................................................................................. 4

## Other

Rule 56, Fed. R. Civ. P. ................................................................................................. 20

Restatement (Second) of Contracts § 205 (1981) ...................................................... 45

Restatement (Second) of Contracts § 235(2)(1981) ................................................... 31

Restatement (Second) of Contracts § 360 (1981) ................................................ 34, 35

Senate Report 97-126 (May 27, 1981), 97th Cong., 1st Sess. at p. 148, 1981 U.S.C.C.A.N. 1965, at 2111, 1981 WL 21324 ......................................................................................23, 24

56 Am. Jur. 2d *Municipal Corporations, Counties, and Other Political Subdivisions*, § 180 ......................................................................42

# I.  INTRODUCTION

This action was filed by the Kickapoo Tribe in Kansas ("the Tribe") on June 14, 2006 in the United States District Court for the District of Kansas.  Efforts were made by the Tribe and the defendants to explore an early resolution of the issues raised in the action but, to date, those efforts have been unsuccessful.  The Tribe is simultaneously filing companion motions for partial summary judgment.  The first addresses a core legal issue in the case – the legal obligation of the Board of Directors of the Nemaha Brown Watershed Joint District Number 7 to proceed with condemnation actions against the fee land property owners within the Plum Creek Reservoir project area.  The second motion for partial summary judgment addresses the legal status of the Tribe's reserved federal water rights, and the duty of the United States to protect those rights. The Tribe believes that there are no disputed issues of material fact and these legal issues are ripe for resolution by the Court.  An early resolution of these issues will, perhaps, enable the parties to resume settlement discussions by narrowing the scope of unresolved legal and factual disputes, or will narrow the unresolved issues for purposes of discovery and trial.

## II.  SUMMARY OF UNDISPUTED MATERIAL FACTS

**A.     Factual Background Leading up to the 1994 Upper Delaware River and Tributaries ("UDT") Agreement.**

1.  All life depends on water, and for that reason water is sacred to the Kickapoo people. Since the time they lived in the Great Lakes region of what is now Ohio, Michigan and later Wisconsin, water has been a central part of the lifeways of the Kickapoo people.  Since signing the 1832 Treaty of Castor Hill, wherein the Tribe secured its Reservation in Kansas, the Tribe

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT**

1

has sought a dependable source of water for its homeland and its members.  *See* Declaration of Steve Cadue, Chairman, Kickapoo Tribe ("Cadue Dec.") at ¶ 2.  The Treaty of Castor Hill created a permanent homeland for the Kickapoo people under which the United States and the Kickapoo Tribe agreed to hold the land of the Reservation in trust for the use and benefit of the Tribe and its members.  Both parties to the Treaty intended this land to provide an economically viable and livable community for the Kickapoo Tribe.  (*See* Kickapoo Tribe's Second Motion for Partial Summary Judgment relating to its water rights, filed with the Court contemporaneous with the filing of this motion.)

2.  Water is an essential resource, necessary to build a viable Reservation community for the Tribe and its members, as well as other non-Indians living there.  The Tribe began developing the Reservation's infrastructure in the 1950s and 1960s.  Individual Indian homes on parcels of allotted land on the Reservation had relied on small, shallow wells for water.  In the 1960s, the Tribe sought its first federal grants to construct tribal housing projects, and it was at this time that serious efforts commenced to develop a reliable water system for the Reservation.  Receipt of those grants was dependent upon having access to a dependable source of potable water.  Small, shallow wells simply would not do the trick.  Cadue Dec. at ¶¶ 4-6.

3.  By the 1970s, the Tribe began its efforts to secure a dependable water supply by constructing a small dam and intake structure on the Delaware River which flows through the Reservation, and a water treatment plant, the first Indian owned and operated water treatment plant in the United States.  These public works projects were completed with financial assistance in the form of a $1.3 million grant from the U.S. Economic Development Administration.  Cadue Dec.at ¶ 8.  The Tribe also established a Tribal Environmental Office supported by the U.S.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

2

Environmental Protection Agency to provide administrative support for the water treatment plant and other environmental matters on the Reservation. The dam and intake structure, and water treatment plant, are modest in size or capacity, and were never viewed as the means of meeting all of the Tribe's needs. The water delivered through that system has likewise never been viewed as comprising all of the Tribe's water rights under federal law. Cadue Dec. at ¶¶ 9-11.

4. The Nemaha Brown Watershed Joint District Number 7 (hereinafter "Nemaha Brown") was organized in 1958 as a watershed district under Kansas law, Kan. Stat. Ann. §§ 24-1201, *et seq.* Exhibit A to Cadue Dec. at page 41. Nemaha Brown exercises authority over the Upper Delaware and Tributaries Watershed which is the geographic area involved in this litigation. *Id.*

5. Watershed districts are established to protect lands subject to erosion, floodwater, or sediment damage, though the construction of works of improvement needed to conserve, develop, utilize or dispose of water. Kan. Stat. Ann. § 24-1201(a)(2005). The Kansas legislature delegated to the Nemaha Brown Board of Directors the authority to advance these public purposes by entering into contracts for the "purchase, development, [and] conveyance of land" necessary to "construct, operate, and maintain works of improvements to carry out such purposes." Kan. Stat. Ann. §§ 24-1201, 1209. It also delegated to watershed districts such as Nemaha Brown the authority to condemn land to effectuate these purposes. Kan. Stat. Ann. § 24-1209.

6. Shortly after the Tribe developed its small water system on the Delaware River, the Tribe began to turn its efforts to the development of a larger water storage project. It made inquiries with the Soil Conservation Service of the U.S. Department of Agriculture ("SCS")

about funding under the PL-566 Program, and was told by SCS that they would not be eligible under the program since they did not have the authority to condemn fee lands for the construction of dams necessary to develop a project under that program.  The possible sites for storage projects on the Reservation would require a project sponsor with the authority to condemn fee land.  The Tribe's condemnation authority under federal law is limited to Indian lands held in trust by the United States within its Reservation boundaries.  SCS encouraged the Tribe to approach Nemaha Brown about joint sponsorship of an application, since Nemaha Brown had a pending application under the PL-566 program.  Nemaha Brown's condemnation authority did not extend to Indian trust lands.  Cadue Dec. at ¶ 14; Exhibit A to Cadue Dec. at page 41.

    7.  In 1978, Nemaha Brown published a "General Plan" under the authority of Kan. Stat. Ann. § 24-1213, with financial and technical assistance from the SCS, for the development of the water resources of the UDT Watershed. Cadue Dec. at ¶¶ 12-13.; Exhibit A to Cadue Dec. at page 41.  Significantly, even at that early stage Nemaha Brown knew of the water needs of the Tribe.  The General Plan identified the Tribe's need for a water storage project for municipal, industrial and fire protection purposes on its Reservation as one of the most important goals for the watershed's development. *Id.*; Exhibit B to Cadue Dec. at 13.  The Tribe had taken SCS' advice and began talking with Nemaha Brown about prospects for mutual development of the water resources of the Upper Delaware.  Both the Tribe and Nemaha Brown were looking at some of the same locations on the mainstem Delaware River and smaller tributaries, within the boundaries of the Kickapoo Reservation, for the potential development of multi-purpose water projects.  Cadue Dec. at ¶¶ 15-16; Exhibit B to Cadue Dec. at pages 14-15.  Nemaha Brown had

already been talking with the Soil Conservation Service ("SCS") of the U.S. Department of Agriculture, about funding for watershed development under the federal Watersheds Protection and Flood Prevention Act of 1954, Public Law 83-566, 16 U.S.C. §§ 1001-1008 ("PL-566" or "Small Watersheds Program").  Cadue Dec. at ¶¶ 15-16; Exhibit A to Cadue Dec. page 41.

8.  The Tribe and Nemaha Brown determined it was in their mutual interest to form a joint watershed board for development under the PL-566 Program and these discussions culminated, in 1983, in Nemaha Brown and the Tribe forming a Joint Watershed Board.  The President of Nemaha-Brown and the Kickapoo Tribal Chairman signed a co-sponsorship Agreement to develop the watershed.  PL-566 was amended in 1981 to include Indian tribes as local sponsors.  *See* Section IV.B., *infra*.  Participation by the Kickapoo Tribe as a local sponsor was a first-time occurrence under the PL-566 Program.  Cadue Dec. at ¶ 17; Exhibits A and C to Cadue Dec.

9.  One advantage to Nemaha Brown in working with the Tribe was its access to Bureau of Indian Affairs ("BIA") funding.  Indeed, the Tribe secured $156,000 in funding from the BIA in 1983 and 1984 to underwrite the technical and engineering analyses necessary to move forward with more detailed water resource planning under the General Plan.  Without the Tribe's participation, Nemaha Brown would not have had the financial resources to make the plan a reality as quickly as it did.  Importantly, the water resource planning facilitated by the BIA funding enabled the plan to receive priority ranking for funding by the State of Kansas and SCS.  Cadue Dec. at ¶¶ 18-19; Exhibit A to Cadue Dec. at page 41.

10.  By partnering, the Tribe and Nemaha Brown were meeting their objectives.  The Tribe had something Nemaha Brown needed – Nemaha Brown was able to access and utilize

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT**

BIA funding for the watershed planning efforts – a novel concept, using BIA funding to plan a watershed development OFF-reservation.  Nemaha Brown had something that the Tribe wanted – fee land condemnation authority.  This was a classic *quid pro quo* – bargained for exchange by both parties.  Cadue Dec. at ¶¶ 19-21.

11.  The Joint Watershed Board functioned between 1983 and 1994, during which time it interacted cooperatively with technical staff from SCS and the State of Kansas to bring the final UDT water resource development plan, under the SCS' PL-566 Small Watersheds Program, to fruition.  Cadue Dec. at ¶¶ 22-24; Exhibit A to Cadue Dec. at pages 41-44.

