Steven Carl Moore, Esq., Colorado Bar #9863
K. Jerome Gottschalk, Esq., New Mexico Bar #3799
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302-6296
smoore@narf.org


Amelia C. Holmes, Esq.  Kansas Bar #20346
Kickapoo Tribal Legal Department
**KICKAPOO TRIBE IN KANSAS**
Post Office Box 110
1107 Goldfinch Road
Horton, Kansas 66439
holmesameliac@yahoo.com


## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS


| | | |
|---|---|---|
| **KICKAPOO TRIBE OF INDIANS OF THE** | ) | |
| **KICKAPOO RESERVATION IN KANSAS** | ) | |
| **(also known as the KICKAPOO TRIBE IN KANSAS),** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **versus** | ) | |
| | ) | **Civil Action 06-2248** |
| | ) | |
| | ) | |
| | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| | ) | |
| **MICHAEL BLACK, in his official capacity as** | ) | |
| **Director, BUREAU OF INDIAN AFFAIRS,** | ) | |
| **UNITED STATES DEPARTMENT OF INTERIOR;** | ) | |
| | ) | |
| **DAVID BARFIELD, in his official capacity as Chief** | ) | |
| **Engineer of the Division of Water Resources,** | ) | |
| **of the KANSAS DEPARTMENT OF AGRICULTURE ;** | ) | |
| | ) | |
| **DEXTER DAVIS, President, Board of Directors** | ) | |
| **WAYNE HEINIGER, Vice President** | ) | |
| **GLENN HENNIGAN, Secretary-Treasurer** | ) | |
| **LEO WESSEL, Officer** | ) | |
| **RODNEY LIERZ, Officer** | ) | |

**JIM RENYER, Officer**                                          )
**ROGER PLOEGER, Officer**                                      )
**DAVID ZEIT, Officer**                                         )
**RODNEY HEINEN, Officer**                                      )
**In their individual capacities and as current or former**     )
**Officers of the District;**                                   )
**NEMAHA BROWN WATERSHED**                                      )
**JOINT DISTRICT NO. 7;**                                       )
                                                                )
                                                                )
        **Defendants.**  )
_____)

## <u>NATURE OF THE ACTION</u>

1.   Water is life to the Kickapoo people.  Since aboriginal times in the Great Lakes region the Kickapoo people have managed water to sustain life.  Many traditional stories and practices of the Kickapoo people revolve around the mystery and sanctity of water.  The Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas, also known as the Kickapoo Tribe in Kansas (hereinafter the "Tribe"), has many historical, social, and religious ties to water.  The selection by the Tribe of the lands which became its present reservation in Kansas was made in part due to the proximity to and abundance of water sources.  Water is vital to make the Tribe's Reservation homeland in Brown County, Kansas a liveable and economically viable place for the Tribe and its members, as well as other non-tribal members who live on the reservation and depend on the same water supply.  Nevertheless, because of the systematic actions of the defendants named herein, and the refusal of the Bureau of Indian Affairs to take affirmative protective action, the Tribe has been systematically deprived of the water to which it is legally entitled for more than a generation.

2.   This is an action under 28 U.S.C. §§ 2201 *et seq*., seeking a declaration against all defendants, State and Federal, that the Tribe and its members hold the senior water rights on the

2

Upper Delaware River and tributaries water system in Kansas, as a matter of Federal and State law. This is also an action seeking declaratory and injunctive relief against certain of the defendants, namely the Nemaha Brown Watershed Joint District No. 7, to prevent any expenditure of State and Federal funding of projects on private land in the Upper Delaware River and Tributaries Watershed ("UDT"). These projects, described in more detail herein, have destroyed and are continuing to destroy the Tribe's access to long-term and sufficiently dependable water quantities, of sufficient quality.

3. This action also seeks enforcement of promises made by the United States and the State of Kansas to provide meaningful access to water for the Kickapoo people. The Tribe seeks specific performance of express promises made to the Kickapoo Tribe in 1994 in the Upper Delaware River and Tributaries Watershed Plan and Agreement ("1994 UDT Watershed Agreement" or "1994 Agreement"), executed by some of the parties to this lawsuit.

4. The 1994 UDT Watershed Agreement was executed under the authority of "PL-566" or the "Small Watersheds Program," as it is known. The PL-566 program was first established and funded by Congress in 1954, with the enactment of the Watershed Protection and Flood Prevention Act. Public Law 83-566, 16 U.S.C. §§ 1001-1008. The Act authorized the Natural Resources Conservation Service of the United Sates Department of Agriculture to cooperate with States, local conservation and watershed districts and private landowners – and was amended in 1981 to include Indian tribes – to carry out works of improvement for soil conservation and for other purposes including flood prevention.

5. This action is also commenced pursuant to the Federal Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* ("APA"). The Federal defendants named herein have acted in ways which are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,

and have repeatedly denied the specific relief sought by the Tribe, as specified in the body of this Complaint.  5 U.S.C. § 706(2).

6.  For far too long the Kickapoo people have waited patiently for their State and Federal neighbors and partners to act honorably and in good faith.  The Kickapoo people now seek to receive justice from the courts of the United States for promises repeatedly delayed, denied and broken.

## JURISDICTION AND VENUE

7.  This action is brought by a Federally recognized Indian tribe and arises under several Federal treaties and statutes, as well as Federal common law, and therefore this Court has Federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1362.  The treaties, statutes and Federal common law under which this action arises include:

a.  The 1832, 1854 and 1862 Treaties between the Kickapoo Tribe of Kansas and the United States – 7 Stat. 391 (1832); 10 Stat. 1078(1854); and 12 Stat. 1249 (1862) – pursuant to which the United States expressly reserved lands in trust for the Kickapoo Tribe as a Reservation, and pursuant to which the United States reserved sufficient water and water rights for the Tribe to provide a viable land Reservation and homeland for the Kickapoo Tribe and its members, and which rights the United States has an obligation to protect.  *Winters v. United States*, 207 U.S. 564 (1908); *Arizona v. California,* 373 U.S. 546 (1963).

b.  A 1994 Federal contract executed expressly under the authority of the Watershed Protection and Flood Prevention Act of 1954 ("Small Watershed Program"), 16 U.S.C. 1001-1008, and in accordance with section 102(2)(c) of the National

Environmental Policy Act of 1969("NEPA"), Public Law 91-190, 42 U.S.C. 4321 *et seq.*, said contract being expressly approved and authorized by Congress in 1998.

c.   The American Indian Agricultural Resource Management Act of 1993, 25 U.S.C. §§ 3701 *et seq.*, wherein the United States expressed its "trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes."   25 U.S.C. at § 3701(2).  Water is expressly defined therein as an agricultural resource subject to Federal trust protection.  25 U.S.C. § 3703(3)(A);

d.   25 U.S.C. § 1632(5), wherein the Congress stated that "it is in the interest of the United States, and it is the policy of the United States, that all Indian communities and Indian homes, new and existing, be provided with safe and adequate water supply systems and sanitary sewage waste disposal systems as soon as possible," because, "many Indian homes and communities still lack safe water supply systems and sanitary sewage and solid waste disposal systems."  25 U.S.C. § 1632(4).

e.   25 U.S.C. § 4301(a)(9)(B), wherein Congress expressly found that "the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to facilitate economic ventures with outside entities that are not tribal entities."

f.   The Federal common law of the United States, pursuant to which the United States has a trust responsibility to protect the trust assets of the Kickapoo Tribe and its members, which includes their land and water resources.

g.   The 1988 "Agreement in Principle Between the U.S. Department of the Interior and U.S. Department of Agriculture," wherein these Federal departments

acknowledge that "the U.S. government is the trustee of most American Indian lands" and that both departments share "a common objective of helping promote the highest and best use of [Indian] trust lands." The Agreement in Principle also States that the Interior Department is the lead agency for the "protection of Indian trust land and resources." The Interior Department "enter[ed] into this agreement as a foundation for their endeavors in promoting the objectives of meeting the needs of American Indians."

      h.  The Secretarial Order 3215 – Departmental Responsibilities for Indian Trust Resources (April 8, 2000), pursuant to which Michael Black and the Bureau of Indian Affairs have an affirmative obligation to account for the potential effect of all Federal and State actions on the trust water rights and resources of the Kickapoo Tribe and its members, and to ensure that the Department's actions promote and protect the Tribe's interests.

