**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| KICKAPOO TRIBE OF INDIANS OF THE KICKAPOO RESERVATION IN KANSAS, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 06-2248-CM-DJW |
| v. | ) ) | |
| MICHAEL BLACK, in his official capacity as Director, BUREAU OF INDIAN AFFAIRS, UNITED STATES DEPARTMENT OF INTERIOR, *et al.*, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**Memorandum in Support of Watershed District's**
**Motion for Summary Judgment**

**Contents**

**Contents** ........................................................................................................ i

**Table of Authorities** .................................................................................. vii

**Nature of the Case** ...................................................................................... 1

**Statement of Uncontroverted Facts** .......................................................... 8

    I.     The Delaware River basin watershed. ................................................. 8

    II.    The Kickapoo Tribe's Kansas Reservation............................................ 8

    III.   The Tribe's allegation that the Watershed District agreed to condemn as part of the consideration for signing the 1994 Watershed Plan has no foundation in fact because until March 12, 2003, the parties, including the Tribe, reasonably believed that the Tribe possessed the power to condemn non-Indian owned land for the Plum Creek Project................................... 9

         A.    As a sovereign nation, the Tribe possesses the power of eminent domain; the only question is the extent of that power. .............................. 9

         B.    In 1976, the Tribe asserted that it had the same powers as a municipality, hence, the power of eminent domain.................................. 11

         C.    In the years prior to signing the 1994 Watershed Plan, the Tribe held itself out as a sovereign Nation, which implies the power to condemn property for a public use............................................................ 12

i

D.    In a 1988 discussion regarding land acquisition for the Tribe's Plum Creek project, the Bureau of Indian Affairs told the SCS/NRCS that the Tribe had the power to condemn non-Indian owned land, reflecting the BIA's and the Tribe's understanding that, as a sovereign, it possessed this inherent power. .............................. 13

E.    The Tribe first learned that it may not have the power to condemn non-Indian owned land in a meeting with the BIA Field Solicitor on March 12, 2003, almost nine years after the execution of the 1994 Watershed Plan. .............................................................. 14

F.    The only indications in the record that the Watershed District had agreed to condemn property for the Tribe are self-serving statements made months after the Tribe first learned that it did not have condemnation powers over non-Tribal land — and nearly ten years after the parties signed the 1994 Watershed Plan. ......................... 15

IV.   The Watershed District was formed pursuant to the Kansas Watershed District Act and was created to advance the interests of the State of Kansas. ............................................................................................................ 16

V.    The Watershed Surveys and Planning program established by P.L. 83-566 is a complicated, multi-year planning process controlled by the SCS/NRCS. ................................................................................................... 19

A.    P.L. 83-566 does not require that local sponsors commit to condemn land in the planning stages; instead, the Act and the implementing regulations require this commitment in a Project Agreement executed at the time a particular structure is to be built......... 20

B.    The Watershed District's 1958 Application for P.L. 83-566 assistance was rejected because the Watershed District's boundaries did not follow natural basin boundaries. .............................. 24

C.    The Watershed District's 1975 Application for P.L. 83-566 assistance specifically declines to agree to exercise its condemnation powers and reflects its policy of not proceeding with any project absent 100% landowner approval. ......................................... 25

VI.   The Tribe became interested in a reservoir on its Reservation in the late 1970s. ............................................................................................................ 27

VII.  The Watershed District's 1978 General Plan further demonstrates that the Watershed District would not condemn land and, in fact, would shoulder no responsibility for land acquisitions for the City of Sabetha or for the Tribe. ............................................................................................................ 27

VIII. Contrary to the Tribe's allegations, its request to file a P.L. 83-566 Application for planning assistance and to act as a "sole sponsor" of a P.L. 83-566 Plan was denied because the Reservation did not cover an entire watershed basin or sub-basin, not because it lacked condemnation authority. ................................................................................................... 30

IX.    The Watershed District agreed to co-sponsor its ongoing P.L. 83-566 planning process with the Tribe, entering into an agreement that defined their respective duties, which did not include condemnation. .............................. 33

    A.    The 1983 Co-Sponsorship Agreement did not mention condemnation or require the Watershed District to acquire land for the Tribe. .................................................................................... 35

    B.    The planning process required extensive effort by numerous contractors and governmental officials and meetings with the Watershed District and the Tribe over a period of years; the alleged obligation to condemn land for the Tribe was never discussed. ............... 36

    C.    At all times throughout the planning process the Watershed District acted in accord with its policy of obtaining voluntary donation of easements for watershed structures so that none of the parties involved in the planning process could have been unaware of the District's opposition to condemnation.  Moreover, it was clear throughout the  planning process that the Tribe was the sole sponsor of the Plum Creek site with the exclusive responsibility to acquire land rights. .................................................................. 37

    D.    Because larger structures made obtaining land rights more problematic, the Watershed District resisted SCS/NRCS efforts to convince the Watershed District to construct larger floodwater retention structures. ................................................................. 39

    E.    The Watershed District continued to oppose large P.L. 83-566 structures at an October 26, 1989, meeting of the Watershed District, the Tribe, and the SCS/NRCS because of the Watershed District's overriding concerns about landowner acceptance and approval. ................................................................................. 40

    F.    At a November 3, 1989, meeting, the SCS/NRCS continued to push for larger structures and the Watershed District continued to resist this pressure. .................................................................. 42

    G.    Obtaining the land for multi-purpose structures was discussed at several meetings but eminent domain was never mentioned. ................... 44

    H.    Letters to the Tribe, the BIA, and numerous landowners clearly stated the Watershed District policy that structures will not be built without 100% landowner approval. .......................................................... 45

    I.    The Tribe entered into a written agreement in September of 1992 reaffirming that the Tribe was the sole sponsor of the floodwater structures on the Reservation and the entire Plum Creek site .................. 47

    J.    Ongoing discussions about acquiring land rights during the planning process did not suggest or even hint that the Tribe expected the Watershed District to condemn land for the Plum Creek site. ............................................................................................... 47

X.    The 1994 Watershed Plan does not state, nor does the document imply, that the Watershed District is obligated to condemn land for the Plum Creek site. ................................................................................ 48

      A.    At the meeting to approve the 1994 Watershed Plan, and in response to concerns about language in the Watershed Plan stating that the Watershed District would condemn land "as needed," the SCS/NRCS representative assured the Watershed District Board that the Plan did not require the Watershed District to condemn land; if the Board did not want to condemn, and could not obtain land for a particular site, that site would not be built. ............................... 48

      B.    The 1994 Watershed Plan is a plan, not a binding commitment to build any sites or to condemn land for any planned structure. ................. 50

      C.    The terms of the 1994 Watershed Plan do not require that the Watershed District condemn land for the Tribe. ........................................ 51

      D.    The 1994 Watershed Plan states that the County Conservation Districts "will obtain" agreements from the owners of 11,000 acres of land even though the landowners have not signed the Plan and are not otherwise obligated to contract with the Conservation Districts. These contracts must require landowners to pay 35%, and in some cases, 100% of the costs of land treatment practices from their own funds. ................................................................................ 55

XI.   The Watershed Plan lacks any of the necessary provisions that would detail when and how the Watershed District's alleged obligation to condemn property for the Tribe is to be performed. ............................................. 56

XII.  The Post-Watershed Plan activities. .................................................................. 60

      A.    Land rights were discussed several times with no indication that the Tribe expected the Watershed District to acquire land for the Tribe. ................................................................................................................ 61

      B.    An amendment to the Watershed Plan was proposed by the NRCS and signed by the Watershed District. The Tribe has not executed the amendment. ....................................................................................................... 63

XIII. In late 2002, the Tribe renewed its efforts to build the Plum Creek Reservoir and in numerous meetings and extensive correspondence clearly indicated that it was solely responsible for acquisition of the land for the Plum Creek site. ..................................................................................................... 64

XIV.  In February of 2003, the BIA suggested the possibility that the Tribe may not have condemnation authority for the portion of the Plum Creek project that was outside the Reservation boundaries but there was no concern about the Tribe's power to condemn land on the Reservation even though most of this land was owned by non-Indians. ....................................................... 71

      A.    The March 10, 2003, Field Solicitor's Opinion, stating that the Tribe lacks authority to condemn non-Indian owned land both on

iv

and off the Reservation, was delivered at a meeting on March 12, 2003............................................................................................ 72

B.    The SCS/NRCS does not contend that the 1994 Watershed Plan obligates the Watershed District to condemn land for the Kickapoo Tribe. ........................................................................................... 75

C.    The Tribe wanted the Watershed District Board to agree to lend its condemnation authority to the Tribe for use as leverage against the landowners. ................................................................................... 76

D.    That the signatories to the 1994 Watershed Plan — including the Tribe —believed that the Tribe had the power of eminent domain was reiterated during a May 20, 2004, Kansas Water Office mediation regarding land acquisition for the Plum Creek project. .......... 79

XV.    There are alternative water supplies available to the Tribe. ................................. 81

**Statement of Issues** ...................................................................... 81

**Argument and Authorities** .................................................................. 84

I.    Summary Judgment Standard ................................................................. 84

II.    The Watershed Plan does not obligate the Watershed District to delegate its eminent domain authority to the Tribe or to otherwise condemn property for the Plum Creek Reservoir. ............................................................... 85

A.    The plain terms of the Watershed Plan make it clear that the Watershed District did not agree to condemn property for the Tribe. ..................................................................................... 85

B.    An agreement to agree in the future does not create a binding obligation. Paragraph 19 of the Watershed Plan expressly provides a "separate agreement" for fund-obligating components of the plan, such as exercising eminent domain. The Watershed District therefore creates no binding obligation on the Watershed District to condemn for the Tribe................................................................ 87

C.    The Kansas Supreme Court concluded that a P.L. 83-566 Watershed Plan was not a binding contract but a mere letter of intent because of a provision nearly identical to Paragraph 19. .............. 89

D.    The Watershed Plan is missing key elements required for a binding contract obligating one party to condemn land for another party............ 90

III.    No one believed that, by executing the Watershed Plan, the Watershed District was obligating itself to condemn on the Tribe's behalf because the Tribe and the other parties believed that it had the power of eminent domain over fee lands in the Watershed until at least March 12, 2003. ............... 91

A.    The parties, including the Tribe, learned for the first time that the Tribe lacked condemnation authority for the Plum Creek Project at a meeting on March 12, 2003, which was also the genesis of the

Tribe's efforts to recruit the Watershed District to condemn on the Tribe's behalf. ................................................................................. 94

B.     Even after the Tribe learned that it lacked condemnation power in March 2003, it did not assert that the Watershed District was obligated under the Watershed Plan to condemn on its behalf until months afterward. ................................................................. 96

IV.    Federal regulations require sponsors to "have" the power of eminent domain but they are not required to "commit" themselves to exercise that authority until the "installation" phase of each individual project. ..................... 97

V.     The unmistakability doctrine applies to contracts that affect the Watershed District's discretionary use of its eminent domain authority and any ambiguity in the 1994 Watershed Plan must be construed in the Watershed District's favor. ............................................................................. 98

VI.    A contract that purports to strip discretion regarding whether and when to condemn is in violation of the Reserved Powers Doctrine and is, therefore, invalid at its inception. ........................................................................ 102

A.     A sovereign cannot be contractually required to exercise its eminent domain power at the whim of a third party. .............................. 102

B.     The Reserved Powers Doctrine provides the Watershed District with discretion regarding whether and when to exercise its eminent domain authority, and no obligation, contractual or otherwise, can validly take that discretion away. ................................................. 104

C.     Even if this Court holds that the Reserved Powers doctrine does not prohibit a Watershed District from contracting away its eminent domain authority, the Tribe's remedy is limited to money damages – not specific performance. ................................................... 105

VII.   The Tribe cannot convert a simple breach of contract case into a violation of the Contracts Clause. ................................................................. 106

VIII.   The Tribe's claims against the Watershed District must be dismissed because the District is an arm of the State of Kansas and is therefore entitled to Sovereign Immunity. ............................................................ 107

A.     Watershed Districts have state, rather than local, characteristics. .......... 108

B.     Nemaha Brown's Lack of Autonomy Likely Points to It Being a State Agency. ............................................................................. 110

C.     The Watershed District's funding indicates that it is a state entity......... 112

D.     The Watershed District's primary concerns deal with state matters....... 112

Conclusion ....................................................................................... 113

Certificate of Service........................................................................... 114

## Table of Authorities

### Cases

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)................................... 84

*Anderson v. Dillard's, Inc.*, 283 Kan. 432, 153 P.3d 550 (2007) ................................ 86

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)......................................... 84, 85

*Barten v. Turkey Creek Watershed Dist.*, 200 Kan. 489, 438 P.2d 732 (1968)............... 89, 90, 98

*Blatchford v. Native Vill. of Noatak*, 501 U.S. 775 (1991)....................................... 108

*Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986)..................... 98

*Bowsher v. Merck & Co.*, 460 U.S. 824 (1983)................................................ 87, 90, 91

*Contributors to Pa. Hosp. v. City of Phila.*, 245 U.S. 20 (1917)........................ 102, 103

*Cory v. White*, 457 U.S. 85 (1982)............................................................ 107

*Edelman v. Jordan*, 415 U.S. 651 (1974) .................................................... 107

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743 (2002) ........................... 107

*Fletcher v. Peck*, 6 Cranch 87, 3 L.Ed. 162 (1810) ........................................... 99

*Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670 (1982) ...................... 107

*Hawaii Housing Auth. v. Midkiff*, 467 U.S. 243 (1984)....................................... 104

*JDN Dev. Co., Inc. v. Terra Venture, Inc.*, 265 F. Supp. 2d 1239 (D. Kan 2003)...................... 86

*Johnson Cnty. Bank v. Ross*, 28 Kan. App. 2d 8, 13 P.3d 351 (2000)......................... 86

*Joleewu, Ltd. v. City of Austin*, 916 F.2d 250, 255 (5th Cir. 1990) ........................... 104

*Kelo v. City of New London, Conn.*, 545 U.S. 469 (2005)...................................... 104

*Kickapoo Tribe of Kan. v. United States*, 372 F.2d 980 (1967)................................ 9

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949).................................. 105

*Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 876 P.2d 1362 (1994)............................ 86

*Mid-Continent Petroleum Corp. v. Russell*, 173 F.2d 620 (10th Cir.)................................. 87, 91

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) ................................ 108

*Needles v. Kansas City*, 37 S.W.2d 300 (Mo. 1963) ......................................... 104

*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984)............................... 107

*Phillips and Easton Supply Co., Inc.*, 212 Kan. 730, 512 P.2d 379 (1973)............................. 87

*Red Dog Saloon v. Sedgwick Cnty.*, 29 Kan. App. 2d 928, 33 P.3d 869 (2001) ....................... 102

*Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003)................................ 101

*Seneca Constitutional Rights Organization v. George*, 348 F. Supp. 51 (D.C.N.Y., 1972)......... 10

*Simon v. Nat'l Farmers Organ., Inc.*, 250 Kan. 676, 829 P.2d 884 (1992)............................. 86

*State Highway Comm'n v. City of Sullivan*, 520 S.W.2d 186 (Mo. Ct. App. 1975).................. 104

*Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250 (10th Cir. 2007) ...... 108, 110, 112, 113

*Thompson Creek Townhomes, LLC v. Tabernash Meadows Water and Sanitation Dist.*, 240 P.3d 554 (Colo. Ct. App. 2010) ................................................................. 106

*U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977) .................................... 102, 103

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ........................... 98, 99, 100, 101

*Urban v. Henley*, 654 F. Supp. 870 (1987) ............................................................ 107

*West River Bridge Co. v. Dix*, 47 U.S. 507 (1848) ................................................. 102

*Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737 (Colo. 2007) .......................................................................................... 105, 106

*Whitlow v. Bd. of Educ. of City of Council Grove,* 108 Kan. 604, 196 P. 772 (1921) ............... 106

*Williams v. City of Wichita*, 190 Kan. 317 (1962) ..................................................... 17

*Winters v. U.S.*, 207 U.S. 564 (1908) ......................................................................... 17

*Young Partners, LLC v. Bd. of Educ., Unified Sch. Dist. No. 214, Grant Cnty.*, 284 Kan. 397, 160 P.3d 830 (2007) ................................................................... 99, 102, 103

### Constitutional Provisions

U.S. Const., art. I, § 10, cl. 1 ..................................................................................... 111

### Statutes

16 U.S.C. § 1001 ......................................................................................................... 115

16 U.S.C. § 1001, *et. seq.* ........................................................................... 1, 12, 20, 52

16 U.S.C. § 1004 ............................................................................................... 24, 101

16 U.S.C. § 1006 ........................................................................................................ 20

25 U.S.C. § 1302(5) ............................................................................................. 10, 15

25 U.S.C. § 81 ......................................................................................................... 106

42 U.S.C. § 4332 ........................................................................................................ 52

42 U.S.C. § 4601 *et. seq.* ........................................................................................ 60, 61

42 U.S.C. §§ 4321 *et seq.* ........................................................................................... 22

42 U.S.C.A. § 4321 ..................................................................................................... 52

82 Okla. St. Ann. § 861 ............................................................................................ 113

Fed. R. Civ. P. 56 ........................................................................................................ 86

K.S.A. 12-845 ............................................................................................................. 12

K.S.A. 24-1201, *et seq.* ........................................................................................ 17, 114

K.S.A. 24-1201a .............................................................................. 113, 114, 115, 119

K.S.A. 24-1202 ..................................................................................................... 19, 114

K.S.A. 24-1203 ............................................................................................................ 18

K.S.A. 24-1203a ................................................................................................ 18

K.S.A. 24-1205 .................................................................................................. 18

K.S.A. 24-1206 ............................................................................................. 18, 19

K.S.A. 24-1209 ........................................................................................ 19, 26, 107

K.S.A. 24-1211 ............................................................................................... 116

K.S.A. 24-1212 ............................................................................................... 116

K.S.A. 24-1213 ............................................................................... 19, 20, 116, 117

K.S.A. 24-1216 ............................................................................................... 117

K.S.A. 24-1222, *et seq.* .................................................................................. 117

K.S.A. 26-507 .................................................................................................. 61

K.S.A. 26-511 .................................................................................................. 61

K.S.A. 82a-301, *et seq.* .................................................................................. 117

K.S.A. 82a-701 ............................................................................................... 117

K.S.A. 82a-702 ......................................................................................... 18, 115

## Treatises

1 Richard A. Lord on Contracts (4th ed.) ............................................................. 93

13 McQuillin, *The Law of Municipal Corporations* (3d. ed.) ................................. 106

16B Am. Jur. 2d Constitutional Law ................................................................. 109

17A Am. Jur. 2d Contracts ........................................................................... 87, 93

26 Am. Jur. 2d Eminent Domain ........................................................................ 10

Marc D. Slonim, *Indian Country, Indian Reservations, and the Importance of History in Indian Law*, 45 Gonz. L. Rev. 517, 518–519, 522 ................................................... 9

Nell Jessup Newton, ed., *Cohen's Handbook of Federal Indian Law* ............................ 9

Restatement (Second) of Contracts ...................................................................... 93

## Regulations

7 C.F.R. § 622.10 ..................................................................... 24, 25, 37, 100

7 C.F.R. § 650.12 ............................................................................... 23, 24

K.A.R. 11-3-4 .................................................................................... 114

**Nature of the Case**

This is a contract enforcement action in which the Kickapoo Tribe has sued the Nemaha Brown Watershed Joint District No. 7 asserting that a 1994 planning document prepared by the United States Department of Agriculture is a binding contract that obligates the Watershed District to condemn 1,200 acres of land for the Tribe so it can build a reservoir on the site.

*The planning that lead to the 1994 Watershed Plan*

The discussion between the Watershed District and the Tribe that resulted in the 1994 planning document began as early as 1975. This planning followed a procedure established by the USDA's Soil Conservation Service, now known as the Natural Resource Conservation Service, ("SCS/NRCS") under what is referred to as P.L. 83-566. (Watershed and Flood Prevention Act, 16 U.S.C. § 1001, *et. seq.*)

The planning process required extensive effort by numerous contractors and governmental officials and meetings with the Watershed District, the Tribe, and others over a period of years; there were numerous conversations, meetings, and even trips to Washington, D.C. to meet with high-ranking agency personnel and elected officials.

This huge planning effort resulted in thousands of pages of documents including letters, written agreements, trip reports, status reports, meeting minutes, resolutions, notes, memos, and other documents prepared by numerous individuals who had various interests in the project.

The 1994 planning document does not require the Watershed District to condemn land for the Tribe and the Watershed District has been unable to find any evidence to support the Tribe's assertion that the Watershed District ever agreed to condemn or that such an agreement was even discussed.

In contrast, the evidence that the Watershed District would not condemn land, even for its own projects, is overwhelming. At all times throughout the planning process the Watershed District acted in accord with its policy of obtaining voluntary donation of easements for watershed structures. All of the parties involved in the planning process knew that Watershed District would have vigorously opposed any provision in any agreement that would require that it

1

condemn land for any project.

Moreover, it was clear throughout the planning process that the Tribe was the sole sponsor of the Plum Creek site with the exclusive responsibility to acquire the land rights for that portion of the overall project, whether the acquisition was through donation, purchase, condemnation, or any other method.

In its 1975 application to the SCS/NRCS for P.L. 83-566 planning assistance, the Watershed District specifically declined to agree to use its condemnation powers, reflecting its policy of not proceeding with any project absent 100% landowner approval.

The Watershed District's 1978 General Plan, which is required by state law, indicates that the Tribe may become a co-sponsor and hoped to build up to five reservoirs on the Reservation. The 1978 General Plan also discussed a lake being planned by the City of Sabetha, but the Plan made it abundantly clear that the City and the Tribe were responsible for acquiring all land rights for these multi-purpose structures, and that the Watershed District would not condemn land for itself, for the City, or for Tribe.

In spite of ongoing plans to include the Tribe as a co-sponsor, the Tribe requested sole sponsorship status from the SCS/NRCS for a separate P.L. 83-566 planning process in the late 1970s. While the Tribe now asserts that it was denied this status because it lacked the power of eminent domain, the record clearly demonstrates otherwise.

First, SCS/NRCS turned the Tribe's request down because the Reservation boundaries do not follow natural watershed lines and therefore did not fully encompass the sub-watersheds on the Reservation in which the Tribe wanted to build reservoirs. This is an important USDA requirement because P.L. 83-566 planning deals with more than just the reservoir. In order to protect water quality and other interests, the planning effort addresses the entire drainage basin above each of the planned structures.

Second, the record contains no evidence that eminent domain was discussed in connection with the Tribe's request or that the request was denied because the Tribe lacked condemnation power. Moreover, the record clearly shows that the Tribe believed that it had the

power to condemn from the inception of its discussions with the Watershed District in 1975 until March 12, 2003, almost nine full years after the 1994 Watershed Plan was signed.

In fact, the Kickapoo Tribe is an Indian Tribe that is recognized by the U.S. as a sovereign nation and the power of eminent domain is a fundamental aspect of sovereignty. As a sovereign, the Tribe possesses the power of eminent domain inherently.  Not only did the Tribe believe that it had this power, the Bureau of Indian Affairs told the SCS/NRCS that the Tribe had the power to condemn non-Indian owned land specifically for the multi-purpose site at issue in this lawsuit.

The evidence shows that during the entire planning process, all parties believed that the Kickapoo Tribe had the power to condemn land.  The question that first came up in 2003 was the extent of that power.

After the SCS/NRCS rejected the Tribe's request to act as a sole sponsor, the Tribe approached the Watershed District.   In 1983 the Watershed District agreed to co-sponsor its ongoing P.L. 83-566 planning process with the Tribe, entering into a written agreement that defined their respective duties.

The Tribe did not request that the Watershed District exercise the power of eminent domain or tell the Watershed District that the Tribe was precluded from becoming a sole sponsor of a P.L. 83-566 watershed plan because it did not have condemnation authority.   In fact, eminent domain was not discussed at all and the 1983 Co-Sponsorship Agreement did not mention condemnation or require the Watershed District to acquire land for the Tribe.

There were numerous meetings between 1983 and the approval of the Watershed Plan in 1994 that involved the Watershed District, the Tribe, the SCS/NRCS, the BIA, and various other interested parties, including the public.  Though the Tribe's multi-purpose site was a frequent topic of discussion at these meetings, and the issue of land rights for that project was occasionally raised, it was never stated, suggested, or implied that the Watershed District had or would ever have any obligation to exercise its eminent domain authority on the Tribe's behalf.

Throughout the process, the Watershed District repeatedly reaffirmed its longstanding

3

policy of not proceeding with floodwater detention structures or other projects without 100% landowner approval.

Moreover, because of the Watershed District's overriding concerns about landowner acceptance and approval and because larger structures made obtaining donated land rights more problematic, the Watershed District resisted SCS/NRCS efforts to convince the Watershed District to construct larger floodwater retention structures

All of the entities involved in the planning and authorization of the Watershed Plan understood this fact, and all of the parties understood that the Tribe was solely responsible for land acquisition inside their Reservation boundaries.

In 1989, Ralph Simon of the Tribe assured the Watershed District that he had personally discussed Plum Creek reservoir with landowners and they supported the project.

Further confirmation of the fact that the Watershed District had no connection or obligation regarding the Tribe's multi-purpose reservoir is found in the 1992 agreement between the Watershed District and the Tribe making it clear that the Tribe is responsible for operation and maintenance of the four structures on the Reservation, including the multipurpose site.

The SCS/NRCS has never taken the position that the Watershed Plan, which it drafted following its own standard form, obligates the Watershed District to exercise its power of eminent domain to acquire land for the Tribe.  From the time the parties first learned that the Tribe may not have this power in 2003, the SCS/NRCS has consistently stated that the Tribe, not the Watershed District, has the obligation to acquire the subject property; it has never suggested that the Watershed District has any obligation to condemn property for Plum Creek and has specifically stated that it cannot force the Watershed District to condemn property for the Tribe.

The extensive record leading up to the execution of the Watershed Plan contains no indication that the Watershed District was ever asked to agree to condemn land for the Tribe or would ever be asked to do so under any scenario.

*The 1994 Watershed Plan*

At the meeting to approve the 1994 Watershed Plan, and in response to concerns about

language in the Watershed Plan stating that the Watershed District would condemn land for its portion of the project "as needed," the SCS/NRCS representative assured the Watershed District Board that, by signing the Plan, the Watershed District would not be required to condemn land. If the Board did not want to condemn, and could not obtain land for a particular site, that site would not be built.

On May 12, 1994, the Watershed Plan was executed by the parties.  It calls for future agreements to construct 20 floodwater-retarding dams, one multipurpose dam with recreational facilities, 11,000 acres of land treatment, 1,000 acres of riparian and other woodland enhancement, 200 acres of riparian easements, and 16 livestock waste management systems.

This plan contains no language indicating that the Watershed District would exercise its eminent domain authority on behalf of the Tribe.  The NEPA Environmental Impact Statement portion of the Watershed Plan states that the Tribe has the necessary authority to finance and install its "portion" of the planned project, including the right of eminent domain, and has agreed to use this power as needed.  It goes on to state that the Tribe "will furnish legal services and obtain all land rights needed for installation of the . . . multipurpose dam."

In fact, the Watershed Plan is not a fund-obligating document.  It expressly requires future Project Agreements between the parties before a party initiates work involving funds of another party.   These agreements are to set forth "in detail the financial and working arrangements and other conditions that are applicable to the specific works of improvement." No such agreement was proposed by the Tribe or entered into before filing this lawsuit.

The terms of the 1994 Watershed Plan do not require that the Watershed District condemn land for the Tribe because it is a plan or a letter of intent, not a binding commitment to build any site or to condemn land for any planned structure.

Even if construed as a binding agreement, the Watershed Plan lacks essential provisions that would detail when and how the Watershed District's alleged obligation to condemn property for the Tribe is to be performed.

Contrary to the Tribe's allegations, P.L. 83-566 does not require that local sponsors

commit to condemn land in the planning stages; instead, the Act and the implementing regulations require this commitment in a Project Agreement executed at the time a particular structure is to be built.

*The post-Watershed Plan events*

Following the execution of the Watershed Plan, there were numerous meetings where the Tribe's reservoir was a point of discussion; however, just as before, it was never stated, suggested, or implied that the Watershed District would be obligated to condemn land for the Tribe under any scenario.

It is also clear from the record that the parties continued to believe for years following the execution of the Watershed Plan that the Tribe had the power of eminent domain and would be solely responsible for land acquisition for Plum Creek.

In the fall of 2000, the Tribe refused to fund its 90% portion of the land rights acquisition as called for under the Watershed Plan.  Instead, the Tribe demanded that the federal government pay for 100% of the costs for Plum Creek, and informed the other sponsors that the federal government was going to do just that.  Because the Tribe refused to sign an amendment to the plan, SCS/NRCS informed the Watershed District that the project had lost all interest from Congress and the local Conservation Districts.