**B.    The "Agreement and Environmental Impact Statement for the Development of the Upper Delaware and Tributaries Watershed" Was Executed by the Local Sponsors, the State of Kansas and the Federal Soil Conservation Service in the Spring of 1994.**

12.   The water resource development plan, signed in the Spring of 1994, is officially called the "Agreement and Environmental Impact Statement for the Development of the Upper Delaware and Tributaries Watershed" ("UDT Agreement," "1994 Agreement," or "Agreement").  This Agreement is the formal document under which this lawsuit was initiated.  The UDT Agreement provided for the development of the UDT Watershed by allowing cost-sharing of flood control and water supply projects to meet the needs of all users in the UDT watershed, authorized under the PL-566 Program.  Cadue Dec. at ¶ 25; Exhibit A to Cadue Dec.  The Small Watersheds Program authorized the SCS – now NRCS – to cooperate with states, local conservation and watershed districts and private landowners to develop watersheds.  *Id.*

13.   Pursuant to the 1994 UDT Agreement, the parties were to fund the construction of twenty smaller water, soil and flood retention structures and one larger multi-purpose structure referred to as the Plum Creek Reservoir project.  The reservoir was intended to be a primary

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT**

6

means of providing the Tribe with a long-term, dependable water supply, at least in _partial_ fulfillment of its _Winters_ water rights.  Cadue Dec. at ¶ 28; Exhibit A to Cadue Dec.  The Agreement was beneficial for all parties.  Notably, Nemaha Brown and the Tribe would secure the benefits of watershed development under the PL-566 Program, and both would also commit a percentage of financial resources to the effort.  Nemaha Brown also agreed to exercise its eminent domain authority necessary to acquire land for the Plum Creek Reservoir in the event the Tribe was unable to purchase the land within the project boundaries.  Cadue Dec. at ¶¶ 19-21; Exhibit A to Cadue Dec. at pages i – xvi (text of Agreement).

14.   On June 30, 1994, the United States Army Corps of Engineers ("ACE") issued a § 404 Clean Water Act permit - Permit # DA-199401028 - for the Plum Creek project to the Nemaha Brown Watershed District.  Revised special conditions for the permit to Nemaha Brown were issued by the Corps of Engineers dated October 16, 2002.  Nemaha Brown has never notified the ACE of its opposition to the development of the Plum Creek project, or of its intent _not_ to carry out the approved activities under the Clean Water Act permit.  Cadue Dec. at ¶ 26.

15.   The successful efforts of the parties to the UDT Agreement lead to Congressional approval of the Agreement in 1998 under the authority of the PL-566 Small Watersheds Program.  Congressional approval was necessary to authorize SCS to proceed with its side of the agreement, and of course to secure the necessary appropriations for the project.  Cadue Dec.at ¶ 27.

**C.   The Key Contractual Provisions of the UDT Agreement and Environmental Impact Statement ("EIS").**

16.   Page iii of the Agreement states that: "Whereas the application has heretofore been

made to the Secretary of Agriculture by sponsors for assistance in preparing a plan for resource management systems for the Upper Delaware and Tributaries Watershed, State of Kansas, under the authority of the Watershed Protection and Flood Prevention Act (16 U.S.C. 1001-1008); ....” It is key that the application is to prepare a plan for resource management systems for the watershed under the authority of the Act.  The Act and implementing regulations require that local sponsoring organizations, or local sponsors, possess and be willing to use – individually or collectively, as needed – eminent domain authority to acquire the land necessary for the works of improvement..  Exhibit A to Cadue Dec. at page iii.

17.  Page iii of the Agreement states that:  “Whereas, there has been developed through the cooperative efforts of the sponsors and SCS a plan for resource management systems for the UDT Watershed, ... hereinafter referred to as the watershed plan/environmental impact statement, which plan is annexed to and made a part of this agreement.”  All representations made in the EIS are thus legally binding on the parties to the Agreement.  Exhibit A to Cadue Dec. at page iii.

18.  Page iii of the Agreement states that:  “Now, therefore, in view of the foregoing considerations, the Secretary of Agriculture, through SCS, and the sponsors hereby agree on this plan and that the works of improvement for this project will be installed, operated and maintained in accordance with the terms, conditions and stipulations provided for in this watershed plan, ... .”  Exhibit A to Cadue Dec. at page iii.

19.  Paragraph 1 of the Agreement, page iv, provides that the “[Nemaha Brown] Watershed District and the Tribe will acquire such land rights as will be needed in connection with the works of improvement..”  The percentages of land rights costs allocable to the Tribe and

the Watershed District are also set out in Paragraph 1.  Exhibit A to Cadue Dec. at page 1.

20.   The obligation to acquire land rights, and the costs of such land rights acquisition, are more fully explained on pages 49 – 53 of the EIS.  On page 49 it states that the "Tribe will be responsible for the ***local cost of land rights*** for the multipurpose dam."  (Emphasis added.) Exhibit A to Cadue Dec. at pages 49-53.

21.   Page 50 of the EIS defines the "***land rights costs***" as "direct and related costs for the right to install, operate, and maintain works of improvement.  These costs include land purchases, easements, agreements, permits, and modifications of properties and utilities." Notably, there is no mention of condemnation as a land right cost.  Exhibit A to Cadue Dec. at 50.

22.   Page 50 of the EIS states that the "Nemaha Brown Watershed Joint District Number 7 and the Kickapoo Tribe of Kansas have the necessary authority to finance and install their portions of the planned project.  This includes the right to . . . exercise the right of eminent domain.  ***They* have agreed to use these powers <u>*as needed*</u> *and will be responsible for excess investigation and design costs resulting from their delay or failure to do so*."**  (Emphasis added.)  Exhibit A to Cadue Dec. at page 50.

23.   Page 51 of the EIS states that "[t]he Watershed District will furnish legal services and obtain all land rights needed for installation of dams not on the reservation.  ***The Tribe will furnish legal services and obtain all land rights needed for installation of the dams on the reservation and the multi-purpose dam.***  (Emphasis added.)  Exhibit A to Cadue Dec. at page 51.  Again, the Agreement and EIS draw an important distinction between land rights acquisition and the costs associated therewith, on the one hand, and the exercise of condemnation, on the

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST                                                      9
MOTION FOR PARTIAL SUMMARY JUDGMENT**

other.  This is because, as it relates to the Plum Creek multipurpose project especially, the project area is both inside and outside the boundaries of the Kickapoo Reservation, and implicates both Indian trust land and non-Indian fee land.  Thus, it is necessary to have local sponsors who, between them, are able, if necessary, to condemn either form of land – Indian trust or non-Indian fee.  Cadue Dec. at ¶ 29.

24.  Page 34 of the EIS states that "[Project] Sponsors have actively communicated with landowners directly affected by construction of floodwater retarding dams and the multipurpose structure and feel assured of social acceptance.  Along with public participation rates estimated on other planned measures, the risk and uncertainty of less than a complete plan is minimal." Exhibit A to Cadue Dec. at 34.

25.  It was known from the outset – and agreed to by all the parties including the Nemaha Brown Board – that the Tribe's primary interest in the project was the development of the Plum Creek multipurpose dam and storage project for a dependable water supply for multiple Tribal needs.  In numerous instances the Agreement and EIS reflects this understanding among all the parties.  Examples include:

Pages 1 and 2: Problem identification – "Lack of a dependable water supply causes economic losses on businesses and livestock producers during periods of drought. A lack of dependable water supply hampers the recruitment of businesses and industries with jobs to the [Kickapoo] [R]eservation.  A lack of jobs causes tribal members to leave the reservation and their cultural ties to seek employment."   Exhibit A to Cadue Dec. at pages 1-2.

Page 12: "In the 1970s the Tribe initiated comprehensive planning. * * * The studies indicate that the key to the Tribe's advancement is the development of industry to supply jobs; and the key to industrial development is a dependable water supply. Since 1975 the Tribe has developed several residential communities, a water treatment and development system, and has attracted several minor businesses.  They also have established their own school system, kindergarten through high school.  The Tribe's main goal now is the

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

10

development of a dependable water supply for increased and sustainable industrial, domestic, and recreational uses." Exhibit A to Cadue Dec. at page 12.

Page 18: Detailed explanation of the water needs of the Tribe – for economic development and employment, fire protection, drought relief, water quality, reliable potable water supply, for the Tribal School, etc. Exhibit A to Cadue Dec. at page 18.

Page 29: Same detailed recitation of reasons for dependable water supply. Exhibit A to Cadue Dec. at page 29

26.   Critical for an understanding of this case is the fact that – since the early days of the Tribe's involvement with Nemaha Brown in the 1970s – the Tribe, Nemaha Brown and the United States agencies involved at the time (the Soil Conservation Service and the Bureau of Indian Affairs) all knew of the necessity of having Nemaha Brown as a partner if the PL-566 Program were to be the means of developing a significant portion of the Tribe's *Winters* water rights.   Nemaha Brown had condemnation authority over fee lands in the watershed and the Tribe did not, and thus it knew that its condemnation authority might be needed for the Plum Creek project area lands. Cadue Dec. at ¶¶ 29-44.

27.   Even after the PL-566 Small Watershed Program statute was amended to enable tribes, such as the Kickapoo Tribe, to become a "local sponsor" under the PL-566 program, it was still necessary for the Tribe to have Nemaha Brown as a partner for its fee land condemnation authority. *Id*.; Cadue Dec at ¶ 15.

28.   Had this not been the case, it would not have been necessary for the Kickapoo Tribe to  partner with Nemaha Brown.   The Tribe would have simply proceeded to develop its own portion of the watershed which drains its Reservation and condemned all the fee land necessary to achieve that end. Cadue Dec. at ¶ 21.

**D.   Post-Agreement Implementation Steps and Nemaha Brown Board Efforts to**

**Thwart the Agreement.**

29.  In 1999, soon after Congress had authorized the project, NRCS convened a meeting with representatives of the Tribe and Nemaha Brown to identify the critical steps to be taken by the local sponsors to get project development underway.  The local sponsors were told by NRCS representatives at the meeting that land acquisition was to be their first and highest priority.  The Tribe set out performing its obligations by working to secure the necessary funding, holding various public meetings and proceeding with efforts to purchase land for the Plum Creek Reservoir project area.  Cadue Dec. at ¶ 31.

30.  NRCS reaffirmed the viability of the Plum Creek project in an April 2002 feasibility report.  Cadue Dec. at ¶ 33.

31.  In March of 2003, the Tribe hosted a meeting with the Nemaha Brown Board of Directors to discuss the process for obtaining land necessary for the project through the use of the Board's eminent domain authority. The Board expressed no intention to breach its obligations by failing to perform under the contract.  In April of 2003 the Tribe opened a Land Office to redouble its efforts to purchase the needed fee land.  Cadue Dec. at ¶¶ 34-35; Declaration of Nellie Cadue, Director, Kickapoo Tribal Land Office.