8.  Jurisdiction is also conferred under 28 U.S.C. § 1346(a)(2), inasmuch as this is a civil action against the United States and other parties for specific performance of a contract with the Kickapoo Tribe to which the United States is a party.

9.  Jurisdiction is also conferred under 28 U.S.C. § 1367, since this action invokes Kansas water law and the duty of non-injury by junior water right holders to senior water rights, K.S.A. §§ 82a-701 *et seq*.; and the duties and responsibilities of the Nemaha Brown Watershed District Board under Kansas law, K.S.A. §§ 24-1201 *et seq*. State

10.  Through numerous letters to the Bureau of Indian Affairs and the Office of the Solicitor, Department of the Interior, between 2002 and 2005, the Kickapoo Tribe and its legal counsel sought the intervention of the United States as trustee to protect the right of the Tribe and its members to dependable and safe water supplies for its land Reservation and its people.

6

Most recently, by letters dated March 23, 2005 from James E. Cason, Associate Deputy Secretary of the Department of the Interior, to Steve Cadue, Kickapoo Tribal Chairman, and dated May 10, 2005, from Arch Wells, Acting Director, Bureau of Indian Affairs to Steve Cadue, Kickapoo Tribal Chairman, the Department of the Interior denied the Tribe's requests to take action to assist the Tribe.

11.   The denial of the relief requested by the Tribe, namely the denial by the BIA to intervene and assist the Tribe protect its land and water resources are, in contravention of the United States' obligations to the Tribe under Federal treaty, statutory and common law. Thus, there is sufficiently final action by the Department of the Interior from which the Tribe is entitled to infer and invoke a waiver of sovereign immunity under the APA.  5 U.S.C. § 706(2).

12.   Venue is properly vested in this Court under 28 U.S.C. § 1391, as the plaintiffs and the defendants reside in the district, the property that is the subject of this action is situated in the district, and a substantial part of the relevant and material events and omissions giving rise to the claims raised herein occurred and continue to occur in this district.

## PARTIES TO THE ACTION

### THE PLAINTIFF KICKAPOO TRIBE OF INDIANS OF THE KICKAPOO RESERVATION IN KANSAS.

13.   The Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas is a Federally recognized Indian tribe and is organized in accordance with Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984), as amended by the Act of June 15, 1935 (49 Stat. 378).  The Kickapoo tribal government operates under the Constitution and By-laws of the Kickapoo Tribe of Indians, which were approved by the Secretary of the Interior on February 26, 1937.

14.   The Tribe has a tragic history in the settlement of the Great Lakes and Midwest regions of what is now the United States.  It has been forcibly moved at least five times by the United States, pursuant to ten treaties spanning a fifty-year period between 1809 and 1862.  *See* 7 Stat. 117 (1809); 7 Stat. 130 (1815); 7 Stat. 145 (1816); 7 Stat 200 (1819); 7 Stat. 202 (1819); 7 Stat. 208 (1820); 7 Stat. 391 (1832); 10 Stat. 1078 (1854); 12 Stat. 1249 (1862).  Those treaties promised the protection of the Federal government of the Tribe's reservation as an exclusive homeland for the Kickapoo people.  Time and again the United States failed to fulfill the promises it made to the Kickapoo Tribe and people; time and again their reservation lands were taken from them and they were moved – first from the Fox River Valley in Wisconsin to Illinois, and then to Missouri and finally to Kansas.

15.   The Tribe has occupied its present territory in Kansas since the 1832 Treaty of Castor Hill,  twenty-nine years prior to the Kansas Statehood Act of 1861, 12 Stat. 126 (1861). In the Treaty of 1854, the Kickapoo Tribe ceded over 600,000 acres of land to the U.S. Government, but retained approximately 150,000 acres of land within its original Reservation boundaries.  In 1862, the Tribe ceded the remaining lands to the U.S. Government, except the current five (5) by six (6) mile Reservation, also within the original boundaries.  These treaties and other Federal laws, and court decisions interpreting same, confer on the United States and its departments of government an express and enforceable fiduciary obligation to protect the land and natural resources of the Tribe.

16.  The Tribe presently holds equitable title to approximately 3,800 acres, and fee title to another 600 acres, of land within its Reservation boundaries located within Brown County, Kansas.  Tribal members own equitable title to another 3,100 acres of allotted land.  Under Federal law the underlying legal title to this land is held in trust for the Tribe and its members by

the United States.

17.   Under Supreme Court precedent, stated herein, the Tribe has a fundamental right to sufficient water from water sources flowing over and through its land reservation, to ensure a viable homeland for the Kickapoo people, for present and future purposes, including domestic, industrial, commercial, municipal, agricultural and other cultural purposes.

## DEFENDANT MICHAEL BLACK, ACTING IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF THE INTERIOR.

18.   Pursuant to the treaties between the Kickapoo Tribe and the United States, and the several Federal statutes cited herein, the Federal government has an obligation to protect sufficient water and water rights to provide a viable land Reservation and homeland for the Kickapoo Tribe and its members, and to carry out its functions in a manner which does not impair the trust resources of the Tribe.

19.   By establishing the Kickapoo Reservation as a permanent homeland for Kickapoo Tribe and its members pursuant to the treaties referenced herein, the United States impliedly reserved for the Tribe and its members a sufficient amount of water to fulfill the purposes of the reservation, in order to make the Reservation a viable place to live for current and future generations.  That amount of water is the corpus of the trust created by the United States for the benefit of the Kickapoo Tribe and its members, and the United States has an affirmative obligation to protect the corpus from degradation or loss. In this instance this specifically includes the water rights and resources of the Upper Delaware River and its tributaries that either flow through or border upon or under the Kickapoo Reservation.

20.  The United States exercises elaborate assertion of and control over the water rights of

the Kickapoo Tribe and its members, pursuant to the federal treaties, statutes and Supreme Court case law referenced in this First Amended Complaint, and has a corresponding affirmative duty to protect said rights and resources.

21.   As stated herein, despite repeated requests from the Tribe for assistance with its water dilemma over the past several decades, the BIA and the Interior Department have failed to lift a hand of support, either administratively or through the initiation of litigation, to protect the Tribe's trust water resources and, inferentially, its homeland rights as protected by treaty.   The lone exception was the provision by the BIA of approximately $150,000 in funding to the newly formed Kickapoo Tribe – Nemaha Brown Joint Watershed Board in the mid-1980s to conduct feasibility studies for a General Watershed Plan for the development of the UDT Watershed.

22.   Failure of the United States to protect the trust water rights and resources of the Tribe and its members constitutes a breach of trust, and said breach is subject to corrective and remedial action by this Court.

## DAVID BARFIELD, IN HIS OFFICIAL CAPACITY AS CHIEF ENGINEER OF THE DIVISION OF WATER RESOURCES, OF THE KANSAS DEPARTMENT OF AGRICULTURE

23.   David Barfield and the Division of Water Resources of the Kansas Department of Agriculture administer Kansas statutory and regulatory law relating to the recognition, enforcement and administration of State-law based water rights.   K.S.A. 82a-701 through 82a-737; 82a-740; and K.S.A. 42-303; 313.

24.   Barfield and the Division of Water Resources have an obligation to recognize, respect and enforce the Federally reserved water rights of the Kickapoo Tribe under the *Winters* doctrine and other Federal law.