In late 2002, the Tribe renewed its efforts to construct the Plum Creek reservoir.  These efforts included trips to Washington, D.C., meetings with the BIA, EPA, the SCS/NRCS, and others as well as efforts to obtain funds to implement the project.  At that point it was clear that the Tribe did not have the funds to build plum Creek and that they were expecting federal funding.

A local newspaper article ran a story on the project, which quoted Steve Cadue, chairman of the Tribal Council, as stating that the Tribe had discussed the project with landowners and that there was no opposition to the Plum Creek project.  Shortly after this newspaper article, landowners in the Plum Creek project area came forward in opposition to the project, and it is now known that, save for one, all of the non-tribal fee owners of land in the project area

strenuously opposed construction of the reservoir, both on and off the reservation.

Despite the fact that the Tribe was gearing up to acquire lands for the project, there is no mention in the record that the Watershed District might be required to condemn if the Tribe was unable to purchase the land it needed.

To the contrary, the Tribe continued to believe that it had eminent domain authority through the spring of 2003. The Tribe finally learned that it lacked eminent domain authority over non-Indian fee lands on March 12, 2003, almost nine years after the execution of the 1994 Watershed Plan, when it was provided with a BIA Field Solicitor's Opinion.

At that point the Tribe first began look to other agencies, including the BIA and the Watershed District requesting that they exercise their condemnation powers on the Tribe's behalf.

The Tribe did not take the position that the Watershed District, or any other agency, was contractually obligated to condemn for the Tribe pursuant to the Watershed Plan until months later. On December 19, 2003, the Tribe, for the first time, stated that the Watershed District had a contractual obligation to exercise its eminent domain authority on the Tribe's behalf.

On January 21, 2004, the Tribe again asked the Watershed District to exercise its eminent domain authority for the Plum Creek project. It was disclosed in that meeting that the Tribe had not yet even contacted all of the affected landowners and the Watershed District chose to not vote on the eminent domain issue until the Tribe had made such efforts.

On May 20, 2004, the Watershed District and the Tribe participated in mediation to try and resolve the eminent domain issue. The Watershed District president, Dexter Davis, stated that he felt the Tribe started out on the wrong foot by trying to push this project ahead without first obtaining the Watershed District's support and by threatening landowners with condemnation. The Watershed District raised a number of other concerns and questions prompting the mediator to propose that the Watershed District study the available information for a period of 30 days before making a final decision. The Tribe refused to take more time, refused to meet again, and demanded an immediate vote, which the Watershed District declined

to do.

Throughout 2004–2005, the Tribe attempted to persuade other entities, most notably the BIA, to exercise eminent domain on its behalf to no avail.  The Tribe filed suit in June 2006.

## Statement of Uncontroverted Facts

### I.        The Delaware River basin watershed.

1.        The Delaware River begins in northeastern Nemaha County, Kansas near Sabetha and flows in a south-southeasterly direction through Brown County and through the Kickapoo Indian Reservation toward Muscotah, Kansas.  From Muscotah, the River flows in a southerly direction for approximately 18 miles to Perry Lake, which is about four miles upstream from the confluence of the Delaware River and the Kansas River between Topeka and Lawrence.  (Ex. 1 at 28 and 117; Ex. 2; Ex. 3.)

2.        There are three separate watershed districts in the Delaware River basin, including the Nemaha Brown Watershed Joint District No. 7, the Defendant in this case.  (Ex. 4.)

3.        The Watershed District's territory covers 177,180 acres in Nemaha, Brown, Jackson, and Atchison Counties in northeast Kansas.  (Ex. 1 at 28 and 151.)

### II.       The Kickapoo Tribe's Kansas Reservation.

4.        The Kickapoo Indian Reservation is located in Brown County in northeastern Kansas.  The Reservation's exterior boundaries enclose a 5 mile by 6 mile area or 30 square miles (approximately 19,200 acres).  (Ex. 1 at 30 and 151.)

5.        The Reservation lies almost entirely within the Watershed District's boundaries. (Ex. 1 at 151.)

6.        The Second Amended Complaint, (Doc. 199, ¶ 17), states:

The Tribe presently holds equitable title to approximately 3,800 acres, and fee title to another 600 acres, of land within its Reservation boundaries located within Brown County, Kansas.  Tribal members own equitable title to another 3,100 acres of allotted land.  Under federal law the underlying legal title to this land is held in trust for the Tribe and its members by the United States.

7.    Land on the Reservation is owned:

a.    By the United States in trust for the Tribe (approximately 3,800 acres);

b.    By the United States in trust for Tribe members, which has resulted, in many cases, in numerous individuals owning a single parcel of land (approximately 3,100 acres);[1]

c.    By the Tribe in fee (it is also possible that some land is owned by Tribe members in fee) (approximately 600 acres); and

d.    By non-Indians (19,200 total acres on the Reservation, less 7,500 acres owned by the United States in trust and by the Tribe in fee leaves approximately 11,700 acres, or 61% of the Reservation owned by non-Indian interests).

**III.    The Tribe's allegation that the Watershed District agreed to condemn as part of the consideration for signing the 1994 Watershed Plan has no foundation in fact because until March 12, 2003, the parties, including the Tribe, reasonably believed that the Tribe possessed the power to condemn non-Indian owned land for the Plum Creek Project.**

**A.    As a sovereign nation, the Tribe possesses the power of eminent domain; the only question is the extent of that power.**

8.    The Kickapoo Tribe is a "sovereign nation" with an inherent right to condemn real property.[2] *See, e.g.*, the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302(5).

———————————————

[1]    For a discussion of allotment of Tribal lands and the resulting fractionalization of title to lands allotted to individual tribal members, see Marc D. Slonim, *Indian Country, Indian Reservations, and the Importance of History in Indian Law*, 45 Gonz. L. Rev. 517, 518–519, 522, and Nell Jessup Newton, ed., *Cohen's Handbook of Federal Indian Law* §§ 1.03[6][a] and 16.03 [1], [2][a], and [2][b] (2012). *See also Kickapoo Tribe of Kan. v. United States*, 372 F.2d 980, 986 (1967) (discussing moves by portions of the Tribe to Oklahoma, Mexico, and back to Oklahoma.) and http://en.wikipedia.org/wiki/Kickapoo_people, (last accessed on November 29, 2012).

[2]    While it is clear that it possesses the power of eminent domain, as more fully discussed below, the extent of the Tribe's power to condemn non-Indian land first came into question in 2003.

9.      "The power of eminent domain is a fundamental attribute of sovereignty, and does not depend on constitutional authorization.  Rather, constitutional provisions relating to eminent domain merely limit a power that would otherwise be without limit."  (Ex. 5 at 808, citing 26 Am. Jur. 2d Eminent Domain § 2.)

10.      In *Seneca Constitutional Rights Organization v. George*, 348 F. Supp. 51, 60 (D.C.N.Y., 1972), an Indian rights organization and others sought to enjoin the Seneca Indian Nation from condemning property held by Lillian Kennedy and Mary Kennedy.  The Court held that the Seneca Nation possesses the power of eminent domain to condemn private property:

> [T]he Seneca Nation possesses all the inherent rights of sovereignty except where restrictions have been placed thereon by the United States.  *See United States v. Kagama, supra*, at 381 [118 U.S. 375, 381 (1886)]; *Worcester v. Georgia, supra*, at 539 [6 Pet. (U.S.) 515, 539 (1832)]; *Iron Crow v. Oglala Sioux Tribe*, 231 F.2d 89, 91–94 (8th Cir. 1956); *Patterson v. Council of Seneca Nation*, 245 N.Y. 433, 443, 157 N.E. 734 (1927).  The power of eminent domain "is an incident of sovereignty, and . . . requires no constitutional recognition." *United States v. Jones*, 109 U.S. 513, 518 (1883).  It is an "offspring of political necessity; and it is inseparable from sovereignty, unless denied it by fundamental law." *Kohl v. United States*, 91 U.S. 367, 371–72 (1886).

> The court has found no federal statute terminating the tribal power of eminent domain.  Moreover, enactment of 25 U.S.C. § 1302(5) . . . indicates congressional recognition of the power.  As was stated in *Kohl v. United States, supra*, at 372–73, the imposition of a limitation on the power of eminent domain is "an implied assertion" of the existence of the power.

> The conclusion that Indian tribes possess the power of eminent domain is reinforced by the view taken by the United States Department of the Interior.  The Department is given broad authority over the conduct of Indian affairs, see 25 U.S.C. § 2, and the views of its officials on the question of the powers of Indian tribes therefore carry weight.  *Cf. Udall v. Tallman*, 380 U.S. 1, 16 (1965).  The Solicitor of the Department has concluded that an Indian tribe organized under 25 U.S.C. § 476 possesses the power of eminent domain.  *See* unpublished opinion of the Solicitor, Dec. 13, 1934, at 19–25 . . . Upon the basis of the foregoing, the court determines that the claim that the Seneca Nation does not possess the power of eminent domain does not state a claim upon which relief can be granted.

(Internal citations formatted.)

**B.     In 1976, the Tribe asserted that it had the same powers as a municipality, hence, the power of eminent domain.**

11.     A July 28, 1976, meeting regarding a proposed multi-purpose reservoir on the Reservation was attended by:

a.     The Tribe's attorney;

b.     Five other Tribal representatives;

c.     Milton E. Saffry and E. A. King, representing the Watershed District;

d.     Van Doren-Hazard-Stallings, Inc., the Tribe's engineers;

e.     U.S. Department of Agriculture, Soil Conservation Service, now known as the Natural Resource Conservation Service.[3]  This entity will be referred to as the "SCS/NRCS," the "SCS," or the "NRCS";

f.     Kansas Park and Resource Authority;

g.     Kansas Soil Conservation Commission;

h.     Kansas Water Resources Board;

i.     Kansas Department of Agriculture, Division of Water Resources; and

j.     Kansas Department of Economic Development.

(Ex. 6.)

12.     In that meeting, the Tribe's attorney assured the participants that the Tribe has "the same legal status as a municipality in participating with federal programs."  (Ex. 6.)  *See, e.g.*, K.S.A. 12-845, which grants cities in Kansas broad powers of eminent domain within city limits and extending out five miles.

---

[3]     The U.S. Department of Agriculture, Soil Conservation Service, now known as the Natural Resources Conservation Service, administers the Watershed and Flood Prevention Act, P.L. 83-566, codified at 16 U.S.C. § 1001, *et seq*.  The Soil Conservation Service ("SCS") changed its name to the Natural Resources Conservation Service ("NRCS") in 1994.

13.     The Tribe's attorney also assured the attendees that:  "The Indian Tribe plans to furnish the easements for this multiple-purpose structure and would assume the responsibility for operation and maintenance."  (Ex. 6.)

**C.      In the years prior to signing the 1994 Watershed Plan, the Tribe held itself out as a sovereign Nation, which implies the power to condemn property for a public use.**

14.     In a June 16, 1989, letter, Steve Henningsen requested a joint meeting of the Watershed District Board, the entire Kickapoo Tribal Council, and the SCS/NRCS planning staff, to be held on June 22, 1989.  (Ex. 7.)  Copies of the letter were sent to Peggy Acoya and Richard Beams at the BIA, the members of the Tribal Council, and seven SCS/NRCS team members.  (*Id.*)

15.     A June 22, 1989, letter of greeting, provided to the participants at this meeting, was signed by Ralph Simon, Vice-Chairman of the Tribe.  It describes the "Kickapoo Nation" as a sovereign governmental entity.  The letter begins as follows:

Greetings:

Welcome to the ***Kickapoo Nation!***  Some of you are old friends and some of you we have not met.

The Kickapoo Tribal Council is happy to be your host today for a very important issue to the Kickapoo Tribe . . . .  Our Kickapoo Reservation was established via the Treaty of May 18, 1854, so ratified by the President and the Senate of the United States.

The Kickapoo Tribe is governed by an elected tribal council in accordance with the ***Constitution*** and By-Laws of the Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas.  The tribal council of the Kickapoo Tribe exercises authority in the ***legislative, executive and judicial branches of government,*** subject to any limitations imposed by the statutes or the constitution of the United States.

(Ex. 8 (emphasis added).)

16.     The Tribe consistently refers to itself as a "sovereign".

a.      The top two lines of the Tribe's legal department letterhead include: "Kickapoo Tribe in Kansas/*A Sovereign People*."  (Ex. 9; Ex. 10.)

b.    The Tribe's Corporate Seal asserts that the Tribe is, "A Sovereign People." (Ex. 11.)

c.    In a September 13, 2000, letter to Jim Ryun, the Tribal Chairperson, Bobbi Darnell, characterized the Tribe as a "sovereign," stating:

The Kickapoo Tribe is a sovereign government . . . .  The Tribe has a government-to-government relationship with the United States Government, based on treaties, statutes and federal common law.

(Ex. 12.)

17.    The SCS/NRCS Pre-Authorization Report dated April 1991, refers to the "Kickapoo *Nation* in Kansas." (Ex. 13 at 636 (emphasis added).)

18.    The Watershed Plan refers to the Tribe as the "The Kickapoo *Nation*" and the U.S. Department of the Interior wrote letters dated July 6, 1993, and August 3, 1993, commenting on the Watershed Plan and referring to the Tribe as the "Kickapoo *Nation*." (Ex. 1 at 30, 97, 98, and 101 (emphasis added).)

**D.    In a 1988 discussion regarding land acquisition for the Tribe's Plum Creek project, the Bureau of Indian Affairs told the SCS/NRCS that the Tribe had the power to condemn non-Indian owned land, reflecting the BIA's and the Tribe's understanding that, as a sovereign, it possessed this inherent power.**

19.    On May 2, 1988, Steve Henningsen of the SCS/NRCS and Gail Dishong, an SCS/NRCS rural sociologist, conducted a series of interviews in connection with the watershed planning activities that culminated in the 1994 Watershed Plan. (Ex. 14; Ex. 15.)

20.    During these interviews, Mr. Henningsen and Ms. Dishong spoke with Peggy Acoya, the Superintendent of the U.S. Department of the Interior, Bureau of Indian Affairs ("BIA"), Horton Indian Agency, and Richard Beams, a BIA Conservationist. (Ex. 14.) [4]

---

[4]    The Horton Agency is a BIA service agency located at Horton, Kansas, less than six miles from the Kickapoo Reservation. (Ex. 16.)  It currently serves approximately 10,000 Tribal

21.     During this 1988 interview, Ms. Acoya and Mr. Beams told the SCS/NRCS that the Tribe has the power of eminent domain for land owned by Indians, as well as land owned by non-Indians:

> We [the SCS/NRCS] asked about the ability of the Tribe to buy land for the multipurpose site or a floodwater retarding structure.  The BIA stated that they did not think the Tribe could afford to buy land at this time.  We asked that if funds were available, ***would there be difficulties in the purchase of allotment land and non-Indian land for a watershed site?***  Acoya stated that on the sale of allotment land that she would want 100 percent in favor of the sale.[5]  Other than that she thought that some of both types of ownership would be willing to sell their land and some would not.  It would depend on the site and individuals as in most watershed districts.  ***The Tribe has the power of eminent domain***, but the BIA doubts whether they would use it due to community relations.

(Ex. 14 (emphasis added).)

22.     The Tribe shared the BIA's belief regarding its power of eminent domain.  As late as February 6, 2003, the Tribe's belief that it had the power of eminent domain regarding the Plum Creek project remained unquestioned.  In a meeting on that date members of the Tribal Council told the U.S. EPA that "eminent domain powers . . .  might [be] exercised ***by the Tribe***" for the Plum Creek project.  (Ex. 17 at 195 (emphasis added).)

> **E.     The Tribe first learned that it may not have the power to condemn non-Indian owned land in a meeting with the BIA Field Solicitor on March 12, 2003, almost nine years after the execution of the 1994 Watershed Plan.**

23.     The record reflects that the Tribe believed that it had the power to condemn land, that it represented that it had this power, and that the other members of the planning group

---

members in the Iowa Tribe, the Kickapoo Tribe of Kansas, the Prairie Band Potawatomi Nation, and the Sac and Fox Tribe of Missouri. http://www.bia.gov/WhoWeAre/RegionalOffices/ SouthernPlains/WeAre/Horton/index.htm (last accessed on September 30, 2012).

[5] According to the Watershed Plan "An individual allotment may have as many as 200 owners. The numerous ownerships are the result of inheritance of the land for several generations. Owners are often absentee and sometimes cannot be located. This land is managed in trust by the Bureau of Indian Affairs (BIA)."  (Ex. 1 at 30.)

believed that it had the power of eminent domain until a meeting on March 12, 2003, at which the BIA provided the parties with a Field Solicitor's Opinion recognizing that the Tribe does possess eminent domain powers but that those powers are limited.  (Ex. 18; Ex. 5.)

24.    The Field Solicitor's Opinion states:

The Indian Civil Rights Act of 1968 ***implicitly recognizes the right of tribal governments to exercise the power of eminent domain***.  The Act provides that "No Indian tribe in exercising powers of self-government shall . . . take any private property for a public use without just compensation."  25 U.S.C. §1302(5).

(Ex. 5 at 809 (emphasis added).)  Thus, the Tribe's belief that it possessed the power of eminent domain was reasonable.

25.    However, the Opinion goes on to state:

It is unlikely the tribe would have the power to condemn non-Indian fee lands within the reservation absent either statutory authorization or a very strong showing that the failure to do so "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe . . . A more likely source of authority might be found in the power of the Department of Interior or other federal agency to condemn property for a public use on behalf of the tribe.

(Ex. 5.)

26.    This Opinion, issued nearly nine years after the execution of the Watershed Plan, is the first indication that anyone questioned the Tribe's authority to condemn all of the land needed for the Plum Creek project.  (*See* Ex. 18.)  It was also the genesis of the Tribe's efforts to obtain assistance from the Watershed District and others to condemn land on its behalf.  There is no evidence dated prior to March 12, 2003, that the Tribe had asked the Watershed District to condemn property for the Plum Creek project or that the Watershed District had agreed to do so.

**F.    The only indications in the record that the Watershed District had agreed to condemn property for the Tribe are self-serving statements made months after the Tribe first learned that it did not have condemnation powers over non-Tribal land — and nearly ten years after the parties signed the 1994 Watershed Plan.**

27.    In a January 21, 2004, letter handed to Dexter Davis at a Watershed District Board meeting that day, Tribal Chairman, Steve Cadue stated:  "As the primary local sponsor possessing eminent domain authority, the Nemaha Brown Watershed Board had full knowledge

that the Kickapoo Tribe would require the Board to fully assert its condemnation authority to aid the Tribe in its acquisition of the necessary land rights." (Ex. 19.)

28.     In a discussion at that Board meeting, "Rodney Lierz asked how long Mr. Cadue and the tribe had known they did not possess the power of eminent domain.  Mr. Cadue stated about 20 years, but took for granted that the Watershed District would support their site." (Ex. 20 at 829.)  There is no indication in the extensive historical record that Mr. Cadue's statement was accurate.

29.     In fact, the record reflects the Watershed District's longstanding policy and practice to not proceed with any project without 100% landowner approval and to never exercise eminent domain for any project.  (*See* Affs. of Dexter Davis, at ¶¶13-16; Glenn Hennigan, at ¶¶ 8-15; Wayne Heiniger, at ¶¶ 6-9, and Leo Wessel, at ¶ 11.)

30.     Moreover, the record clearly shows that the Tribe maintained an unwavering belief in its condemnation power over non-Indian owned fee lands until March 12, 2003.

**IV.     The Watershed District was formed pursuant to the Kansas Watershed District Act and was created to advance the interests of the State of Kansas.**

31.     The Watershed District was formed pursuant to the Kansas Watershed District Act, which was first enacted in 1953 and is now codified at K.S.A. 24-1201, *et seq*.  1953 Kan. Sess. Laws, ch. 477.

32.     The Watershed District Act is one of the methods the State of Kansas uses to address "serious problems of water management resulting from erosion, floodwater or sediment damages or instability of natural water supplies . . . arising in the watersheds of the rivers and streams of the state." K.S.A. 24-1201.

33.     The Kansas Legislature determined that there is a "public necessity" to establish watershed districts in order to alleviate these damages and to further the "conservation, development, utilization and disposal of water . . . thereby preserving and protecting the ***state's land and water resources***." K.S.A. 24-1201 (emphasis added).

34.     The State of Kansas has an interest in protecting its water resources for numerous reasons, including the fact that **all of the water** within the State of Kansas is owned by the State and is subject to its control and regulation.[6]   K.S.A. 82a-702; *Williams v. City of Wichita*, 190 Kan. 317, 333–34 (1962).

35.     In order to form a watershed district, a verified petition signed by not less than 20% of the landowners and representing 25% of the acreage within a proposed district must be filed with the Kansas Secretary of State.[7]   K.S.A. 24-1203.

36.     The Secretary of State is required to review the petition to determine whether it meets statutory requirements.  K.S.A. 24-1205.

37.     If the Secretary of State finds that the petition is in proper form, a certified copy is sent to the Chief Engineer of the Kansas Department of Agriculture, Division of Water Resources (the "DWR") for review and approval or disapproval.  K.S.A. 24-1206(a).

38.     The State's Chief Engineer is then required to conduct an investigation of the proposed district, its territory, and its purposes and to transmit a written report of the findings, together with a written approval or disapproval of the petition, to the Secretary of State and to the local steering committee.  K.S.A. 24-1206(b).

39.     The report must consider seven factors set out in the Act, including a determination that the proposed watershed district's statement of purposes conforms to the intents and purposes of the Act.  K.S.A. 24-1206(c).

------------------------------------------

[6]     The cited statute is subject to the rule announced in *Winters v. U.S.*, 207 U.S. 564 (1908), recognizing federal reserve water rights on Indian Reservations.  The federal reserved right on the Kickapoo Reservation is an issue in this case but not in this Motion.

[7]     The Act was amended in 1995 to provide that the board of county commissioners could adopt a resolution proposing the establishment of one or more watershed districts under limited circumstances not applicable here.  K.S.A. 24-1203a.

40.     Once formed, watershed districts have the following powers, among others:

*Second.*  To sue and be sued by its corporate name.

*Third.*   To purchase, hold, sell and convey land and personal property and to execute such contracts . . .

*Fourth.*  To construct, improve, maintain and operate works of improvement . . . necessary for the conservation of soil, prevention of floods, disposal of water and the conservation, development and utilization of water for domestic, municipal, agricultural, industrial, recreational purposes and such other uses . . .

*Eighth.*  To acquire land and interests in land by gift, purchase, exchange or eminent domain; such power of eminent domain to be exercised within or without the boundaries . . .

*Tenth.*  To cooperate and contract with [a wide variety of persons and entities but not specifically with Indian Tribes] and to enter into co-operative contracts and agreements with any such districts, corporations or agencies.

K.S.A. 24-1209.

41.     Upon formation, watershed districts are required to prepare a "General Plan."

K.S.A. 24-1213(a).  A General Plan is defined as:

[A] preliminary engineering report describing the characteristics of the district, the nature and methods of dealing with the soil and water problems within the district, and the projects proposed to be undertaken by the district.  It shall include maps, descriptions and such other data as may be necessary for the location, identification and establishment of the character of the work to be undertaken and such other data and information as the chief engineer [of the Kansas Department of Agriculture, Division of Water Resources] may require.

K.S.A. 24-1202(f).

42.     In the same way that the petition is subject to review and approval by the State, the General Plan must be submitted to the State's Chief Engineer for examination and study to determine its (1) feasibility; (2) co-ordination with the General Plans for other watershed districts in the same basin; (3) safety of the proposed projects; and (4) conformity with the intents and purposes of the Watershed District Act.  K.S.A. 24-1213(b).

43.     The State's Chief Engineer is empowered to require any changes or modifications deemed necessary.  K.S.A. 24-1213(b).

V.   **The Watershed Surveys and Planning program established by P.L. 83-566 is a complicated, multi-year planning process controlled by the SCS/NRCS.**

44.   The federal Watershed and Flood Prevention Act, 16 U.S.C. § 1001–1008, ("P.L. 83-566,") was enacted on August 4, 1954.[8]

45.   Section 6 of the Act provides for cooperation among federal, state, and local agencies "to make investigations and surveys of the watershed of rivers and other waterways as a basis for the development of coordinated programs." 16 U.S.C. § 1006.

46.   Through its watershed programs, the SCS/NRCS provides technical and financial assistance to States, local governments, and Tribes to plan and implement authorized watershed project plans, to carry out works of improvement for soil conservation; flood prevention; conservation, development, utilization, and disposal of water; and conservation and proper utilization of land.[9]   More specifically, these federal programs address:

> watershed protection; flood mitigation; water quality improvements; soil erosion reduction; rural, municipal and industrial water supply; irrigation; water management; sediment control; fish and wildlife enhancement; wetlands and wetland function creation and restoration; groundwater recharge; easements; wetland and floodplain conservation easements; hydropower; and watershed dam rehabilitation.[10]

47.   During planning, problems such as water quality, flooding, water and land management, and sedimentation are evaluated and works of improvement are proposed to alleviate identified problems.[11]   In order to justify federal assistance to install works of

---

[8]   This Act, as amended, is referred to in the documents as "PL-566," "P.L. 566," and "P.L. 83-566."

[9]   http://www.nrcs.usda.gov/wps/portal/nrcs/main/national/programs/landscape/wo, accessed on July 10, 2012.

[10]   *Id*.

[11]   http://www.nrcs.usda.gov/wps/portal/nrce/detail/national/programs/landscape/wsp/?&cid-nrcs143_008273, accessed on July 10, 2012.

improvement, the resulting watershed plans estimate benefits, costs, local contribution requirements, and arrange for operation and maintenance. [12]

A.    **P.L. 83-566 does not require that local sponsors commit to condemn land in the planning stages; instead, the Act and the implementing regulations require this commitment in a Project Agreement executed at the time a particular structure is to be built.**

48.    The federal planning process includes multiple steps.  (*See* generally Ex. 21; Ex. 22; Ex. 13.)

a.    The process begins with an identification of the "problem" and the local sponsors. *Id*.

b.    The local sponsors apply for P.L. 83-566 assistance.  In Kansas, the Application must be consistent with a watershed district's General Plan and must be approved by the State.  (Ex. 21.)

c.    The Application is reviewed by multiple State entities, called the Watershed Review Committee, which assigns the Application a "planning priority" among other P.L. 83-566 applications.[13]  (Ex. 23.)

d.    The SCS/NRCS performs an extensive preauthorization study in order to obtain "planning authorization."  (*See* the Preauthorization Report at Ex. 13.)

---

[12]    *Id.*

[13]    For example, in 1983 the State's Watershed Review Committee consisted of the Executive Director and the individual Members of the Kansas State Conservation Commission, now the Kansas Department of Agriculture, Conservation Division; the Director of the Kansas State University Agricultural Experiment Station; the Executive Director of the Kansas Fish & Game Commission, now the Department of Wildlife, Parks and Tourism; the Director of the Kansas Water Office; the Secretary of the State Board of Agriculture, now the Department of Agriculture; the Secretary of the Department of Health & Environment; the Director of the Kansas State University Extension Service; and the SCS/NRCS State Conservationist.  (Ex. 27.)

e. P.L. 83-566 planning requires coordination with other federal and state agencies; compliance with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4370h ("NEPA"), including the preparation of an Environmental Impact Statement; planning for land treatment; and analysis of the benefit-cost ratios. The Tribe's engineering firm reported that the planning effort would require 1,400 man-years.  (Ex. 24.)

f. Project "scoping" involves looking at all problems in the watershed area and determining how they will be affected by the P.L. 83-566 watershed project. Scoping is a continuous activity throughout the planning process.  (Ex. 25 at 94; Ex. 26.)

g. Plans that cost more than $5 million or with dams with a storage capacity in excess of 2,500 acre-feet[14] require congressional authorization.

h. Any necessary amendments to a watershed district's General Plan must be reviewed and approved by the State's Chief Engineer of the Division of Water Resources.

i. Upon approval of the Watershed Plan, local sponsors prepare to construct improvements and land treatment.  This includes acquisition of land rights, survey and design, raising local matching funds, and obtaining other permits, including, *e.g.*, Clean Water Act § 404 permits from the Army Corps of Engineers.  (*See also* Ex. 17, a letter from E. Jane Kloeckner, U.S. EPA's Senior Assistant Regional Counsel, to the Tribe setting out an extensive but non-exclusive list of

---

[14] An "acre-foot" is the quantity of water it takes to cover one acre of land to a depth of one foot or about 325,841.4 gallons.

environmental issues that would need to be addressed before the Plum Creek project could proceed.)

j.     Individual projects described in the Watershed Plan are constructed by the appropriate local sponsor with financial and technical assistance from the SCS/NRCS pursuant to project specific written agreements.  (Ex. 1 at 08, ¶ 19.)