32.  However, for reasons undisclosed to the Tribe, in July 2003 the Board passed a resolution to "not proceed with condemnation at this time."  And most recently, in January of 2004, the Board tabled "indefinitely" a resolution to proceed with condemnation. The Board's decision to indefinitely table the vote to condemn lands necessary to build Plum Creek has halted all efforts to develop the Plum Creek Reservoir and other smaller conservation facets of the UDT Agreement under the PL-566 program.  The Tribe's efforts to voluntarily acquire land within the

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT**

12

Plum Creek project area have resulted in the purchase of only one tract of fee land – the Stuckey tract.  Cadue Dec. at ¶¶ 36-40.

33.   Notwithstanding its steadfast support for the UDT Agreement until mid-2003, in addition to its indefinite tabling of a resolution to proceed with condemnation, the members of the Board of Nemaha Brown have been working behind the scenes to eviscerate the viability of the overall UDT Agreement.  As detailed in the Tribe's complaint, they actively pursued the reprogramming of sites identified as part of the larger UDT Agreement for funding through other available State of Kansas Conservation Commission or NRCS cost-share funding programs. Cadue Dec. at ¶¶ 44-47.

34.   The UDT Agreement requires any amendments or revisions to be made by a mutual agreement between the parties.  Exhibit A to Cadue Dec.; Agreement at page viii, ¶ 20.  Since the execution of the Agreement in 1994,  Nemaha Brown has never modified or even indicated an intention to modify the Agreement.

35.   The Nemaha Brown Board's refusal to perform has directly caused a delay in the construction of Plum Creek Reservoir, and has rendered the Tribe without access to a dependable water supply for future growth and needs.  This systematic depravation violates the express terms of the 1994 Agreement and has prevented the Tribe from developing a secure and reliable water supply for drinking and household purposes, economic development opportunities and essential government services on the Reservation. *See* Cadue Dec. at ¶¶ 48-58; Declaration of Nellie Cadue, Director, Kickapoo Tribal Land Office; Declaration of John Thorpe, Executive Director, Kickapoo Tribal Housing Authority; Declaration of Jason Auvil, Director, Kickapoo Environmental Department; Declaration of Rick C. Jones, Acting Chief, Kickapoo Tribal Fire

Department.

36.    Currently, the Kickapoo Water Treatment Plant supplies water to both Tribal members and non-Indians who live within the Reservation boundaries. The Tribe also operates a fire department, and several commercial operations including a casino, all of which are supplied by the Plant.  In 2003, the combined effect of man-made impoundments and summer drought conditions in the UDT watershed caused the Upper Delaware to run dry for long periods of time. To provide the most basic of community water needs the Tribe had to truck in over 7,000,000 gallons of drinking water to the Reservation.  The Tribe's commercial operations and residents were forced to cut water consumption by almost 60%, which severely diminished Tribal business revenues and quality of life on the Reservation.  Cadue Dec. at ¶¶ 52-54.

37.    Since January of 2004, due to low water levels, the quality of the Tribe's water supply has been in violation of the Safe Drinking Water Act of 1974, Public Law 93-523 (Dec. 12, 1974), 42 U.S.C.§§ 300j *et seq*., and is the subject of ongoing notices of violation from the U.S. Environmental Protection Agency.  Cadue Dec. at ¶ 51; Declaration of Jason Auvil, Director, Kickapoo Environmental Department.

38.    The Tribal Fire Department must operate under a "containment policy" via order of the Tribal Council to contain fires but not save structures from complete fire damage due to lack of water supply.  Cadue Dec. at ¶ 57; Declaration of Rick C. Jones, Acting Chief, Kickapoo Fire Department.

39.    The Tribe is also unable to develop housing on the Reservation which deters Tribal members from returning to the Reservation.  Thorpe Dec.; Cadue Dec. at ¶ 56; Exhibit A to Cadue Dec. at pages, 1, 2, 18, and 29.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                    14
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

40.  The Tribe has forgone economic opportunities as investors have been dissuaded from entering economic development protects due to an unsanitary and undependable water supply on the Reservation.  Cadue Dec. at ¶ 56; Exhibit A to Cadue Dec. at pages, 1, 2, 18, and 29.

**E.  Post Agreement Correspondence Reaffirms The Original Intentions Of The Parties Concerning Nemaha Brown's Condemnation Obligation, And The Detrimental Reliance By The Tribe And The United States On The Promise By Nemaha Brown To Exercise Its Condemnation Authority If Needed.**

41.  Correspondence between parties to the 1994 Agreement <u>consistently</u> supports the interpretation that Nemaha Brown had the obligation to use its condemnation authority to acquire the land for the Plum Creek project area should the Tribe fall short in its efforts to purchase the land.  For instance, the United States, which holds the underlying legal title to the Tribe's federal reserved water rights, called *Winters* water rights, relied on the promises of the Nemaha Brown Board to condemn the fee lands needed for the Plum Creek project, and agreed to perform in reliance on the promises made by the Board:

(a.)  *Letter from Tomas M. Dominguez, State Conservationist, United States Department of Agriculture, Natural Resources Conservation Service, Salina, KS, to Gale E. Miller, President, Nemaha-Brown Watershed Joint District Number 7, dated April 28, 1999:*  "The amount requested for FY 2000 is more than Kansas NRCS has received in recent years.  The actual amount that Kansas receives will depend on the total amount that Congress budgets and any specific budget language.  *Your portion of the FY 2000 request is:  Upper Delaware and Tributaries, Site 21-14 landrights – $125,000* – Please work closely with the local NRCS staff and appropriate state agencies to wrap up plans, agreements, and permits and be ready to sign a project agreement with us if we receive funding for the requested amount."  (Emphasis added.  Note that Site 21-14 is the Plum Creek multipurpose project site.)  Cadue Dec. at ¶ 42.

(b.)  *Letter from Harry D. Slawter, Acting Director, Watershed and Wetlands Division, Natural Resources Conservation Service, Washington, D.C., to Steve Cadue, Chairman, Kickapoo Tribe in Kansas, dated May 28, 2003:*  "You requested that the Department of Agriculture provide assistance in satisfying the land acquisition requirement in the Watershed Agreement.  NRCS does not have authority of eminent domain or the authority to acquire land rights for works of improvement funded in the

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**                                    15

Watershed Protection and Flood Prevention Program.  Legal authorities are specified in Public Law 83-566, the Watershed Protection and Flood Prevention Act.  The statute requires that local organizations shall acquire land as needed for works of improvement without cost to the Federal Government from funds appropriated to the Watershed Program.  *  *  *  *It is our understanding that the Nemaha-Brown Watershed Joint District Number 7, Project Sponsor, had the legal authority to acquire land rights with the power of eminent domain when the plan was signed.  We encourage you to work with The Nemaha Brown Watershed District in order to implement the Agreement as executed by you as the project sponsors.*  We vigorously support your continuing efforts to acquire the required lands rights for the project.  We trust your efforts will result in solutions that will allow for the funding, design, and construction of the Plum Creek Dam and Reservoir.  This project will provide valuable flood mitigation, water supply, fish and wildlife habitat, and recreation opportunities for the Kickapoo Tribe of Kansas and other residents of the area.  (Emphasis added.)  Cadue Dec. at ¶ 42.

(c.)  *Letter from Harold Klaege, State Conservationist, USDA, NRCS, Salina, Kansas, to Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, dated June 30, 2003:*  "*  *  *As you are aware, we were unable to enter into a project agreement with the Tribe for land rights acquisition because we require a sponsor with the power of eminent domain to be signatory to the agreement.  This is to ensure that a sponsor can carry through to completion the acquisition of all of the lands necessary to ensure construction of the project.  Should the Nemaha-Brown Watershed District (or any other legal authority with the power of eminent domain in Brown County) agree to be a signatory to the project agreement, we could move forward with a project agreement immediately.*"  (Emphasis added.)  Cadue Dec. at ¶ 42.


41.  The Tribe also relied on the promises of the Board to condemn the fee lands of the

Plum Creek project, and in turn performed numerous actions, involving the expenditure of large

sums of money and staff resources, in reliance on the Board's promises:

(a.)  *Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas to Secretary Gale Norton, U.S. Department of Interior, Washington, DC 20240, dated September 4, 2003:*  *  *  *  Essential to the fruition of the Watershed Plan is the requirement that the Tribe acquire approximately 800 acres of fee land in the impoundment area.  The Kickapoo Tribe already owns other Tribal trust land in the project area.  *The USDA - Natural Resource Conservation Service (NRCS) has stipulated that the release of already appropriated planning funds to the tribe is contingent on the tribe first acquiring the fee land within the impoundment area. * * * The local watershed board, a quasi-governmental authority possessing such eminent domain authority, cannot or refuses to assert any such authority on behalf of the Tribe.*  (Emphasis added.)  Cadue

Dec. at ¶ 43.

(b.)   *Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, to Annabelle Romero, Director, Native American Programs, United States Department of Agriculture, Washington, D.C., dated October 24, 2003:* "A significant issue to the Kickapoo Tribe concerns the issue of eminent domain and the use of condemnation in any public works project.  Any public works project of significant size requires the use of eminent domain authority as a necessary tool to aid in the acquisition of property. *However, as USDA is well aware, the Tribe does not possess such authority over non-Indian lands.  The local watershed board, an entity that does possess such authority and who was also a local sponsor of the 1998 watershed plan, has steadfastly refused to assert such authority on behalf of the tribe.*  Moreover, the local watershed board has used its eminent domain authority on numerous non-Indian projects that were included in the overall planning of the Upper Delaware Watershed plan.  The denial of eminent domain serves as a de facto denial of any USDA financial assistance on the tribal water project." (Emphasis added.)  Cadue Dec. at ¶ 43.