25.  To date, Barfield and his predecessors within the Division of Water Resources have not taken any affirmative steps to so recognize, respect and enforce said *Winters* water rights.

26.  By this action, the Tribe seeks a declaration of the existence of said rights, and priority date of said rights senior to all other existing and future State-law based water rights in the Upper Delaware River and its tributaries, and an order that Barfield and the Division of Water Resources have an obligation to administer, and so ordering the administration, of said *Winters* rights, vis-à-vis all other State-law based rights, surface and groundwater, as the senior rights in the watershed.

## DEFENDANTS THE PRESIDENT AND MEMBERS OF THE BOARD OF DIRECTORS, ACTING IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES, OF THE NEMAHA BROWN WATERSHED JOINT DISTRICT No. 7.

27.  The Nemaha Brown Watershed Joint District No. 7 ("Nemaha Brown") is a special district established under the laws of the State of Kansas, K.S.A., §§ 24-1201 *et seq*., for specified statutory purposes.  Under Kansas law, Nemaha Brown has taxing, regulatory and eminent domain authority, and may use these powers to enter into contracts such as the UDT Agreement to improve, maintain and operate works of improvement for its members.  K.S.A § 24-1209.  Nemaha Brown first entered into a formal partnership with the Tribe in 1983 to develop a General Watershed Plan for the UDT Watershed.  This led to specific plans by the partnership to develop numerous watershed projects under Public Law 83-566, the NRCS Small Watersheds Program.

28.  This partnership and the planning efforts carried out thereunder in the 1980s and early 1990s culminated in the 1994 UDT Watershed Agreement between the Tribe, Nemaha Brown, and the other named defendants herein – wherein Nemaha Brown expressly promised the

Tribe to exercise its power of eminent domain and condemn lands necessary for the Plum Creek project – described more fully in this complaint in the following paragraphs.

29.  Despite its express promises to the Tribe, Nemaha Brown and its Board of Directors knowingly and willingly participated in Federal and State cost-share programs, such as the Federal EQIP program and the Kansas Water Resources Cost-Share financial assistance program and the Kansas Watershed Dam Construction program, which enabled Nemaha Brown to develop portions of the watershed within its jurisdiction which ultimately violated the terms and conditions of the 1994 Agreement.

30.  Defendants Dexter Davis, President, Wayne Heiniger, Vice President, Glenn Hennigan, Secretary-Treasurer, Leo Wessel, Rodney Lierz, Jim Renyer, Roger Ploeger, David Zeit, and Rodney Heinen are the members of the Nemaha Brown Board of Directors.  They are named in this action in both their individual and official capacities, inasmuch as, on information and belief, their indeterminate tabling of the decision to proceed to condemn fee lands for the Plum Creek project, and their individual and collective actions to oppose the implementation of the 1994 Agreement are *ultra vires* their official duties as members of the Board and *ultra vires* their obligations under Kansas law, Federal law, and the UDT Agreement.

## FACTUAL ALLEGATIONS

**Introductory and general statement of the case.**

31.  The 1994 UDT Agreement, executed under the authority of the Watershed Protection and Flood Prevention Act of 1954 ("Small Watershed Program"), Public Law 83-566, 16 U.S.C. §§ 1001-1008, and in accordance with § 102(2)(c) of the National Environmental Policy Act of 1969 ("NEPA"), Public Law 91-190, 42 U.S.C. §§ 4321 *et seq*., was freely entered into by the the Tribe and Nemaha Brown in the months of April – June of 1994, and officially approved and

ratified by the United States Congress in 1998.  The Small Watershed Program and the 1994 Agreement, Tribe and Nemaha Brown are local "sponsors" of the project.

32.  Pursuant to the 1994 UDT Agreement, the Tribe and the Watershed Board are to fund the construction of twenty (20) smaller water, soil and flood retention structures and one (1) larger multi-purpose structure.  The larger structure is known as the Plum Creek Project, to be sited on Plum Creek, a tributary to the Upper Delaware River, partly within the exterior boundaries of the Tribe's Reservation.

33.  The Plum Creek project has been viewed by the Tribe for over three decades as the primary means by which it would secure the long-term, dependable and ultimately decreed rights to water to which the Tribe and its members are entitled as a matter of Federal law.

34.  Under the Supreme Court precedent established in *Winters v. United States*, 207 U.S. 564 (1908); and re-affirmed in *Arizona v. California,* 373 U.S. 546 (1963), and in numerous subsequent Federal and State court decisions, the Tribe and its members have reserved Federal water rights, called "*Winters* rights, sufficient to fulfill the purposes of the creation of its Reservation, first established in Kansas in 1832.  The Tribe's *Winter's* rights and those of its members are the senior rights on the Upper Delaware River and its tributaries. Under both Federal and State law, the water impoundment projects of junior users – and associated holders of State- law based water rights – cannot be approved, funded and constructed if they harm the rights of a senior right holder such as the Tribe.  The Plum Creek project is crucial to ensuring the senior rights of the Tribe were not adversely affected.

35.  As set out in more detail in this Complaint, since the date of execution of the UDT Watershed Agreement in 1994, the defendant Nemaha Brown and its Board members have engaged in deliberate funding and construction activities focused on the development of the

13

water resources of the Upper Delaware and Tributaries Watershed – while knowingly, purposefully and intentionally denying promised benefits of the UDT Watershed Agreement to the Kickapoo Tribe, benefits crucial to the legality of all other water-related developments in the watershed.

36.   The Board of Directors of the Nemaha Brown Watershed Joint District No. 7 ("Nemaha Brown") refuses to perform express contractual promises made to the Tribe and the other State and Federal parties to the UDT Agreement to condemn approximately 900 acres of the 1,297 acres of land required for the large multi-purpose dam and water storage project on Plum Creek.  The Tribe presently owns the balance of land, approximately 400 acres, needed for the project.   Nemaha Brown's refusal to proceed with condemnation has effectively stalled efforts by the Tribe as well as other parties to the Agreement to proceed with their express commitments.

37.   The use of its eminent domain authority by Nemaha Brown to condemn land for the Plum Creek project would be consistent with applicable law, as the project is designed to serve multiple underlined_public purposes including water storage, soil erosion and flood control, and water and fisheries-based recreation.

38.   On information and belief, because Nemaha Brown and its Board of Directors have found alternative means of developing the water resources of the watershed using State and Federal cost-sharing programs, Nemaha Brown and its Board have been able to avoid the express obligations to the Tribe under the 1994 UDT Agreement, as well as the financial expenses associated with fulfilling those obligations; and in doing so, they have illegally interfered with the Tribe's Federally reserved water rights.

39.   Michael Black and the Bureau of Indian Affairs are in violation of their fiduciary

14

obligations to the Tribe, which emanate from the treaties between the Tribe and the United States, other Federal law and policy relating to the protection of trust assets such as water, the 1994 UDT Agreement as well as other Federal laws which they are either responsible or co-responsible for administering, and Federal common law trust obligations to the Tribe, as set out in more detail herein.

40.   Defendants Nemaha Brown and its Board have, for many years prior to the execution of the UDT Watershed Agreement, sought the benefits of development of the Upper Delaware and Tributaries Watershed; have relied on the Tribe and Federal Bureau of Indian Affairs funding to secure approval of a general watershed plan for the Upper Delaware and Tributaries Watershed; and have relied on the Federal and State cost-share programs to provide funding in the watershed for dams, ponds, terraces and other structural conservation and land treatment measures which directly benefit Nemaha Brown, its Board, and the non-Indian landowners of the watershed.