49.     In order to insure that environmental information is provided to decision makers in a timely manner and that the policies and purposes of NEPA and Counsel on Environmental Quality regulations are complied with, NRCS regulations impose specific regulations governing its decision-making process. 7 C.F.R. § 650.12(a).

50.     For Watershed Protection and Flood Prevention projects, the major decision making points set out in the regulation and their relationship to NEPA compliance are as follows:

(i)     Application for assistance by the sponsoring local organization (SLO).

(ii)     A preauthorization report identifying goals, alternatives, and effects of alternatives (including environmental impacts) prepared by the RFO and submitted to the applicant for decision.  It is circulated to local, State, and Federal agencies and public comment is solicited.  A decision is made to stop planning assistance or to develop a watershed plan.

(iii)     Granting of planning authorization by the Administrator.  The [Responsible Federal Official] RFO must provide an evaluation of the potential environmental impacts to obtain the authorization.

(iv)     A watershed agreement between the SLO and NRCS.  The agreement is based on a completed watershed plan and associated environmental documents, which have been adequately reviewed within NRCS.

(v)     A project agreement between the SLO and the RFO executed after the NEPA process is complete and the watershed plan has been approved and final plans and specifications have been developed.

7 C.F.R. § 650.12(b)(1)(i)–(v).

51.     Steps (i) through (iv) lead up to the preparation of a plan like the Watershed Plan in this case. *Id*.

52.     The fifth step, a project agreement between the local sponsor and the NRCS, is signed only "*after the NEPA process is complete* and the *watershed plan has been approved* and *final plans and specifications have been developed*."  (*Id*. (emphasis added).)

53.     The act imposes several conditions on receiving "Federal assistance for the *installation of works of improvement*." 16 U.S.C. § 1004 (emphasis added).   To receive assistance for project installation, local sponsoring organizations must, among other requirements:

> (1) acquire, or with respect to interests in land to be acquired by condemnation provide assurances satisfactory to the Secretary that they will acquire, without cost to the Federal Government from funds appropriated for the purposes of this chapter, such land, easements, or rights-of-way as will be needed in connection with works of improvement installed with Federal assistance . . .

54.     The Act does not require these assurances prior to a project agreement entered into pursuant to 7 C.F.R. § 650.12(b)(5) and, in this case, paragraph 19 of the Watershed Plan, discussed infra.  *Id.*

55.     Consistent with the statute, federal regulations require sponsors to "*have* . . . the power of eminent domain" but they are not required to "*commit themselves*" to use that power until they seek federal financial assistance for project installation.  7 C.F.R. § 622.10 (emphasis added.)

56.     The regulation provides:

> (a)     Watershed projects are sponsored by one or more local organizations qualifying as sponsors. All watershed plans shall be sponsored by entities legally organized under State law or by any Indian tribe or tribal organization having the authority to carry out, operate and maintain works of improvement. Those plans that incorporate the use of nonstructural or structural measures shall be sponsored by organizations that, individually or collectively, *have*:

> > (1)     *The power of eminent domain*,

> > (2)     The authority to levy taxes or use other adequate funding sources, including state, regional, or local appropriations, to finance their share of the project cost and all operation and maintenance costs.

23

(b)    To receive Federal assistance for **_project installation, sponsors must commit themselves to use their powers_** and authority to carry out and maintain the project as planned.

7 C.F.R. § 622.10 (emphasis added.)

**B.     The Watershed District's 1958 Application for P.L. 83-566 assistance was rejected because the Watershed District's boundaries did not follow natural basin boundaries.**

57.    On May 5, 1958, the Watershed District, together with the Brown and Nemaha County Soil Conservation Districts, submitted an Application to the U.S. Department of Agriculture for planning assistance under the P.L. 83-566 program.  (Ex. 28.)

58.    On July 21, 1958, the State's Watershed Review Committee made a field examination.  (Ex. 29.)

59.    The Field Examination Report states that "The sponsors and directors of the watershed district are cognizant of their responsibility to secure easements and rights-of-way, to act as contracting agent, and to operate and maintain the project."  (Ex. 29.)

60.    The application did not seek to construct any large or multi-purpose sites and there was no mention of condemnation or acquiring title to land.  (Ex. 30.)

61.    The State's Watershed Review Committee recommended that no action be taken on the Watershed District's 1958 application until its boundaries were realigned to fit natural watershed lines rather than political boundaries.  (Ex. 1 at 59; Ex. 29.)

62.    An effort to correct the boundary was initiated in early 1960 and finalized in 1975.  (Ex. 1 at 59.)

63.    Nevertheless, on March 30, 1965, the State's Chief Engineer formally ratified the Watershed District's formation, thus allowing the Watershed District to construct works for the conservation, development, utilization, and disposal of the waters of the State and to mitigate erosion, floodwater, and sediment damages.  (Ex. 31.)

64.    This allowed the Watershed District to build floodwater retarding structures under State law.  (*See, e.g.,* Ex. 21.)

**C.** **The Watershed District's 1975 Application for P.L. 83-566 assistance specifically declines to agree to exercise its condemnation powers and reflects its policy of not proceeding with any project absent 100% landowner approval.**

65.     In 1975, the Atchison, Brown, Jackson, and Nemaha County Conservation Districts and the Watershed District submitted a second P.L. 83-566 "Application for Assistance." (Ex. 32.) The Tribe was not a co-applicant.

66.     This Application followed years of planning, beginning with the Watershed District's October 28, 1971, decision to reapply for P.L. 83-566 assistance. (Ex. 33.)

67.     The Application described the upper Delaware watershed and the problems that were occurring because of persistent flooding.   It also described the objectives, expected benefits, the anticipated land treatment, and the anticipated structures needed to address these concerns. (Ex. 32.)

68.     In addition to other types of projects, the Application stated that floodwater-retarding structures may be needed throughout the District. (Ex. 32.) There was no mention of multi-purpose or water supply structures for the Tribe.

69.     The Application included a "Local Participation" section, which states, in part, as follows:

> The legally organized Nemaha Brown Watershed District has the authority to levy taxes, issue bonds and make special assessments in order to participate in the project.[15] The Board of Directors will carry out the following:
>
> 1.     Obtain all land rights, easements and rights-of-ways needed for the installation of the watershed structures.
>
> 2.     Make arrangements with township officials and county commissioners for abandonment, relocation or modification of any township or county road needing such.

───────────────────

[15]     The Watershed District also had the power of eminent domain but did not mention that in the list of authorities it relied on for this Application. K.S.A. 24-1209 *Eighth*.

3.     Arrange for any relocation or modification to communication lines or other public utilities which are necessary in connection with installing improvements.

4.     Contract for the construction of the watershed structures.

5.     Appoint a contracting officer and bear costs of contract administration.

6.     Operate and maintain the watershed structures.

(Ex. 32.)

70.     The Application includes a number of SCS/NRCS forms, one of which poses a question about the method of land acquisition.  The Watershed District stated that it would be acquiring land rights by donation.  In spite of an opportunity to do so, they did not agree to exercise their power of eminent domain or to purchase easements.  The portion of the relevant form is as follows:



(Ex. 32.)

71.     This is consistent with the Watershed District's longstanding policy and practice of not proceeding with any project in the watershed without 100% landowner approval and the requirement that the landowner donate any easements necessary for construction of the project. (*See* Affs. of Dexter Davis, at ¶¶13-16; Glenn Hennigan, at ¶¶ 8-15; Wayne Heiniger, at ¶¶ 6-9, and Leo Wessel, at ¶ 11.)  It also reflects the Watershed District's unwavering policy of not exercising its power of eminent domain for any projects in the watershed.  (*See id.*)

72.     The SCS/NRCS Application form also contains a section entitled "Part V Assurances."  The SCS/NRCS did not require local sponsors to provide assurances or otherwise agree to exercise their powers of eminent domain.  Instead, the Watershed District was only

required to assure the federal agency that it "possesses legal authority to apply for the grant, and to finance and construct the proposed facilities . . ."[16] (Ex. 32.)

**VI.     The Tribe became interested in a reservoir on its Reservation in the late 1970s.**

73.     A September 23, 1974, letter from Roscoe Long to Orville Love, both SCS/NRCS employees, stated that the Tribe was interested in developing reservoirs on the Reservation for recreation and water supply.  Mr. Long also stated that he had advised the Tribe that the only way these structures could be built was through the P.L. 83-566 program.  (Ex. 34.)

74.     A July 31, 1975, letter from Orville Love to Kenneth Corpstein, an SCS/NRCS Hydraulic Engineer, stated that the Tribe was interested in developing three potential water storage sites.  (Ex. 35.)

75.     As discussed above, in a July 28, 1976, meeting with numerous interested parties discussing a potential multi-purpose site, the Tribe's attorney assured the participants that the Tribe has "the same legal status as a municipality in participating with federal programs." (Ex. 6.)

76.     The Watershed Plan discusses the Tribe's interest in a water supply. (Ex. 1 at 31.

**VII.    The Watershed District's 1978 General Plan further demonstrates that the Watershed District would not condemn land and, in fact, would shoulder no responsibility for land acquisitions for the City of Sabetha or for the Tribe.**

77.     As is required by the P.L. 83-566 planning process (Ex. 21), the Watershed District completed the development of a General Plan under the authority of the Kansas Watershed District Act in 1978.  (Ex. 36; Ex. 1 at 59.)

---

[16]     On May 1, 1991, the SCS/NRCS in Salina, Kansas submitted a Planning Authorization Request and a Pre-Authorization Report to the SCS/NRCS in Washington, D.C.  (Ex. 13.)  The Pre-Authorization Report specifically states that the application for assistance under the P.L. 83-566 program was submitted in October of 1975.  (Ex. 13.)

78.     The Watershed District made it clear from the outset that it would not obtain land rights for any multi-purpose site and would not use its power to condemn.  (Ex. 36 at 328.)

79.     The Tribe had copies of the General Plan and was aware of its contents early on. (*See, e.g.,* Ex. 37, a June 9, 1983, letter from Emory Negonsott, Chairman of the Tribe and Ex. 38, a June 27,1989, letter from the Tribe's Vice-Chairman, Ralph E. Simon.  Both letters refer specifically to the Watershed District's 1978 General Plan.)

80.     The General Plan discussed multi-purpose sites, the Tribe's plans, and the Watershed District's co-sponsorship of multi-purpose dams.  Multi-purpose structures for both the Tribe and the City of Sabetha were included, but the Watershed District expressly disclaimed any duties or responsibilities for these structures:

> The watershed district and the Kickapoo Tribal Council are co-sponsoring multipurpose dams, sites 15-30, 20-17; 21-14A [Plum Creek] and 24-7 . . .
>
> The 4 multipurpose sites are in conformity with the longtime plans for the Reservation . . . Site 21-14A [Plum Creek] to serve as floodwater retardation; [i]ndustrial and supplemental irrigation water source and recreation . . .
>
> Further, the district and city of Sabetha will co-sponsor a multipurpose structure, site 31-25 on the project map.  This installation will function as floodwater retardation, municipal and industrial water supply, and recreation for Sabetha.
>
> There are no construction costs assigned to the watershed district in Table I for the multipurpose sites.  ***Co-sponsors to the project, the Kickapoo Tribal Council and the City of Sabetha will procure land rights for the reservoir, both spillways, and recreational developments.***  Agreements for maintenance of the facility will be made before construction begins.

(Ex. 36 at 323 (emphasis added).)

81.     In its General Plan, the Watershed District went on to make it even clearer that it was not interested in acquiring fee title to real property and that the Tribe and the City of Sabetha were responsible for land acquisition for their multi-purpose structures, stating:

> The watershed district has ***no interest*** in owning land in fee title except as required to achieve stated project objective.

(Ex. 36 at 309 (emphasis added).)

> The Board of directors will obtain all land rights, ***except at the multipurpose sites***.

(Ex. 36 at 328 (emphasis added).)

> Relocation costs associated with the multipurpose structures will be paid by **sponsors other than the watershed district**.

(Ex. 36 at 327 (emphasis added).)

> The multipurpose structures, sites No. . . . 21-14A [Plum Creek] . . . will be operated and maintained by the Kickapoo Tribal Council.  Site 31-25 will be maintained by the city of Sabetha.  Therefore no cost to the watershed district is shown.

(Ex. 36 at 323.)

82.     The Watershed District's 1978 General Plan states that Site 21-14A, the Plum Creek reservoir, would cover 220 acres under normal conditions and up to 400 acres during flood events.  (Ex. 36 at 343.)

83.     A color version of the map attached to the 1978 General Plan (Ex. 36 at 357 and 59) shows that Site 21-14A was not slated to extend outside of the Tribe's Reservation boundaries. (Ex. 39.)   The expanded view of the map shows the location of this proposed structure in relationship to the Reservation boundary.

84.     The 1978 General Plan proposed the possibility of up to "300 odd" small dam sites.  (Ex. 39.)

85.     As discussed below, though the Plum Creek reservoir was later increased to 472 acres, thereby causing it to extend outside the Reservation boundaries, the Watershed District was not informed of this until 1989.[17]   (Ex. 40; Ex. 25 at 894.)

---

[17]     The Watershed Plan calls for a 475 acre reservoir.  (Ex. 1 at 81.)

VIII.    **Contrary to the Tribe's allegations, its request to file a P.L. 83-566 Application for planning assistance and to act as a "sole sponsor" of a P.L. 83-566 Plan was denied because the Reservation did not cover an entire watershed basin or sub-basin, not because it lacked condemnation authority.**

86.    There is no factual basis for the Tribe's allegation that its joint sponsorship of the Watershed Plan planning effort was required because the Tribe lacked condemnation authority and thus needed a co-sponsor who would lend its power of eminent domain to the Tribe.  (*See* Second Am. Compl., Doc. 199, ¶ 69.)

87.    On December 14, 1982, Steve Cadue of the Tribe; John White, an engineer employed by the Tribe; and other Tribal members, met with SCS/NRCS representatives regarding the Tribe's desire "to be a sole sponsor of a watershed project covering their reservation area and asked if that was possible."  (Ex. 41 (emphasis added).)

88.    The detailed P.L. 83-566 planning process and the cover of the Watershed District's July 1978 General Plan showing the relationship between the Reservation and the Watershed District boundaries were reviewed.  (Ex. 21.)

89.    The SCS/NRCS representatives concluded that, although not required by statute, USDA policy required that the Tribe's Reservation boundaries needed to have "complete watershed area coverage" for the Tribe to be a sole sponsor.  (Ex. 41.)

90.    This is the case because, while the Watershed District and the Tribe have focused on dams and reservoirs, "land treatment" is a key element of P.L. 83-566 planning and implementation.  As noted above, the Watershed Plan proposed 11,000 acres of "land treatment." (Ex. 1 at 03.)

91.    In a 1991 letter to Senator Dole, prompted by a letter to the Senator from the Tribe, James Habiger, the SCS/NRCS State Conservationist, pointed out that the P.L. 83-566 planning process is complex.  "Other problems such as non-point source water pollution and flooding are also being addressed."  (Ex. 42.)

92.    Thus, under the Watershed Plan, the County Conservation Districts, as local sponsors, are to obtain agreements from the owners of at least 75 percent of the land above each

dam.  These agreements are to require the landowners to pay the local share of the costs to construct, operate, and maintain land treatment measures for the protection and improvement of the watershed.  The Conservation Districts must also assure the installation of these land treatment measures.  (Ex. 1 at 07, ¶¶ 9–11 and 13.)  For a discussion of the comprehensive nature of the various land treatment measures required by the Watershed Plan, *see* Ex. 1 at 63–64.

93.     On December 16, 1982, two days after the Tribe's meeting with the SCS/NRCS staff, John Thomas, chairman of the Tribe, wrote to John Block, the Secretary of the U.S. Department of Agriculture, stating that the Tribe "would like to be approved as a ***sole sponsor*** to carry out, maintain and operate the works of improvement" under the P.L. 83-566 Program.  (Ex. 43 (emphasis added).)

94.     In that letter, Mr. Thomas stated: "As a tribal council we have an obligation, the commitment and capability to administer a P.L. 566 sole sponsorship plan for works of improvement."  (Ex. 43.)

95.     In a letter dated January 13, 1983, Joseph W. Haas, the SCS/NRCS Deputy Chief for Natural Resource Projects, rejected the Tribe's request.  The letter states that Indian Tribes with authority to carry out, maintain, and operate works of improvement may become sponsors of a watershed project, but only if the other provisions of the law and the program rules are met.  (Ex. 44.)

96.     The letter points out that the Tribe's Reservation boundaries cut across several drainage areas and that the Kickapoo Tribal lands do not encompass the entire hydrologic watershed area that would contribute runoff to potential reservoirs located on Tribal lands.[18]  (Ex. 44.)[19]

---

[18]     This is consistent with the rejection of the Watershed District's 1958 application for P.L. 83-566 assistance because some of the Watershed District's initial boundaries followed political

97.     A January 27, 1983, letter to John Tippie, SCS/NRCS State Conservationist, from Edgar Nelson, Director of SCS/NRCS Basin and Area Planning in Washington, D.C., stated that sole sponsorship could not be approved "since the Tribe cannot exercise control over the contributing watershed area." (Ex. 45.)

98.     At the time this lawsuit was filed, the Tribe was well aware that the rejection of its request to act as a sole sponsor of a P.L. 83-566 Plan had nothing to do with any lack of condemnation power.  In a January 21, 2004, letter to Dexter Davis of the Watershed District, Steve Cadue, Tribal Chairman, demanded that the Watershed District agree to exercise its condemnation power on its behalf.   In a discussion about the history of the 1983 Co-Sponsorship Agreement, discussed below, the letter stated:

> The Kickapoo Tribe sought this joint agreement as *PL 83-566 projects could only be utilized for the benefit of an entire watershed and not merely the area which the Kickapoo Reservation occupies*.  Therefore, the *Tribe had little choice* but to work cooperatively with the Nemaha-Brown Watershed Joint District #7 to pursue joint PL 83-566 projects that would provide the greater benefit to the landowners of the greater Upper Delaware and Tributaries watershed.

(Ex. 19 at 1129 (emphasis added).)  Mr. Cadue did not argue that the basis for the rejection was the lack of condemnation authority.

99.     In addition, even though the Watershed District was already including the Tribe in the Watershed District planning process voluntarily, the Tribe's continued participation in the

---

lines thus cutting across natural drainage basin boundaries.  (*See* Ex. 1 at 59; Ex. 29.)  The SCS/NRCS rejection of the Tribe's sole sponsorship, just like the rejection of the Watershed District's 1958 application, had nothing to do with the power of eminent domain.

[19]     A map in the Watershed Plan highlights the drainage areas to be controlled by the planned P.L. 83-566 structures both on and off the Reservation and their relationship to the Reservation boundaries.  (*See* Ex. 1 at 151 (areas highlighted in green).  *See also* the areas highlighted in pink on Ex. 39.)  The drainage areas for the four structures planned for the Reservation each extend outside of the Reservation boundaries.

Watershed District's planning process became mandatory.  The January 27, 1983, letter from

Edgar Nelson to John Tippie went on to state:

> Mr. Thomas and other Tribal Officials met with Department of Agriculture,
> Farmer's Home Administration (FmHA), and Soil Conservation Service (SCS)
> representatives in Washington, D.C. on January 24, 1983. . . .
>
> At the conclusion of the meeting, I agreed to inform you that any project which
> would involve or directly affect Tribal lands of the Kickapoo Tribe of Kansas
> ***would have to include the Tribe as a joint sponsor***.  It should be clear that any
> plan which would involve their lands would need to address their problems and
> concerns.  They should be provided an equal voice in decision making, and ***their
> sponsorship would be required*** to implement economically efficient and cost
> effective solutions to the problems.  ***These considerations should be reflected in
> any and all future assistance provided under the authority of Public Law 83-
> 566.***

(Ex. 45 (emphasis added).)

100.   There is no indication in the record that the SCS/NRCS rejection of the Tribe's

request to serve as a sole sponsor had anything to do with the Tribe's condemnation authority or

the lack thereof.  In fact, eminent domain was not mentioned because the Tribe reasonably

believed that it had this power.  Instead, the rejection was based solely on the fact that the Tribe's

Reservation was not coextensive with the boundaries of the sub-watersheds that make up

portions of the Reservation.

## IX.   The Watershed District agreed to co-sponsor its ongoing P.L. 83-566 planning process with the Tribe, entering into an agreement that defined their respective duties, which did not include condemnation.

101.   Soon after the rejection of the Tribe's request to be a sole sponsor of their own

P.L. 83-566 Plan, the Tribe turned to the Watershed District, holding a February 9, 1983, special

meeting to discuss co-sponsorship of the P.L. 83-566 planning efforts.  (Ex. 46; Ex. 47 at 1696.)

102.   Several topics were discussed at that meeting, including:

a.     Joint sponsorship of the watershed plan;

b.     The fact that the projects proposed by the Tribe were to be multi-purpose
       structures;

c.     BIA support of joint sponsorship because it would benefit the Tribe;

d.      Water quality and the *Winters* Doctrine water rights;

e.      Population projections for the Reservation;

f.      Whether multi-purpose sites could provide water supplies for surrounding communities; and

g.      Regulation of water quality by EPA or the Indian Public Health Service.

(Ex. 47.)

103.    The Tribe did not request that the Watershed District exercise the power of eminent domain on the Tribe's behalf or tell the Watershed District that the Tribe was precluded from becoming a sole sponsor of a P.L. 83-566 Plan because it lacked condemnation authority. In fact, eminent domain was not discussed at all.  (Ex. 46; Ex. 47.)

104.    On February 17, 1983, the Watershed District held a special meeting attended by Steve Henningsen of the SCS/NRCS at which the Board unanimously approved a resolution stating that the Watershed District was,

> interested in cooperating with and jointly sponsoring with the [Tribe] . . . provided a written agreement can be worked out satisfactory to both parties as to how the joint sponsorship would be administered and how funds would be spent and the selection of priority of sites.

(Ex. 48.)

105.    The Watershed District also decided to send four of its Board members to Washington, D.C. to meet with the Tribe and Pete Myers, the SCS/NRCS Chief, to discuss joint sponsorship and co-development of the watershed.  (Ex. 48.)

106.    There is no indication in the record that condemnation was discussed when the Watershed District and the Tribe met with SCS/NRCS officials in Washington, D.C.

107.    On March 24, 1983, John Thomas, representatives from the BIA, the SCS/NRCS, and local farmers attended a Watershed District meeting, at which Mr. Thomas advised those present that the Tribe had offered to co-sponsor the watershed plan.  (Ex. 24.)

108.    Mr. Thomas told the Board that "there is a lot of money allotted for Indian Tribes. They get a lot of money because they go directly to D.C. and knock on all the right doors."  Later in the meeting, Mr. Thomas told the Board that he believed that the Tribe could obtain the entire "$30 million needed for construction."  (Ex. 24.)

109.    At the end of this meeting someone asked "[W]ho donates land for structures?"
John White, the Tribe's engineer, answered that the Tribe will put up the land on the reservation in land purchases and donations.[20]  In some cases the farmer donates the land for construction and so he gets to maintain control.  [Each] site will be dealt with individually.  Eldon Schwant [the SCS/NRCS District Conservationist] from Seneca stated that land rights are important.  Money goes quick when it is used for purchasing land.

(Ex. 24.)

110.    There was extensive discussion about all aspects of the planning and the P.L. 83-566 process, including land acquisition.  However, eminent domain was not discussed at the March 24, 1983, meeting.  (Ex. 24.)

111.    Also on March 24, 1983, the Watershed District held a separate quarterly meeting at which a Co-Sponsorship Agreement between the Tribe and the Watershed District was discussed.  Delwin Meyer asked about maintenance on the "state structures that we must condemn and build."  (Ex. 49.)  This is one of the very few pre-1994 references to condemnation in the record and it clearly refers to State-funded structures to be constructed by the Watershed District, not P.L. 83-566 structures, and not to the Tribe's planned multi-purpose sites.

A.    **The 1983 Co-Sponsorship Agreement did not mention condemnation or require the Watershed District to acquire land for the Tribe.**

112.    On March 28, 1983, the Watershed District and the Tribe signed a Co-Sponsorship Agreement on P.L. 83-566 Structures, establishing a joint watershed board.  The

---

[20]    There was no plan for Site 21-14A to extend outside of the Reservation boundaries until 1989.  (Ex. 39.)

Agreement states that it is an "unprecedented initial joint tribal and watershed district project." (Ex. 50.)

113.   The Co-Sponsorship Agreement contains a recital stating that "the District and the Tribe, ***both being qualified local agencies under Public Law 566*** are desirous of obtaining planning and improvements under Public Law 566." (Ex. 50 (emphasis added).) *See* 7 C.F.R. § 622.10.   While this provision does not directly state that the Tribe possesses the power to condemn, it is consistent with the Tribe's belief that it possesses this right.

114.   The Agreement specifically stated that the Watershed District would continue to "monitor, design, [and] construct all structures in the watershed except PL566 structures.  This work to be done with local tax money and any state monies that it may receive." (Ex. 50.)

115.   The Tribe asserts that the Watershed District has continued to build State-funded structures and that this practice has somehow harmed the Tribe.  (*See, e.g.*, Second Am. Compl., Doc. 199 at ¶¶ 101, 102, 113, and 117–23.)   However, the Watershed District's practice was specifically approved in the 1983 Co-Sponsorship Agreement.  (Ex. 50, ¶ B.3.)

116.   The Co-Sponsorship Agreement does not require the Watershed District to obtain land or land rights for the Tribe and does not mention eminent domain.  (Ex. 51.)

117.   The Co-Sponsorship Agreement was unanimously endorsed by the Kansas State Conservation Commission and by the Kansas Governor.  (Ex. 52; Ex. 53, respectively.)

**B.     The planning process required extensive effort by numerous contractors and governmental officials and meetings with the Watershed District and the Tribe over a period of years; the alleged obligation to condemn land for the Tribe was never discussed.**

118.   In late April 1983, the Tribe retained an engineering firm to perform the P.L. 83-566 planning, (Ex. 22); however, it appears that the Watershed District was generally not kept in the loop regarding the engineers' activities and that the Watershed District and the SCS/NRCS may have considered Van Doren-Hazard-Stallings, Inc. to be the Tribe's consultant.  (*See* Ex. 240 (responding to a telephone inquiry from Gale Miller of the Watershed District, recapping

Van Doren-Hazard-Stallings, Inc.'s involvement in the planning process and referring to the engineers as the Tribe's "consultant").)

119.   There were numerous meetings between 1984 and the approval of the 1994 Watershed Plan.  Attendees at these meetings varied, but they generally included various combinations of Watershed District Board members; the Tribe; the Joint Tribe-Watershed District Board; the SCS/NRCS; and the BIA.  In addition, there were some public information meetings.  (*See, e.g.,* in chronological order, Ex. 54; Ex. 55; Ex. 56; Ex. 57; Ex. 58; Ex. 59; Ex. 60; Ex. 61; Ex. 62; Ex. 63; Ex. 64; Ex. 65; Ex. 66; Ex. 67; Ex. 68; Ex. 69; Ex. 70; Ex. 71; Ex. 72; Ex. 73; Ex. 74; Ex. 75; Ex. 76; Ex. 77; Ex. 78; Ex. 79; Ex. 80; Ex. 81; Ex. 82; Ex. 83; Ex. 84; Ex. 85; Ex. 86; Ex. 87; Ex. 88; Ex. 89; Ex. 90; Ex. 91; Ex. 92; Ex. 93; Ex. 94; Ex. 95; Ex. 96; Ex. 97; Ex. 98; Ex. 99; Ex. 100; Ex. 101; Ex. 102; Ex. 103; Ex. 104; Ex. 105; Ex. 106; Ex. 107; Ex. 108; Ex. 109; Ex. 110; Ex. 111; Ex. 112; Ex. 113.)

120.   The Tribe's Plum Creek project was a frequent topic of discussion at these meetings.  And though the issue of land rights was occasionally raised, the record contains no evidence indicating that it was ever stated, suggested, or implied that the Watershed District had or would ever have a contractual or any other obligation to exercise its eminent domain authority on the Tribe's behalf for the Plum Creek project or any other undertaking.  *Id.*

**C.**      **At all times throughout the planning process the Watershed District acted in accord with its policy of obtaining voluntary donation of easements for watershed structures so that none of the parties involved in the planning process could have been unaware of the District's opposition to condemnation.  Moreover, it was clear throughout the  planning process that the Tribe was the sole sponsor of the Plum Creek site with the exclusive responsibility to acquire land rights.**

121.   At a December 16, 1986, Watershed District Board meeting there was a discussion about maintaining open communications with landowners so that they knew why inspectors were on their land.  There was no discussion about warning landowners that the Watershed District might have to exercise its power of eminent domain on behalf of the Tribe. (Ex. 63.)