(c.)   *Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, to Harold L. Klaege, State Conservationist, U.S. Department of Agriculture-Natural Resource Conservation Service, Salina, Kansas, dated January 8, 2004:* "* * * As the Kickapoo Tribe continues to approach landowners with offers to purchase, the lack of eminent domain places the Tribe in an inequitable bargaining position. *Without any incentive to sell, the Kickapoo Tribe is not able to purchase any land required by the Plum Creek Reservoir project.  Similar multi-use reservoirs such as Banner Creek in Jackson County and Pony Lake near Sabetha, Kansas are clearly example of the need for eminent domain authority to complete such public use projects.*  Yet, despite the lack of such authority on fee lands within our reservation boundaries, the Kickapoo Tribe continues its pursuit of Plum Creek as the Tribe's need for a reliable long-term water supply is too great. (Emphasis added.)  Cadue Dec. at ¶ 43.

(d.)   *Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, to Dexter Davis, President, Nemaha-Brown Watershed Joint District #7, Seneca, Kansas, dated January 21, 2004:* "* * * *The Upper Delaware and Tributaries Watershed Plan represents a recognition by all parties that eminent domain would be required to complete the single tribal project, the Plum Creek Reservoir.  As the primary local sponsor possessing eminent domain authority, the Nemaha-Brown Watershed Board had full knowledge that the Kickapoo Tribe would require the Board to full assert its condemnation authority to aid the Tribe in its acquisition of the necessary land rights.*  As a Public Law 83-566 project, the USDA requires its local sponsors to acquire or provide assurances satisfactory to USDA that they will acquire the property rights needed in connection with the public use project.  The acquisition or an assurance of the necessary acquisition would then allow the parties to enter into a project agreement with NRCS, which would initiate the release of federal planning monies to begin the project.

See Letter to Steve Cadue from Harold Klaege - NRCS, September 4, 2003. ***The Kickapoo Tribe does recognize that condemnation is a power of last resort for any government to assert. However, without condemnation, public projects such as the Plum Creek Reservoir cannot succeed as there is no incentive for recalcitrant land owners to enter into good faith negotiations for land purchases.*** As elected leaders, it is your duty to ensure that projects that advance the interests of the greater population are allowed to continue. As clearly stated within the Watershed Plan, the project purposes include flood prevention, water supply development, and water-based recreational development for the entire watershed. For the Kickapoo Tribe, Plum Creek represents the only viable and cost-effective solution to providing a reliable long-term water supply to the Kickapoo Reservation. (Emphasis added.) Cadue Dec. at ¶ 43.

(e.) ***Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, to Greg Foley, Executive Director, Kansas Conservation Commission, Topeka, Kansas, dated December 29, 2004:*** "* * * Governor Carlin praised the effort of the joint watershed board in a letter written April 11, 1983 to Peter Meyers the Chief of the US Soil Conservation Service and offered the full support of his office. The planning was ultimately completed and in 1998 our Tribal Council and the Nemaha Brown Board along with the NRCS signed an agreement to move forward with the project. ***Included in this agreement was a commitment by the Board to use their power of eminent domain as necessary to complete the project. Based on this commitment, the plan was approved by the Congress of the United States in 1998. During the past 2 years the Tribal Council has made repeated requests of the board that they honor their commitment and move forward with completion of the Plum Creek Reservoir, a multipurpose reservoir that was agreed to in the Congressionally approved plan. The Board has continued to ignore our request and have refused to take any action, either positive or negative. At the same time they are actively working on their portions of the approved plan.*** (Emphasis added.) Cadue Dec. at ¶ 43.

(f.) ***Letter from Steve Cadue, Tribal Chairman, Kickapoo Tribe in Kansas, to Greg Foley, Executive Director, Kansas Conservation Commission, Topeka, Kansas, dated February 14, 2005:*** "* * * The Kickapoo Tribe is powerless in their effort to complete this project without power of eminent domain and this had been known from the inception of the plan. ***The Kickapoo Tribe's lack of eminent domain authority is why the tribe was encouraged to support the watershed board more than 20 years ago.*** This is why the NRCS worked closely with the board and not the tribe during the planning process. ***This is also why Congress required the watershed board to agree to eminent domain before they would approve the project. Everyone knew the tribe had no condemnation power and now the local farmers/landowners are using the tribe's powerlessness to demand exorbitant prices for land for the Plum Creek Reservoir.***" (Emphasis added.) Cadue Dec. at ¶ 43.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

### III.  STATEMENT OF THE ISSUES

1.   Did federal law require that the Nemaha Brown Board possess condemnation authority under state law, and be ready and willing to use it to acquire land rights necessary for works of improvement as a "local sponsor" under a project authorized to be funded by the SCS' PL-566 program?

2.  Do the terms of the 1994 UDT Agreement specify that the Nemaha Brown Board was willing, consistent with its obligations under federal law -- the PL-566 Program -- to exercise its state-law delegated condemnation authority "as needed" to acquire lands for the Plum Creek project should the Tribe be unable to acquire the lands by purchase or exchange?

3.  Is the Nemaha Brown Board in continuing breach of its obligations to the Tribe and the other parties to the 1994 UDT Agreement by refusing to vote to proceed with the condemnation of fee lands within the Plum Creek project area?

4.   Should the Court order the Nemaha Brown Board to specifically perform its obligations under the 1994 Agreement to condemn the fee lands in the Plum Creek project area, because money damages for refusal to perform are an inadequate remedy?

5.  By virtue of promises made and reliance thereon by the Tribe and the United States, are the Officers and members of the Nemaha Brown Board of Directors estopped from asserting that they and the watershed district do not have an obligation under the 1994 Agreement to condemn lands necessary for the Plum Creek Reservoir project?

6.  Is the refusal of the Nemaha Brown Board to perform said obligations *ultra vires* their delegated responsibilities as public officials under Kansas and federal law, and the UDT Agreement?

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                    19
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# IV.  ARGUMENT

## A.      Applicable Summary Judgment Standard.

As set out in detail in the underlying Complaint this action seeks, in part, a declaration that the Nemaha Brown Board of Directors has an obligation under the 1994 Agreement, and has failed to perform and must specifically perform that obligation, to exercise its state law-based authority of eminent domain to acquire fee lands within the Plum Creek project area because the Tribe has made every reasonable effort to acquire the project lands through purchase or exchange.  The Tribe also is seeking an order from the Court that the Board members' refusal to vote to proceed with condemnation is *ultra vires* their obligations as watershed board members acting under Kansas and federal law and the 1994 Agreement.  As to these threshold questions of law the Tribe asserts that there are no material facts in dispute.

An early resolution of these initial legal questions will facilitate this litigation by narrowing the issues that remain for trial.  Rule 56, Fed. R. Civ. Proc.., allows the Court to render summary judgment where the records and files of the case show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  This Court instructs that summary judgment "is an important procedure 'designed to secure the just, speedy and inexpensive determination of every action.'"  *DP-TEK, Inc. v. AT & T Global Information Solutions Co*., 891 F. Supp. 1510, 1516 (D. Kan. 1995), *aff'd*, 100 F.3d 828 (10th Cir. 1996) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).  Rule 56 permits the selective disposition of questions of law via the filing of *partial* summary judgment motions. Rule 56(d), Fed. R. Civ. Proc..

**B.   The Federal PL-566 Small Watersheds Program Requires That As A "Local Sponsor" The Nemaha Brown Watershed Board Possess Condemnation Authority Under State Law, And Use It If Necessary To Acquire Land Rights Necessary For Works Of Improvement Under A Project Funded By The Soil Conservation Service [Now Natural Resource Conservation Service].**

The initial support favoring the Tribe's interpretation of the 1994 Agreement requiring the Nemaha Brown Board to perform its condemnation obligation is contained in the federal law under which the Agreement was executed.  As will be seen from the text of the statute, its implementing regulations, and relevant legislative history pertaining to a key 1981 Congressional amendment, the offer by the Nemaha Brown Board to condemn lands for the Plum Creek Reservoir project was a *necessary* precondition to approval of the project by SCS [now NRCS].  Indeed, it is implicit in the PL-566 program – as explained below – that local sponsors could only be local entities which possessed that authority and which were ready to exercise it if necessary.

As originally enacted, PL-83-566, the Watershed Protection and Flood Prevention Act of 1954, 16 U.S.C. §§ 1001 *et seq*., required the participation of local sponsoring organizations with eminent domain authority.  16 U.S.C. § 1002 defines a "local organization" as "any State, political subdivision thereof, soil or water conservation district, flood prevention or control district, or combinations thereof, or any other agency *having authority under State law to carry out, maintain and operate the works of improvement*; or any irrigation or reservoir company, water users' association, or similar organization having such authority * * * ."  (Emphasis added.)  The program authorized and created under this Act became known as the Small Watersheds Program of the Soil and Conservation Service ("SCS").

16 U.S.C. § 1004, "Conditions for Federal assistance," also contains the following

provision: "The Secretary shall require as a condition to providing Federal assistance for the installation of works of improvement that local organizations shall--(1) acquire, or with respect to **interests in land to be acquired by condemnation** provide assurances satisfactory to the Secretary that they will acquire, without cost to the Federal Government from funds appropriated for the purposes of this chapter, such land, easements, or rights-of-way as will be needed in connection with works of improvement installed with Federal assistance * * * ." (Emphasis added.)

NRCS regulations for the program also make these requirements clear.  7 CFR § 622.10, "Sponsors," requires that "(a) Watershed projects are sponsored by one or more local organizations qualifying as sponsors.  All watershed plans shall be sponsored by entities legally organized under State law or by any Indian tribe or tribal organization having the authority to carry out, operate and maintain works of improvement. Those plans that incorporate the use of nonstructural or structural measures shall be **sponsored by organizations that, individually or collectively, have:  (1) The power of eminent domain**, (2) The authority to levy taxes or use other adequate funding sources, including state, regional, or local appropriations, to finance their share of the project cost and all operation and maintenance costs. *    *    * (b) **To receive Federal assistance for project installation, sponsors must commit themselves to use their powers and authority to carry out and maintain the project as planned**.  (Emphasis added.)

When the Tribe and the Nemaha Brown Board became partners in the formation of the Joint Watershed Board, in 1983, both entities were looking at as many as five multipurpose sites for water storage projects on the Kickapoo Reservation.  One of those five sites, the Plum Creek site, in fact ultimately implicated lands both within and outside the boundaries of the Kickapoo

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                        22
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Reservation.  With both entities looking to partner to develop the same possible sites for development, it was necessary for *both* to become "sponsors" under the PL-566 program, since both fee and Indian trust lands would likely be implicated in the development.