41.   For over 30 years the Tribe has been seeking a way to secure a long-term, dependable source of water for its homeland and its Tribal members.  It has been working *in good faith* with Nemaha Brown and its Board since 1983 – a period of 28 years – to secure the multi-purpose Plum Creek project as part of the larger UDT Watershed Agreement.  At no time prior to 2003, when the Nemaha Brown Board of Directors first evinced its intent not to perform its obligations under the Watershed Agreement by *indefinitely tabling the vote to condemn private lands* within the Plum Creek project boundaries, has there been any indication to the Tribe that Nemaha Brown or its Board had any change of heart concerning its obligations under the Agreement.  The Tribe has been betrayed by the Nemaha Brown Board's refusal to proceed with the promised condemnation of the lands necessary for the Plum Creek multi-use project.

42.   As a direct consequence of the activities of the named defendants complained of herein, the Delaware River and its tributaries, flowing through the Kickapoo Reservation, are choked with so many dams, ponds, terraces, waterways and related impoundments that the river system currently cannot produce sufficient water quantity flows of adequate quality, to meet the homeland rights of the Kickapoo Tribe and the Kickapoo people.  The Tribe's water quality treatment plant, adjacent to its tribal offices in Horton, Kansas, is presently under a Federal Environmental Protection Agency notice of violation of the Federal Safe Drinking Water Act of 1974, Public Law 93_523 (Dec 12, 1974), 42 USC Section 300j *et seq*., and has been <u>continuously</u> since January of 2004.

43.   In times of natural drought such as that experienced in the summer of 2003, the combined effect of the drought and the man-made impoundments in the UDT Watershed cause the Upper Delaware River to run dry for long periods of time.  A generation ago the watershed was far more reliable for meeting the Tribe's needs, but upriver development has altered it radically.

44.   The  Bureau of Indian Affairs  has known for decades of the fragile and precarious nature of the Upper Delaware and Tributaries Watershed, of the Tribe's dependence upon that watershed, and thus of the fragile and precarious nature of the Tribe's water situation.  Given the trust obligation to protect the trust assets of the Tribe, it is therefore unconscionable that the Bureau of Indian Affairs would permit other Federal departments and agencies, as well as State of Kansas departments and agencies, to spend millions of dollars to develop the non-Indian water resources in the watershed in violation of and interference with the *Winters* rights of the Tribe and its members.

45.   Consequently, there is no other recourse for the Tribe but to bring this action to

compel the Nemaha Brown Board to specifically perform its obligations under the UDT Agreement, and to hold Michael Black and the Bureau of Indian Affairs accountable for their role in permitting the depletion of the water resources of the UDT watershed, and infringing upon the Federal *Winters* water rights of the Tribe and its members.

**The Kickapoo Tribe faces chronic natural and man-made water shortages.**

46.   The Kickapoo Tribe in Kansas is a Federally recognized Indian tribe and has occupied its present territory since the 1832 Treaty of Castor Hill, twenty-nine years prior to the Kansas Statehood Act of 1861.  Currently, the Kickapoo Tribe and its members own over 6,000 acres of the 19,200 acres of land that lies within the Kickapoo Reservation boundary.

47.   In the mid-1970s, the Tribe constructed its own water treatment and supply system with financial assistance from the U.S. Economic Development Administration.  The Tribe also established a Tribal Environmental Office supported by the U.S. Environmental Protection Agency.  The Tribal water system includes a low water impoundment dam on the Delaware River, an intake and raw water pump station, water treatment plant, and distribution system.  The Tribal water treatment plant was constructed in accordance with Federal drinking water quality standards.  The low water impoundment dam was developed merely as a temporary supply measure to serve the Tribe until a permanent upstream reservoir on Plum Creek could be developed.

48.   During the drought of 2003 the Delaware River, and its upstream tributaries, were completely without flow for over sixty days due to the severe weather conditions in the Midwest and Western States, as well as the adverse effects of upstream impoundments developed by the named defendants.  The Tribe was forced to severely ration water and truck over 7,000,000 gallons of drinking water to the Reservation.  The Tribe's commercial operations as well as

individuals and families were forced to cut water consumption by almost 60%.

49.   Sadly, these climate extremes are not new, unknown, or an unexpected part of living in Northeast Kansas, where the Tribe was forcibly relocated in the 19th Century, unlike in the Tribe's original homeland in the Lower Great Lakes.  Thus the Kickapoo Reservation faces off-again–on-again drought conditions resulting in a continual crisis in obtaining an adequate and reliable water source to meet the basic health and sanitary needs of the Kickapoo people.

50.   As a direct and foreseeable consequence of the water resource development activities undertaken by Nemaha Brown and its Board, however, the natural drought fluctuations and resulting water shortages which have beset the Upper Delaware River and the Kickapoo Tribe have been badly exacerbated.  This result could and should have been foreseen by Nemaha Brown and its Board, which had been a partner of the Tribe's since the late 1970s, and which has a contractual obligation pursuant to the 1994 UDT Agreement to assist the Tribe in the development of the Plum Creek project, so as not to interfere with the Tribe's water rights.  The result also should have been foreseen by the Bureau of Indian Affairs, which has a fiduciary obligation to the Kickapoo Tribe and its people to protect their land and water resources – their homeland.

51.   The Kickapoo Water Treatment Plant currently supplies water to both Indian members and non-Indians alike who live within the Reservation boundaries. The Tribe operates its own Tribal School – grades K through 12 – and would like to supply water to this facility, but they are unable to supply the school with water from their own water supply.  Several economic development opportunities for the Kickapoo people have been lost over time because the Kickapoo Tribe could not ensure that the Tribe's water works could meet their water needs.  The Tribe had to forego a State housing program which would have provided funds to build homes

for tribal members, due to a lack of a dependable water supply.   The lack of water is also restricting the economic growth and development of the Kickapoo people.

52.   The Tribe also provides basic fire protection to all Reservation residents, both Kickapoo tribal members and non-Indians alike, under mutual aid agreements executed with neighboring jurisdictions.   The Tribe's ability to do so, however, is severely impaired by the lack of water.   Reservation residents and numerous Tribal structures are in constant danger.   In March of 2005, an arsonist set a large fire on Kickapoo lands, destroying 1,500 acres.   Without the aid of neighboring communities, a larger land area, including homes and other structures, would likely have been destroyed due to the shortage of water.

53. The Kickapoo Tribe has been under EPA violation notice continuously since January 2004 because its water does not meet standards set under the Safe Drinking Water Act of 1974, Public Law 93-523 (Dec 12, 1974), 42 USC Section 300j *et seq*.

54.   The water hauling expenses incurred in the drought of 2003 were covered in part by the Federal Bureau of Indian Affairs and Bureau of Reclamation, in recognition of their trust responsibility to provide safe drinking to Indian people; indeed a cruel irony, given that the *Winters* rights of the Tribe and its members to water are the most senior on the Upper Delaware River system.   The United States has an affirmative obligation to protect the Tribe's *Winters* rights in the UDT watershed, not to deliberately permit their depletion, and then haul water to the Tribe and its members under emergency conditions partly of its own making.

**The Plum Creek Project is intended to both alleviate short-term water shortages and to provide a long-term dependable source of water for the Tribe, its members and other residents of the Reservation.**

55.   Since the mid 1970s the Tribe has worked continuously to develop a long-term, dependable water supply.   For over 30 years the Tribe has looked to the Plum Creek Dam and

Reservoir to fulfill its *Winters* rights and to provide an answer to its water shortages.  As the first step in that process, in 1978, Nemaha Brown submitted to the Soil Conservation Service a general watershed plan for the development of the Upper Delaware and Tributaries Watershed. In March of 1983, Nemaha Brown and the Tribe signed a co-sponsorship agreement on PL-566 structures and formed a Joint Watershed Board.  The Tribe was the first in the nation to become a local sponsor under the Small Watersheds Program, and as such was able to secure $150,000.00 in funding from the BIA to make the more detailed watershed planning process possible.  Without the BIA funds Nemaha Brown would not have been able to complete its watershed plan to submit to NRCS; the first step in the Federal funding process.