122.     In a June 10, 1988, letter to Fred Thomas, Larry Miles reiterated that the Tribe is the "joint sponsor with responsibility for the land inside their reservation boundaries.  The [Watershed District] is the joint sponsor responsible for P.L. 566 activities in the rest of the watershed."  (Ex. 114.)[21]

123.     On June 23, 1988, Steve Henningsen informed the Watershed District that Peggy Acoya "expressed the desire to have 100% affirmative consensus from the landowners [of allotted lands].  An area of 80 acres might easily have 100 landowners or more."  (Ex. 115.)

124.     A September 16, 1988, letter from Steve Henningsen to Fred Thomas reinforces that the Tribe, not the Watershed District, was responsible for land rights for the Plum Creek project:  "As the sponsor with responsibility for the watershed on the Reservation, [the Tribe] will need to obtain permission from the landowners for the contractor to enter the properties" to perform field investigations.  (Ex. 116.)

125.     On September 22, 1988, in a meeting of the Board of Directors of the Watershed District, Steve Henningsen reported on the progress made on the P.L. 83-566 planning on the Kickapoo Reservation.  Mr. Henningsen stated:

> Working under the joint agreement *the Kickapoos have responsibility for land rights on the reservation*.  Damages caused by the engineering firm doing their work such as damages to crops, would be paid by the sponsors (Nemaha-Brown and Kickapoo).  The Kickapoos don't think they would have any money to pay damages.  If the landowners don't agree to allow the work to be done on their land, the SCS would withdraw the funds from the watershed and the contract . . . the work can't be transferred to other sites in the watershed.

---

[21]     Note that Site 21-14A in the 1978 General Plan covered only 220 acres and did not extend off the Reservation.  (*See* Ex. 36 at 1343, 1357, and 1359; Ex. 39.)  The 1994 Watershed Plan states that the Plum Creek reservoir would cover 472 acres, but the increased size of the reservoir, and hence its extension outside of the Reservation boundaries, was not communicated to the Watershed District until 1989.  (*See* Ex. 40; Ex. 25.)  At that time, Steve Henningsen informed the Watershed District that "[t]he sites have been designed to their maximum potential on request by the Kickapoo Tribe" and that the Plum Creek reservoir would cover 472 acres.

(Ex. 117.  (emphasis added; ellipsis in original).)

126.    By June 20, 1989, the preliminary design data for the Plum Creek project had been compiled and at the Tribe's request, the reservoir had been expanded from 220 acres to 472 acres.  (Ex. 40; Ex. 25 at 894.)  Thus, the size of the reservoir more than doubled.

127.    Steve Henningsen gave the preliminary design data for the Plum Creek project to the Watershed District Board on June 29, 1989.  (Ex. 25 at 894–895.)

128.    At that meeting, Steve Henningsen told the Board that SCS/NRCS and the Tribe had expanded the size of the Plum Creek project to the "maximum potential on request by the Kickapoo Tribe" and that it would cover 472 acres.  (Ex. 25.)

129.    The Board expressed concern about the expanded size of the Plum Creek project and the fact that it would affect U.S. Highway 75.  (Ex. 118.)

130.    This appears to be the first time the Watershed District was informed that the Plum Creek project had been expanded.  Since Highway 75 is one mile west of the Reservation, this is also the first time the Watershed District learned that the proposed Plum Creek reservoir might extend outside of the Reservation boundaries.  (*See* map at Ex. 1 at 150.)

131.    At a September 21, 1989, meeting the Watershed District Board discussed inquiries from Congressmen Dole and Slattery regarding the Tribe's planned Plum Creek reservoir.  The Watershed District's response was that "we don't have much to do with these multi-purpose sites.  It was suggested that . . . the congressmen contact Steve Cadue of the Kickapoos."  (Ex. 70.)

   **D.    Because larger structures made obtaining land rights more problematic, the Watershed District resisted SCS/NRCS efforts to convince the Watershed District to construct larger floodwater retention structures.**

132.    In a Watershed District progress report covering the period from December 16, 1988, to March 30, 1989, Marilyn Snider states that the SCS/NRCS asked the Watershed District to choose 12 sites from a list of 26 sites for topographic surveys.  These sample sites were designed to determine the feasibility of a P.L. 83-566 plan and were "representative sites [that]

may or may not be in a final selection to build if the plan is authorized for federal funding." (Ex. 119 at 1343.)

133. The report goes on to state that Gale Miller and Wayne Heiniger of the Watershed District selected 13 sites from the SCS/NRCS list. Marilyn Snider reported that even though these were only sample sites, "[l]andowners on all sites except 9-25 and 13-27B have been contacted and agreed. Landowners on site 9-25 need to contact interested relatives before giving an answer. If they agree then we won't contact landowners on 13-27B." (Ex. 119.)

134. On October 18, 1989, the Watershed District held a special meeting at which it adopted a resolution unequivocally confirming its position that it would not support "any large P.L. 83-566 dams" that were opposed by the landowners. The resolution stated:

> The Board of Directors of Nemaha-Brown Watershed Joint District No. 7 state that they do not want any large PL566 dams in the watershed until the landowners who will be affected by said dam are contacted by the board to determine if said dam or dams are acceptable to said landowners.

(Ex. 71.)[22]

**E.    The Watershed District continued to oppose large P.L. 83-566 structures at an October 26, 1989, meeting of the Watershed District, the Tribe, and the SCS/NRCS because of the Watershed District's overriding concerns about landowner acceptance and approval.**

135. At an October 26, 1989, meeting of the Joint Watershed District/Tribe Board, the SCS/NRCS encouraged the Watershed District to locate additional dams with drainage basins

---

[22]    The minutes of the October 18, 1989, meeting were not signed and there was no quorum at the December 14, 1989, meeting so the minutes could not be approved. (Ex. 121; Ex. 72.) Instead, the minutes were approved at the Watershed District's March 22, 1990, meeting. (Ex. 241 at 04.

larger than four square miles in order to increase the flood control potential of the structures being planned.  (Ex. 72 at 2153, 2157, and 2181.)[23]

136.    Note that while the Watershed Plan provided for 21 floodwater retarding structures, the Watershed District's 1978 General Plan provided for as many as "300 odd," much smaller dams.  (*See* Ex. 39; Ex. 120.)  The minutes of the August 4, 1976, Watershed District meeting state:

> About 70 of the 300 odd dam sites proposed have most of the engineering done.  Those reviewed appear to possess satisfactory benefit/cost rations for eligibility for title P.S. 566 [sic] or Special Project structures.

137.    Reflecting the Watershed District's long-standing policy against exercising eminent domain, Gale Miller stated:

> [I]f the landowners were in agreement today to go ahead with a site covering a large area with water by the time that we could construct the landowner will probably have changed, then we can't get an easement.

(Ex. 72.  *See also* Affs. of Dexter Davis, at ¶ 16; Glenn Hennigan, at ¶¶ 8-15; Wayne Heiniger, at ¶¶ 6-9; and Leo Wessel, at ¶¶ 11-13.)

138.    In response, Larry Miles of the NRCS did not suggest the use of eminent domain, but instead stated that "it is tough when trying to look 10 to 15 years down the road.  The Joint Board needs to decide if they should include sites where landowners are currently against the site if the site is important to the watershed as a whole."  (Ex. 72.)

139.    The meeting notes and the first draft of the minutes indicate that Mr. Miles stated that: "It is tough to deal with neighbors when trying to look 10–15 years down road."  (Ex. 72.)

---

[23]    The handwritten notes from this meeting, the first draft of the minutes, the SCS/NRCS handwritten suggestions, as well as the final version of the minutes are provided.  In addition, the SCS/NRCS Trip Report is included.

The reference to "neighbors" was deleted from the final draft of the minutes at Steve Henningsen's request.  (Ex. 72.)

140.    Steve Henningsen added that:

Each dam stands on its own as far as benefits.  Who is to be responsible for land rights on each site must be decided by the sponsors (Watershed, Kickapoos and Conservation Districts).

(Ex. 72 (parenthetical in original).)

141.    During a lengthy discussion about the pros and cons of the P.L. 83-566 program, the Tribe's multi-purpose sites, other sites in the plan, and related issues, Ralph Simon of the Tribe stated that he had talked to landowners on multi-purpose site 21-14A and "they are in agreement."  (Ex. 72.)

142.    Despite the extensive discussion regarding land acquisition for the Plum Creek project, eminent domain was never mentioned.  (Ex. 71.)

**F.      At a November 3, 1989, meeting, the SCS/NRCS continued to push for larger structures and the Watershed District continued to resist this pressure.**

143.    On November 3, 1989, the Watershed District held a special meeting with Matt Sprick and Eldon Schwant.  All but one of the Board members attended the meeting.  (Ex. 73.)

144.    Mr. Schwant and Mr. Sprick first obtained a consensus from the Board that the goal was a 40–50% reduction in flooding.  (Ex. 73.)

145.    They then provided the Board with a series of maps showing only 14 potentially feasible sites and informed the Board that these sites would only result in a 23% reduction in flooding.  (Ex. 73.  *See also* Ex. 72 for map showing 14 "feasible" sites as of October 1989.)

146.    They told the Board that in addition to reduction in flooding, P.L. 83-566 structures must have a cost-benefit ratio of at least 0.8 to 1.0.  Mr. Sprick's Report goes on to state:

After it was established how important the combination of drainage areas was, Schwant and myself discussed example drainage areas which potentially could be combined. . . .  Schwant and myself presented aerial photos and topographic maps of the example areas.  These example areas drained from 3 to 18 square miles.  ***Immediately after seeing the first aerial photo, the Watershed Board became***

42

*skeptical due to the potentially large size of each example structures.* Schwant and myself estimated that the example structures permanent pool areas could range from 20 to 100 acres . . .

Realizing the potential need to locate larger PL-566 structures, the Watershed Board is planning to contact landowners of the combined PL-566 structures to get their feelings. . . .

Although the Watershed Board is going to look at the combination sites . . . *they would still like to have smaller structures*.

(Ex. 73 (emphasis added).)

147.    At that meeting, Matt Sprick stated that "[b]ecause the watershed board had indicated they would feel more comfortable with sites with smaller drainages, [Sprick and Schwant] went back and developed sites of five square miles or less." (Ex. 75.)

148.    However, the SCS continued to push the Watershed District to include larger sites in the watershed plan.  Both Steve Henningsen and Larry Miles were present and expressed frustration that the Board continued to insist on smaller sites:

> Steve Henningsen suggested that basically the watershed board needs to tell SCS what sites they want in the plan.  Larry Miles said the board needs to decide how they are going to obtain 40% damage reduction if that is their objective.

(Ex. 75.)   The Watershed Board believed that smaller sites were preferable for a number of reasons, including the fact that the District had a waiting list of landowners who wanted small ponds on their land and a small pond would not take as much income-producing property out of production.  Aff. of Leo Wessel, ¶¶ 6-11.

149.    In response to Henningsen, Gale Miller asked the same question he had posed at the October 26, 1989, joint meeting about what would happen if the Watershed District was "unable to obtain the landrights on the sites chosen for inclusion in the plan?  Larry Miles answered that sometimes you can't get all the sites.  The board has to decide how far they want to go to get sites." (Ex. 75.)

150.    The prospect of the Watershed District exercising eminent domain was not raised for any of the proposed sites in the Watershed, much less the Plum Creek project, but the

Board's concerns about acquisition of the land rights was clearly driving the Watershed District Board toward proposing smaller sites in their portion of the plan.

> **G.    Obtaining the land for multi-purpose structures was discussed at several meetings but eminent domain was never mentioned.**

151.    On July 9, 1990, Steve Henningsen and Duane Evans with the SCS/NRCS met members of the Watershed District Board, the Tribe, and Linda Saunders, the "new" BIA Superintendent of the Horton Agency.    In that meeting, the SCS/NRCS reiterated that "[s]ponsors would be responsible for land rights on all . . . uses except recreation."  (Ex. 122.)

152.    Gale Miller said that "he preferred to not hold a public meeting until the system of dams was finalized.  He did not want to give landowners hopes of a dam and then it turn out to be not feasible."  (Ex. 122.)

153.    There was no indication that the Tribe did not have the power to condemn or that a single sponsor, the Watershed District, would be required to obtain land rights for other sponsors.  (Ex. 122.)

154.    On February 28, 1991, the Joint Board held a public meeting regarding the Preauthorization Watershed Planning.  (Ex. 81.)  A joint Board meeting was also convened to determine "whether the watershed district wishes to proceed with the planning."  Approximately 50–55 people were in attendance.   The benefits and problems of the Watershed Plan, as presented by Steve Henningsen, were discussed.  (Ex. 81.)

155.    Land acquisition and eminent domain were not mentioned as potential concerns. (Ex. 81.)  This is a notable omission in light of the fact that this meeting was designed to "test the public's reaction to a PL-566 program in the watershed to see if they are in favor."  (Ex. 123.)

156.    During meetings on March 21, 1991, the Watershed District discussed the Watershed Plan; there was no mention of eminent domain, however, the Board's continuing concern about land acquisition was evidenced by its discussion about moving its sites either upstream or downstream where a landowner was opposed to construction of a dam.  (Ex. 82; Ex. 124.)

H.     **Letters to the Tribe, the BIA, and numerous landowners clearly stated the Watershed District policy that structures will not be built without 100% landowner approval.**

157.    Marilyn Snider sent nearly identical letters dated April 19, 1991, to Linda Saunders, the BIA Superintendent of the Horton Agency, and to Steve Cadue.  These letters sought permission for the parties to access land to conduct geological testing and to survey potential sites.  Both letters set out the Watershed District policy that:

> **"None of the sites can be built without written landowner approval through a written easement."**

(Ex. 125; Ex. 126 (emphasis in original).)

158.    Similar letters, all containing the same quoted language in bold type, were sent to 21 or 22 other landowners as well.  Letters were sent to William Webster, August 8, 1990, (Ex. 127); Donald Barnes, August 8, 1990, (Ex. 128); Dennis Finger, April 19, 1991, (Ex. 129); Cashman Bros., Maurice Cashman, April 19, 1991, (Ex. 130); Harry Wenger, April 19, 1991, (Ex. 131); Francis Henry, May 8, 1991, (Ex. 132); Raymond Heinen, May 8, 1991, (Ex. 133); LaVon and Donald Wenger, May 8, 1991, (Ex. 134); Leo Wessel, May 9, 1991, (Ex. 135); Clyde Sourk, May 9, 1991, (Ex. 136); Avitus Haverkamp, May 9, 1991, (Ex. 137); Leona Mast, May 9, 1991, (Ex. 138); Roy Bell, May 9, 1991, (Ex. 139); Gale King, May 9, 1991, (Ex. 140); Mark Heinen, May 9, 1991, (Ex. 141); David McCoy, May 9, 1991, (Ex. 142); Clarence R. Engelken, May 9, 1991, (Ex. 143); Elmer Jordan, May 13, 1991, (Ex. 144); Larry Heinen, May 13, 1991, (Ex. 145); Steve Barrett, June 26, 1991, (Ex. 146).  It also appears that George Hollister received a letter dated September 25, 1991, (Ex. 147).

159.    A May 6, 1991, letter from Marilyn Snider to Gale Miller stated that Ralph Simon of the Tribe had contacted her regarding the "upcoming staking and geology work on MP Site 21-14A."  Mr. Simon was to pick up "agreements with the landowners" so that he could obtain signatures allowing access to various properties.  (Ex. 148.)

160.    Mr. Simon actually obtained signatures from at least five landowners:   Alvin Wenger, May 6, 1991; Leonard G. Johnson, May 6, 1991; Warren Ploeger, May 6, 1991; Clair E. Krebs, May 6, 1991; and Larry Stuckey, June 3, 1991.  (Ex. 149).

161.    In each case, the form was signed by both the landowner and by Mr. Simon.

162.    On May 13, 1991, the Tribe agreed to reimburse landowners for any crop damages and to hold the Watershed District harmless for any damages caused to lands entered "to research construction possibilities" for sites 21-14A and 24-7A.  (Ex. 150.)

163.    On June 5, 1991, Larry Miles wrote a letter to Gale Miller asking him to rate a list of concerns selected by SCS regarding the Watershed Plan.   Land acquisition and eminent domain were not included on the list.  (Ex. 151.)

164.    On June 17, 1991, the SCS/NRCS notified the Watershed District and the Tribe that it had received authority to provide planning assistance under the P.L. 83-566 program. (Ex. 152.)

165.    In September 1991, an SCS/NRCS P.L. 83-566 Planning Progress Report indicated that "Site No. 21-14 is presently being planned as a water supply and recreational area. The Kickapoo Tribe is the **lone sponsor**."  (Ex. 153 (emphasis added).)  This progress report was mailed to Steve Cadue, Gale Miller, and others.  (Ex. 153.)  Because the Watershed District was not considered a "joint sponsor" of the Plum Creek portion of the Watershed Plan, the SCS/NRCS did not think that the Watershed District's condemnation authority was necessary.

166.    An April 17, 1992, letter from Larry Miles to John White, with a copy to Steve Cadue, states:

> The [SCS] cannot begin the construction design [of Site 21-14A] until the PL-566 plan has been approved by Congress and land rights are assured.  We understand that the Tribe is looking for design funding from other sources prior to PL-566 plan completion in order that the dam might be built as soon as possible.

(Ex. 154.)  No mention of eminent domain was made.

I.      **The Tribe entered into a written agreement in September of 1992 reaffirming that the Tribe was the sole sponsor of the floodwater structures on the Reservation and the entire Plum Creek site.**

167.    On September 23, 1992, the Tribe and the Watershed District signed a written agreement stating that:

> It is hereby understood and agreed that the Kickapoo Tribe in Kansas will be responsible for those Public Law 566 floodwater detention structures, including the multi-purpose site identified as Site 21-14A, that are within the reservation while the Nemaha-Brown Watershed Joint District #7 will be responsible for those sites which are not within the reservation.

(Ex. 155.)

J.      **Ongoing discussions about acquiring land rights during the planning process did not suggest or even hint that the Tribe expected the Watershed District to condemn land for the Plum Creek site.**

168.    On October 29, 1992, Steven Henningsen and Larry Miles met with the Tribe's newly-elected council at which the Tribe stated that they are working on acquisition of land rights.  The Tribe requested a land-rights map to help with expected BIA funding of land-rights acquisition.  No members of the Watershed District were present at this meeting.  (*See* Ex. 91.)

169.    On December 8, 1992, the SCS/NCRS held a meeting "for the purpose of reviewing sponsor PL-566 responsibilities."  (Ex. 92.)   The meeting was attended by five Watershed District Board Members; all eight members of the Tribal Council; representatives of the BIA; the Tribe's engineering firm, White, Martin, and Associates; the watershed office; and two SCS field offices.  There were 21 persons in attendance.  The following was noted regarding the Plum Creek project:

> Sites flooded by the permanent pool are Nos. 20-17*, 21-14MP* [Plum Creek], and 24-7*.  Sites 28-4A and 21-14MP* affect known utilities. (Sites with a "*" are the responsibility of the Tribe.)  Land rights maps with water elevations and acreages were given to the Tribe, watershed district, and both district conservationists.

(Ex. 92 (parenthetical in original).)

170.    Even though the purpose of this meeting was to discuss "sponsor… responsibilities" in the context of the Plum Creek project, and land-rights maps were distributed,

there was no discussion of the Watershed District's alleged obligation to condemn land on the Tribe's behalf.

171.    On July 22, 1993, a public meeting sponsored by the Watershed District and the Tribe was held to discuss the draft Watershed Plan.  (Ex. 96; Ex. 156.)

172.    "Nemaha-Brown board members, Kickapoo Tribal people, state agency people, S.C.S. people and a small number of landowners came for this meeting."  (Ex. 97.)

173.    Marilyn Snider provided information to the attendees at the meeting, expressly addressing land rights and land acquisition for the 20 floodwater-retarding dams included in the Plan.  She stated:

> As presently planned, three of these proposed Public Law 83-566 dams will be located on the Kickapoo Reservation and will be contracted by them.  The other 17 dam sites are located throughout the drainage of the Nemaha-Brown Watershed District and will be contracted by the Watershed.  In other words the watershed will be responsible for obtaining land rights or easements from landowners to allow construction of these dams on landowner property.  ***The watershed's policy has been to obtain donated easements from landowners.***  There is no landowner cost for construction of these dams.

(Ex. 242 (emphasis added).)

## X.    The 1994 Watershed Plan does not state, nor does the document imply, that the Watershed District is obligated to condemn land for the Plum Creek site.

### A.    At the meeting to approve the 1994 Watershed Plan, and in response to concerns about language in the Watershed Plan stating that the Watershed District would condemn land "as needed," the SCS/NRCS representative assured the Watershed District Board that the Plan did not require the Watershed District to condemn land; if the Board did not want to condemn, and could not obtain land for a particular site, that site would not be built.

174.    Prior to the May 12, 1994, meeting at which the Watershed District approved the Watershed Plan, Glenn Hennigan received a copy of the Watershed Plan and saw the language indicating that the Watershed District would condemn land "as needed."  This was alarming to Mr. Hennigan because of the Watershed District's longstanding policy to never exercise its eminent domain authority or proceed with any project in the watershed without complete landowner approval.   (Aff. of Glenn Hennigan, at ¶¶ 6 and 7.)

175.    There were five members of the Watershed District Board present at the May 12, 1994, meeting where authorization and signing the Watershed Plan was discussed: Gale Miller, Leo Wessel, Glenn Hennigan, Wayne Heiniger, and Dexter Davis.  (*See* Ex. 157.)

176.    At that meeting Dexter Davis, who had recently joined the Watershed District Board,[24] asked Matt Sprick whether the Watershed Plan required the Watershed District to condemn land for any of the planned structures.  Mr. Sprick responded that condemnation was not required; if the Watershed District did not want to exercise its power of eminent domain, it could elect not to build any site for which landowner approval could not be obtained.  (Aff. of Dexter Davis, at ¶¶ 5-16; *see also*, Aff. of Glenn Hennigan, at ¶¶ 8-13.)

177.    Matt Sprick's statement is consistent with previous statements made by Larry Miles referenced above.  Mr. Miles stated that "sometimes you can't get all the sites.  The board has to decide how far they want to go to get sites."  (Ex. 75.)

178.    There was no indication in the meeting that, by authorizing and signing the Watershed Plan, the board would be obligated to exercise its condemnation authority for the Tribe under any scenario.  (Aff. of Dexter Davis, at ¶¶ 13-16.  *See also* Affs. of Glenn Hennigan, at ¶¶ 9-11; Wayne Heiniger, at ¶ 9; Leo Wessel, at ¶¶ 11-13.)

179.    None of the Board members who were present at that meeting would have authorized signing the Watershed Plan if they had known there was any possibility that the Watershed District would be obligated to exercise its eminent domain authority for the Plum Creek project — or any other project — under any scenario.  (Affs. of Dexter Davis, at ¶¶ 15-16; Glenn Hennigan, at ¶¶ 11-12; Wayne Heiniger, at  ¶ 9; Leo Wessel, at ¶ 13.)

_____

[24]    Mr. Davis was elected to serve on the Watershed District Board at the March 26, 1992, Annual Meeting.  (Ex. 87.)

180.    On May 12, 1994, Emery Negonsott, Chairman of the Tribe; Gale Miller of the Watershed District; and others signed the Watershed Plan.  (Ex. 1 at 14.)

**B.    The 1994 Watershed Plan is a plan, not a binding commitment to build any sites or to condemn land for any planned structure.**

181.    The Watershed Plan sets out a plan for the future construction of 20 floodwater-retarding dams, one multipurpose structure with recreational facilities (Plum Creek), 11,000 acres of land treatment, 1,000 acres of riparian and other woodland enhancement, 200 acres of riparian easements, and 16 livestock waste management systems.  (Ex. 1 at 03.)

182.    Expected environmental impacts include reduced sedimentation, reduced flooding damage, reduced flood-plain scour, increased aquatic reservoir habitat, decreased terrestrial wildlife habitat, decreased stream aquatic habitat, and improved water quality associated with sediment and phosphorus reductions.  (Ex. 1 at 03.)

183.    In addition, reductions in sediment and other nonpoint source pollutants delivered to Perry Lake, approximately 18 miles downstream, were expected.  (Ex. 1 at 03 and 117.)

184.    The Watershed Plan and the Environmental Impact Statement were prepared under the authority of the Watershed Protection and Flood Prevention Act, Public Law 83-566, as amended (16 U.S.C. § 1001–1008) and in accordance with Section 102(2)(C) (42 U.S.C. § 4332(2)(C)) of the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4321, *et seq.* ("NEPA"), as amended.  (Ex. 1 at 03.)

185.    Other sponsors included the Atchison County Conservation District, the Brown County Conservation District, the Jackson County Conservation District, the Nemaha County Conservation District, and the Kansas Department of Wildlife and Parks.  (Ex. 1 at 04.)

186.    On June 16, 1994, State Conservationist, James N. Habiger, sent a copy of the signed Watershed Plan, his Record of Decision, and other documents to the SCS/NRCS National Headquarters in Washington, D.C. for transmittal to the Office of Management and Budget through the U.S. Department of Agriculture.  (Ex. 158 at 4509 and 4518.)

187.    Mr. Habiger signed the Record of Decision on June 13, 1994.  (Ex. 159 at 4517.)

Its main focus is the potential environmental impact of the project but it also describes the

planning process in some detail.  It states, in part, as follows:

> Throughout the planning process, sponsors, the public, and concerned agencies were asked to identify significant water resource and problem considerations in the watershed area.
>
> *In June 1989 the watershed district and Kickapoo Tribal Council were asked to update watershed resource and problem considerations* as outlined in the watershed district's 1978 general plan.   After receiving planning authorization, *the scoping process was continued with requests to all sponsors*, Bureau of Indian Affairs, Indian Health Service, Kansas Department of Wildlife and Parks, Kansas Water Office, and Kansas Department of Health and Environment.  Each was asked to review and rate the problems and concerns in the watershed area and to consider the likely effects of the alternative.  *They were also asked to list any additional concerns of a significant nature.*  Other agencies were also notified of planning assistance and were asked for their input in scoping the economic and environmental studies.  Each water resource concern was rated as to the degree of impact and significance to decision making completing the scoping process in June 1991.  Recommendations from the evaluation were included in the EIS.

(Ex. 159 (emphasis added).)   Acquisition of property was not raised as an "additional concern"

during this extensive scoping process.

188.    That the 1994 Watershed Plan is just a plan and not a binding agreement, and

especially not a binding agreement to condemn land for the Tribe is consistent with the structure

of the Act and the implementing regulations as discussed above.

189.    It is also consistent with the terms of the 1994 Watershed Plan when read as a

whole.

**C.    The terms of the 1994 Watershed Plan do not require that the Watershed District condemn land for the Tribe.**

190.    The "Watershed Agreement" portion of the Watershed Plan (Ex. 1 at 04)

provides, in part, as follows:

> 1.    The Watershed District and the Tribe will acquire such land rights as will be needed in connection with the works of improvement.  The percentages of land rights costs to be paid by the sponsors and the NRCS are as follows:

| Works of improvement | Watershed District | Tribe (percent) | SCS (percent) | Estimated Land |
|---|---|---|---|---|

| | (percent) | | | Rights Costs (dollars) |
|---|---|---|---|---|
| 17 Floodwater Retarding Dams | 100.0 | 0 | 0 | 652,300 |
| 3 Floodwater Retarding Dams | 0 | 100.0 | 0 | 257,700 |
| Multipurpose Dam No. 21-14 | 0 | 98.3 | 1.7 | 749,200 |
| Recreational Facilities Dam No. 21-14 | 0 | 50.0 | 50.0 | 172,200 |

The sponsors agree that all land acquired or improved with P.L. 83-566 financial or credit assistance will not be sold or otherwise disposed of for the evaluated life of the project except to a public agency which will continue to maintain and operate the development in accordance with the Operation and Maintenance Agreement.

(Ex. 1 at 05.)

6. The Watershed District will be responsible for the operation, maintenance, and replacement of the floodwater retarding dams including mitigation areas not on the Kickapoo Reservation by actually performing the work or arranging for such work, in accordance with agreements to be entered into before issuing invitations to bid for construction work.

7. The Tribe will be responsible for the operation, maintenance, and replacement of the floodwater retarding dams on their reservation and the multipurpose dam, reservoir area, recreational facilities, water intake structure, and any mitigation areas by actually performing the work or arranging for such work, in accordance with agreements to be entered into before issuing invitations to bid for construction work.

(Ex. 1 at 06.)

18. This agreement is not a fund-obligating document. Financial and other assistance to be furnished by [NRCS] and the [Kansas Department of Wildlife and Parks] in carrying out the plan is contingent upon the fulfillment of applicable laws and regulations and the availability of appropriation for this purpose.

19. A separate agreement will be entered into between [the NRCS] and sponsors before either party initiates work involving funds of the other party. Such agreements will set forth in detail the financial and working arrangements and other conditions that are applicable to the specific works of improvement.