The prospect of a joint watershed board with the Tribe as a partner had become a possibility under the PL-566 program only two years earlier, with amendments in 1981 to PL 83-566.  The 1981 Amendments to the Small Watersheds Program law, enacted as part of  Pub. L. 97-98, the Agriculture and Food Act of 1981, expanded the definition of "local organization" to include "any Indian tribe or tribal organization having authority under Federal, State, or Indian tribal law to carry out, maintain, and operate works of improvement."  *See* Section 1512(a) of Pub.L. 97-98.  Expanding the program to include Indian tribes as local sponsors did not mean that Congress was expanding the condemnation authority of Indian tribes such as the Kickapoo Tribe over *fee lands* within reservation boundaries, however.

Critically, the legislative history behind the amendments makes clear that the expansion of the program to include Indian tribes or tribal organizations as local sponsoring organizations was for the purpose of expanding the benefits of the program to *"Indian lands"*:

> "The Watershed Protection and Flood Prevention Act (16 U.S.C. § 1002) (Public Law 83-566) currently denies program benefits to some Indian tribes and native groups that do not qualify as local sponsors for small watershed projects. Historically, the program has been limited to state and local agencies, and non-profit organizations having authority under state law to carry out such projects. Consequently, some *Indian lands* with serious water and related land resource problems have not received necessary protection and treatment even when these lands were within a proposed watershed project. The USDA has noted several instances where this has occurred in the past. Millions of acres of *reservation and various Indian lands* are subjected to flooding and erosion caused by high-intensity rainstorms and would benefit from inclusion in watershed projects." (Emphasis added.)

Senate Report 97-126 (May 27, 1981), 97th Cong., 1st Sess. at p. 148, 1981 U.S.C.C.A.N. 1965,

at 2111, 1981 WL 21324.

Thus, at the time of the 1981 amendments to the Small Watersheds Program, and also at the time of the execution of both the 1983 Joint Watershed Board agreement and the 1994 UDT Agreement and EIS to construct Plum Creek, federal law ***precluded*** Indian tribes from exercising condemnation authority over fee lands owned by non-Indians.  *See Montana v. United States,* 450 U.S. 544, 564 (1981)("exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, . . .  without express congressional delegation.");  *Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation,* 492 U.S. 408 (1989)(followed *Montana* decision to preclude a tribe from zoning non-Indian fee lands within the tribe's reservation).   The substantial limitations on tribes' adjudicatory or regulatory jurisdiction over non-Indian fee land remain today.  *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 654 (2001).

When Congress amended the Small Watersheds Program statute in 1981, to include tribes as local sponsors, it could have expanded tribal condemnation authority over fee lands, but it did not.  Given existing Supreme Court precedent on the issue, an expansion of tribal authority would have been very controversial and likely would not have succeeded.  The purpose for the amendment – expanding the program's benefits to Indian lands – was significant and important enough, given the apparent scope of the problem on Indian lands..  Importantly,   there   is   no evidence in the history of the UDT Agreement, and specifically of the Plum Creek project, which supports the interpretation that the Tribe was to condemn fee lands for Plum Creek.  Indeed, all of the correspondence relating to the Agreement makes it very clear that Nemaha Brown had the authority to condemn fee lands for the Plum Creek project, and if necessary was committing to

use that authority.   It is beyond refute that were the Tribe to attempt to commence a condemnation action over fee lands for the project – in either federal or tribal court – the fee landowners would have successfully opposed the Tribe's action.

The Tribe does not concede that there is any ambiguity in the 1994 Agreement concerning the Board's condemnation obligation, *see* discussion in Section IV.C., *infra*.   If, however, the Court is possibly persuaded to the contrary, it is worth noting that a cardinal principle of contract construction is that ambiguous provisions will be interpreted to effectuate, not violate, law or public policy.   "Since a general rule of construction presumes the legality and enforceability of contracts, 6A A. Corbin on Contracts §§ 1499, 1533 (1962), ambiguously worded contracts should not be interpreted to render them illegal and unenforceable where the wording lends itself to a logically acceptable construction that renders them legal and enforceable." *Walsh v. Schlecht*,  429 U.S. 401, 408 (1977);  *Weber v. Tillman*, 913 P.2d 84 (Kan.1996)(duty of courts to sustain legality of contracts in whole or in part when fairly entered into, if reasonably possible to do so, rather than to seek loopholes and technical legal grounds for defeating their intended purpose; the paramount public policy is that freedom to contract is not to be interfered with lightly).   The only legitimate interpretation of this condemnation question is that the Nemaha Brown Board has the obligation to proceed with legal action against fee landowners within the Plum Creek Project area who are unwilling to sell.

Under the Small Watersheds Program, then, without Nemaha Brown the Tribe would not have the authority to "carry out" the requirements set out in 16 U.S.C. § 1004, relating to fee lands within the boundaries of the Kickapoo Reservation.   If the Tribe had such authority, it would not have needed to partner with Nemaha Brown in the first instance.

**C.**     **The UDT Agreement of 1994 Is Capable of Only One Interpretation – That Federal Law Required and All Parties Thereto Understood the Exercise of Nemaha Brown's Eminent Domain Authority over Fee Lands Within the Plum Creek Project Boundaries Would Be Necessary in the Event the Landowners Would Not Willingly Sell or Exchange Lands to the Kickapoo Tribe.**

A fundamental question the Tribe wants answered in this litigation is whether Nemaha Brown committed in the written 1994 Agreement – to the Tribe and the other parties thereto – to exercise its condemnation authority to acquire lands necessary for the Plum Creek multi-purpose project.   Beyond the statutory and legislative interpretation arguments set out in the preceding section, there are several additional legal and factual reasons this can be the only plausible interpretation of the Agreement.

First, the Agreement itself, and the EIS which is incorporated into and is part of the Agreement, spell out that Nemaha Brown was proceeding under the statutory requirements of the PL-566 Program.   It filed its initial application under the PL-566 Program, for funding and technical assistance, in preparing a plan for the development of resource management systems for the watershed under that authority.   The PL-566 Program statutes and implementing regulations *require* local sponsoring organizations to possess and be willing to use – individually or collectively – eminent domain authority to acquire the land necessary for the works of improvement.   Therefore, Nemaha Brown cannot now assert that it did not understand its condemnation obligations.   They are held to the requirements of the federal watershed program just as any other local sponsor seeking to enjoy the benefits of participation in the program.   There are costs and obligations for participation in the program, and local sponsors such as Nemaha Brown should not be permitted to avoid those costs and obligations when other parties to an agreement are relying on them to their detriment.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                                                    26
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Other parties to the Agreement appear to concur with the Tribe's interpretation that Nemaha Brown was proceeding under the strictures of the PL-566 Program.  Notably, the United States, in its *Memorandum in Support of Federal Defendants' Motion to Dismiss*, at page 2, n. 5, acknowledges that federal law requires local sponsors such as Nemaha Brown to possess eminent domain authority and be willing to use it if necessary.  And in the *Answer of Defendants' Brad Swearingen as President of the Board of Supervisors of Brown County Conservation District, and Timothy J. Burdiek as President of Board of Supervisors of Nemaha County Conservation District*, at page 10, ¶ 72, Defendants Swearingen and Burdiek concede that "the planning documents [submitted under the PL-566 Program] refer to the use of eminent domain power by the Watershed District."

Second, the Agreement carefully distinguishes between the obligation to condemn and the obligation to acquire land rights.  In the Agreement, the Tribe committed to pay the costs of **acquiring the land rights** necessary for the Plum Creek Project and three smaller retention dams on the Reservation.  Nemaha Brown committed to do the same with respect to the other smaller retention dams outside the Kickapoo Reservation which are also part of the project.  The **act of acquiring land rights** is not tantamount to the act of condemning fee lands for the project, however, and the Agreement is carefully structured to differentiate between the two.

The EIS, which has been expressly annexed to and made a part of the Agreement by the parties thereto, makes clear at page 50 that "land rights costs" are "direct and related costs for the right to install, operate, and maintain works of improvement.  These costs include land purchases, easements, agreements, permits, and modifications of properties and utilities."  *See* Exhibit A to Declaration of Steve Cadue, at page 50.  Notably, there is no mention of

condemnation as a "land rights cost."  The Agreement clearly differentiates between the two, and directs the parties as to when each is necessary.

The preferred means of obtaining lands for watershed projects is by purchase or exchange, of course, and condemnation is meant to be used as a last resort.  It is much cheaper and faster to obtain project lands through purchase or exchange, with the willing consent of the landowner.  The act of condemnation implies that the landowner is unwilling and that judicial machinery is necessary to obtain the land for a public purpose.

The evidence is clear that the Tribe has made Herculean efforts to acquire fee lands through their repeated offers to purchase or exchange project lands held in fee by non-Indians; offering up to twice fair market value, with little result.  Now that the Tribe's land acquisition efforts have fallen short, it is time for the Nemaha Brown Board to perform its obligation under the Agreement.

Third, both fee lands owned by non-Indians, and Indian trust lands, are located within the Plum Creek Project boundaries.  Indeed, part of the Plum Creek project boundaries are located within the Kickapoo Reservation and part are outside the Reservation boundaries.  From the outset, then, given this land ownership pattern, the parties understood that if the exercise of condemnation were needed, the Tribe would utilize its condemnation authority over *Indian* lands, and the Nemaha Brown Board would use its authority over the *fee* lands.  That simply is the only way all of the lands necessary for the Plum Creek project area could be acquired if landowners refused to sell or exchange willingly, which has proven to be the case.  Even if the Tribe had the legal authority to condemn fee lands within its Reservation boundaries, it never has had the authority to condemn fee lands outside those boundaries.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT**

28

The exercise of eminent domain authority is always intended to be a last resort, but even when constructing projects which serve the larger public good – as all parties to the 1994 Agreement **and Congress** have recognized is the basis for the Plum Creek project – some landowners invariably are unwilling to give up their land without its invocation.  Most recently, two other PL-566 projects in northeast Kansas – the Pony Creek and Banner Creek projects – have required local sponsors to invoke their condemnation authority.   Some landowners willingly relinquished their land, others did not.  Even in the case of Plum Creek, one family – the Stuckey family – willingly sold to the Tribe, but the rest have not.