56.  Between 1983 and 1994, the Tribe, Nemaha Brown and SCS/NRCS analyzed and selected viable sites for flood retention dams ("FRDs") and related land treatment activities to be part of the final UDT Watershed Plan, to be funded and built with PL-566 Small Watershed Program dollars, as well as Tribal and other State and local watershed district funding.

57.  Specifically, the joint Kickapoo Tribe and Nemaha Brown Board met in 1989 for the purpose of reviewing the feasibility of the dam's sites under the project, and jointly approved the sites under consideration.

58.  Nemaha Brown Board Meeting minutes in the 1980s and 1990s indicate that the District participated <u>willingly</u> and <u>actively</u> in the site selection, analysis and survey work for both the Plum Creek multi-purpose site as well as the 20 other sites under consideration for FRDs. Neither Nemaha Brown nor its Board ever expressed any uncertainty or unwillingness regarding their interest in being a part of the project under PL-566 with the Tribe, the State and the United States.

59.  Public meetings sponsored jointly by the Kickapoo Tribe and Nemaha Brown were

held in 1990 and 1991 to explain the nature and scope of the project to interested individuals, communities, and the like.

60.  In May through June of 1994, the Kickapoo Tribe entered into the UDT Agreement with Nemaha-Brown, the Atchison, Brown, Jackson and Nemaha Counties Conservation Districts, the NRCS, and the State of Kansas, to jointly develop the Upper Delaware and Tributaries Watershed.  This program would allow cost-sharing of flood control and water supply projects within the entire Upper Delaware River watershed, under the PL-566 Program.

61.  As part of the 1994 UDT Agreement, a Watershed Plan and Environmental Impact Statement ("EIS") document was jointly signed, and legally adopted by all Federal, State, local and tribal parties in June of 1994.  It set forth an express plan to control erosion, provide drinking water and reduce flooding for the entire watershed, through the construction of 20 small FRDs and one large, multi-purpose water storage project, the Plum Creek dam and reservoir, designed to provide a reliable long-term water supply for the Kickapoo reservation.

62.  The 1994 UDT Agreement was the binding legal framework for the four partner team effort to develop Plum Creek that was started in 1978 between the United States government, the State of Kansas, the Brown Nemaha Joint Watershed District No. 7, and the Kickapoo Tribe.

63.  Plum Creek is a 400 acre _water_ surface area and 1200 acre _land_ area, multi-use reservoir that will provide for sufficient water to meet the present and future needs of the Kickapoo Reservation and its Indian and non-Indian residents.  The lake's size, location and uses were determined by the participating Federal and State government agencies.  The majority of the costs associated with building Plum Creek are to be paid for by the Tribe.

64.  Under the PL-566 Small Watersheds Program, the Plum Creek project will be a cost-

sharing arrangement whereby the Kickapoo Tribe will finance 66% of the construction costs and 100% of the costs of the water supply intake system. The total cost of construction of the dam was estimated by the USDA-NRCS at approximately $4,040,000.

65.  A notice of the EIS was published in the Federal Register on May 13, 1994.  59 Fed. Reg. 25,050 (1994).  No comments were received from Nemaha Brown or its Board members, or any landowners in the District, opposing the project.

66.  Under the UDT Agreement, the Kickapoo Tribe is responsible for the purchase of all land rights within the Plum Creek Reservoir Project area, with the express promise by Nemaha Brown to exercise its powers of eminent domain to acquire the identified lands should the exercise of such power become necessary.

67.  The need for a joint agreement with Nemaha Brown was simple.  PL 83-566 projects require at least one local sponsor with eminent domain authority to acquire the necessary lands. Without the agreement of such a local sponsor, NRCS will not enter into a project agreement and release planning funds to begin the initial phases of the project.  The Tribe possesses the legal authority to condemn *Indian* trust lands within its jurisdiction pursuant to Federal law, but Federal law generally prohibits the exercise of Tribal condemnation authority over fee lands owned by non-Indians within its Reservation boundaries.

68.  On June 30, 1994, the United States Army Corps of Engineers ("ACE") issued a § 404 Clean Water Act permit – Permit # DA-199401028 – for the Plum Creek project to Nemaha Brown Watershed District.  Revised special conditions for the permit to Nemaha Brown were issued by the Corps of Engineers dated October 16, 2002.  Nemaha Brown has never notified the ACE of its opposition to the development of the Plum Creek project, or of its intent not to carry out the permitted activities under the Clean Water Act permit.

22

69.   In 1998, the parties to the 1994 UDT Watershed Agreement obtained final Congressional authorization for the development of the UDT Project, including Plum Creek, under the Federal PL-566 program.  Nemaha Brown and the other State and Federal parties to the Agreement participated actively in the Congressional approval process.

70.   Due to delays attributable solely to the refusal of Nemaha Brown to perform under the UDT Agreement, all costs related to land acquisition, construction and related matters have increased significantly, and all cost increases due to the delay or failure of a party to perform are exclusively the responsibility of Nemaha Brown to reimburse the Tribe, under the *express* terms of the Agreement and EIS.

## Land Acquisition Efforts – Opening of the Tribal Land Office.

71.   In 1999, at a meeting of the Tribe, NRCS, and Nemaha Brown, land rights acquisition was identified by NRCS as the first step in the process following Congressional authorization.  The Nemaha Brown Board was fully aware of its express obligations under the 1994 UDT Agreement regarding land rights acquisitions, and fully aware that under Federal law the Tribe would not be able to condemn fee lands held by non-Indians should the exercise of that authority be necessary.

72.   As recently as September 2000, the Nemaha Brown Board unanimously reaffirmed in a formal Board resolution and voted its continued support for and participation in the UDT Project under the PL-566 Program.

73.   In April of 2002, a NRCS 5-year feasibility analysis reaffirmed the viability of the project under the PL-566 UDT Watershed Agreement.

74.   On March 12, 2003, the Kickapoo Tribe hosted a meeting with the Nemaha Brown Board President and other Board representatives to discuss initiating the process for obtaining

land rights, and the use of Nemaha Brown's eminent domain authority.  The Nemaha Brown Board expressed <u>no</u> reluctance at that time to proceeding with its contractual commitment to condemn land for the Plum Creek Project.

75.   In April of 2003, the Kickapoo Tribe opened a Land Office for the purpose of purchasing the land needed for the Plum Creek Reservoir.  Certified appraisals of the fee land in question were purchased by the Tribe at substantial expense.  Offers to purchase were sent first by certified letter dated May 12, 2003, and again by certified letter dated May 12, 2005, by the Kickapoo Land Office to the landowners in question.  A number of individual telephone calls and meetings were arranged by the Land Office and individual land owners.  A variety of incentives, notably offers at twice the appraised value, were made.  The Tribe also offered to exchange tracts of land with individual landowners, *in lieu* of outright purchase.

76.  To date only <u>one</u> of the landowners has accepted an offer of purchase from the Tribe. In 2004, the Tribe successfully acquired 230 acres of privately held land within the site 21-14 project boundaries, from the Stuckey family.

77.  The Plum Creek project and the rest of the UDT Project cannot proceed – NRCS will not release any Federal funds or seek Federal appropriations for this specific project – until Nemaha Brown performs under the UDT Agreement and moves forward with the condemnation of the needed lands for Plum Creek.  Once Nemaha Brown's condemnation authority is used, the Tribe is responsible for the cost of land acquisition.  The Tribe is ready, willing and able to come forward with these funds, as required by the UDT Agreement.

78.  On July 24, 2003, the Nemaha Brown Board met and passed a resolution "not [to] proceed with condemnation at this time," and to "revisit the issue" once the Tribe made an effort to negotiate with the landowners.  The motion was seconded and carried by unanimous vote.

This is little more than a stall tactic by the Board; it is fully aware of the Tribe's efforts – largely unsuccessful – to purchase or exchange lands with the private landowners.