(Ex. 1 at 08.)

191.   The "Environmental Impact Statement" (Watershed Plan 0001 at 67) provides, in part, as follows:

> The Kickapoo Tribe will pay for portions of Multipurpose Dam No. 21-14 to store water for an agricultural water supply and recreational uses. The Tribe will pay all cost associated with the agricultural water supply. Cost of recreational facilities will be shared by the government and the Tribe. The Tribe will be responsible for the local cost of land rights for the multipurpose dam. The Tribe will also be responsible for all operation and maintenance associated with the multipurpose dam. . . .
>
> Nemaha-Brown Watershed Joint District No. 7 and the Kickapoo Tribe of Kansas have the necessary authority to finance and install ***their portions of the planned project***.  This includes the right to accept contributions, levy taxes, make assessments against benefited land, issue bonds, and exercise the right of eminent domain.  They have agreed to use these powers as needed and will be financially responsible for excess investigation and design costs resulting from their delay or failure to do so.

(Ex. 1 at 50 (emphasis added).)

192.   The Watershed District did not represent that it had the authority to finance and install the Tribe's portion of the project.  It only represented that it had the power of eminent domain as to its portion of the planned project (17 floodwater retarding dams outside of the Reservation boundaries).  *Id.*  It therefore only agreed to use the power of eminent domain in support of its portion of the planned project.  The Watershed Plan imposes no duties or obligations on the Watershed District for the multi-purpose dam or the three floodwater retarding dams on the Reservation.

193.   The "Environmental Impact Statement" goes on:

> The Watershed District will furnish legal services and ***obtain all land rights*** needed for installation of floodwater retarding dams ***not on the Reservation.  The Tribe will*** furnish legal services and ***obtain all land rights needed for installation of the floodwater retarding dams on their Reservation and the multipurpose dam.***  The sponsors will maintain a land rights schedule showing status of land rights for each planned dam in the watershed.  The sponsors will also make arrangements to abandon, move or modify roads, utilities, and other improvements where necessary.

(Ex. 1 at 69 and 71 (emphasis added).)  The Plan clearly states that the Tribe is responsible for "obtaining all land rights" for the Plum Creek site.

194.   In addition to ¶19, quoted above (Ex. 1 at 08), the Environmental Impact Statement discusses the requirement that the parties enter into separate project agreements.

Works of improvement will be installed in a 16-year period following authorization of federal assistance under P.L. 566. Table H shows anticipated cost by fiscal year for land treatment and structural measures.

P.L. 566 funds for construction of structural measures will be provided to the Watershed District and the Kickapoo Tribe through project agreements with the SCS. Funds transferred to the sponsors by these agreements are subject to the Office of Management Budget circular A-102. A project agreement will be prepared for each construction contract.[25]

Prior to making agreements that obligate funds of the SCS, the Watershed District and/or Tribe must certify they have a financial management system for adequate control and accountability for property and other assets purchased with P.L. 566 funds. The Watershed District and Tribe will pay their own contract administration costs . . .

The Watershed District will employ a contracting officer and contract for construction of FRDs not on the Kickapoo Reservation. The Tribe will employ a contracting officer and contract for construction of the multipurpose dam and those FRDs on the reservation. Construction contracts will be awarded on the basis of competitive sealed bidding.  Project agreements for construction will begin when land rights have been certified, applicable water rights obtained land[,] treatment certifications are made, habitat mitigation requirements are met, P.L. 566 funds and technical assistance are available, approved drawings and specifications have been developed, and all necessary permits obtained.

(Ex. 1 at 69.)

Operation and maintenance agreements for the individual floodwater retarding dams and the multipurpose dam will be made with the sponsors before construction. The agreements will provide for the sponsors to operate and maintain project dams and vegetation according to operation and maintenance plans to be developed with [NRCS] technical assistance. Operation and maintenance agreements will be signed before land rights, relocation, or project agreements are signed. They will be based on the [NRCS] National Operations and Maintenance Manual.  Emergency action plans will be included where appropriate.

(Ex. 1 at 73.)



[25]    *See* ¶ 19 of the Watershed Plan quoted above.  (Ex. 1 at 08.)

The multipurpose structure and water supply facilities will be operated and maintained by the Tribe.

Recreational facilities will be operated, maintained, and replaced by the Tribe.

(Ex. 1 at 74.)

    **D.**     **The 1994 Watershed Plan states that the County Conservation Districts "will obtain" agreements from the owners of 11,000 acres of land even though the landowners have not signed the Plan and are not otherwise obligated to contract with the Conservation Districts. These contracts must require landowners to pay 35%, and in some cases, 100% of the costs of land treatment practices from their own funds.**

195.     In addition to the "separate agreements" regarding any fund-obligating portions of the Plan, such as land acquisition and eminent domain, another clear indication that the Watershed Plan is a non-binding agreement to agree in the future is that it obligates the Conservation Districts to enter into contracts with third parties who are under no obligation to agree to any of the terms set out in the Watershed Plan.

196.     The Watershed Plan states that the County Conservation Districts, which are also local sponsors, "*will obtain* agreements from owners of not less than 75 percent of the land above each floodwater retarding and multipurpose dam." These are the areas highlighted in green on the map in the Watershed Plan. (Ex. 1 at 07 (emphasis added); Ex. 1 at 151.)

197.     These agreements must require that landowners carry out farm or ranch conservation plans to ensure that 75 percent of the land in the subwatershed above each proposed structure is "adequately protected before construction of any dam."[26] (Ex. 1 at 07, ¶ 9.)

198.     Moreover, the Watershed Plan states that the County Conservation Districts "*will obtain* agreements with landowners or operators to operate and maintain land treatment measures for the protection and improvement of the watershed." (Ex. 1 at 07, ¶ 10 (emphasis added).)

---

[26]     For a discussion of the various treatment measures required by the Watershed Plan, *see* Ex. 1 at 63–64.

199.    Finally, these agreements must require the "Landowners and Operators" to pay 35.0% of "Conservation Treatment Practices" and "Riparian Woodland Practices" and 100% of "Other Woodland Practices."  (Ex. 1 at 07–08, ¶ 13.)

200.    If the Watershed Plan is a binding contract, it requires the County Conservation Districts to enter into land treatment contracts with the owners – who are not parties to the agreement and have no duty or obligation to the Conservation Districts – of 11,000 acres of land, and riparian and other woodland enhancement contracts with the owners of another 1,000 acres.  (Ex. 1 at 03, 21, and 23.)[27]  If it were a binding contract, and if the Conservation Districts were unable to obtain such agreements, they would presumably be in breach of the "contract."

XI.    **The Watershed Plan lacks any of the necessary provisions that would detail when and how the Watershed District's alleged obligation to condemn property for the Tribe is to be performed.**

201.    The WP does not address the issues that would need to be dealt with in any agreement to exercise condemnation authority on behalf of a third party under the same or similar circumstances of this case.

202.    Paragraph 19 of the 1994 Watershed Plan requires a "separate agreement," called a "Project Agreement" that would "set forth in detail the financial and working arrangements and other conditions that are applicable to the specific works of improvement."  (Ex. 1, ¶ 19.)

---

[27]    The Plan states that a 90 percent participation rate for land treatment of cropland is expected, but it does not address the possibility that the Conservation Districts may fail to convince landowners to spend their own funds on these practices and structures or what happens if the Conservation Districts are unable to contract with the requisite number of landowners.  (Ex. 1 at 49.)  In fact, in 1990, the Watershed District Board expressed concerns about whether 90 percent was achievable.  "With fewer structures and larger drainage areas, this could be difficult to obtain in some instances."  (Ex. 80.)

203.    On March 11, 2003, Jeff Gross sent a letter to Steve Cadue indicating that the Tribe "will be assuming contracting responsibilities for acquiring land rights needed for the subject dam." (Ex. 160.)

204.    On that same date, Grace N. McGrath, the NRCS State Administrative Officer, wrote to Steve Cadue regarding a proposed Project Agreement for the Plum Creek project. Ms. McGrath stated:

> In order to move forward on the construction of a Multi-purpose Dam at Site 21-14 in Brown County, Kansas, we are ready to sign a project agreement and begin land acquisition, which includes the Tribe contracting for appraisal work. This will begin the land acquisition.  As part of the land acquisition process, the Tribe will be responsible for providing legal services as necessary to:
>
> 1.    Obtain appraisal and review appraisal services.
>
> 2.    Develop real property instruments and documents for rights and interest to be acquired.
>
> 3.    Develop legal descriptions to be included in real property instruments, including the making of any needed boundary surveys.
>
> 4.    Conduct negotiations with property owners and tenants.
>
> 5.    Make title searches and obtain adequate title evidence.
>
> 6.    Determine the legal adequacy of real property rights and interests obtained.
>
> 7.    Before financial assistance is furnished, assure to the Natural Resources Conservation Service (NRCS) the adequacy of real property rights and interests, water rights, if applicable, permits and licenses required by federal, state, and local law, ordinance, or regulation, and related actions that have been taken to obtain the legal right to install, operate, maintain, and inspect the project measures.
>
> 8.    Support the assurance of adequacy by an attorney's opinion that certifies that the real property instruments and files were examined and found to provide adequate title, right, permission, and authority for the purpose which the property was acquired.
>
> 9.    Submit proposed special provisions to the NRCS for approval that affect construction cost of the project measures to be installed before making commitments to owners of real properly.
>
> A knowledgeable attorney is a very important team member in the land acquisition process. It is our understanding that at this time the Tribe has not made a decision as to an attorney to provide these services. Before a project agreement is signed for land acquisition, the NRCS will want assurance that the

> Tribe has retained a capable attorney knowledgeable of the Uniform Relocation
> Assistance and Real Property Acquisition Policies Act of 1970.

(Ex. 161.)

205.   None of these terms are set out in the 1994 Watershed Agreement, and they were all essential to the NRCS before it would agree to fund the NRCS's portion of the Plum Creek land rights costs, as set out in paragraph 1 of the 1994 Watershed Plan and the Supplemental Watershed Agreement No. 1, discussed *infra*.  (Ex. 1 at 05; Ex. 162; Ex. 163.)

206.   To the Watershed District's knowledge, none of the issues discussed in Ms. McGrath's letter were resolved with the NRCS.  More importantly, there is no evidence in the record showing that the Tribe made any attempt to address these and related issues with the Watershed District prior to filing suit.  Instead, the Tribe's demands were limited to insisting that the Watershed District agree to condemn land for the Tribe on completely unspecified terms.

207.   Moreover, the following is a partial list of issues that parties in similar circumstances would need to address in order to reach a binding agreement to exercise condemnation authority.

(a)   What criteria would the Tribe be required to demonstrate to show that its efforts at private negotiation have failed and eminent domain is the only viable course of action?

(b)   How would the current and future disagreements about the appropriate level of effort required to trigger the Watershed District's alleged obligation to condemn be resolved?

(c)   Once the Watershed District takes over the effort to acquire property, it would be required to comply with numerous federal pre-condemnation requirements including compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4601 *et. seq.* ("URA").  Generally speaking, the Watershed District would be required to: notify each landowner of the intent to acquire their property and the landowner's protections under the URA, including the availability of relocation advisory services; appraise the property; invite the owner to accompany the appraiser; review the appraisal and determine the amount of just compensation for the property; provide the owner with written offer and summary statement for the property to be acquired; negotiate for the purchase of the property; and if negotiations were unsuccessful, implement eminent domain proceedings.  *Id.*

i.   Who would provide direction to counsel during the pre-condemnation proceedings?

ii.     How would the appraiser be selected?

iii.     How would disagreements between the Watershed District and the Tribe about the value of each parcel and other aspects of the appraisal reports be resolved?

iv.     Who would review the appraisal reports and determine the amount of compensation that is "just"?

v.     Who would conduct the negotiations for the purchase of the property and how would they be handled?

vi.     Who would determine whether the pre-condemnation negotiations have been unsuccessful so that condemnation proceedings are necessary?

(d)     After the technical requirements of the pre-condemnation process was complete, who would determine that negotiations with each landowner had reached impasse and that an eminent domain proceeding on the Tribe's behalf was necessary?

(e)     How would an attorney to represent the Watershed District in the condemnation proceedings be selected?  Would that attorney also represent the Tribe?

(f)     How would conflicts of interest that may arise in the course of the attorney's representation of the Watershed District be dealt with?

(g)     What assurances would the Tribe provide to the Watershed District that the attorney would be paid?

(h)     Who would direct and control the attorney's handling of the condemnation proceedings?

(i)     Who would direct and control the eminent domain litigation, making strategy decisions on offers to compromise or whether to accept offers to compromise from landowners?

(j)     How would the Tribe assure the Watershed District that all expenses associated with the condemnation would be paid?

(k)     How would the Tribe demonstrate the actual ability to pay those expenses?

(l)     What assurances must the Tribe provide that it has the funds to pay an award within 30 days after the court-appointed appraisers file their report?  K.S.A. 26-507.[28]

---

[28]     The Watershed District should not be required to do a useless act and is therefore entitled to assurances that are adequate to it that the Tribe has the funds to pay an expected award and will actually pay the award before filing the condemnation proceedings.

(m)     Who would decide whether to appeal any award that either the Tribe or the Watershed District believes is excessive?

(n)     What assurances must the Tribe provide to the Watershed District that the Tribe has the funds to pay any deficiency judgment if a landowner is successful on appeal?  See K.S.A. 26-511.

(o)     Since title to the property acquired in a condemnation proceeding would be held by the Watershed District, when, and under what circumstances, would the condemned property be transferred to the Tribe?  *See* K.S.A. 26-507.

(p)     How would the responsibility for compliance with both procedural and substantive aspects of any eminent domain proceedings be allocated, including requirements imposed by the NRCS under the Small Watershed Program, the Watershed Plan, and the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq*., as amended.

(q)     Who would bear the consequences of any failure on the part of the Watershed District, or its attorney, to achieve the results the Tribe expected, that are required by the Watershed Plan, or by the P.L. 83-566 program?

(r)     What assurance would the Watershed District have that it would not be sued if the results of any condemnation proceeding were unsatisfactory to the Tribe.

(s)     How would disputes regarding any of these issues be resolved?

(t)     Who bears the risk if there are limitations or restrictions on, or defenses to, the Watershed District's power of eminent domain?

## XII.   The Post-Watershed Plan activities.

208.    There were numerous meetings between the 1994 approval of the Watershed Plan and March 12, 2003, when the Tribe first discovered that it lacked the power of eminent domain. Attendees of the meetings varied, but generally included: the Watershed District alone, the Tribe and the Watershed District, and some public information meetings.  The SCS/NRCS and BIA were often in attendance at these meetings as well.

209.    As in the years prior to the 1994 Watershed Plan, the Tribe's multipurpose site was a frequent topic of discussion, and the issue of land rights was occasionally raised.  And, just as in those meetings, it was never stated, suggested, or implied that the Watershed District has a contractual (or any other) obligation to exercise its eminent domain authority on the Tribe's behalf if the Tribe was otherwise unable to obtain the land for the Plum Creek project by purchase.  (*See, e.g.*, in chronological order, Ex. 101; Ex. 102; Ex. 103; Ex. 164; Ex. 165; Ex. 166; Ex. 167; Ex. 168; Ex. 169; Ex. 170; Ex. 171; Ex. 172; Ex. 173; Ex. 174; Ex. 175;

Ex. 176; Ex. 177; Ex. 178; Ex. 179; Ex. 180; Ex. 181; Ex. 182; Ex. 183; Ex. 184; Ex. 185;

Ex. 186; Ex. 187; Ex. 188; Ex. 189; Ex. 190; Ex. 191; Ex. 192; Ex. 193; Ex. 104; Ex. 194.)

### A.    Land rights were discussed several times with no indication that the Tribe expected the Watershed District to acquire land for the Tribe.

210.    On October 10, 1995, Tom Conklin, Vice Chairman of the Tribe, sent a letter to

Matt Sprick requesting assistance in initiating "an evaluation of the Land Rights Mitigation of

the multi-purpose dam number MP 21-14 [Plum Creek]." (Ex. 195.)

211.    At a September 22, 1998, Watershed District meeting, at which no members of

the Tribe were present, it was noted that the Watershed Plan had been approved. Speaking only

to the Watershed District, Matt Sprick stated:

> [T]he time was at hand to show effort in attaining easements for these sites. If effort is not shown for participation, a district can be de-authorized for funding. There are 21 structures currently affected in our Watershed District, which includes the Kickapoo site. ***Matt noted that there would be no easements to acquire on the Kickapoo site.***

(Ex. 182 (emphasis added).) In other words, the Watershed District would not be required to

obtain easements for any of the sites on the Reservation including the Plum Creek project.

212.    Mr. Sprick then explained the process for obtaining easements for the P.L. 83-566

sites:

> In attaining easements for these sites, Matt stated that ***it would be the discretion of the district as to whether to purchase, barter or ask that easements be donated***. Usually the first step is to ask for the land to be donated, then to barter or trade, then to buy; condemnation is the last resort. It was noted that our structures range from approximately ***10 to about 70 acres of surface area***; the smaller structures with fewer landowners would possibly be easier to attain easements. There was discussion of how to proceed with organization of the structures for feasibility and attainment of easements. The board members could be involved in discussions with the landowners. Also noted was the possibility of a separate 5-year plan for the PL566 structures once easements are acquired.

(Ex. 182 (emphasis added).)

213.    The discussion excluded any reference to Plum Creek, which was to have a

surface area of 475 acres (Ex. 1 at 81), because both the Watershed District Board and the

SCS/NRCS personnel believed that the Tribe had the sole responsibility to obtain land rights for the Plum Creek project.  (Ex. 182.)

214.   At the Watershed District's January 28, 1999, quarterly meeting there was extensive discussion about obtaining easements for the Watershed District's 17 sites:

> The Board spent much discussion time on the PL566 sites.  It was agreed at a previous meeting that at least to begin with, the board would like to approach landowners for donation of land rights, instead of purchasing or bartering for easements at this time.

(Ex. 183.)

215.   The Board did not even consider condemnation as an option.  To the contrary, at that same meeting the Board decided that at least one potential P.L. 83-566 site was "not feasible" because "the landowners have adamantly stated they are not interested."  (Ex. 183.)

216.   On October 7, 1999, Tomas Dominguez of the SCS/NRCS wrote a letter to Steve Cadue of the Tribe stating that "land rights must be secured" before SCS/NRCS will invest funds.

> One of the criteria that should be met before NRCS invests funds into the geologic investigation and design is that the land rights must be secured.  This demonstrates that there is a local commitment to the project.  Since Site 21-14 is your first priority within the upper Delaware plan and NRCS shares 50 percent of those land rights costs,[29] we asked for $125,000 for land rights on upper Delaware in our Fiscal Year 2000 funding request. . . .  After we receive a fund allocation, we will offer the sponsors an agreement to share in the costs of obtaining those land rights in accordance with proper land acquisition procedures.

(Ex. 196.)

---

[29]   This is an inaccurate or, at least, an incomplete statement.  The NRCS is to pay 50% of the land rights allocated to recreational use at Site 21-14, but not for land rights allocated to other uses.  (Ex. 1 at 05, 67, and 75.)  As discussed below, the SCS/NRCS sought an amendment to the Watershed Plan, stating that it was responsible for 11.2% of the land rights for the Plum Creek project.  The Tribe has not executed this amendment.

217.    In a report produced and distributed by the Tribe entitled *Building for Tomorrow Planning for 2000 – Goals and Objectives for the Kickapoo Tribe*, the Tribe states that "several facts that are ***very clear and concrete*** with regard to the Plum Creek Reservoir. . . . [The] Kickapoo Tribe is 100% responsible for the purchase of all land rights within the Plum Creek Reservoir Project area." (Ex. 197 at 271 (emphasis added).)

218.    The Tribe did not indicate that they were relying on the Watershed District for any help in the form of eminent domain or otherwise. (Ex. 197.)

219.    At the time the Tribe valued the land rights at $1,462,500. (Ex. 197 at 272.)

220.    An August 9, 2000, letter from John Ourada, P.E., of the SCS/NRCS, to David Pope, the State's Chief Engineer of the Division of Water Resources, discussed the breach hazard classification for Site 21-14. Documentation for the site was enclosed for Mr. Pope's review and approval. In that documentation, it was noted that approximately 1,200 acres would be needed and that "***Land acquisition will be the responsibility of the Kickapoo Tribe in Kansas***." (Ex. 198 at 386 (emphasis added).)

221.    The documentation went on to state that,

"[p]rior to any federal funds being obligated towards the implementation of multipurpose site 21-14, a 'project agreement' has to be developed between the local sponsors and the NRCS. The project agreement identifies the responsibilities (financial, managerial, and physical) and involvement of each party, and would generally set the tone for the future construction of multipurpose site 21-14."

(Ex. 198. *See also* Ex. 1 at 08, ¶ 19 and pp. 63–64.)

**B.    An amendment to the Watershed Plan was proposed by the NRCS and signed by the Watershed District. The Tribe has not executed the amendment.**

222.    On September 7, 2000, the Watershed District held a special meeting at which it agreed to and signed Supplemental Watershed Agreement No. 1. The Agreement would amend the Watershed Plan to state that SCS/NRCS would pay for 11.2% of the land acquisition costs for Site 21-14A. (Ex. 162; Ex. 163.) This is the NRCS share of the costs of landrights for the recreational component of the Watershed Plan.

223.    On September 13, 2000, Bobbi Darnell, Tribal Chairperson, wrote a letter to Congressman Jim Ryun.  In that letter, Ms. Darnell noted the Tribe's understanding that Mr. Ryun's office will only support fiscal year 2001 funding of the Tribe's watershed project if the Tribe would provide a 90% match on land acquisition.  Ms. Darnell stated that this would require approximately $980,000–$1,100,000 from the Tribe.  (Ex. 12.)

224.    Ms. Darnell indicated that the Tribe would "not authorize the issuance of tribal revenue bonds to finance land acquisition for the watershed project."  Instead, she demanded that the federal government provide 100% of the money "to fund the Indian portion of the Water Shed Project."  (Ex. 12.)

225.    On or about September 15, 2000, Ken Hoffman of the NRCS indicated that the Tribe was unwilling to sign the Supplemental Watershed Agreement No. 1 because the Tribe claimed to have been told "that Congressman Ryun will be sponsoring legislation for an emergency bill to provide 100% of the cost of the project."  (Ex. 199.)[30]

226.    This "emergency bill" was apparently never enacted and there is no indication in the record that the Tribe ever executed the Supplemental Watershed Agreement No. 1.

**XIII.    In late 2002, the Tribe renewed its efforts to build the Plum Creek Reservoir and in numerous meetings and extensive correspondence clearly indicated that it was solely responsible for acquisition of the land for the Plum Creek site.**

227.    On February 18, 2003, Jeff Gross responded to an e-mail from Herb Graves, the Executive Director of the Kansas State Association of Watershed Districts, with copies to other NRCS employees.  Mr. Gross stated that the Tribe had "just recently decided to pick [the Plum Creek] project up again."  (Ex. 200.)

------------------------------------

[30]    In response to interrogatories, the Tribe asserts that it approved and signed "Supplemental Watershed Agreement No. 1," but that it has looked and cannot find a signed copy.

228.    In 2002, the Tribe produced a presentation in which it stated: "Approximately 1200 acres of land will need to be secured to facilitate site 21-14.  Land acquisition will be the responsibility of the Kickapoo Tribe in Kansas."  (Ex. 201.)

229.    In early December 2002, delegates from the Tribe met with various individuals in Washington, D.C., as summarized in a December 12, 2002, letter from Steve Cadue of the Tribe to Jennifer M. Farley, Deputy Associate Director of the Office of Intergovernmental Affairs at the White House.  Even though the primary purpose of the trip was to discuss the Plum Creek project, condemnation was not mentioned in Mr. Cadue's letter.  Instead, the trip consisted of meetings:

a.    *With Senator's Roberts and Brownback and Rep. Ryan:* Plum Creek Dam & Reservoir and a possible new detention center.

b.    *With the Dept. of Housing and Urban Development:* explained the Plum Creek project.

c.    *With the Indian Senate Select Committee – Democrat & Republican:*  Explained the importance of the Plum Creek project.

d.    *With the U.S. Department of Agriculture*:

Discussed at length the relationship between USDA and the initial planning and process that has led to the current status of Plum Creek Dam & Reservoir.  Mr. Bowman stated that USDA does have some potential funding based upon budget appropriations from Congress, however, this funding has a limit to amount and use although they felt that Plum Creek would qualify. . . .

e.    *With the USDA-Natural Resources Conversation Services (NRCS)*:

NRCS was the initial federal agency that worked with northeast Kansas counties, Watershed Boards & Districts, communities, [the Tribe] and many other state, local, and private agencies and individuals, in assessing the water problems and solutions that could be implemented to address the water quantity & quality situations of our rural Kansas location. The original approval by the House of Representatives and Senate were predicated on the report and recommendations from NRCS-USDA. NRCS is committed to assist the [Tribe] in our endeavors to bring the Plum Creek Dam & Reservoir back to the forefront of recognition for funding by Congress, and NRCS has stated they do not have any problem

with our project replacing other Watershed Projects that are not ready to develop due to some inconsistency with permits, funding, or development criteria.  We are excited about NRCS taking an agency lead for the future development of Plum Creek Dam & Reservoir, they should be recognized by Congress for the wealth of success that watershed projects have brought to rural America.

(Ex. 202.)  There was no discussion or indication that the Watershed District had any obligation to condemn under any scenario or that the Tribe was looking to the Watershed District for any help with land acquisition.

230.    The Tribal Council also met with then assistant BIA secretary, Neal McCaleb, and Larry Scrivner, deputy director of the BIA office of Trust Responsibilities, to discuss the Plum Creek project.  (Ex. 203.)

231.    At this meeting, the Tribe discussed the planned acquisition of land for the Plum Creek project and the procedure for conversion of land purchased by the Tribe into land held in Trust by the United States, but neither the Tribe's lack of eminent domain authority nor any supposed agreement by the Watershed District to condemn on the Tribe's behalf was discussed. (Ex. 202; Ex. 203.)

232.    In a December 20, 2002, newspaper article, Steve Cadue is quoted: "We've been talking with the [Watershed District] and negotiating with landowners and we've been getting great support . . . ."  The Article goes on to state:

[Cadue] said tribal representatives two weeks ago went to Washington, D.C., and discussed the project with Kansas senators Sam Brownback and Pat Roberts and Rep. Jim Ryun, along with officials from the Department of Agriculture.

"And the response was excellent.  So we're hopeful of getting funding in the current budget year, in 2003. We're very excited about it," Cadue said.

(Ex. 204.)

233.    The article states that the Tribe owns about two-thirds of the land it needs and is negotiating for the purchase of the remaining property.[31]  Mr. Cadue then reaffirmed the Tribe's longstanding, but unverified—and ultimately incorrect—assumption of 100% landowner support of the Plum Creek project: "[i]t's all been positive.  There's no real opposition to it and it looks like a go."  (Ex. 204.)

234.    On January 13, 2003, Galen Hubbard, with the BIA's Horton Field Office, wrote to Steve Cadue about appraising lands for the Plum Creek project.  The letter requests that the Tribe provide BIA with a list of allotted trust lands and Kickapoo Tribal trust lands within the project area.  He stated that the BIA does not appraise "fee" lands.  (Ex. 205.)

235.    Harold Klaege of the NRCS was scheduled to make a presentation in January 2003, at a public meeting to be attended by Congressman Jim Ryun.  In preparation for that presentation, Mr. Klaege's colleagues, Matt Sprick and Jeff Gross, provided him with an outline of key facts.[32]  The summary stated:

a.    The Tribe is the "local sponsoring entity" and the "primary sponsor."

b.    Land acquisition will be the Tribe's responsibility.

c.    The Tribe is also responsible for wildlife habitat mitigation and operation and maintenance.

d.    Once completed, the Tribe will own the site.

e.    Approximately 1,200 acres will need to be acquired.

---

[31]    The Tribe now owns significantly less than two-thirds of the property needed for the Plum Creek project.

[32]    *See* letter dated December 23, 2002, inviting Harold Klaege, the SCS/NRCS State Conservationist, to participate in the meeting and tour with Congressman Ryun scheduled for January 23, 2003, and the attached agenda showing Mr. Klaege's presentation.  (Ex. 208.)

    f.      Before obligating any federal funds, a "project agreement" must be signed by the NRCS and the "local sponsors" identifying the financial, managerial, and physical responsibilities of each party.

    g.      Once the project agreement has been signed, implementation of the project can begin.

(Ex. 206.)

236.    A February 4, 2003, newspaper article reporting on the January 30, 2003, tour by Congressman Ryun states that some landowners are opposed to the Plum Creek project.  The article reported that during the Congressman's visit, a landowner handed Representative Ryun a letter setting out her opposition to the Plum Creek project, which, if completed, would result in her land being taken by eminent domain.  (Ex. 207.)