The Agreement, at Page 50 of the EIS, acknowledged this reality: "They [Nemaha Brown and other local sponsors] have agreed to use these powers [of eminent domain] **as needed** and will be responsible for excess investigation and design costs resulting from their delay or failure to do so."  (Emphasis added.)

All of the post-1994 correspondence relating to the Agreement reflects one understanding: that the Nemaha Brown Board of Directors has the authority to condemn the land for the Plum Creek project area and all other parties to the Agreement are ready and willing to proceed once the Board exercises its authority.  The Agreement should be enforced according to the intentions of the parties thereto, at the time of its execution and for many years thereafter.

**D.     The Nemaha Brown Board's Continuing Breach Of Its Contractual Obligation To The Tribe And The Other Parties To The 1994 Agreement Can Only Be Remedied By Ordering It To Specifically Perform.**

Non-performance of an express contractual duty is a breach of contract.  All contracts impose a duty of good faith and fair dealing which includes a duty to perform contractual obligations in a timely manner.  Failure to do so is a breach of contract.  Specific performance is warranted for breach of definite terms of a fair and reasonable contract if enforcement will not cause hardship and remedy at law – such as damages – is inadequate.  Equitable proceedings for specific performance require the Court to look at the real intent of the parties and enforce the contract accordingly.  The Court has discretion to award specific performance where to do so would be reasonable, proper and equitable based upon the facts and circumstances of the particular case.

The UDT Agreement is a fair and reasonable contract, with definite terms that were mutually agreed upon after several years of careful and deliberate planning, and consideration by the parties, of their respective interests at stake.  These interests included the community and environmental benefits and impacts of the project.  The UDT Agreement was encompassed within a federal Environmental Impact Statement of substantial, comprehensive detail, was executed in 1994 by all parties, and was approved and authorized for funding by Congress in 1998.

The Tribe and the other parties thereto agreed to perform specific obligations necessary to design, fund and construct the large Plum Creek Project and the 20 other smaller projects within the UDT Watershed.  The contract terms, and the respective duties and responsibilities of each party arising from the contract, are clear and unambiguous.  It was the intention of the

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST MOTION FOR PARTIAL SUMMARY JUDGMENT**                                                                 30

parties to develop the UDT Watershed to provide a long term dependable water supply for the Tribe and various other user groups, while preventing flooding and soil erosion.  The Nemaha Brown Board's failure to perform its obligation to condemn land for the Plum Creek Reservoir is a continuing breach of the Agreement.  Specific performance is warranted in this case as the failure to obtain the specific tract of land for the Plum Creek Reservoir would deprive the Tribe of the benefits of the bargain.  Monetary damages are an inadequate remedy.

> **1.** **The Nemaha Brown Board's Non-Performance Of Its Condemnation Authority To Acquire The Plum Creek Reservoir Project Lands Is A Continuing Breach Of Contract.**

Non-performance of an express contractual duty is a breach of contract.  All contracts impose a duty of good faith and fair dealing which includes a duty to perform contractual obligations in a timely manner.  Failure to do so is a breach of contract.  *Franconia Associates v. United States*, 536 U.S. 129, 142-43 (2002)(failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach.); *Northwest Arkansas Masonry, Inc. v. Summit Specialty Products, Inc.*, 31 P.3d 982 (Kan. App. 2001)(breach of contract occurs when there is a failure of performance of a duty arising or imposed by agreement); Restatement (Second) of Contracts § 235(2)(1981).  *And see* Restatement (Second) of Contracts §§ 205, 235, comment. b, and illustration 3 (1981):  "Non-performance of a duty when performance is due is a breach whether the duty is imposed by a promise stated in the agreement or by a term supplied by the court, as in the case of the duty of good faith and fair dealing."

The Agreement's terms outlined obligations for each party to take to implement the development of the UDT Watershed.  Pursuant to the Agreement, Nemaha Brown was to exercise condemnation authority "as needed" in the event the Tribe was unable to successfully

purchase all land in the project area for the Plum Creek Reservoir.  As of the filing date of this litigation, the Board has failed to perform said obligations by tabling indefinitely the vote to condemn land for the Reservoir.  The Nemaha Brown Board's refusal to vote to perform is a continuing breach of the terms in the Agreement.

Pursuant to the Agreement, the Tribe was to purchase land in fee simple in the specific location designated in the Agreement for the Plum Creek Reservoir.  To accomplish this task, the Tribe opened a Land Office to facilitate the process of acquiring the land.  The Tribe paid for certified appraisals of the fee land, and offers to purchase were sent in May of 2003 and again in May of 2005.  The Tribe made generous offers to purchase, at up to twice the appraised fair market value.  Repeated calls, letters and face-to-face meetings have occurred over the past three years to meet the Tribe's obligation to purchase and out of reliance on the promise by the Nemaha Brown Board that it would condemn lands once the Tribe's reasonable efforts fell short.  To date, only one of the landowners has accepted an offer of purchase from the Tribe.

Difficulty obtaining land for the Reservoir was a foreseen obstacle that all parties anticipated for in the Agreement.  Non-Indian governments in neighboring counties have faced similar difficulties when attempting to build water storage projects on Pony Creek and Banner Creek.  Those governments utilized their condemnation authority against unwilling landowners.

In July of 2003, and again in January of 2004, Dexter Davis, President of the Nemaha Brown Board, and all other officers and members of the Board, refused to proceed with their condemnation obligation under the Agreement.  At the July 2003 meeting, their reasoning was that they would revisit the issue after the Tribe had negotiated with the landowners.  That was at a point when the Tribe had been attempting for *more than two years* to get the landowners to

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                                                    32
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

engage them in meaningful negotiations.   The Tribe can understand the Board wanting a reasonable period of time for negotiations to occur, given the time and expense of formal condemnation proceedings.   But more than two years is unreasonable.   What is even more galling is that at its meeting, in January of 2004, the Board dropped the excuse of "watching the course of the negotiations" and ***tabled indefinitely*** the decision to condemn land needed for the construction of the Plum Creek Reservoir.   This action told the Tribe, in effect, "not only are we not going to decide now to meet our obligations to you, but we have no idea when in the future we will decide to meet those obligations."

The Board's position is *per se* non-performance, and is unacceptable.   The parties to the UDT Agreement knew from the outset that under the PL-566 Program a "local sponsor" with condemnation authority was necessary.   NRCS would not agree to proceed with an agreement under the program, or to release funds thereunder, without a local sponsor with such authority. The parties to the Agreement knew from the outset that the Tribe does not possess the authority under federal law to condemn ***fee*** land, whether within or outside its Reservation boundaries. The Tribe has done all that it can do to attempt to secure the land rights for the project area, and so it has met its obligations under the contract to date.

Moreover, pursuant to the express terms of the UDT Agreement, the parties agreed to assume responsibility for all increased costs resulting from the failure to perform obligations and commitments in a timely fashion. Exhibit A to Cadue Dec. at 50.   The Board's decision to table indefinitely the vote to condemn land is affecting the costs associated with the construction of the projects contemplated under the UDT Agreement.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                    33
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

2.    **Specific Performance Is Required In This Case As Damages Are An Inadequate Remedy For The Continuing Breach Of Definite Terms Of The Agreement Involving Interests In Specific Tracts Of Land For The Plum Creek Project.[1]**

Specific performance is warranted for breach of definite terms of a fair and reasonable contract, if enforcement will not cause hardship and available remedies at law is inadequate. *Hochard v. Deiter*, 219 Kan. 738 (1976).  Equitable proceedings for specific performance require the Court to look at the real intent of the parties and enforce the contract accordingly.  *DeBauge Bros., Inc. v. Whisitt*, 212 Kan. 758, 512 P.2d 487 (Kan. 1973).  The Court has discretion to award specific performance "where to do so would be reasonable, proper, and equitable" based upon the facts and circumstances of the particular case.  *Dusenberry v. Jones*, 359 F. Supp. 712, 715 (D. Kan. 1972).

Specific performance is warranted in cases where monetary damages are an inadequate remedy for a breach of contract. *Hochard v. Deiter*, 219 Kan. 738 (1976).  To determine if damages would be inadequate, the Court considers the difficulty of proving damages with reasonable certainty.  Restatement (Second) of Contracts § 360 (1981).  Damages are an inadequate remedy for the breach of a contract term involving an interest in a specific tract of land because such land is "impossible of duplication" by the award of any amount of money.  *Id.* at § 360

---

[1]  It is important to distinguish damages that might be sought for the Board's breach of its condemnation obligation– which would presumably be an amount of money necessary to compensate the Tribe for its inability to secure a dependable water supply from the Plum Creek project – and the damages sought by the Tribe for the increased costs of the Plum Creek project for the delays attributable to the refusal to honor the condemnation obligation.  In the former case, damages are an inadequate remedy because it is a long term, dependable water supply that is needed by the Tribe, and the land for the project is a unique location.  In the latter, the monetary damages are most certainly calculable, and will require the presentation of evidence to establish the actual amount of financial damages incurred by the Tribe against the Nemaha Brown Board members.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                    34
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

comment e (1981).  Breach of contract terms involving land are especially well-suited to specific

performance remedies.  The nature of real property's can be unique with regard to quantity,

quality or location, making monetary damages an inadequate remedy.  *Henry v. Scurry,* 142 P.2d

717 (Kan. 1943).

In this case, an award of damages would be especially inadequate to compensate for

injuries suffered by the Tribe by the Board's refusal to proceed with condemnation.  The Board's

continuing breach involves its failure to obtain specific tracts of land necessary for the Plum

Creek Reservoir project area.  These lands are the only viable location for a water storage project

remaining in that portion of the watershed which drains the Kickapoo Reservation, in terms of

geology, hydrology and other technical factors necessary to site a reservoir of its size.