79.   In January of 2004, several public information sessions and presentations were provided by the Tribe to answer the public's questions and hear their concerns regarding the Plum Creek Project.

80.   In January of 2004, the Nemaha Brown Board met and tabled <u>indefinitely</u> a resolution to "proceed with condemnation at this time."

81.   Most recently, by letter dated June 28, 2005, then-Chairman Steve Cadue sent a letter to Nemaha Brown Board President Dexter Davis, requesting the Board to act on its obligations, and attaching copies of all of the letters of offer made to the fee land owners.

82.   Under the 1994 UDT Agreement with the Tribe, Nemaha Brown has an express commitment and obligation to condemn the fee lands within the Plum Creek project boundaries should the Tribe's purchase efforts fail, as they so far have.  Significantly, the UDT Agreement did not give Nemaha Brown the option of later voting to reject the Agreement or their obligations under the Agreement.  The Agreement provides a mechanism for parties to <u>modify</u> the Agreement.  Since the date of execution of the Agreement in 1994, Nemaha Brown has never sought to modify the Agreement or its obligations thereunder.  Nemaha Brown is simply refusing to perform their part of the Agreement, and thus is in breach of its contractual obligation to the Tribe.

83.   Dexter Davis, Board President, and the other Nemaha Brown Board members named herein have an obligation under Kansas and Federal law, and under the UDT Agreement itself, to honor and effectuate all legal and contractual obligations of the Watershed District.  By virtue of their refusal to proceed with land condemnation for the Plum Creek Project, they acting *ultra*

*vires* their authority and obligations under State and Federal law and the UDT Agreement.

84.  Out of frustration, the Tribe has also requested that the Bureau of Indian Affairs and the Department of the Interior, its trustee, exercise <u>Federal</u> condemnation authority to acquire the lands for the Plum Creek project.  The Department and the Bureau have effectively denied the Tribe's request that it exercise Federal condemnation authority.

**<u>Water development activities by the State and Federal defendants, in violation of the UDT Agreement, trust obligations to the Tribe, and Federal and State law, continue unabated within the UDT Watershed.</u>**

85.  Notwithstanding the recent refusal of Nemaha Brown to perform its contractual obligations, since 1994 Nemaha Brown has been involved in a complex process to develop many, many flood retention dams and other water storage projects within the UDT watershed, under several State and Federal cost-share programs.

86.  In written and oral reports over the intervening years, NRCS Staff have boasted to the Nemaha Brown and the county conservation districts that more dams and impoundments have been built with Federal dollars in Nemaha Brown's UDT Watershed District than any other watershed district in the State of Kansas.  The Tribe has obtained these reports and minutes of meetings through requests filed under the Federal Freedom of Information Act.

87.  Many impoundments have also been built in the UDT Watershed with KSCC cost-share funds.  Records of these activities have been obtained by the Tribe from KSCC, Nemaha Brown and the conservation districts through requests under the Kansas Open Records Act. These impoundments, and other related structural components have been completed and installed at significant damage to the water resources of the Tribe.

88.  In addition to the damage to the Tribe's rights and resources, the net effect has been to create a situation wherein the Nemaha Brown Board, and the District and its members, have

been receiving, and continue to receive, the benefits of the bargain it struck with the Tribe and other State and Federal partners to develop the water resources of the UDT watershed: namely, the benefits of State and Federal cost-share programs with which to make water storage, soil erosion, and other improvements on their private lands as they would have received under the PL-566 funded UDT Watershed Project.  Yet, by Nemaha Brown refusing to perform its promise to condemn land, the Tribe is the only partner to the 1994 UDT Watershed Agreement not receiving what it was promised.

**Specific Benefits Received by Nemaha Brown from NRCS Activities in the UDT Watershed since 1994.**

89.  NRCS has admitted, in response to several Freedom of Information Act requests in the past six months, that it expends substantial Federal human and financial resources within the geographic limits of the UDT Watershed for various agricultural improvements on private lands.

90.  Of greatest concern to the Tribe's water resources is the Environmental Quality Incentives Program ("EQIP").  The EQIP program is extensive in the UDT Watershed, and numerous forms of "improvements" are made upriver from the Kickapoo Reservation with these funds, many of which can and do have an adverse impact upon the quantity and quality of water in the Delaware River that arrives at the Tribe's water intake structure on the Reservation.

91.  Through the EQIP program, according to NRCS records, between 1997 and 2005 NRCS has invested $1,409,344 million in improvements in Brown County, and $4,329,095 in Nemaha County, for a total of about $5.7 million over that 8 year period.  Landowners in Nemaha County, for example, received a total of $500,000 between 1998 and 2005 for the construction of "ponds" on private lands within that county.  Landowners in Brown County received a similar amount for ponds in that same time period.  The designation "ponds" is one of

several under which water impoundments are funded by NRCS.

92.  It is presently not precisely known how NRCS has allocated the $5.7 million among the landowners in Brown and Nemaha Counties between 1997 and 2005. But one list obtained from NRCS indicates that about 425 farms/landowners received EQIP funds for ponds, land terraces and other related improvements over that time period in those two counties.

93.  It is known that on average, annually between 1994 and the date of this action, NRCS has funded through the EQIP and related programs the construction of dozens of water dams and storage facilities, land terraces and other forms of water impoundments within the UDT watershed.  The most recent data obtained through FOIA indicates that of all EQIP funded activities within the UDT Watershed, the construction of ponds and terraces have far and away been the most active programs, accounting for approximately 50% of the EQIP funding over the programs' life span.

94.  Many of these ponds and other water diversion structures are either the same flood retention dams and other forms of water impoundments, in the same or very similar locations, as those that were to have been built under the UDT Watershed Agreement with the Tribe, or are projects built on the same private lands or within the same sub-watersheds as those planned under the UDT Watershed Agreement.

95.  There is a substantial and growing body of evidence indicating that federal funding has been invested in the UDT Watershed by the NRCS for the direct benefit of Namaha Brown, to produce the same water storage, flood prevention and soil erosion control benefits as intended by the UDT Project, except that the Tribe is not seeing the benefits of the Agreement, since the Plum Creek Project has not moved forward due to the refusal of Nemaha Brown to vote on whether to condemn lands needed for the project.  As a direct consequence the Tribe continues to

face EPA Drinking Water Act violations for the dangerous quality of water produced at the Tribe's treatment plan, and suffers the other numerous economic and social disruptions described herein.

## Kansas State Conservation Commission Activities Specifically Benefitting Nemaha Brown Within the UDT Watershed.

96. The KSCC has the responsibility to administer Kansas conservation and watershed laws. It also works directly with federal agencies, such as NRCS, as well as local conservation districts and watershed districts, to administer a broad array of federal and state programs, ostensibly to improve water quality, reduce soil erosion, conserve water and reduce flood potential.

97. NRCS has a unique partnership with the KSCC and local conservation and watershed districts. Conservation districts in Kansas have working mutual agreements with the NRCS and the State of Kansas. Conservation districts provide grassroots input to the NRCS. Their offices are usually co-located with NRCS in USDA Service Centers. Of specific relevance and importance to this action, the KSCC and the local conservation districts also receive administrative funds from the NRCS to provide services to NRCS in the allocation and distribution of federal funds to private landowners within the Upper Delaware River watershed.

98. The KSCC uses funding from the State Water Plan Special Revenue Fund to support ten administrative programs. The special revenue fund has been in existence since FY 1991. Programs of note in the area of water quantity and quality include the Water Resources Cost _ Share Program, providing state financial assistance to landowners for water conservation practices; and the State Assistance to Watershed Dam Construction program, providing state financial assistance to watershed districts and other special purpose districts for the

implementation of structural and non-structural practices.