237.    On February 6, 2003, Tribal Council member Arlan Whitebird met with the U.S. EPA, Region 7 for a "brainstorming session" where some of the Tribe's concerns about the Plum Creek project were discussed, including NEPA, Native American graves, historic preservation, and numerous Clean Water Act issues and concerns.  (Ex. 17.)

238.    Following the meeting, E. Jane Kloeckner, U.S. EPA's Senior Assistant Regional Counsel, wrote an extensive letter to Mr. Whitebird, with copies to Steve Cadue and other Tribe officials, setting out a non-exclusive list of environmental issues that would need to be addressed before the project could proceed.  (Ex. 17.)

239.    Her final numbered paragraph stated that eminent domain might be exercised ***by the Tribe***:

    9.    Finally, we note that the Project involves various land use plans, land purchases, and possibly zoning or ***eminent domain powers that might by*** [sic] ***exercised by the Kickapoo Tribe.***  We anticipate close consultation working with the Tribe to understand such plans in accordance with our responsibility to consult in a government-to-government manner with the Kickapoo Tribe.

(Ex. 17 (emphasis added).)

240.    As of the February 6, 2003, meeting with the EPA, the Tribe believed that it could exercise eminent domain powers to acquire land for the Plum Creek project and was not looking to the Watershed District for this task.  (*See* Ex. 17 at 195.)

241.    On February 13, 2003, Steve Cadue wrote a letter to Aurene Martin, Acting Assistant Secretary of the BIA, regarding land acquisition for the Plum Creek project.  This letter provided some additional detail about the Tribal Council's conversations with BIA officials during the December 2002 trip to Washington, D.C.  He stated that the "Tribe *in partnership with the USDA and the State of Kansas* are moving to procure these lands and will need BIA assistance."  The letter focused on the development and implementation of a "land acquisition plan . . . that would place the acquired fee land into trust upon purchase."  (Ex. 203 (emphasis added.))

242.    The letter went on to complain about the BIA policy to not appraise "fee" lands; acknowledges that federal funding is limited; claims that the Tribe is prepared to borrow the necessary funds from the federal government; and raises concerns about liens jeopardizing the ability to convey title to the acquired lands to the United States in trust for the Tribe.  (Ex. 203.)

243.    There is no indication in the record that eminent domain was discussed in the December 5, 2002, meetings in Washington, D.C., and Steve Cadue did not raise the issue in the February 13, 2003, follow-up letter.  In fact, as of February 13, the Tribe's only "particular issue," beyond its lack of financial resources was the BIA policy not to appraise land held in fee. (Ex. 203.)

244.    Mr. Cadue's letter specifically pointed out that the Tribe was working "in partnership with the USDA and the State of Kansas."  It did not state that the Tribe was working with the Watershed District or mention any supposed obligation that the Watershed District had to condemn land for the Tribe.  (Ex. 203.)

245.    In a February 18, 2003, e-mail to Herb Graves, Jeff Gross summarized the Tribe's renewed interest as follows:

The Kickapoo Tribe is working with their Congressional Representatives to see if they can move this project to the front burner. . . .   We have provided some information to the tribe to help them in their information/education efforts to inform stakeholders of their need.  Mr. Klaege has agreed to fund NRCS's portion of the land rights acquisition this FY if the tribe is ready to make that commitment.

We have set a meeting up with the tribe in March to discuss the provisions of a potential landrights acquisition project agreement (costs, legal requirements. etc.). There has been one public meeting so far (January 30, 2003) where the tribe invited the public along with various local, state, and federal agencies to discuss their desire to proceed with this project.  Congressman Ryun toured the site with the tribe (that day) and made a few comments at the public meeting.

The key on this project will of course be the commitment of funds by the tribe and allocation of sufficient federal funds through the PL-566 program.  If everything was to click just right, we would anticipate the landrights acquisition process to begin perhaps in April of 2003 and continue perhaps through June of 2004 (with public meetings, landowner negotiations, etc.); Contracting for design might begin with NRCS staff doing initial investigations this fiscal year and hiring of a private engineering firm to do the design work in calendar year 2004. Construction on both the dam and rec areas could begin in Jan of 2005 and continue well into 2007. This is if everything "clicked along" just right.

Again there has not been a lot of information and public meetings at this point because the tribe has just recently decided to pick this project up again.  When the tribe decides to actively pursue and commit the dollars for the landrights, I am sure that they will begin active public meetings and discussions with affected landowners.  This commitment has not happened yet.

(Ex. 200.)

246.    On February 18, 2003, Jeff Gross sent a fax to Steve Cadue that stated that the estimated cost to acquire the land rights for the Plum Creek project was $1,464,000.00, with the Tribe's portion being $1,304,761.00.  Mr. Gross went on to state:

We believe that we have sufficient dollars in our FY2003 budget to fund NRCS's portion of the landrights costs.  We are expecting to enter into a project agreement with the Kickapoo Tribe for the landrights portion of this contract in March/April of 2003.

(Ex. 209.)

247.    There is no indication in the record that any party, least of all the Tribe, ever questioned the Tribe's authority to condemn land for the Plum Creek project through February 18, 2003.

XIV.   **In February of 2003, the BIA suggested the possibility that the Tribe may not have condemnation authority for the portion of the Plum Creek project that was outside the Reservation boundaries but there was no concern about the Tribe's power to condemn land on the Reservation even though most of this land was owned by non-Indians.**

248.   The first time the Tribe's authority to acquire property by condemnation came into question was on February 19, 2003, six days after the letter to BIA Acting Assistant Secretary, Aurene M. Martin.  On that date, Steve Cadue had a conversation with Terry Brunner, the BIA Tribal Government Officer in the Anadarko, Oklahoma Area BIA Office.  This conversation was followed by a letter to Mr. Brunner, in which Steve Cadue states:

> *As per our discussion this morning*, you asked me to request an opinion of the Kickapoo Tribe's eminent domain authority in conjunction with the referenced project.  Also, we need an opinion as to the federal government's authority to exercise eminent domain authority in the Tribe's behalf for land off the reservation.

(Ex. 210 (emphasis added).)

249.   Note that there is non-Indian owned land both on and off of the Reservation. (Ex. 211.)

250.   On February 21, 2003, the Tribe prepared a breakdown of individual land rights and the potential purchase price for those rights, which it estimated to be $1,102,000.00.  This is $202,761.00 below the NRCS estimate of $1,304,761.00.  (Ex. 212.)

251.   Between February 19, 2003, and the receipt of the Solicitor's Opinion (discussed *infra*) on March 10, 2003, the Tribe appeared to be unsure about its ability to exercise eminent domain as reflected in an e-mail from Matt Sprick to Jeff Gross, which states:

> Steve [Cadue] said that [the Tribe has] been researching their legal ability to secure land *outside of reservation boundaries.*  We hope to have a definitive answer by [March] 12th.

(Ex. 213 (emphasis added).)   Again, the Tribe was not concerned about their authority to condemn non-Indian owned land within the Reservation.

252.   Thus, Steve Cadue was concerned about the Tribe's ability to acquire land *outside of the Reservation boundaries*.  He was unconcerned about the Tribe's power to

71

condemn non-Indian owned land within the Reservation boundaries.  (*See* Ex. 211 (emphasis added).)

> **A.    The March 10, 2003, Field Solicitor's Opinion, stating that the Tribe lacks authority to condemn non-Indian owned land both on and off the Reservation, was delivered at a meeting on March 12, 2003.**

253.    As discussed above, the parties first learned that the Kickapoo Tribe does not have eminent domain authority to acquire non-Indian owned land either on or outside of the Reservation in a March 12, 2003, meeting with the U.S. Department of Interior Solicitor's office. (Ex. 18.)

254.    The meeting was attended by the Kickapoo Tribal Council, Gale Miller of the Watershed District, the NRCS, the BIA, and the U.S. Department of the Interior Solicitor's Office.  (Ex. 214.)

255.    The Field Solicitor's Opinion concluded that "[i]t is unlikely the tribe would have the power to condemn *non-Indian fee lands within the reservation* absent either statutory authorization or a very strong showing that the failure to do so threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." (Ex. 5 (internal quotations omitted; emphasis added).)

256.    The Opinion goes on to state that "[a] more likely source of authority might be found in the power of the Department of Interior or other federal agency to condemn property for a public use on behalf of the tribe."  (Ex. 5.)

257.    That same day, Steve Cadue wrote substantially similar letters to Senator Roberts and Congressman Ryun summarizing the March 12, 2003, meeting and stating that the "primary critical issue" is the Tribe's lack of eminent domain authority.  (Ex. 214; Ex. 215.)  The letters state, in part:

> The primary critical issue to overcome is the eminent domain authority to condemn land for the project. . . .   Several options were discussed by all present and are outlined as follows: Nemaha-Brown Watershed Board has the authority to condemn land for this project and the Board will be meeting on March 21, 2003, at which time, the Board will make a decision; The US Congress can enact federal legislation condemning the land for the project; the Department of the Interior or

other federal agency can be requested to utilize their respective power to condemn property for a public use on behalf of the tribe.

The Kickapoo Tribe is severely handicapped by the eminent domain issue and this critically important water project is dependent upon outside government agencies to complete this project.  We will pursue every possible option and solution to meet the federal government requirements for appropriation of the necessary funding.

258.   Notably, Steve Cadue did not indicate that the Watershed District was contractually bound to exercise eminent domain on behalf of the Tribe.  (Ex. 214; Ex. 215.)

259.   Two days later, Matt Sprick met with the Watershed District Board regarding acquisition of land rights for the Tribe.  Mr. Sprick sent a summary of the meeting to Steve Cadue and various NRCS officials.  (Ex. 216.)  Specifically, Mr. Sprick informed Mr. Cadue that he and the Watershed District Board discussed:

a.   The history of the watershed's development;

b.   The joint board created by the Watershed District and the Tribe;

c.   The joint efforts of the Watershed District and the Tribe culminating in the Watershed Plan;

d.   Congressional authorization in 1998;

e.   The Plum Creek Reservoir;

f.   Land rights acquisition;

g.   The pros and cons of eminent domain; and

h.   A March 20, 2003, deadline to submit an appropriations request for the Plum Creek Reservoir for FY 2004 federal funds.

(Ex. 216.)

260.   Matt Sprick's memo states that the Watershed Board understands that the Kickapoo Tribe does not have the right of eminent domain but was not ready to make a decision about exercising that power on the Tribe's behalf.  (Ex. 216.)

261.   The notion that the Watershed District was contractually obligated to exercise eminent domain for the Tribe was not mentioned in either meeting.  (Ex. 216; Ex. 217.)

262.    Matt Sprick also attended the Watershed District's March 21, 2003, meeting stating that the Tribe "would like to know what the watershed's position on the site as to support and eminent domain.  The Tribe does not have eminent domain on any land on the reservation or otherwise."  (Ex. 217 at 796.)

263.    The minutes indicate that:

Leo Wessel stated he would prefer a *wait-and-see attitude* on how the tribe handles land acquisition. . . .  Dexter Davis made the motion to *table support or lack thereof* of the Watershed District Board until the next meeting.

(Ex. 217 (emphasis added).)  The Watershed District did not refuse to condemn property for the Tribe.

264.    On March 26, 2003, Steve Cadue wrote a letter to Gale Miller requesting the Watershed District's "assistance to satisfy the NRCS eminent domain issue."  (Ex. 18.)

Thank you for attending the upper Delaware & Tributaries Watershed (Plum Creek) project meeting held on March 12, 2003.  Please recall that *during the meeting we learned* from Mr. McCarthy Solicitor, US Department of the Interior, *the Kickapoo Tribe does not have eminent domain authority over non-Indian owned land*.

(Ex. 18 (emphasis added).)

265.    On April 22, 2003, Steve Cadue wrote a letter to Harold Klaege stating that the Tribe has "requested the [Watershed District] to utilize their eminent domain authority in our behalf since they are a joint sponsor" of the upper Delaware Watershed Plan.  (Ex. 218.)

266.    The Tribe did not make formal contact with the landowners in the Plum Creek project area until May 12, 2003.  (Ex. 219.)  This is inconsistent with tribal member in charge of land acquisition, Nellie Cadue's, statement at the January 21, 2004, Watershed District Board meeting where she stated that the Tribe had only contacted a few landowners.  (Ex. 20.).

267.    In a May 5, 2003, letter to Congressman Ryun, Steve Cadue called the lack of eminent domain authority "unfortunate and a setback."

It is unfortunate and a setback in the progress to not have been able to complete a Grant Agreement with the USDA/NRCS due to the issue of the Tribe not having eminent domain authority.  This is clearly an issue which we have no control.

(Ex. 220.)

**B.      The SCS/NRCS does not contend that the 1994 Watershed Plan obligates the Watershed District to condemn land for the Kickapoo Tribe.**

268.    On June 30, 2003, Harold Klaege wrote to Steve Cadue stating that the NRCS will not "enter into a project agreement with the Tribe for land rights acquisition because [it] require[s] a sponsor with the power of eminent domain to be a signatory to the agreement." (Ex. 221.)

269.    The letter goes on to state that "[i]f the Tribe cannot enlist the support of a sponsor with the power of eminent domain" the NRCS would enter into a project agreement if the Tribe could acquire the land by agreement.  (Ex. 221.)

270.    The June 30, 2003, letter does not indicate that the 1994 Watershed Plan obligates the Watershed District to use its condemnation power on behalf of the Tribe.  Mr. Klaege warned Mr. Cadue:

> I must caution you that any land purchased prior to a signed project agreement for land acquisition would not be eligible for cost-sharing through the PL-566 program.

(Ex. 221 (underlining in original).)

271.    In a July 14, 2003, letter to Steve Cadue, Harold Klaege reconfirmed the fact that the Watershed Plan is not a binding agreement and that the Watershed District did not obligate itself to condemn property for the Tribe stating:

> As you are aware, the Natural Resources Conservation Service (NRCS) **has no authority to require or force any watershed sponsor to utilize their power of eminent domain to obtain landrights for a specific project.**  Acquisition of landrights is solely the responsibility of the watershed sponsors signatory to the watershed plan. . . .

(Ex. 222 (emphasis added).)

272.    A March 3, 2005, letter to David Zeit of the Watershed District from Matt Sprick states that the NRCS did not present or send a document pertaining to eminent domain for signature by the Watershed District in 2003.  He states that the only document he is aware of that

was presented to the Watershed District Board at any time that references eminent domain is the Watershed Plan itself.  (Ex. 223.)

273.    Similarly, on March 7, 2005, in response to a FOIA request from Mr. Zeit, Grace McGrath, the NRCS Freedom of Information Act Officer, stated:

> The only document we are aware of that references eminent domain is the Upper Delaware and Tributaries Watershed Plan and Environmental Impact Statement (January 1994).  The reference to eminent domain is on page 50 of this plan, under the heading "Financing". This plan was presented to the Nemeha-Brown Watershed Board, and approved by the watershed's governing body, on May 12, 1994.

(Ex. 224.)  The NRCS never asked that the Watershed District condemn property for the Tribe because they had no authority to force, or even request, that the Watershed District condemn.

### C.    The Tribe wanted the Watershed District Board to agree to lend its condemnation authority to the Tribe for use as leverage against the landowners.

274.    At a Special Meeting on July 24, 2003, the Watershed District discussed the use of its eminent domain authority relating to the project.  The Tribe was present with their attorney, Lance Burr.  (Ex. 225.)

275.    Nellie Cadue "addressed the board and stated the tribe is currently going through the process of appraising the land and negotiating, ***but want the power of eminent domain to leverage landowners***."  (Ex. 225 (emphasis added).)

276.    The minutes of the meeting state:

> Dexter Davis made the motion not to proceed with condemnation ***at this time*** and will ***revisit the issue*** once the tribe has made an effort with negotiating with landowners without eminent domain.  George Renyer seconded the motion. The motion carried by unanimous vote. (Rodney Lierz abstained from voting.)

(Ex. 225 (emphasis added).)

277.    The Watershed District did not refuse to condemn property for the Tribe at this meeting.  *Id*.

278.    On August 26, 2003, Steve Cadue wrote to Gale Miller requesting that the Board exercise eminent domain on the Tribe's behalf.  (Ex. 226.)

279.    The next day, on August 27, 2003, the Watershed District sent the following to Steve Cadue:

> Mr. Gale Miller and the Board of Directors of the Nemaha Brown Watershed Joint District #7 has asked that I provide you with the minutes of the Special Meeting on July 24, 2003 (minutes approved as written by unanimous vote at the Budget Meeting on August 14, 2003) where the motion was made, seconded and voted on by the board not to proceed with granting eminent domain to the Kickapoos *unless and until the tribe had shown a good faith effort in negotiating land purchase without the threat of eminent domain*.  At this time, the board is of the understanding that most of the landowners have not been contacted and no negotiating for purchase of land has been attempted.  The position of the Watershed Board will stand until these developments have occurred.

(Ex. 227 at 05 (emphasis added).)

280.    About a week later, on September 3, 2003, Steve Cadue wrote to Gale Miller stating that the Tribe "cannot comply with the conditions set forth in your correspondence dated August 27, 2003.  It is unfair to require these conditions."  (Ex. 228.)  Mr. Cadue does not state why or how the Board's position is unfair.  He concludes by stating that they are looking for eminent domain authority from other sources.

281.    Steve Cadue wrote to the BIA on September 4, 2003, demanding that the BIA condemn land for the Tribe and fund the acquisition, stating that "the Department of the Interior has the obligation and authority under the trust responsibility to provide the necessary funding to acquire the land needed and to fund all construction and other related costs."  (Ex. 229.)

282.    Steve Cadue went on to request, among other things, that the Department of Interior:

a.    Have BIA take over full responsibility for the Plum Creek project;

b.    Exercise its condemnation authority on the Tribe's behalf to acquire the land within the project area;

c.    Fund the purchase of the land;

d.    Fund all construction and related costs of the Plum Creek project; and

e.    Provide any additional assistance and costs needed to complete the project.

(Ex. 229.  *See also* Ex. 230.)

283.    On or about October 20, 2003, Gale Miller informed the Watershed District that he was resigning as President of the Watershed District Board of Directors.  (Ex. 231.)

284.    Dexter Davis was elected as the new president on October 28, 2003.  (Ex. 232.)

285.    In a January 8, 2004, letter to Harold Klaege, Steve Cadue states:

As the Kickapoo Tribe continues to approach landowners with offers to purchase, the lack of eminent domain places the Tribe in an inequitable bargaining position. Without any incentive to sell, the Kickapoo Tribe is not able to purchase any land required by the Plum Creek Reservoir project.

(Ex. 233.)  In other words, the Tribe contends that it is inequitable that it cannot effectively threaten landowners.

286.    A January 21, 2004, annual meeting of the Watershed District Board drew a standing-room-only crowd, including local landowners and members of the Tribe.  (Ex. 20.)

287.    Jeff Gross stated that the NRCS is waiting for the sponsors to obtain the land rights by purchase or eminent domain.  (Ex. 20.)

288.    Steve Cadue gave a presentation on the Tribe's need for water.  He introduced the members of the Tribal Council and passed a letter to Dexter Davis and the Board members.  (Ex. 19.)  He stated that the Tribe does not have the power of eminent domain and "requires such power from the Watershed District."  (Ex. 20.)

289.    In his letter, Steve Cadue stated that,

[W]ithout condemnation, public projects such as the Plum Creek Reservoir cannot succeed as there is no incentive for recalcitrant land owners to enter into good faith negotiations for land purchases. . . .

A vote to utilize the Nemaha-Brown Watershed Joint District's eminent domain authority simply allows the parties to come to the table and negotiate in good faith to complete the necessary land acquisition for the public use Plum Creek Project. Actual judicial condemnation proceedings would only occur in the event that the parties fail to reach a satisfactory agreement.  The potential costs involved in any judicial condemnation are effective in encouraging the parties to work toward completing purchase agreements in a timely and amicable manner.

(Ex. 19 at 1130.)

290.    Steve Cadue then demanded that the Board to agree to use its condemnation power to take the land needed for the Plum Creek project.  (Ex. 20.)

291.    Dexter Davis asked if the Tribe had contacted any or all of the landowners.  Steve Cadue stated that they had contacted every landowner and that negotiations had begun with those who would meet with the Tribe.  (Ex. 20.)

292.    Nellie Cadue corrected him stating that they had actually only contacted a few landowners.  (Ex. 20.)

293.    Mr. Davis then requested that all discussion from the audience cease and asked if anyone on the Board was interested in making a motion that would grant powers of eminent domain to the Tribe.  None of the Watershed District Board members made such a motion and Mr. Davis then thanked the audience for their input but stated that no vote on this issue would take place that day.  (Ex. 20.)

**D.    That the signatories to the 1994 Watershed Plan — including the Tribe — believed that the Tribe had the power of eminent domain was reiterated during a May 20, 2004, Kansas Water Office mediation regarding land acquisition for the Plum Creek project.**

294.    On May 20, 2004, the Kanas Water Office attempted to mediate the dispute about property appraisal and acquisition of land for the Plum Creek project.  "The meeting ended with Steve Cadue demanding a vote by the Watershed Board.  When they declined, both parties left the meeting."  (Ex. 234.)

295.    Jeff Gross prepared a summary of the mediation, describing Dexter Davis' opening statement, in part, as follows:

> Mr. Davis stated that he felt the tribe has started out on the wrong foot in trying to push this project ahead.  He stated that he felt the tribe was pushing the project forward without the support of the Nemaha-Brown watershed board and ***only when they (the Tribe) realized that they did not have the power of eminent domain did they come to the watershed board asking them to support the project***.  He stated that he felt the tribe had threatened landowners that if they didn't sell, they would take the land through eminent domain.

(Ex. 235 (emphasis added).)

296.    Other NRCS meeting notes are in accord:

> Mr. Davis stated the tribe had gotten off on the wrong foot. According to Mr. Davis, the tribe began by saying we will build this lake, ***but then discovered it didn't have the power of eminent domain***.  He suggested the tribe needs to smooth things over.  The tribe needs to understand the landowners are angry.

(Ex. 236 (emphasis added).)

297.    Both of these sets of notes clearly show that Mr. Davis was referring to the Tribe's discovery that it lacked the power of eminent domain in March 2003 and there is no indication in either set of detailed NRCS notes from this meeting that the Tribe disputed this fact at the time.   (Ex. 235; Ex. 236.)

298.    Near the conclusion of this meeting, Mr. Harkins, the mediator, stated that "he felt that in order for the Nemaha-Brown watershed board to make an informed decision, they needed to be given time to have any questions answered regarding the proposed project."  He suggested a 30-day period for the Watershed District to study available information regarding its eminent domain authority for the Tribe.   The Watershed District was agreeable to this.  (Ex. 235; Ex. 236.)

299.    The Tribe went into caucus to discuss this proposal and, according to Mr. Gross of the NRCS, when they returned:

> Chairman Cadue stated that [the Tribe] would not agree to this and requested an immediate decision of the Nemaha-Brown watershed district concerning whether they would sign a project agreement supporting the Plum Creek Dam and Reservoir and committing to use their power of eminent domain if necessary . . . the Tribe would not accept any more delays.

(Ex. 235.)

300.    The other NRCS summary states:

> Mr. Harkins stated he understood the tribal council's desire for that action, but noted the district board was not comfortable making a decision before it had more information.  Mr. Cadue stated he wanted to hear the board vote.  Mr. Harkins asked if the tribal council was willing to meet again after both parties had time to digest additional information.  Mr. Cadue stated the tribal council was willing to meet only to hear the decision of the district board on eminent domain.

(Ex. 236.)

301.     In light of the Tribe's unwillingness to meet again, the meeting was adjourned with no plans for a future meeting.  (Ex. 236.)

302.     In the years following, the Tribe has continued to demand that the Watershed District exercise its eminent domain authority for the Plum Creek project, though it has since concocted the theory that the Watershed District is contractually obliged to do so pursuant to the 1994 Watershed Plan, which the Watershed District has adamantly denied.

**XV.     There are alternative water supplies available to the Tribe.**

303.     The Kansas Farm Bureau produced a report dated January 21, 2005, entitled Plum Creek Watershed Project, The Landowners Response.   This report identified at least three alternatives sources of water available to the Tribe.  (Ex. 237 at 741–742.)

304.     In addition, water is available from other public water suppliers in the area.  See the KWO Map of Public Water Suppliers in the Nemaha, Brown, and Jackson Counties (Ex. 238); KRWA Brown County Map showing the following water suppliers near the Reservation: Public Wholesale Water Supply District #18; Brown County RWD No. 02; Jackson County RWD No. 3; Nemaha County RWD No. 04; and Atchison County RWD No. 05C (Ex. 239).

305.     At a January 21, 2004, meeting, Mr. Gross of NRCS stated that the Plum Creek site was the only site that would serve the Tribe, because it was what they wanted, not necessarily what they needed.  (Ex. 20.)

**Statement of Issues**

1.     A P.L. 83-566 Watershed Plan expressly states that it is not a "fund obligating" document and that a "separate agreement" is required before any project is undertaken that involves funds of another party.  Land acquisition and eminent domain proceedings involve the funds of both the Tribe and the United States and the United States will not enter into the agreement with the Tribe.  Does the Watershed Plan obligate the Watershed District to exercise its eminent domain authority on behalf of the Tribe in the absence of the required separate agreement or is it a non-binding agreement to agree in the future?

2.      The Kansas Supreme Court has held that a P.L. 83-566 Watershed Plan was not a binding contract that obligated another watershed district to perform but instead was a mere letter of intent because it was not fund obligating and it required a "separate agreement."  This Watershed Plan contains substantially identical terms.  Is the Watershed Plan in this case a mere letter of intent?

3.      In the plain terms of the Watershed Plan, the Watershed District and the Tribe asserted that they each had authority to finance and install "their portions" of the plan, including the "right of eminent domain."  The Plan expressly provides that the Plum Creek Reservoir is part of the Tribe's "portion" of the Plan.  Does the Watershed Plan state that the Watershed District will condemn land for the Plum Creek reservoir even though it is not part of the District's "portion" of the project?

4.      In the plain terms of the Watershed Plan, the Tribe agreed to acquire the land for the multipurpose site.  Does the Watershed Plan obligate the Watershed District to condemn land for the Plum Creek reservoir even though the responsibility to acquire this land is clearly allocated to the Tribe?

5.      The Watershed Plan contains no detail regarding the method, manner, or timing of the Watershed District's alleged duty to condemn land for the Tribe and requires a "separate agreement" for land acquisition and condemnation proceedings.  Does that document obligate the Watershed District to condemn land for the Tribe's Plum Creek reservoir in the absence of a separate agreement?  Alternatively, even if there was no requirement for a separate agreement, does the Watershed Plan itself contain all of the essential terms of an agreement to undertake condemnation for a third party?

6.      The Watershed District has longstanding, well-documented policies to not undertake any project without 100% landowner approval; of opposing construction of large floodwater retarding structures; and never exercising its condemnation authority.  The parties to the Watershed Plan, including the Tribe, were aware of these policies.  In addition, until at least March 12, 2003, the parties believed that the Tribe had the power of condemnation to acquire

non-Indian owned land.  How could the parties have intended that the 1994 Watershed Plan would obligate the District to condemn for the Tribe's Plum Creek reservoir?

7.      In light of the parties' belief that the Tribe had eminent domain authority until 2003, was the Tribe denied sole P.L. 83-566 sponsorship in 1983 because it lacked the power to condemn when the reason actually given at the time of denial was that the Tribe's boundaries did not fully encompass the watershed and mentioned nothing about eminent domain?

8.      The unmistakability doctrine applies to contracts that pertain to the Watershed District's discretionary use of its eminent domain authority and provides that any conveyance of this authority must appear in clear and unmistakable terms.  A conveyance of a sovereign power cannot be made by implication.  If the Court finds that the Watershed District agreed to condemn for the Tribe, did it do so in clear and unmistakable terms when there is no evidence that the Watershed District intended to convey or delegate that power to the Tribe?

9.      The reserved powers doctrine invalidates agreements that purport to contract away an essential attribute of a governmental entity's sovereignty.  Assuming the court accepts the Tribe's interpretation that the Watershed Plan contractually binds the Watershed District to condemn on the Tribe's behalf, was the Plan void *ab initio* when courts have long held that the power of eminent domain is an essential attribute of sovereignty?

10.     If the court finds that the Watershed Plan is an enforceable agreement whereby the Watershed District is required to condemn land for the Plum Creek reservoir at the Tribe's discretion, are the Tribe's remedies limited to money damages when no statute or decision in any U.S. jurisdiction has ever required specific performance against the government relating to the exercise of eminent domain?