The complex terms of the Agreement described herein are the result of thirty years of

careful and deliberate consideration of the needs and interests of the involved parties, the

environmental impacts of the project, and the environmental and community benefits of the

project.  Negotiations over watershed development began in the late 1970s.  Between 1983-1994,

the Tribe, Nemaha Brown and SCS/NRCS analyzed and selected viable sites for flood retention

dams and related land treatment activities.  Nemaha Brown Board Meeting minutes from the

1980s and 1990s indicate that the District participated willingly and actively in the site selection,

analysis and survey work for dam sites.  In 1989, the Nemaha Brown Board of Directors and the

Tribe held a meeting during which the dam's sites under the project were jointly approved.

The parties petitioned for federal funding under the Small Watershed Act, PL-566 and

obtained a Section 404 Clean Water Act permit - Permit # DA-199401028 - for the Plum Creek

Reservoir and other impoundments authorized in the Agreement.  Their successful efforts lead to 1998 Congressional authorization of the Agreement with specific dam sites for 20 smaller impoundments and the Plum Creek Reservoir.  As a part of the Agreement, an Environmental Impact Statement with scientific information specific to the location of the dam sites was conducted; the specific dam sites were legally endorsed by all federal, state, local and tribal parties to the Agreement through the signing of the Environmental Impact Statement and Agreement.

The parties intended the Plum Creek Reservoir to be one of the primary means by which the Tribe and the Kickapoo Reservation  residents would secure a long-term dependable water supply.  The Plum Creek Reservoir is a multipurpose reservoir that will meet the present and future needs of the many Indian and non-Indian users in the UDT Watershed.  The lake's size, location, and uses were determined by the participating Tribe, federal and state government agencies.  These activities, conducted over almost thirty years, express the intentions of the parties to build the Plum Creek Reservoir and other impoundments in specific sites provided for in the Agreement.  This Agreement is far too complex for an award of damages to adequately compensate the Tribe.

It is clear from the history of the development in the UDT Watershed over the past 30 years that the non-Indian farmers have benefited abundantly from the federal and state cost-share programs for water resource development and land conservation.  The Tribe, too, has also seen some limited benefits from those programs.  If the Nemaha Brown Board is permitted to continue to frustrate the promise to the Tribe to build the Plum Creek project, however, a great

injustice will have been committed.  The Tribe, under the federal *Winters* doctrine, holds the most senior water rights in the watershed, yet everyone in the watershed has received their benefits of watershed development ***except*** the Tribe.  The Plum Creek project is one of the largest, and yet still missing pieces, in the Upper Delaware and tributaries watershed.

Absent an order from this Court finding a continuing contract breach, and an order requiring the Nemaha Brown Board to specifically perform its obligations under the Agreement, this grave injustice will continue unabated.

**E.**     **By Virtue Of Promises Made And Reliance Thereon by the Tribe and the United States, The Nemaha Brown Board Of Directors Is Estopped From Asserting That They Do Not Have An Obligation Under The 1994 Agreement To Condemn Lands Necessary For The Plum Creek Reservoir Project.**

At the time of their application to SCS for approval of a project under the PL-566 Small Watersheds Program, in the early 1980s, the Nemaha Brown Watershed District and its Board members knew that a condition of the federal program was that they offer to use their state condemnation authority if necessary to implement the works of improvement authorized under their plan.  SCS made this condition clear to the Board even before they entered into the joint watershed agreement with the Tribe.  It was also understood by the Board at the time it and the Tribe filed the joint application under the PL-566 Program.

Thus, there is no rational dispute that the Nemaha Brown Board promised to use its condemnation authority.  The Tribe, SCS, and the other parties to the 1994 Agreement relied substantially on the promise by the Board, in order for the entire project to be able to be completed.  The Tribe's reliance has been the greatest of all the parties to the Agreement, given its dire need for a dependable source of water for the array of water needs on the Kickapoo

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                              37
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Reservation.  The Tribe's reliance on that promise has been, so far, to its detriment.  It has been aware, since 1994, of the ongoing efforts by the state and federal defendants named herein to use their programs and financial resources to assist Nemaha Brown and private landowners in the watershed develop their water resources – all with the belief that the Plum Creek project would be developed to meet a substantial portion of their *Winters* water rights.  Had the Tribe known that, in the end, Nemaha Brown would defeat the development of the Plum Creek project, the Tribe would certainly have taken an aggressive stance against these other activities in the watershed which are now dewatering the mainstem Delaware River in below average water years.

This is a classic case of promissory estoppel and detrimental reliance.  "For the doctrine of promissory estoppel to be invoked, the evidence must show that the promise was made under circumstances where the promisor intended and reasonably expected the promise would be relied upon by the promisee and, further, that the promisee acted reasonably in relying upon the promise." *Patrons Mut. Ins. Ass'n v. Union Gas System, Inc*., 250 Kan. 722, 726, 830 P.2d 35, 39 (1992), *quoting Marker v. Preferred Fire Ins. Co*., 211 Kan. 427, 434, 506 P.2d 1163 (1973); *B & E Investments, Inc. v. City of Wichita,* 2006 WL 1816328 (Kan. App. 2006).  "[P]romissory estoppel should be applied only if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice. *See Marker v. Preferred Fire Ins. Co*., 211 Kan. 427, 434, 506 P.2d 1163 (1973)." *Patrons Mut. Ins. Ass'n v. Union Gas System, Inc*. *supra*, 250 Kan. at 726, 830 P.2d at 39.

The plaintiff's argument here is that where one person promises to do something and another relies on that promise to his detriment, the promisor should not be allowed to

assert claims and defenses inconsistent with his promise. In support of this position the plaintiff relies upon Section 90 of the RESTATEMENT OF THE LAW, CONTRACTS: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' Section 90 of the RESTATEMENT OF THE LAW, CONTRACTS, is cited in *Southwestern College v. Hawley*, 144 Kan. 652, 62 P.2d 850, and in *Greiner v. Greiner*, 131 Kan. 760, 293 P. 759. In the more recent cases the doctrine set forth in Section 90 of the RESTATEMENT OF THE LAW, CONTRACTS, quoted above has been designated as "promissory estoppel.'"

*Marker v. Preferred Fire Ins. Co.*, *supra*, 211 Kan. at 434, 506 P.2d at 1169-70. *See also*, *EDO Corp. v. Beech Aircraft Corp.*, 911 F.2d 1447 (10th Cir.1990); *Glasscock v. Wilson Constructors, Inc.*, 627 F.2d 1065 (10th Cir. 1980); *Mohr v. State Bank of Stanley*, 770 P.2d 466 (Kan.1989); *Templeton v. Kansas Parole Bd.*, 6 P.3d 910 (Kan. App. 2000).

"Promissory estoppel" is also viewed as an alternative theory of recovery to breach of contract claim, an equitable doctrine resorted to for enforcement of promises that are noncontractual and otherwise unenforceable; where proof of express contract fails on one or more of essential elements such as consideration and where refusal to enforce party's promise would be unjust because of reliance upon it, promissory estoppel is appropriate theory for recovery. *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 1154 (10th Cir. 1990). The Tribe believes that the 1994 Agreement is a contract and is enforceable' should the Court believe otherwise, the equitable doctrine of promissory estoppel provides an alternative means of enforcement and recover.

**F.    The Conduct Of The Of The Nemaha Brown Watershed Board Is *Ultra Vires* Its Obligations Under Federal And State Law And The 1994 UDT Watershed Agreement, And The Board Should Be Ordered To Perform Those Obligations.**

Finally, the Tribe asserts that the Nemaha Brown Board has acted *ultra vires* its duties

MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST                                              39
MOTION FOR PARTIAL SUMMARY JUDGMENT

and obligations under the Kansas Watershed District Act, PL-566 – the federal Small Watersheds

Program statute, and the 1994 UDT Agreement itself in refusing to bring the matter of

condemnation to a vote to proceed with the condemnation of fee lands for the Plum Creek

Project.   The Tribe has shown facts, about which there is no materials dispute, that Nemaha

Brown has a definite obligation under the 1994 Agreement, one that the Board supported and

performed under for many years.   The sea change occurred when new members of the Board

were elected and took control around 2003-2004, and these new members refused to perform a

duty imposed on them by law.   This refusal to perform is an abuse of its power as a public body,

and is *ultra vires* their duty under law.

     For purposes of <u>this</u> partial summary judgment motion, however, the Tribe is not seeking

an award of damages against the Nemaha Brown Board members in their personal capacities, for

the delay caused in the Plum Creek project.   Such allegations have been raised in the Complaint,

*see* Cause of Action Five, but the Tribe acknowledges there are likely disputed material facts

surrounding these allegations, and thus it has not raised that claim for disposition by the Court at

this point in the proceeding.

> **1.     The Nemaha Brown Board and its Members are Authorized under the Kansas Watershed District Act and the Federal PL-566 Small Watersheds Program to Condemn Fee Lands to Construct Works of Improvement Needed to Conserve, Develop, Utilize or Dispose of Water.   The 1994 Agreement Between The Board, The Tribe And Other Parties Was Executed Pursuant To These Authorities, Wherein The Board Promised To Take Certain Actions Under Its State Delegated Authority.**

     The Nemaha Brown Watershed District was established under the Watershed District Act

("Watershed Act"), which declared it a public necessity to create watershed districts to protect

lands subject to erosion, floodwater, or sediment damage.  This is done through the construction of works of improvement needed to conserve, develop, utilize or dispose of water.  Kan. Stat. Ann. § 24-1201(a)(2005).  Through the Watershed Act, the Kansas legislature delegated to the Nemaha Brown Board the authority to advance these public purposes by entering into contracts for the "purchase, development, conveyance of land" necessary to "construct, operate, and maintain works of improvements to carry out such purposes." Kan. Stat. Ann. §§ 24-1201, 1209 (2005).  *Huser v. Duck Creek Watershed Joint District Number 59*, 234 Kan. 1, 668 P.2d 172 (Kan. 1983).  It also delegated to the Nemaha Brown Board the authority to condemn fee land within its district to accomplish these purposes, Kan. Stat. Ann. § 24-1209, and it also waived the Board's immunity from suit in circumstances associated with the exercise of these delegated authorities.  K.S.A § 24-12

The 1994 UDT Agreement with the Tribe and other parties was exactly the type of contract the Kansas legislators intended watershed district boards to enter into, to facilitate the development of watersheds in the State of Kansas.  It was also the type of agreement contemplated by Congress, under the PL-566 Small Watersheds Program, to develop the water resources in watersheds such as the Upper Delaware.  Congress saw the need for local sponsors of water development projects with condemnation authority, and Nemaha Brown fit the bill perfectly.  For the Board to enter into a contract freely and willingly under these state and federal statutory authorities, and then intentionally not perform its obligations under that contract, raises serious questions about the propriety of the Board's conduct, and whether that conduct violated the Board's sacred trust as a public body to comply with the 1994 Agreement and thus its

obligations under the Kansas Watershed Law and the federal Small Watersheds Program.