99.  On information and belief, dozens of water-restricting dams and impoundments, land terraces, and the like, have been built with KSCC funding, primarily through its cost-share and dam construction programs, in the UDT Watershed since 1991.  Nemaha Brown and its Board and members are direct beneficiaries of these programs, to the detriment of the Tribe and its water rights and resources.

**Nemaha Brown Activities Within the UDT Watershed.**

100.  The 1994 UDT Watershed Agreement and Project called for 1 multiple-use site and 20 smaller flood retention dams ("FRDs").  The general site planning for the determination of feasible sites for FRDs and multi-purpose sites was commenced in the 1980s with the use of funds obtained by the Tribe from the U.S. Department of the Interior, Bureau of Indian Affairs.

101.  At a February 22, 1990 Special Meeting of the Nemaha Brown Board, the Board unanimously approved the NRCS list of PL-566 sites to be constructed as part of the 1994 UDT Agreement and Project.

102.  To date, none of these approved dam sites was ever constructed under the 1994 UDT Agreement with PL-566 funding but, as will be detailed below, with Nemaha Brown endorsement and involvement, many impoundments have been built on the same land, or in the same vicinity, as the original PL-566 sites under the UDT Agreement.  Funding for the impoundments and related land treatment projects has instead come from State cost-sharing and dam construction programs implemented on a local level through Five Year Plans, and through Federal cost-sharing programs funded by the NRCS with the administrative assistance of the KSCC.

103.  There is evidence in the minutes of the Nemaha Brown Board meetings that, over

the past twelve years since the UDT Agreement was executed, the Board has deliberately engaged in the practice of relocating and reprogramming sites – sites both selected and/or rejected as PL-566 sites under the UDT Agreement – as sites eligible for State cost-share and dam construction funding through the KSCC, by prioritizing said sites on its Five Year planning and construction lists to the KSCC.

104.   For example, according to the minutes of an April 1995 meeting of the Nemaha Brown Board, the Board considered and approved its Five Year Plan.  Importantly, Site 7-19 [Leo Wessel property] is on the Five Year Plan.  Site 7-19 is also one of the PL-566 selected sites under the UDT Watershed Plan.  Leo Wessel was at the time on the Nemaha Brown Board of Directors, and remains on the Board at the time of this action.

105.   The same Nemaha Brown Five Year Plan contains another PL-566 approved site – a site owned by one Gary Edelman – Site 14-17.  Edelman's site is on the Nemaha Brown Five Year Plan for years 1995, 1996 and 1997. At this point the evidence is inconclusive whether this site was ever built with KSCC cost-share funds, or other Federal NRCS cost-share program funds.  That information has been requested from Nemaha Brown but to date it has not been produced to the Tribe under the Kansas Open Records Act.

106.   Additionally, according to the minutes of a 1999 meeting of the Nemaha Brown Board, the David Eisenbise site – Site 28-10B – is discussed as part of the Five Year Plan for State cost-share funding.  This site is also one of the final recommended sites for the PL-566 site plan.  According to the minutes of the December 2004 Nemaha Brown Meeting, bid notices went out on the Eisenbise site that month and construction proceeded soon thereafter.

107.   Further evidence of moving dam sites from one program to another can be found in the minutes of the October 2002 Nemaha Brown Board meeting: "Rick Meggison site (Site 9-

31A) is on the PL-566 site list, but Meggison wants to be taken off the Nemaha Brown Five Year Plan list, since he already has built a couple of EQIP ponds on his property and so at this time he is not interested in a cost-share watershed dam.  Will be taken off the Five Year Plan next spring when revisions are made."

108.   According to its own records, Nemaha Brown has been an active partner in the construction of 53 dams within the UDT Watershed during the time period when it was presumably an active participant and supporter of the 1994 UDT Agreement with the Tribe.

109.   Despite this behind the scenes activity by the Board and the landowners within its jurisdiction, Nemaha Brown continued to publicly support the UDT Agreement.   At its September 7, 2000 Meeting, Nemaha Brown voted unanimously to sign the Supplemental Watershed Agreement #1 regarding the Plum Creek Multiple Use site.

## CAUSES OF ACTION
## COUNT ONE

**Declaration of the Existence of *Winters* Water Rights in the Kickapoo Tribe and Its Members, of the Obligation of Named Defendants to Protect and Preserve Said Water Rights, and of the Consequent Violation of and Interference With Said Rights by Defendant Federal and State Departments, Agencies and Special Districts, and Request for Injunctive Relief Against Defendants for Actions Taken Contrary to Said Rights.**

110.  Paragraphs 1 through 109 are incorporated herein by reference.

111.   By virtue of the establishment of a land Reservation for the Kickapoo Tribe and its members pursuant to the Treaty of Castor Hill in 1832, the Tribe and its members are entitled to sufficient water rights from the Upper Delaware River and its tributaries both within the Reservation boundaries and upstream thereof, to fulfill the purposes for the creation of said Reservation.  These water rights are commonly known as *Winters* water rights.

112.  These *Winters* water rights are for all reasonable and foreseeable uses – domestic,

commercial, municipal, industrial, agricultural and cultural – necessary to fulfill the purposes of the Reservation, both at present and in the future.

113.  These *Winters* water rights are Federal water rights, have a priority date of 1832, and cannot be lost, forfeited or abandoned due to non-use.

114.  These *Winters* water rights are the senior water rights within the Upper Delaware and Tributaries Watershed in Kansas and are affirmatively enforceable as against all other water users and uses within said watershed.  Both Federal and State law provides that junior water users cannot injure or prevent the Tribe's use and enjoyment of these rights.

115.  It is the affirmative obligation of the Federal and State defendants named herein to recognize, protect and preserve the *Winters* water rights of the Tribe and its members, and not interfere with, impair or injure said rights.

116.  By virtue of their actions described in detail herein, the named Federal and State defendants have failed to recognize, protect and preserve said water rights and have acted and continue to act in violation and contravention of these water rights.

117.  By virtue of the foregoing, the Tribe seeks a declaration of the existence of Federally reserved Winters water rights in the name of the Tribe and its members, a declaration that these rights are the senior water rights in the Upper Delaware and Tributaries Watershed, and seeks the issuance of mandatory injunctive relief preventing all named defendants from taking actions which violate the Tribe's senior water rights.

## **COUNT TWO**

**Violation of the Federal Statutory and Common Law Trust Obligations to the Kickapoo Tribe, and the Administrative Procedures Act, by  Michael Black in his official capacity as Director of the Bureau of Indian Affairs**.

118.  Paragraphs 1 through 117 are incorporated herein by reference.

119.  Michael Black and the BIA have the primary trust obligation to the Tribe, and this requires them to protect the viability of the Tribe's water and land resources.  Pursuant to the several treaties with the Tribe, most notably the 1832 Treaty of Castor Hill, the United States expressly reserved lands in trust for the Kickapoo Tribe as a Reservation, and the United States and all of its executive branch departments have an obligation to protect sufficient water and water rights to provide a viable land Reservation and homeland for the Tribe and its members.

120.  Michael Black  and the BIA have an affirmative obligation to enforce the American Indian Agricultural Resource Management Act of 1993, 25 U.S.C. §§ 3701 et seq., wherein the United States expressed its "trust responsibility to protect, conserve, utilize, and manage Indian agricultural lands consistent with its fiduciary obligation and its unique relationship with Indian tribes."

121.  Under Federal common law, Michael Black and the BIA have an enforceable trust duty to protect the corpus of the trust, the water rights and resources of the Tribe, and not to permit the water resources of the Upper Delaware River to be developed in such a way as to interfere with the quality and quantity of the water rights and resources of the Tribe.

122.  Michael Black and the BIA have an obligation to prevent other Federal agencies from carrying out any Federal program implementing activities which are in conflict with the water rights and resources of the Tribe.  This obligation to the Tribe has been ignored, to the direct injury of the Tribe.