11.     If the court finds that the Watershed Plan is an enforceable agreement whereby the Watershed District is required to condemn land for the Plum Creek reservoir at the Tribe's discretion, is the Tribe impermissibly attempting to convert a simple breach of contract case into a violation of the Contracts Clause when it has made no allegation that the Watershed District

has altered the Tribe's remedies and, at best, the Tribe has asserted a claim for breach of contract?

12.     The doctrine of sovereign immunity bars claims against the State of Kansas as well as "arms of the state."  The Watershed District is an "arm of the state." Is the Tribe's lawsuit against the Watershed District barred by sovereign immunity?

**Argument and Authorities**

The Tribe misreads and misinterprets both the plain language and the purpose of the 1994 Watershed Plan in order to justify its after-the-fact reinterpretation made necessary by its 2003 discovery that it lacked the authority to condemn property for the Plum Creek Project.  The Watershed District did not agree to condemn property for the Tribe.  The plain language of the Plan cannot be read to mean that it did.  Had the document clearly stated that the Watershed District would condemn land for the Tribe it is unlikely that it would have been signed, but that issue aside, if the Tribe had been relying on the Watershed District to condemn, it could have and should have made that reliance clear in the written document.  It did not do so because it believed that it had the power and was not relying on the Watershed District condemn. Or because it just made a bad bargain.

## I.     Summary Judgment Standard

Summary judgment is proper when the moving party shows that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In applying this standard, the Court views the evidence and all reasonable inferences in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998).

"By its very terms, this standard provides that the mere existence of ***some*** alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of ***material*** fact."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (emphasis in original).  Therefore, if the plaintiff's evidence is "merely colorable, or is not significantly probative, summary judgment may be

granted." *Id.* (internal citations omitted.)  The proper inquiry is not whether the plaintiff's claim has "literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it . . . ." *Id.*  (internal citations and quotations omitted). Accordingly, if the evidence "is so one-sided that one party must prevail as a matter of law," summary judgment is proper. *Id.* at 251.

A plethora of documentary evidence has been produced in this case.  There is an abundance of pre-2003 evidence that the Watershed District made no commitment to condemn for the Tribe and that the Tribe believed it had this power until March 2003.  There are no pre-2003 documents that support the Tribe's claim that the Watershed District agreed to condemn; all of documents that support the Tribe's allegations are after-the-fact, self-serving, and conclusory allegations.   In light of the overwhelmingly one-sided weight of the evidence, summary judgment is proper.

## II.    The Watershed Plan does not obligate the Watershed District to delegate its eminent domain authority to the Tribe or to otherwise condemn property for the Plum Creek Reservoir.

### A.    The plain terms of the Watershed Plan make it clear that the Watershed District did not agree to condemn property for the Tribe.

A contract must be construed as a whole, and the intention of the parties is to be ascertained from the entire instrument. The contract's meaning must be gathered from the entire context, and not from particular words, phrases, or clauses, or from detached or isolated portions of the contract.  All the words in a contract are to be considered in determining its meaning, and the entire contract in all of its parts should be read and treated together.   The entire agreement is to be considered to determine the meaning of each part.

17A Am. Jur. 2d Contracts § 375.

In the plain text of the Watershed Plan, both the Tribe and the Watershed District asserted that they had the "authority to finance and install *their portions* of the planned project.  This includes the *right to* . . . *exercise the right of eminent domain*."  Exhibit 1, p. 68 (emphasis added).  The Watershed Plan clearly allocates "Multipurpose Dam No. 21-14" ("Plum Creek") to the Tribe.  Facts, ¶¶ 190–194.  The Tribe, and not the Watershed District, is the sole sponsor of the Plum Creek reservoir.  *Id.*; Facts, ¶¶ 118; 122; 124; 125–131; 165; 167; 227–247.  And, until

March 12, 2003, the parties believed that the Tribe had the right of eminent domain.  Facts, ¶¶ 8–

10; 11–13; 14–18; 19–22; 23–26; 248–252; 253–267 Part II.A., *infra*.

> In addition, the Watershed Plan states:

> The Watershed District will furnish legal services and obtain all land rights needed for installation of floodwater retarding dams not on the Reservation.  ***The Tribe will furnish legal services and obtain all land rights*** needed for installation of the floodwater retarding dams on their Reservation ***and the multipurpose dam***.

Exhibit 1, pp. 69 and 71 (emphasis added).

> [The Court's] primary function in construing a contract is to determine the parties' intent from the four corners of the instrument by construing all provisions together and in harmony with each other rather than by critical analysis of a single or isolated provision.  This rule must be applied prior to the introduction of any extrinsic evidence regarding the intent of the parties. Where the language of the contract is clear and can be carried out as written, there is no room for construction or modification of the terms.

*JDN Dev. Co., Inc. v. Terra Venture, Inc.*, 265 F. Supp. 2d 1239, 1249 (D. Kan 2003) (internal

citations and quotations omitted) citing *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 671,

876 P.2d 1362 (1994).

"As a general rule, if the language of a written instrument is clear and can be carried out

as written, there is no room for rules of construction."  *Simon v. Nat'l Farmers Organ., Inc.*, 250

Kan. 676, 680, 829 P.2d 884, 888 (1992) (citation omitted).  Furthermore, "[t]he primary rule for

interpreting written contracts is to ascertain the parties' intent.  If the terms of the contract are

clear, the intent of the parties is to be determined from the language of the contract without

applying rules of construction."  *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550,

554 (2007).  In that instance, the terms of the document are ascribed their "plain, general, and

common meaning in order to ensure the intentions of the parties are enforced."  *Johnson Cnty.

Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000).

Because the agreement clearly states that the "Tribe will . . . obtain all land rights needed

for . . . the multipurpose dam"; because the Watershed District and the Tribe each represented

that they had the power of eminent domain; and because they only agreed to use that power for

"their portions" of the project, the Watershed Plan cannot be read to obligate the Watershed

District to condemn land for the Tribe's portion of the project.  Moreover, when read as a whole, the Watershed Plan does not obligate the Watershed District to condemn any property.  Thus, even if the Watershed Plan is a binding contract in some other respect, the Watershed District is not in breach of its terms and is entitled to summary judgment.

> **B.   An agreement to agree in the future does not create a binding obligation. Paragraph 19 of the Watershed Plan expressly provides a "separate agreement" for fund-obligating components of the plan, such as exercising eminent domain.   The Watershed District therefore creates no binding obligation on the Watershed District to condemn for the Tribe.**

"Generally, an agreement to make a contract in the future is not binding unless all the essential terms and conditions are agreed upon and nothing essential to complete it is left to future negotiations."  *Phillips and Easton Supply Co., Inc.*, 212 Kan. 730, 734, 512 P.2d 379, 383 (1973) (internal citations omitted).  *See also Bowsher v. Merck & Co.*, 460 U.S. 824, 864 (1983). "[W]here some of the material terms and conditions of the agreement are still unsettled and are reserved for negotiations, no completed contract is created."  *Mid-Continent Petroleum Corp. v. Russell*, 173 F.2d 620, 622 (10th Cir.).

Paragraph 19 of the Plan requires a "separate agreement" between the NRCS and the sponsor "before either party initiates work involving funds of the other party."[33]  Exhibit 1, p. 8, ¶ 19.  Elsewhere, "A project agreement will be prepared for each construction contract."  *Id.* at p.

---

[33]  In addition the Watershed Plan states that "Operation and maintenance agreements for the individual floodwater retarding dams and the multipurpose dam will be made with the sponsors before construction. . . .   Operation and maintenance agreements will be signed *before land rights, relocation, or project agreements are signed*. . . ." Exhibit 1, p. 73 (emphasis added).

Moreover, paragraphs 6 and 7 refer to "agreements to be entered into before issuing invitations to bid for construction work."  Though these paragraphs do not specifically relate to the eminent domain issue, they do lend support to the proposition that the Watershed Plan is merely an agreement to agree in the future. See also, Facts, ¶¶ 195–200, and footnote 26 regarding the procurement of land treatment contracts from landowners.

69.  Land acquisition for the Plum Creek reservoir involves NRCS funds, and, therefore, requires a separate agreement.  *Id*., p. 5, ¶ 1.[34]

It is difficult to imagine a clearer expression than Paragraph 19 that the parties intended the document to be a plan, and that they did ***not*** intend to obligate themselves to build each of the planned structures, or to otherwise bind themselves by executing the Watershed Plan.  They expressly stated that a separate agreement would be required for all fund-obligating components of the Plan.  When landowners are unwilling to donate easements, land acquisition and the attendant negotiations and purchase, including any eminent domain proceedings, is, without doubt, intrinsically fund-obligating.

Furthermore, each "separate agreement" required by Paragraph 19  is essential for each respective portion of the project in order to "set forth in detail the financial and working arrangements and other conditions that are applicable to the specific works of improvement."[35]  *Id.* at p. 8, ¶ 19.  These provisions are not included in the Watershed Plan itself.  To the extent that land acquisition for the Plum Creek reservoir requires the Watershed District's power of eminent domain, it must be a party to this "separate agreement."  A June 30, 2003 letter from the NRCS to Steve Cadue states:

> As you are aware, we were unable to enter into a project agreement with the Tribe for land rights acquisition because we require a sponsor with the power of eminent domain to be Signatory to the agreement. This is to ensure that a sponsor can carry through to completion the acquisition of all of the lands necessary to ensure construction of the project.

Exhibit 221; *see also* Facts, ¶¶ 268–273.

---

[34]     *See also*, Facts, ¶¶ 222–226, discussing the Supplemental Watershed Agreement No. 1. that would amend the Watershed Plan to state that SCS/NRCS would pay for 11.2% of the land acquisition costs for the Plum Creek Reservoir.

[35]     The NRCS has made it clear that it will enter into such an agreement with the Tribe if it can acquire the property for this project without condemnation.  Facts, ¶¶ 268–269.

Therefore, in order to proceed with land acquisition for Plum Creek, the NRCS, the Tribe, and the Watershed District would need to reach an agreement setting out "***in detail*** the financial and working arrangements and other conditions."   Exhibit 1, p. 8, ¶ 19 (emphasis added).

Because the Watershed Plan expressly requires a future agreement for the acquisition of land rights for the Plum Creek project, it is, at best, an unenforceable agreement to agree in the future, *i.e.*, a letter of intent.  Such agreements do not create binding obligations.

     **C.**    **The Kansas Supreme Court concluded that a P.L. 83-566 Watershed Plan was not a binding contract but a mere letter of intent because of a provision nearly identical to Paragraph 19.**

In 1968, the Kansas Supreme Court addressed a P.L. 83-566 watershed plan with substantially the same terms as the Watershed Plan at issue here.  Relying on a paragraph that was substantively identical to paragraph 19, the Court held that the plan in that case did not impose contractual obligations on a Watershed District precisely because it was a nonbinding agreement to agree in the future.  *Barten v. Turkey Creek Watershed Dist.*, 200 Kan. 489, 507, 438 P.2d 732, 746–47 (1968).  The Court characterized the Watershed Plan in *Barten* as follows:

> [A] careful reading of the Work Plan Agreement discloses that it is only a part of a projected program or General Plan . . . and that ***by the very terms of the contract between the [SCS/NRCS] and the District a separate agreement in connection with each construction project specifying the financial and working arrangements and other conditions applicable to the specific works of improvement was a prerequisite to any binding obligation as to that project***.  It is fair to say the Work Plan Agreement is nothing more than a fulfillment of a requirement of the federal act, which is ***tantamount to a letter of intent*** to proceed with the fulfillment of the Watershed District Plan."

*Id.* (emphasis added.)

The fact that the Watershed Work Plan in *Barten* was not a "fund obligating" document was an important factor in holding that no binding contract existed.  In that case, the Plan merely provided estimates of the "contemplated costs" of the works of improvement and provided that "[f]inancial assistance is made contingent upon the appropriation of funds . . . ."  *Id.* Accordingly, the Court held that "because the agreement does not constitute a financial

document to serve as a basis for the obligation of federal funds" the sponsors would not be liable "for failure to build any one or more of the projects embraced within the General Plan." *Id.*

Just as in *Barten*, this Watershed Plan "is not a fund-obligating document . . . ." Exhibit 1, p. 8, ¶ 18.)  Moreover, "[t]he costs shown in [the] plan are preliminary estimates," *id.* at p. 8, ¶ 17, and "assistance to be furnished by SCS[/NRCS] and the KDWP in carrying out the plan is contingent upon the fulfillment of applicable laws and regulations and the ***availability of appropriation*** for this purpose," *id.* at p. 8, ¶ 18 (emphasis added).  The Watershed Plan here is not a binding contract.  *See* Facts, ¶¶ 181–189 (discussing general framework of the Watershed Plan).

### D.     The Watershed Plan is missing key elements required for a binding contract obligating one party to condemn land for another party.

The Watershed Plan does not contain terms, conditions, or criteria regarding the method and manner in which the Watershed District is required to perform its alleged obligation to condemn; it is therefore missing numerous key elements that would be required for a valid contract in which a municipal corporation agrees to exercise its eminent domain authority for a third party.[36]

"If any essential term is left open for future consideration, there is no binding contract, and an agreement to agree is not enforceable."  17A Am. Jur. 2d *Contracts* § 39; *Bowsher v. Merck & Co.*, 460 U.S. 824, 864 (1983).  "The omission of a material element from a contract renders the contract unenforceable because there has been no meeting of the minds."  17A Am. Jur. 2d Contracts § 30.  "No contract is complete without the mutual assent of the parties to all essential elements of the agreement.  The minds of the parties must meet and unite on all

---

[36] As more fully discussed below, it is likely that the Watershed District's power of eminent domain cannot be transferred or assigned to the Tribe.

essential elements before an effective contract is created." *Mid-Continent Petroleum Corp. v. Russell*, 173 F.2d 620, 622 (10th Cir. 1949) (citations omitted); *See also In re First Penn Corp.*, 793 F.2d 270, 271 (10th Cir. 1986); *Bowsher*, 460 U.S. at 864; 1 Richard A. Lord on Contracts § 4:1 (4th ed.); Restatement (Second) of Contracts § 17, cmt. c.

Even if the Watershed Plan did not require another agreement for each project, a separate agreement would be essential in this case because the Plan does not include terms and conditions that would be essential to any agreement requiring the exercise of condemnation authority for a third party. The necessary terms and conditions are missing from the Watershed Plan. Facts, ¶ 207. *See also* ¶¶ 201–206.

Moreover, the Tribe did not even propose such terms before filing suit. The record reflects that Mr. Cadue appeared at Watershed District meetings and demanded a vote to exercise condemnation authority. Facts, ¶¶ 274–277; ¶¶ 286–293. *See also* ¶¶ 294–302. But there is no evidence that he, or anyone with the Tribe, ever presented a proposal setting forth "detailed financial and working arrangements" that would be required for such an agreement. *See id.*

Because there was no meeting of the minds on the essential terms of an agreement to condemn, future negotiations about the exercise of that authority would be required in order to reach a binding agreement. Even under the Tribe's interpretation, the Watershed Plan fails for lack of certainty.

**III.    No one believed that, by executing the Watershed Plan, the Watershed District was obligating itself to condemn on the Tribe's behalf because the Tribe and the other parties believed that it had the power of eminent domain over fee lands in the Watershed until at least March 12, 2003.**

In order to prevail, the Tribe must convince the Court that it must look outside the terms of the Watershed Plan and to interpret it in light of facts and circumstances that it wishes were true, but that are not supported, and, in most cases, refuted by the record.

For years leading up to the execution of the Watershed Plan, and for years afterwards, the parties, and, in particular, the Tribe, believed that it had the power of eminent domain. The request that the Watershed District condemn land for the Plum Creek project was not made until

after the Tribe first learned that it may not have the ability to condemn land owned by non-Indians — nearly ten years after the Watershed Plan was executed.

The extensive factual record in this case reflects a confident belief on the part of the Tribe that it had sufficient eminent domain authority to exercise condemnation for all lands required for the Plum Creek project.  *See* Facts, ¶¶ 8–10, 14–18 (held itself out as a sovereign nation); ¶¶ 11–12 (Tribal attorney represented that the Tribe had the same status as a municipality); ¶ 13 (Tribe would furnish easements for the project).

At least as important, however, is the fact that, none of the pre-2003 documents refer to any Watershed District agreement to exercise its eminent domain authority on the Tribe's behalf. As discussed in the facts, planning and preparation for a P.L. 83-566 watershed plan is a complex and detailed process that spans numerous years and involves multiple parties that involved thousands of documents, letters, memoranda, etc.  *See* Facts, ¶¶ 44–47; 48–56.

If the Watershed District had, in fact, promised to condemn, which the Tribe alleges was the basis of the bargain, there would be some reference to this extraordinary promise in documents that pre-date 1994.  The Watershed District could find no documents before 2003, much less 1994, that referenced, or even hinted, of any supposed agreement to condemn under any scenario.  *See* Facts, ¶¶ 101–111; 112–117; 119 (pre-1994).  *See* Facts, ¶¶ 208–209 (1994–2002).  This is true, even though the issue of land acquisition for the Plum Creek project was specifically addressed multiple times.  *See* Facts, ¶¶ 120; 121–127; 151–156; 157–166; 168–173 (pre-1994).  *See* Facts, ¶¶ 210–221 (1994–2002).  This is, quite simply, because no such agreement was ever even proposed, much less reached.

On the contrary, there are multiple documents that expressly state the parties' belief that the Tribe had condemnation authority in the years leading up to and surrounding the Watershed Plan.  *See, e.g.,* Facts, ¶¶ 19–22 (1988 BIA statement to NRCS that the Tribe "has the power of eminent domain" relating to fee lands for the Plum Creek project) and Facts, ¶¶ 251–252 (NRCS e-mail correspondence on March 10, 2003, stating that the Tribe is "researching their legal ability to secure land outside of reservation boundaries."  And even as late as February 2003, the

Tribe was expressly representing that it would be the condemning authority. *See* Facts, ¶ 22 (February 2003 statement by the Tribe to the U.S. EPA that it might exercise its "eminent domain powers" for the Plum Creek project).

Thus, there was no reason for such an agreement by the Watershed District to have been discussed. If the Tribe could condemn, it would not need an agreement from the Watershed District.

The parties' belief that the Tribe had adequate condemnation power to carry out the Plum Creek project is confirmed by the plain language of the Watershed Plan stating that they each have the necessary authority to finance and install "their portions of the planned project." Exhibit 1, p. 68. The Tribe's "portion" included all projects on the reservation "and the multipurpose dam"; the Watershed District's "portion" included the 17 floodwater retarding dams off of the Reservation. *See* Exhibit 1, p. 5, ¶ 1, p. 6, ¶¶ 6–7, p. 67–68; Facts, ¶¶ 190–194; Part I.B., *supra*.

The parties' belief is also fully consistent with:

- The Watershed District's longstanding practice and policy to not condemn land for any project and have 100% landowner approval, Facts, ¶¶ 29–30; 77–85; 121; 123; 135–142; 157–162; 174–180; and
- The Watershed District's persistent opposition to large structures in the watershed for which 100% landowner approval would be difficult or impossible to get, Facts, ¶¶ 126–131; 132–133; 143–150.

In fact, at one point in 1989, when the SCS/NRCS was pressing the Board to approve construction of larger structures under the P.L. 83-566 plan, the Watershed District passed a resolution that unambiguously stated their opposition to large structures without 100% landowner approval. Facts, ¶¶ 132–133.

All of these facts are unequivocally reflected in the copious memoranda, letters, meeting minutes, notes, and many other documents that *pre-date* the Watershed Plan. Notably, the Tribe's claims relating to the Watershed District's supposed obligation to condemn are all based on self-serving documents prepared and presented by the Tribe after March of 2003; i.e., after the Tribe discovered that it lacked condemnation power.

Even in late 2002 and early 2003, as the Tribe was ramping up its efforts to move the Plum Creek project forward after years of inactivity, there was no suggestion that the Tribe was concerned about land acquisition whatsoever.  Facts ¶¶ 227–247.  In fact, the first indication of any doubt relating to the Tribe's eminent domain authority was on February 19, 2003.  On that day, Steve Cadue of the Tribe met with Terry Brunner of the BIA.  That same day, Mr. Cadue requested an opinion on the Tribe's eminent domain authority relating to the Plum Creek project.  Facts ¶¶ 248–252.  No independent evidence indicates that the Tribe so much as *questioned* its authority to condemn for the Plum Creek project prior to this date.

The record clearly reflects that the Tribe never stated, suggested, or implied that any party would need to assist it with land acquisition for the Plum Creek project until it learned that it likely did not possess the requisite condemnation authority.  The only contrary evidence is either completely circumstantial or after-the-fact, self-serving statements by the Tribe.

**A.**    **The parties, including the Tribe, learned for the first time that the Tribe lacked condemnation authority for the Plum Creek Project at a meeting on March 12, 2003, which was also the genesis of the Tribe's efforts to recruit the Watershed District to condemn on the Tribe's behalf.**

Everything changed at a meeting on March 12, 2003 when the Tribe and others met with the U.S. Department of Interior's Solicitor Office.  Facts ¶¶ 253–256.  At that meeting, the Tribe and others were advised that "[i]t is unlikely the tribe would have the power to condemn ***non-Indian fee lands within the reservation*** absent either statutory authorization or a very strong showing that the failure to do so threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Facts, ¶ 255.

The Tribe alleges that this meeting was "to discuss initiating the process for obtaining land rights, and the use of Nemaha Brown's eminent domain authority.  The Nemaha Brown

Board expressed <u>no</u> reluctance[37] at that time to proceeding with its contractual commitment to condemn land for the Plum Creek Project."  Doc. 199, Sec. Am. Compl., ¶ 76.  In fact, the record shows this meeting was to discuss *the Tribe's* power to condemn for the Plum Creek project. *See* Facts, ¶ 251 (e-mail from Matt Sprick to Jeff Gross, both of the NRCS, relaying that "Steve [Cadue] said that [the Tribe has been researching their legal ability to secure land outside of reservation boundaries.  We hope to have a definitive answer by [March] 12th."

This meeting was the first time the parties, including the Tribe, had learned of the Tribe's lack of condemnation authority, which was expressly confirmed in a letter Mr. Cadue sent to the president of the Watershed District on March 26, 2003:

> Thank you for attending the upper Delaware & Tributaries Watershed (Plum Creek) project meeting held on March 12, 2003.  Please recall that ***during the meeting we learned*** from Mr. McCarthy Solicitor, US Department of the Interior, ***the Kickapoo Tribe does not have eminent domain authority over non-Indian owned land***.

Facts ¶ 264 (emphasis added).

The complete absence of any independent evidence regarding the Watershed District's alleged "agreement" to condemn prior to March 12, 2003, stands in stark contrast to the flood of correspondence and other documents on the same subject after that date.  *See* Facts, ¶¶ 27–28; 257–267; 268–273; 274–282; 285–293; 294–301.  It is beyond credible dispute that this meeting in 2003, nearly ten years after the Watershed Plan was signed, was the genesis of the Tribe's efforts to obtain assistance from the Watershed District and others to condemn land on its behalf.

---

[37]    There are no documents in the record supporting the allegation that the Board was not reluctant and Matt Sprick's e-mail to Steve Cadue documenting a meeting two days later specifically states that while the Watershed Board now understands that the Kickapoo Tribe does not have the right of eminent domain it was not ready to make a decision about exercising that power on the Tribe's behalf.  Facts ¶¶ 259–261.

**B.**     **Even after the Tribe learned that it lacked condemnation power in March 2003, it did not assert that the Watershed District was obligated under the Watershed Plan to condemn on its behalf until months afterward.**

Following the March 12, 2003, meeting, the Tribe's focus shifted to finding someone to condemn property for the Plum Creek project.  On the same day as the March 12 meeting, Mr. Cadue wrote substantially similar letters to Senator Pat Roberts and Congressman Jim Ryun. Facts ¶¶ 257–258.  Mr. Cadue did not allege that the Watershed District was under a contractual duty to condemn; rather, their voluntary use of this power was one of three options discussed at the meeting:

> Several options were discussed by all present and are outlined as follows: Nemaha-Brown Watershed Board has the authority to condemn land for this project and the Board will be meeting on March 21, 2003, at which time, the Board will make a decision; The US Congress can enact federal legislation condemning the land for the project; the Department of the Interior or other federal agency can be requested to utilize their respective power to condemn property for a public use on behalf of the tribe.

*Id.*

Two days later the Watershed District met with the NRCS.  Facts ¶ 259.  Though the issue of condemning for the Tribe was discussed, it was not suggested that the Watershed District was obligated to do so.  Facts ¶¶ 260–261.  The same goes for a follow-up meeting on March 21, 2003.  Facts ¶¶ 262–263.  Additional documents confirm that the Tribe was merely "requesting" the Watershed District condemn for the Plum Creek project in the immediate aftermath of the March 12, 2003 meeting.  *See* Facts, ¶¶ 264–265; 267; 268–270; 271–273; 274–277; 278–280; 281–282.  There is no indication in the record that the Tribe began to allege that the Watershed District was under a "contractual obligation" until several months later.  This, too, suggests that the supposed contractual obligation that the Watershed District must condemn for the Tribe is an after-the-fact reinvention of history.

Because all of the parties believed the Tribe had the power of eminent domain at the time they executed the Watershed Plan, the prospect of the Watershed District exercising its eminent domain authority on the Tribe's behalf was not contemplated when the Watershed Plan was signed.  There was, therefore, never a meeting of the minds regarding the Watershed District

exercising its eminent domain authority for the Tribe under any circumstances, which is reflected by the terms of the Plan itself as well as the extensive documentary record in this case.

**IV.    Federal regulations require sponsors to "have" the power of eminent domain but they are not required to "commit" themselves to exercise that authority until the "installation" phase of each individual project.**

There is no factual basis for the Tribe's allegation that it was forced to co-sponsor the Watershed Plan with the Watershed District because P.L. 83-566 "requires at least one local sponsor with eminent domain authority to acquire the necessary lands."  Doc. 199, Sec. Am. Compl., ¶ 67.  In 1958, the Watershed District applied for P.L. 83-566 assistance.  *See* Facts, ¶¶ 57–60.  Despite having condemnation authority, the Watershed District's application was not approved because its boundaries are based on "political boundaries rather than natural hydrologic boundaries." Exhibit 1, p. 59; Exhibit 29; Facts, ¶¶ 61–64.  Similarly, in 1982, the Tribe applied for, and was denied P.L. 83-566 sponsorship, but not because it lacked the power of eminent domain.  In reality, the Tribe, like the Watershed District in 1958 could not be a sole sponsor because its Reservation did not cover or was not coextensive with a natural drainage basin. Facts, ¶¶ 86–100.  There is no indication in the record that the denial of sole sponsorship had anything to do with condemnation power.  *See id.*  Nor is there any evidence that the Tribe informed or even suggested to the Watershed District that by agreeing to co-sponsor the plan with the Tribe that it could be obligating itself to condemn.  Facts ¶¶ 101–117.

Even if the Tribe's allegation had merit, the statute and NRCS regulations do not require a local sponsor to make a commitment to condemn in a watershed plan.  See Facts, ¶¶ 48–56 (describing the P.L. 83-566 planning process).  That commitment is only required in a project-specific "separate agreement."  *Id.*; ¶ 19; Part II.B., *supra*.  Moreover, in the 1975 application on which this Watershed Plan was founded, the Watershed District declined to acquire land by eminent domain, or even purchase; rather, land acquisition for watershed projects was expressly limited to "donated easements." Facts ¶¶ 70; 65–69; 71–72.  *See also* Exhibit 1, p. 0059.

The statute only conditions federal assistance for the "***installation*** of works of improvement" on the acquisition of necessary landrights or a commitment to condemn.  16

97

U.S.C. § 1004 (emphasis added).  Likewise, NRCS regulations require sponsors to "**have** . . . the power of eminent domain" but they are not required to "**commit themselves**" to use that power until they seek "Federal assistance **for project installation**."   7 C.F.R. § 622.10 (emphasis added); *see also*, Facts, ¶ 51–56.

Since the Watershed Plan states that it is not a "fund-obligating document," it is clear that federal financial assistance for the "installation of works of improvement" comes after the approval of the Watershed Plan.  Exhibit 1, p. 8, ¶ 18; Facts, ¶¶ 49-56.  *See also Barten v. Turkey Creek Watershed Dist.*, 200 Kan. 489, 507, 438 P.2d 732, 746–47 (1968).  Thus, the Watershed Plan itself cannot be read as an agreement or commitment by any sponsor to condemn property; it is nothing more than an unenforceable plan, a letter of intent, or an agreement to agree in the future.

**V.     The unmistakability doctrine applies to contracts that affect the Watershed District's discretionary use of its eminent domain authority and any ambiguity in the 1994 Watershed Plan must be construed in the Watershed District's favor.**

The unmistakability doctrine states that "'[S]overeign power . . . governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.'"  *United States v. Winstar Corp.*, 518 U.S. 839, 872 (1996) quoting *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986)).