**2.      The Standard For Setting Aside *Ultra Vires* Conduct By Government Officials In Kansas Focuses On The Actions Of Those Members Who At Bottom Use Public Power To Oppress Or Subvert Private Rights.  The Board's Refusal To Perform Its Obligations Under The UDT Agreement Is Unlawful And Is Thus *Ultra Vires* Their Duties Under Kansas Law.**

As a general rule, what the state may do directly, it may authorize its municipalities or other political subdivisions to do.  When public power over a particular subject matter is delegated to a municipal corporation or other political subdivision by the state legislature, the extent to which that power is exercised rests in the discretion of that subdivision, as long as it is exercised in good faith and for a valid purpose.  56 Am. Jur. 2d *Municipal Corporations, Counties, and Other Political Subdivisions*, § 180; *Pacific Fire Protection Dist. v. Mosley*, 939 S.W.2d 467 (Mo. Ct. App. E.D. 1996), *reh'g and/or transfer denied*, (Feb. 19, 1997), *transfer denied*, (Mar. 25, 1997); *Comstock & Davis, Inc. v. City of Eden Prairie*, 557 N.W.2d 213 (Minn. Ct. App. 1997), *review denied*, (Mar. 18, 1997).  Acts beyond the scope of the powers conferred on a municipality or other political subdivision are *ultra vires* and are void.  *Michigan Mun. Liability and Property Pool v. Muskegon County Bd. of County Road Com'rs*, 235 Mich. App. 183, 597 N.W.2d 187 (1999).

When a public official refuses to perform an act or duty imposed by law, such refusal to act can also be considered to be *ultra vires* the officials' legal powers.  Such is the case with respect to the refusal on the part of the Nemaha Brown Board and its members to utilize the delegated condemnation authority to facilitate the development of the Plum Creek project.  "The underlying test applied seems to be whether the refusal of the public official, commission or

board to perform the duty imposed by law is reasonable under all of the confronting facts and circumstances." *Barton v. Turkey Creek Watershed Joint District Number 32 of Dickinson and Marion Counties*, 200 Kan. 489, 512, 438 P.2d 732, 750 (1968), *quoting Linden v. Board of Park Commissioners of Wichita*, 178 Kan. 333, 337, 285 P.2d 1070 (1955).  The guiding  principle is that "a public body 'cannot use public power to oppress.'"  *Barton*, 200 Kan. at 511, 438 P.2d at 749.

Courts in Kansas have considered government officials' actions to be *ultra vires*, and have set aside such actions, when they have been found to be an unreasonable exercise or abuse of delegated public powers.  *Eudora Dev. Co. Of Kansas v. City of Eudora,* 276 Kan. 626, 629, 78 P.3d 437, 440 (2003), *quoting Schulenberg v. City of Reading*, 196 Kan. 43, 52, 410 P.2d 324, 331 (1966)("unlawful act under a statute, or because action under a valid statute is so arbitrary, capricious, unreasonable and subversive of private rights as to indicate a clear abuse rather than a *bona fide* exercise of power.").  *See also*, *Mullins v. City of El Dorado*, 200 Kan. 336, 436 P.2d 837 (1968); *Drainage District Number 3 of Sedgwick County v. Riverside Drainage District*, 104 Kan. 233, 178 P. 433 (1919); *Murphy v. Fairmount Twp*., 89 Kan. 760, 133 P. 169 (1913); *Shanks v. Pearson*, 66 Kan. 168, 71 P. 252 (1903): *Symns v. Graves*, 65 Kan. 628, 70 P. 591 (1902).

3.     **The Nemaha Brown Boards' Failure To Perform Under The UDT Agreement Meets The Standard For Conduct Which Is U*ltra Vires* its Duties Under Kansas And Federal Law.  The Appropriate Remedy is To Compel The Board To Perform.**

For several decades the Tribe has relied on its partnership with the Board, and the Board's willing and enthusiastic participation in effectuating the watershed development plan.

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST**                                                                              43
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

The Board's sudden change of mind and refusal to perform under the UDT Agreement meets the Kansas standard for finding *ultra vires* conduct.

The Board clearly has the duty to utilize its condemnation authority under the circumstances faced presently by the parties to the UDT Agreement.  The Board long ago was faced with the decision whether to partner with the Tribe under the PL-566 Program.  It saw obvious advantages to be gained by partnering with the Tribe, including access to BIA funds with which the technical planning to implement the Board's General Plan was made possible, and the resulting improved access to and priority ranking in the PL-566 Program.

The Plum Creek Reservoir, once completed in accordance with the Agreement, will advance the purposes of the Kansas Watershed Act and the PL-566 Small Watersheds Program. The UDT Agreement, and the underlying EIS, confirm the underline public purposes served by the Plum Creek Reservoir, for the Nemaha Brown Watershed District and all its members: protecting lands subject to erosion, flooding, and sediment damage, and providing recreational benefits in addition to a critical, reliable source of water for the residents of the Kickapoo Reservation.  The reservoir is also intended to be one of the Tribe's primary sources of the fulfillment of its *Winters* water rights.

Once the Board made the decision to opt for the partnership with the Tribe, however, and the Tribe relied to its detriment on the promises by the Board, the duty became fixed and could not be revoked or refused by the Board.  The Board members' refusal to exercise its condemnation authority, once the Tribe had fallen short in its efforts to acquire the fee lands necessary for the Plum Creek project, thus, is a continuing breach of its binding obligations

under the Agreement.  *See e.g.*, Restatement (Second) of Contracts § 235(2) (1981).

The Board's conduct is also unreasonable and abusive of its powers under state law, when considering all of the relevant facts surrounding the present circumstances.  The Nemaha Brown Board is invested with a sacred trust, the exercise of state-delegated power and authority in a reasonable and good faith manner.  The Board has violated its sacred trust in this case, and is using public power to oppress the Tribe.  The Court should find that the conduct is *ultra vires,* under *Barton* and other Kansas decisions cited above, and order the specific performance of condemnation under the Agreement.

## V.   CONCLUSION

For the foregoing reasons, the Court should grant the Tribe's motion for partial summary judgment on all matters presented in this motion, viz.:

1.  Hold that federal law requires that the Nemaha Brown Board possess condemnation authority under state law, and be ready and willing to use it to acquire land rights necessary for works of improvement as a "local sponsor" under a project authorized to be funded by the SCS' PL-566 program.

2.  Hold that the terms of the 1994 UDT Agreement specify that the Nemaha Brown Board was willing, consistent with its obligations under federal law, namely the PL-566 Program, to exercise its state-law delegated condemnation authority as needed to acquire lands for the Plum Creek project should the Tribe be unable to acquire the lands by purchase or exchange.

3.  Hold that the Nemaha Brown Board is in continuing breach of its obligations to the

Tribe and the other parties to the 1994 UDT Agreement by refusing to vote to proceed with the condemnation of fee lands within the Plum Creek project area.

4.   Order the Nemaha Brown Board to specifically perform its obligations to the Tribe and the other parties to the 1994 Agreement to condemn the fee lands in the Plum Creek project area, and find that money damages for refusal to perform are an inadequate remedy.

5.   Order that by virtue of promises made and reliance thereon by the Tribe and the United States, the Officers and members of the Nemaha Brown Board of Directors are estopped from asserting that they and the watershed district do not have an obligation under the 1994 Agreement to condemn lands necessary for the Plum Creek Reservoir project.

6.   Order that the refusal of the Nemaha Brown Board to perform said obligations is *ultra vires* their delegated responsibilities as public officials under Kansas law, federal law, and the 1994 UDT Agreement.

Dated this 7th day of November, 2006.

Respectfully submitted,


s/ Steven C. Moore
Steven C. Moore, Esq.
Walter R. Echo-Hawk, Esq.,
K. Jerome Gottschalk, Esq.,
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302-6296
smoore@narf.org


**MEMORANDUM IN SUPPORT OF PLAINTIFFS' FIRST
MOTION FOR PARTIAL SUMMARY JUDGMENT**                                    46

s/Damon Williams_____
Damon Williams, Esq.,
Amelia C. Holmes, Esq.
Kickapoo Tribal Legal Department
**KICKAPOO TRIBE IN KANSAS**
Post Office Box 110
1107 Goldfinch Road
Horton, Kansas 66439
holmesameliac@yahoo.com


ATTORNEYS FOR THE PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the _7th_ day of November, 2006, the foregoing Plaintiff's First Motion for Partial Summary Judgment was filed with the Clerk of the Court using the CM/ECF system which will send a notice of electronic filing to the following:

| | |
|---|---|
| Damon K. Williams | dkeone@yahoo.com |
| Kim Jerome Gottschalk | jeronimo@narf.org |
| Steven Carl Moore | smoore@narf.org |
| Walter R. Echo-Hawk | wechohwk@narf.org |
| Daniel G. Steele | daniel.steele@usdoj.gov |
| Robin Barkett Moore | robin.moore@usdoj.gov |
| David W. Davies | daviesd@ksag.org |
| David M. Traster | dtraster@foulston.com |
| Jay F. Fowler | jfowler@foulston.com |
| Timothy B. Mustaine | tmustaine@foulston.com |
| J. Steven Massoni | jsm@massonilaw.com |

s/ Amelia C. Holmes_____
Amelia C. Holmes
Kickapoo Tribal Legal Department
**KICKAPOO TRIBE IN KANSAS**
Post Office Box 110
1107 Goldfinch Road
Horton, Kansas 66439
holmesameliac@yahoo.com

**<u>Exhibit List</u>**

Declaration of Steve Cadue

Declaration of Jason Auvil

Declaration of Fire Chief Rick Jones

Declaration of John Thorpe

Declaration of Nellie Cadue

  Part 1

  Part 2