123.  Michael Black and the BIA have violated other Federal statutory and common law trust obligations to the Tribe as described in this Count and throughout the body of this Complaint,  specifically: (1) 25 U.S.C. §§ 1632(4) and (5), wherein Congress Stated that "it is in the interest of the United States, and it is the policy of the United States, that all Indian

communities and Indian homes, new and existing, be provided with safe and adequate water supply systems and sanitary sewage waste disposal systems as soon as possible," because, "many Indian homes and communities still lack safe water supply systems and sanitary sewage and solid waste disposal systems"; (2) 25 U.S.C. § 4301(a)(9)(B), wherein Congress expressly found that "the United States has an obligation to assist Indian tribes with the creation of appropriate economic and political conditions with respect to Indian lands to facilitate economic ventures with outside entities that are not tribal entities"; and (3) the Federal common law of the United States, pursuant to which the United States has a trust responsibility to protect the trust assets of the Kickapoo Tribe and its members, including their land and water resources.

124.  By their conduct described herein, Michael Black and the BIA have acted in ways which are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as specified in the body of this Complaint, and have specifically denied relief requested by the Tribe, also in violation of applicable law.  5 U.S.C. § 706(2).

125.  By virtue of the foregoing, the Tribe seeks a declaration that Michael Black and the BIA have violated Federal statutory and common law in the several ways described herein, and seeks the issuance of mandatory injunctive relief against Michael Black and the BIA to compel them to comply with obligations under Federal statutory and common law.

## COUNT THREE

**Declaration of Failure to Perform Express Obligations under Contract by Dexter Davis, President, and All Other Officers and Members of the Nemaha Brown Board of Directors, and Request for Order of Specific Performance.**

126.  Paragraphs 1 through 125 are incorporated herein by reference.

127.  The contract at issue in this action was executed in 1994 and approved by Congress in 1998, whereby the Tribe, the Board of Directors of Nemaha Brown, and other State and

Federal entities agreed to perform specific commitments which would lead to the construction of the UDT Watershed Project.  The contract terms, and the respective duties and responsibilities of each party, are clear and unambiguous.

128.  It has been the intention of all parties to the Agreement since its inception to fulfill all terms and conditions of the Agreement.

129.  NRCS and KSCC have expended substantial financial resources within the UDT Watershed since the execution of the 1994 UDT Agreement, building water impoundments and other water storage facilities and land treatment measures.  As a direct consequence, the Nemaha Brown Watershed District and its Board members have received and will continue to receive all the benefits of the 1994 UDT Agreement.

130.  To date, the Tribe has performed all of its obligations under the Agreement.  Private landowners within the Plum Creek Project, with one exception, have refused the Tribe's generous offers of sale or exchange, thus necessitating the exercise of the promised eminent domain authority by Nemaha Brown.

131.  Since January of 2004, Dexter Davis, President of the Nemaha Brown Board, and all other Officers and members of the Board, have tabled indefinitely the decision to condemn the necessary property.  This decision not to proceed with its obligations, and other specific conduct undertaken by the Board and its members, is in breach of the UDT Agreement and is *ultra vires* the Board's obligations under Federal and State law.

132.  An award of damages against Dexter Davis and other officers and members of the Nemaha Brown Board for failure to perform is an inadequate remedy for the injuries suffered by the Tribe and its members.

133.  By virtue of the foregoing, the Tribe seeks a declaration that Dexter Davis and the

other officers and members of the Nemaha Brown Board of Directors are in breach of the UDT Agreement with the Tribe, and seeks mandatory injunctive relief compelling them to specifically perform their obligations under the contract.

## COUNT SIX

**Limited and Specific Recovery of Damages Against Dexter Davis, President, and All Other Officers and Members of the Nemaha Brown Watershed District Board of Directors for Failure to Perform its Particular Obligations Under the UDT Agreement in a Timely Fashion, and Resulting Cost Increases Imposed Upon the Tribe.**

134.  Paragraphs 1 through 133 are incorporated herein by reference.

135.  Pursuant to the express terms of the UDT Agreement and EIS, all parties thereto expressly agreed to assume responsibility for all increased costs associated with the implementation of the Agreement resulting from the failure to perform obligations and commitments in a timely fashion.

136.  Under these express terms Nemaha Brown and its Board have, by virtue of their refusal to perform express obligations under said Agreement in a timely and responsible fashion, directly caused the costs to the Tribe associated with the various phases of the completion of the projects under the UDT Agreement to increase substantially.

137.  The Tribe is entitled to the enforcement of these express contract terms, and an award of damages directly associated with increased costs due to the delays caused by Nemaha Brown should therefore not jeopardize the request of an order of specific performance.

## PRAYER FOR RELIEF

Based upon the above, the Tribe respectfully seeks:

1.  An order declaring the existence of Federal reserved *Winters* water rights from the Upper Delaware River and Tributaries watershed, in the name of the Kickapoo Tribe and its

members, in sufficient quantities to fulfill the purposes of its Reservation, with a priority date of 1832, making it the senior right in the watershed and declaring the other parties to this action to be in violation of Federal and State law by virtue of the actions described herein which have injured the Tribe's right to the use and enjoyment of said rights;

2.  An order from the Court declaring Michael Black and the BIA, to be in breach of their fiduciary obligations to the Tribe arising out of Federal statutory and common law to protect the water and land rights and resources of the Tribe;

3.  An order declaring Michael Black and  the BIA, to be in violation of the Federal Administrative Procedures Act, 5 U.S.C. § 706(2), arising out of their  denial of requests by the Tribe to take various actions to prevent other parties to the 1994 UDT Agreement from violating both the agreement and jeopardizing water rights and resources of the Tribe.

4.  An order declaring Dexter Davis and the other officers and members of the  Nemaha Brown Board of Directors to be in breach of contractual obligations to the Tribe, and accordingly ordering specific performance of the promise to exercise its eminent domain authority to condemn lands necessary for the Plum Creek Project;

5.  An order declaring Dexter Davis and the other officers and members of the Nemaha Brown Board to be acting *ultra vires* their obligations under State and Federal law by virtue of the indefinite tabling of a decision and refusal to proceed with its express condemnation promise under the UDT Watershed Agreement, and other specific conduct;

6.  An award of damages against Dexter Davis and the other officers and members of the Nemaha Brown Board under the terms of the UDT Agreement, by virtue of their refusal to perform express obligations under said Agreement in a timely and responsible fashion, thereby directly causing the costs associated with the various phases of the completion of the projects

38

under the UDT Agreement to increase substantially;

7.  All orders of mandatory and affirmative injunctive relief necessary to effectuate the prospective relief against defendants pled in the body of this Complaint;

8.  All other orders and instructions to the parties necessary to effectuate the UDT Watershed Agreement and all Federal statutory and common law obligations to the Tribe herein above Stated;

9.  An award of attorneys fees and costs to the Tribe arising under applicable State and Federal law, including the Equal Access to Justice Act, 5 U.S.C. §§ 504 *et seq.*

10.  All further relief that this Court deems just.


DATED this 22nd day of December, 2011.


                                        */s/ Steven Carl Moore*

                                        _____
                                        Steven Carl Moore, Esq., Colorado Bar #9863
                                        K. Jerome Gottschalk, Esq.,New Mexico Bar #3799
                                        **NATIVE AMERICAN RIGHTS FUND**
                                        1506 Broadway
                                        Boulder, Colorado 80302-6296
                                        smoore@narf.org


                                        */s/ Amelia C. Holmes*

                                        _____
                                        Amelia C. Holmes, Esq.  Kansas Bar #20346
                                        Kickapoo Tribal Legal Department
                                        **KICKAPOO TRIBE IN KANSAS**
                                        Post Office Box 110
                                        1107 Goldfinch Road
                                        Horton, Kansas 66439
                                        holmesameliac@yahoo.com