The Tribe's Second Amended Complaint alleges that the Watershed District "expressly promised the Tribe to exercise its power of eminent domain and condemn lands necessary for the Plum Creek Project."  (Doc. 199, at ¶¶ 30, 68.)  However, the Tribe has not pointed to any language in the Watershed Plan that "expressly" states that the Watershed District did, in fact, agree to exercise its eminent domain authority.  The Tribe merely infers that the Watershed Plan contractually obligates the Watershed district to condemn on its behalf because of its allegation that P.L. 83-566 projects "require at least one local sponsor with eminent domain authority to acquire the necessary lands."  (Doc. 199, at ¶ 69.)  And because the Tribe does not have eminent domain authority to do that — a fact that it did not learn of until the Spring of 2003 — it asks the Court to infer that the Watershed District is obligated to condemn on the Tribe's behalf.

The unmistakability doctrine "marks the point of intersection between two fundamental constitutional concepts . . ." *Winstar*, 518 U.S. at 873. In England, Parliament was supreme the source of law; no "higher law" limited its power. In America, the Constitution places limits on legislative power. While a legislature can always amend or repeal its own laws and is generally not bound by previous legislation, it cannot undo a previous act. "The past cannot be recalled by the most absolute power." *Id.* (quoting *Fletcher v. Peck*, 6 Cranch 87, 3 L.Ed. 162 (1810)).

Moreover, sovereignty is limited by the bar against laws impairing the obligation of contracts. Thus, in *Fletcher v. Peck*, the court held that the legislature cannot repeal a law to undo a conveyance of real estate, divesting the owner of rights the state lawfully conveyed. *Id.* It could however, reacquire the property by condemning it. *See Young Partners, LLC v. Bd. of Educ., Unified Sch. Dist. No. 214, Grant Cnty.*, 284 Kan. 397, 403–405, 160 P.3d 830 (2007).

> Although [the Contract] Clause made it possible for state legislatures to bind their successors by entering into contracts . . . two distinct limitations developed to protect state regulatory powers. One came to be known as the "reserved powers" doctrine, which held that certain substantive powers of sovereignty could not be contracted away. The other . . . was a canon of construction disfavoring implied governmental obligations in public contracts. Under this rule that ***all public grants are strictly construed,*** we have insisted that ***nothing can be taken against the State by presumption or inference, [no] power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.***

*Winstar* 518 U.S. at 874 (emphasis added; citations and internal quotations omitted; ellipsis in original).

The unmistakability doctrine "applies when the Government is subject . . . to a claim that its contract has surrendered a sovereign power . . ." *Id.* at 839, 878–79.

> [A] contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a ***conveyance*** or surrender of sovereign power. . . . The application of the doctrine thus turns on whether enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government.

*Id.* at 878–79 (emphasis added).  Contracts with a sovereign always remain subject to subsequent legislation unless there is an unmistakable waiver.  *Id.* at 877–78.

The essence of the Tribe's position is that the Watershed District has surrendered its discretion to decide whether and when to exercise its sovereign power of eminent domain.  A contract that compels the Watershed District to exercise an essential element of sovereignty surrenders or conveys sovereign authority.  The unmistakability doctrine dictates that such a requirement be clearly and specifically stated in unmistakable terms and any an ambiguity must be construed against the Tribe and in favor of the Watershed District.

There are two alternative applications of the doctrine in this case.  An ambiguous term in a contract with a sovereign government will not be construed as a conveyance of sovereign power.  *Id.*  The essence of the Tribe's claim is that the Watershed District must do the Tribe's bidding; it must condemn property upon demand, which is hardly the act of a true sovereign.  Any contract in which the Watershed District agrees to exercise its condemnation power at the behest of the Tribe operates as a conveyance or surrender of sovereign power.[38]  To the extent that such a contract is otherwise permissible, the surrender of the discretion to exercise or not exercise the sovereign power delegated to it must be set out in clear and unmistakable terms.

The *Winstar* Court further stated that when the government does contract away a sovereign power in unmistakable terms, the remedies for breach are limited:

────────────────────

[38]     This is true in two separate ways.  First, a contract that obligates the District to exercise eminent domain is a delegation of a purely governmental function to a third party.  In the alternative, it is a limitation on the discretion conferred on elected officials to act or not act in the public interest and falls in the same way that the Tribe's claims against the individual Board members fell.  *See* Doc. 184, p. 6, ("The power of eminent domain is a power inherently invested in the State . . . expressly delegated . . . to the Watershed District.  The individual defendants' decision to vote on whether to exercise that power, or to refrain from exercising it, is clearly a legislative activity to which immunity attaches.")

> The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.

*Id.* at 881–82.

This aspect of the doctrine was discussed in a concurring opinion in *Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109, 1140 (10th Cir. 2003) (vacated on other grounds). The concurrence would have applied the unmistakability doctrine to a contract that would limit the exercise of the government's sovereign authority.

In *Rio Grande*, the 10th Circuit held that the BOR had discretion to reduce previously contracted water deliveries to comply with the Endangered Species Act ("ESA"). *Id.* at 1113–14. Two concurring judges stated that even if the contracts at issue did not expressly retain authority to reduce water deliveries, "under the unmistakable terms doctrine the ESA nonetheless modifies the contracts because the contracts do not affirmatively state that future legislation will not apply." *Id.* at 1139. Distinguishing *Winstar,* in which the unmistakability doctrine was not applied, the *Rio Grande* concurrence stated:

> In [*Winstar*], the plaintiffs sought only *damages* from the government for its breach of contract occasioned by the applicability of legislation enacted after the contract was executed. Most significantly for our purposes the plaintiffs did *not seek injunctive relief* or some form of exemption to prevent the subsequent legislation from applying to their contracts; rather, they merely sought damages for the loss suffered as a result of the application of that new law.

*Id.* at 1140 (emphasis in original)

The Tribe is asking this Court to insert an unwritten term into the Contract requiring the Watershed District to condemn on the Tribe's behalf. This construction is prohibited under the unmistakability doctrine. Moreover, to the extent that this Court finds the Watershed Plan ambiguous regarding the Watershed District's obligation to condemn for the Tribe, it must construe that ambiguity in the Watershed District's favor.

VI.  **A contract that purports to strip discretion regarding whether and when to condemn is in violation of the Reserved Powers Doctrine and is, therefore, invalid at its inception.**

A.  **A sovereign cannot be contractually required to exercise its eminent domain power at the whim of a third party.**

Assuming, *arguendo*, that the terms of the Watershed Plan obligate the Watershed District to condemn, the contract is void and unenforceable under the Reserved Powers Doctrine which stands for the proposition that a state is not required to "adhere to a contract that surrenders an essential attribute of its sovereignty," such as eminent domain.  *Young Partners*, 284 Kan. at 403.  *See also Contributors to Pa. Hosp. v. City of Phila.*, 245 U.S. 20, 23–24 (1917) (holding that the eminent domain power cannot be surrendered by contract).

It is important to note that persons contracting with governmental entities do so "at their peril" and "must inquire into" the extent of an entity's authority.  *Red Dog Saloon v. Sedgwick Cnty.*, 29 Kan. App. 2d 928, syl. 1, 930, 33 P.3d 869 (2001), *rev. denied* (2002). ("An attempt by a governmental agency to enter into a contract in violation of its authority will be considered void.")   In this case, the shoe could have as easily been on the other foot since it is well understood that there are significant limitations on contracts with Indian Tribes.  *See e.g.*, 25 U.S.C. § 81.

Courts have long held that the power of eminent domain is one of the powers that cannot be contracted away.  *West River Bridge Co. v. Dix*, 47 U.S. 507, 532 (1848) (holding that the Contracts Clause does not prevent a State from exercising the power of eminent domain.  "This power denominated *eminent domain*, of the State, is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yield in every instance to its proper exercise."); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22 (1977) (stating that "the doctrine that a State cannot contract away the power of eminent domain has been established since *West River Bridge Co. v. Dix*").  *See also Young Partners*, 284 Kan. at 403–04, 160 P.3d at 836–37 ("The Supreme Court

102

has long held that the states' power of eminent domain is one of the 'essential attributes of sovereignty' that is not subject to the limitations of the Contract Clause.").

Therefore, any attempt to contract away the power of eminent domain is simply unenforceable and a contract that purports to do so is void. *See U.S. Trust Co. of N.Y.*, 431 U.S. at 23. "This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment." *Id.* at 22.

Furthermore, the Reserved Powers Doctrine applies to municipal corporations, such as the Watershed District. *See, e.g.*, *Contributors to Pa. Hosp. v. City of Phila.*, 245 U.S. 20 (1917) (applying the Reserved Powers doctrine to the exercise of eminent domain by a municipality); *Young Partners*, 284 Kan. at 403–04, 160 P.3d at 836–37 (applying the doctrine to a local school district).

The Kansas State Legislature entrusted Watershed Districts with the power of eminent domain. *See* K.S.A. 24-1209. Watershed Districts also have the power to enter into contracts "deemed necessary" by its "board of directors" to enable it to "properly carry out the purpose for which organized." *Id.* However, the reserved powers doctrine expressly prohibits the Watershed District from contracting away its power of eminent domain, which, according to the Tribe, is precisely what the Watershed Plan purports to do. To the extent that the Court finds a contractual obligation for the Watershed District to exercise its power of eminent domain on behalf of the Tribe, the Reserved Powers Doctrine renders that obligation invalid *ab initio*.

The Tribe alleges that the Watershed District has received the "benefits" of the Watershed Plan and so should therefore be required to perform its part of the "bargain." The Watershed District disputes that it has received any benefit; however, to the extent that the Court disagrees, the Reserved Powers Doctrine invalidates contracts that purport to surrender the power of eminent domain, even when the municipal corporation has received the benefit of the bargain. 13 McQuillin, *The Law of Municipal Corporations*, § 37:116 (3d. ed.) (citing *Needles*

*v. Kansas City*, 371 S.W.2d 300 (Mo. 1963); *State Highway Comm'n v. City of Sullivan*, 520 S.W.2d 186 (Mo. Ct. App. 1975)).

**B.**      **The Reserved Powers Doctrine provides the Watershed District with discretion regarding whether and when to exercise its eminent domain authority, and no obligation, contractual or otherwise, can validly take that discretion away.**

The Tribe alleges that the Watershed Plan is a contract that obligates the Watershed District to exercise the power of eminent domain on the Tribe's behalf, but such an obligation would be tantamount to the Watershed "surrendering" an essential element of state sovereignty to the Tribe.  "If the acquisition of land for a public purpose is a governmental function, so is the decision about the timing of the acquisition.  A contract restricting a city's freedom in choosing *when* to acquire property is thus a contract in derogation of that function."  *Joleewu, Ltd. v. City of Austin*, 916 F.2d 250, 255 (5th Cir. 1990) *vacated in part on other grounds*.  Accordingly, a contract "in derogation of the municipality's governmental function is unenforceable."  *Id.*

This is consistent with the Supreme Court's newer decisions, which bolster the "longstanding policy of deference to legislative judgments in this field."  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 480 (2005).  As the Supreme Court stated, "[w]hen the legislature's purpose is legitimate, and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts."  *Id.* at 488 (quoting *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 243 (1984)).

Here, the Tribe alleges that the Watershed District is contractually obligated to exercise its eminent domain authority.  In so doing, it is asserting that the Watershed Plan not only removes the Watershed District's discretion regarding exercise of its eminent domain authority, but the Tribe is dictating *when* the Watershed District must exercise that authority, which is prohibited by the Reserved Powers doctrine.

### C.   Even if this Court holds that the Reserved Powers doctrine does not prohibit a Watershed District from contracting away its eminent domain authority, the Tribe's remedy is limited to money damages – not specific performance.

No court has required a governmental entity to exercise its power of eminent domain, even in the face of a valid and enforceable contract that specifically calls for the same.  Even if this Court finds a valid Contract and holds that the Watershed District's refusal to exercise its eminent domain authority on behalf of the Tribe is a breach thereof, specific performance is not an available remedy for the Tribe.

Allowing the government to be sued for damages is "a far different matter" than allowing "a court to exercise its compulsive powers to restrain . . . or to compel [the government] to act." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 704 (1949) (stating that there are strong public policy reasons to not allow specific performance against a sovereign.)

In *Wheat Ridge Urban Renewal Auth. v. Cornerstone Group XXII, L.L.C.*, 176 P.3d 737 (Colo. 2007), the Colorado State Supreme Court held that a contractual obligation requiring the use of eminent domain was not a violation of the Reserved Powers Doctrine.  *Id.* at 743. However, even in *Wheat Ridge*, the Court found no basis for ordering the governmental entity to specifically perform under the contract.  *Id. at* 744.  To the contrary, the *Wheat Ridge* opinion speaks strongly against ordering specific performance in such cases.

> Apart from any implied waiver of sovereign immunity, or consent to be sued in court, the question of equitable relief for breach of contract, or specific performance, implicates an additional concern for the separation of governmental powers.  As recognized by the Supreme Court, there are "the strongest reasons of public policy" for the rule that specific performance cannot be had against the sovereign.

*Id.* at 745.  Moreover,

> [w]hile the Supreme Court has readily acknowledged that Congress has the power to entrust the business of the government to agencies that are able to contract and be sued in their own names, in the absence of such congressional action it nevertheless holds that **courts are without authority to order specific relief against the government for breach of contract**. . . .  In light of the [fact] that the instant contract could not be performed without the exercise of the . . . power of eminent domain, it is enough that courts in this jurisdiction lack the authority to compel the exercise of core governmental powers that rest within the discretion of

> a coordinate branch of government, regardless of binding contractual obligations
> to do so.

*Id.* (emphasis added).

The *Wheat Ridge* opinion goes on to confirm that eminent domain is one of the "core governmental powers" for which courts have no authority to order specific relief. *Id.* at 746. Therefore, "as a matter of public policy, if not constitutional necessity, the discretion to exercise the power of eminent domain in the public interest must remain with the body to which it was delegated, and not the courts." *Id.*

The *Wheat Ridge* holding was clarified in *Thompson Creek Townhomes, LLC v. Tabernash Meadows Water and Sanitation Dist.*, 240 P.3d 554 (Colo. Ct. App. 2010). In that case, the Court notes that it is "aware of no statute or decision in any United States jurisdiction that allows for . . . a remedy" of specific performance against the government. "We read *Wheat Ridge* in this context of overwhelming authority prohibiting the enforcement of specific performance against a sovereign as a contractual remedy and hold that it prohibits . . . action for specific performance here." *Id.* at 556–57.

Like *Wheat Ridge* and *Thompson*, other cases have held that specific performance is not an available remedy in similar contexts. *See, e.g.*, *Whitlow v. Bd. of Educ. of City of Council Grove,* 108 Kan. 604, 196 P. 772 (1921) (Where public officers ignored their contractual obligations because of a mistaken view of a pure question of law, the Court held that contractual compliance may be enforced by mandamus, but declined to require specific performance.) Therefore, even if the Court holds that the Watershed District is in breach of its contractual obligations, summary judgment should be granted against the Tribe to the extent that it seeks specific performance of the Watershed District's eminent domain authority.

## VII. The Tribe cannot convert a simple breach of contract case into a violation of the Contracts Clause.

This is a simple breach of contract case and does not involve or implicate the Contracts Clause which prohibits states from passing "any . . . Law impairing the Obligation of Contracts."

U.S. Const., art. I, § 10, cl. 1.   The Contracts Clause is implicated when a state exercises legislative authority to modify the terms of a contract.

> Legislation that mandates that the state breach one of its contractual obligations yet does not change or eliminate the obligation itself does not contravene the Contracts Clause. The state, like any private party, must be able to breach contracts without turning every breach into a violation of the Contracts Clause. The distinction between a breach of contract and an impairment of contract depends on the availability of a remedy in damages. If a contract is merely breached and the duty to pay damages remains, then the obligation of the contract remains and there has been no impairment. This is known as the "availability-of-remedy" test. Stated another way, simple breach of contract by a government entity does not impair the obligation of the breached contract as long as the governmental action does not foreclose adequate damages or a special performance remedy.

16B Am. Jur. 2d Constitutional Law § 782

The Second Amended Complaint alleges that the Watershed District has impaired the Tribe's constitutional rights under the Contracts Clause by refusing to exercise eminent domain authority on the Tribe's behalf. (Doc. 199, at ¶¶ 152–54.)  Assuming, *arguendo*, that this Court finds that the Watershed District had a contractual obligation to exercise its eminent domain authority and has refused to do so, the alleged breach does not violate the Contracts Clause unless the legislative action also removes a remedy.   As discussed in previous sections, injunctive relief is not available to the Tribe but it has not asserted that the Watershed District has taken any action precluding an award of damages and obviously lacks the power to do so.

**VIII.   The Tribe's claims against the Watershed District must be dismissed because the District is an arm of the State of Kansas and is therefore entitled to Sovereign Immunity.**

Because the Watershed District is an agency of the State of Kansas, the Tribe's claims against it are barred by the Eleventh Amendment.  *See Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984); *Florida Dept. of State v. Treasure Salvors, Inc.*, 458 U.S. 670, (1982); *Cory v. White*, 457 U.S. 85 (1982); *Urban v. Henley*, 654 F. Supp. 870 (1987).

The primary purpose of the Eleventh Amendment is to accord states the respect owed them as joint sovereigns.  *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 765

(2002).   Consequently, sovereign immunity bars any action brought against a state in federal court.  *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).  And because Indian Tribes are foreign states for purposes of the Eleventh Amendment, they cannot sue states in federal court.  *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779–83 (1991).

The Eleventh Amendment also precludes federal suits against "arm[s] of the state."  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).  Accordingly, if the Watershed District is an "arm of the state" the Tribe's lawsuit is barred, and the Watershed District should be granted summary judgment.

The Tenth Circuit assesses four factors to determine whether an entity qualifies as an "arm of the state": "the character ascribed to the entity under state law[;] . . . the autonomy accorded the entity[;] . . . the entity's finances[;] . . . [and] whether the entity in question is concerned primarily with local or state affairs."  *Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007) (citations omitted).

In *Steadfast*, multiple claimants sued the Grand River Dam Authority ("GRDA") for damages sustained in a series of floods.  GRDAs are, in many respects, the Oklahoma equivalent of Kansas watershed districts.  *Cf.* 82 Okla. St. Ann. § 861 *with* K.S.A. 24-1201a.  The GRDA's primary insurer sought a declaration that it had no obligation to cover the underlying claims.  It also sued GRDA's excess liability insurer, asserting that an excess liability policy might come into play.  *Steadfast*, 507 F.3d at 1253.  The District Court dismissed the claims against GRDA holding that it was entitled to sovereign immunity under the Eleventh Amendment and the Tenth Circuit affirmed.  *Id.* at 1251.  As in *Steadfast*, here, each of the factors weighs in favor of granting the Watershed District summary judgment based on sovereign immunity.

### A.   Watershed Districts have state, rather than local, characteristics.

To analyze the first factor, courts "conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state."  *Id. at* 1253.  The statute authorizing the creation of watershed districts offers little direct guidance on whether they are state entities,

but a watershed district's primary concerns, as a whole, revolve around state, not local, issues. *See* K.S.A. 24-1202(f).

> **1.     Kansas public policy indicates that the concerns of Watershed Districts are statewide and transcend local boundaries.**

The Watershed District Act, K.S.A. 24-1201, *et seq.*, sets out the Kansas Legislature's declaration of public policy relating to the formation of Watershed Districts:

> It is recognized that serious problems . . . are arising in the ***watersheds of the rivers and streams of the state of Kansas***; that for the purpose of alleviating such damages and furthering the conservation, development, utilization and disposal of water and thereby preserving and protecting ***the state's land and water resources***, it is legislatively determined that it is necessary and advisable to establish watershed districts . . . ; that there is hereby declared the ***public necessity*** for the creation of such districts in watersheds including lands that are subject to erosion, floodwater or sediment damages . . . .

K.S.A. 24-1201a (emphasis added).  *See also* Facts, ¶¶ 31–43 (setting forth relevant provisions of the Kansas Watershed District Act).

> **2.     A key goal of the statute is protection of water—an asset owned by the State of Kansas.**

Watershed Districts are formed for the express purpose of controlling the soil and the unappropriated floodwater and other water owned by the State of Kansas.  *See* K.S.A. 24-1201a. This follows from the well-established fact of Kansas law that "[a]ll water within the state of Kansas is . . . dedicated to the use of the people of the state, subject to the control and regulation of the state in the manner herein prescribed."  K.S.A. 82a-702.  Since at least one of the major reasons for enacting the Watershed District Act was the control of water, a resource owned by the State, it cannot be said that Watershed Districts act on purely local interests.  Instead, Watershed Districts are State entities, doing business on behalf of the State of Kansas, with the purpose of protecting water, a State resource.

Likewise, a major reason for enacting the Watershed District Act was the control of the State's soil.  *See* K.S.A. 24-1201a.  Preserving and protecting land and water resources transcend local interests because soil erosion at one location negatively impacts downstream interests because that soil is subsequently deposited at downstream locations.  This point is illustrated by

the major focus of the Kansas Water Office on sediment being deposited in federal reservoirs and their resulting diminished capacity.[39]   Accordingly, the Watershed District's 1978 General Plan stated: "Sediment deposition is of major importance throughout the floodplains in the watershed district."  Exhibit 36, p. 16.

Watershed districts are not merely local entities with local concerns.   Rather, the fundamental aspect of their existence, design, and practice impacts statewide soil and water concerns.  The issue has even more far-reaching implications; P.L. 83-566 identifies these same issues as a "menace to the *national* welfare."  16 U.S.C. § 1001 (emphasis added).

**B.     Nemaha Brown's Lack of Autonomy Likely Points to It Being a State Agency.**

The second factor discussed in *Steadfast* — the entity's autonomy — measures the "degree of control the state exercises over the entity."  *Steadfast*, 507 F.3d at 1253.  Kansas law places significant limitations on Watershed Districts that result in a high degree of state control, which indicates that the Watershed District is entitled to sovereign immunity as an "arm of the state."

First, Kansas imposes substantial auditing and reporting requirements on watershed districts.  Specifically, the Watershed District is required to give the state an annual report on its financial condition and activities, which must include a determination of whether each proposed project is still "cost effective and in the current public interest."  K.S.A. 24-1211.  Moreover, at least once a quarter, the Watershed District's board must have a public meeting and provide the minutes to the Kansas Department of Agriculture.  K.S.A. 24-1212.  Big Brother watches.

Second, the Chief Engineer of the Division of Water Resources provides direct oversight and control over Watershed Districts.   This control is so extensive that it must be said that

---

[39]      http://www.kwo.org/reservoirs/Reservoirs.htm

Watershed Districts are largely controlled by the Chief Engineer.  For example: The Chief Engineer has the power to disapprove a petition calling for the formation of a Watershed District.  K.S.A. 24-1208.  Further, newly formed Watershed Districts are required to prepare a General Plan, which must be submitted to the Chief Engineer for review and approval.  K.S.A. 24-1213.  In addition:

> The chief engineer shall examine and study said general plans as to: (1) Feasibility.  (2) Co-ordination of the plan with any general plan for the watershed of which the district might be a part.   (3) The safety of the works and improvements proposed.  (4) ***Conformity with the intents and purposes of this act***.  The chief engineer shall transmit a written report . . . which shall include any changes or modifications which ***he deems necessary*** and ***which shall include a specific approval or disapproval of the general plan***.

*Id.* (emphasis added).  If the Chief Engineer determines that a General Plan should be modified, the changes must be resubmitted to the Chief Engineer for approval.  *Id.*

Once the General Plan and the financing methodology are adopted, the Watershed District must obtain the Chief Engineer's approval on surveys; cost estimates and calculations; detailed construction plans; and specifications showing the location, amount, and character of work to be done and the estimated cost of right-of-way, construction, maintenance, and operation for each specific project.  K.S.A. 24-1216(a).  The Chief Engineer retains similar oversight authority for updates to the General Plan, which are required every five years.  K.S.A. 24-1216(b).

Even further, the Chief Engineer must review and approve requests to transfer territory from one Watershed District to any other adjacent Watershed District (K.S.A. 24-1222, *et seq.*); to extend the boundaries of an existing Watershed District (K.S.A. 24-1227, *et seq.*); and to dissolve a portion of a Watershed District.  K.S.A. 24-1229, *et seq.*

The requirements set out in the Watershed District Act are in addition to the requirements imposed by the Chief Engineer under the Water Appropriation Act, K.S.A. 82a-701, *et seq.*, and the Dam Safety Act, K.S.A. 82a-301, *et seq.,* with which watershed districts must also comply.

As these laws make clear, the State, through the Chief Engineer, maintains extensive direction and control over the activities of a Watershed District. This State control is made even clearer when one considers the fact that the benefits of a floodwater-retarding dam are felt downstream and benefit State interests that lie outside the boundaries of a particular Watershed District.

### C.     The Watershed District's funding indicates that it is a state entity.

The third factor examines the entity's finances. Here, courts observe "the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007).

Though the Watershed District does have limited taxing authority, it receives substantial money from the state treasury. Specifically, the state pays up to 80% of the costs for each Watershed District project with an annual cap of $120,000 per structure. K.A.R. 11-3-4(b). This state funding commitment is yet another indication that the Watershed District is an "arm of the state."

### D.     The Watershed District's primary concerns deal with state matters.

The final factor is whether the entity's primary concerns are state or local affairs. In deciding this issue, courts analyze the agency's purpose, composition, and function. *Steadfast*, 507 F.3d at 125.

In *Steadfast*, the GRDA covered twenty-four Oklahoma counties, and the court concluded that "[t]he GRDA's geographical scope, in tandem with its conservation function, suggests the agency was designed to fulfill a state purpose." *Id.* at 1255. Like the GRDA in *Steadfast*, the Watershed District's boundaries are not politically circumscribed, spanning parts

of four counties.  Moreover, other watershed districts in the state, such as Pawnee, cover as many as eight counties.  *See* Kansas State Department of Agriculture website.[40]  Although these districts are smaller than the GRDA, their scope extends beyond that of a local government entity, clearly indicating that the Watershed District has a state purpose.

Moreover, the statewide nature of the Watershed District's purpose is evidenced by its goals of water and soil conservation.  The statute provides that they are "for the purpose of . . . furthering the conservation, development, utilization and disposal of water and thereby preserving and protecting ***the state's*** land and water resources."  K.S.A. 24-1201a (emphasis added).

Finally, the Court in *Steadfast* noted that the GRDA's functions "mirror the conservation and regulatory missions of state-run utilities, parks, and recreation areas across the nation." *Steadfast*, 507 F.3d at 1256.

Like the GRDA in *Steadfast*, the administrative duties and functions of watershed districts resemble the "conservation and regulatory missions of state-run utilities, parks, and recreation areas across the nation."  *Id.*  As stated above, the creation of watershed districts is a public necessity for the preservation and protection of the state's, and indeed the Nation's, land and water resources.  Such a purpose is clearly concerned with promoting statewide, not merely local, interests.

## Conclusion

The Tribe's allegations that the Watershed District entered into an agreement to exercise its condemnation authority for the Tribe is without a factual or legal basis.  It is unfortunate that the Tribe did not investigate the extent of its eminent domain powers in the early part of this

---

[40]http://www.ksda.gov/includes/images/doc/WatershedDistricts/Wtrsheds_Districts2535.jpg (last visited June 18, 2012).

planning process, but that failure cannot be blamed on the Watershed District nor does it create any duties for the District.  For the reasons set out, the Watershed District is entitled to Summary Judgment.

Respectfully submitted,

*s/David M. Traster*
David M. Traster, KS #11062
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
316-291-9725
866-347-3138 (fax)
dtraster@foulston.com
*Attorneys for the Nemaha Brown Watershed Joint District No. 7*

## Certificate of Service

I hereby certify that on the 16th day of January, 2013, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to the following:

*Attorneys for Plaintiff:*

Steven C. Moore                         smoore@narf.org
Kim J. Gottschalk                       jeronimo@narf.org
Native American Rights Fund
1506 Broadway
Boulder, CO 80302

Steven A. Campbell                      steve.campbell@ktik-nsn.gov
Amelia C. Holmes                        holmesameliac@yahoo.com
Kickapoo Tribe Legal Dept.
P. O. Box 110
1107 Goldfinch Road
Horton, KS 66439

*Attorneys for Defendant, Michael Black:*

Daniel G. Steele                        daniel.steele@usdoj.gov
U.S. Department of Justice

114

P. O. Box 663
Washington, DC 20044-0663

and

Robin Barkett Moore                          robin.moore@usdoj.gov
Office of the United States Attorney
301 N. Main Street, Suite 1200
Wichita, KS 67202-4812


*Attorney for Defendant, David Barfield:*

Christopher M. Grunewald                      chris.grunewald@ksag.org
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597



                                        *s/David M. Traster*
                                        David M. Traster, KS #11062