Steven Carl Moore, Esq., Colorado Bar #9863
K. Jerome Gottschalk, Esq., New Mexico Bar #3799
**NATIVE AMERICAN RIGHTS FUND**
1506 Broadway
Boulder, Colorado 80302-6296
smoore@narf.org

Amelia C. Holmes, Esq.  Kansas Bar #20346
Kickapoo Tribal Legal Department
**KICKAPOO TRIBE IN KANSAS**
Post Office Box 110
1107 Goldfinch Road
Horton, Kansas 66439
holmesameliac@yahoo.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

_____
                                                    )
KICKAPOO TRIBE OF INDIANS OF THE                    )
KICKAPOO RESERVATION IN KANSAS,                     )
                                                    )
          Plaintiff,                                )
                                                    )     No. 06-2248 CM-DJW
               v.                                   )
                                                    )
MICHAEL BLACK, et al.                               )
                                                    )
          Defendants.                               )
_____)

## PLAINTIFF KICKAPOO TRIBE'S REPLY TO THE WATERSHED DISTRICT'S
## *DE FACTO* RESPONSE TO THE TRIBE'S CROSS-MOTION
## FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

STATEMENT OF UNCONTROVERTED FACTS....................................................1

<u>Tribal Water Development on the Kickapoo Reservation</u>...................................2

<u>Water Development by the Nemaha Brown Watershed
Joint District Development No. 7</u>.....................................................................5

<u>Joint Watershed Board Water Development</u> .....................................................6

ARGUMENT...................................................................................................19

  I.  The Tribe And The District Collaborated On The P.L. 83-566 Projects
     Because They Were Of Mutual Benefit To Both Parties..........................19

  II.  Federal Law Mandates The Tribe's Construction Of The Contract.......20

  III.  The Record Supports The Tribe's Construction Of The Contract..........23

  IV.  The Agreement Contains All Essential Terms. .........................................25

     A.  The "As Needed" Language Is Not Vague......................................25

     B.  The Future Project Implementation Agreement Does Not
         Affect The Validity Of The 1994 Agreement..................................26

  V.  The Contract Does Not Violate Either The Reserved Powers Or The
     Unmistakability Doctrines....................................................................27

     A.  The Agreement By The District To Exercise Eminent Domain Is
         Not A Contract Surrendering A Core Governmental Function,
         Rather It Is A Contract To Exercise That Function And As Such
         Does Not Run Afoul Of The Reserved Powers Doctrine................27

     B.  The Unmistakability Doctrine Does Not Apply To An Exercise Of
         Authority And At Any Rate The  District Unmistakably Agreed To
         Exercise Its Eminent Domain Authority.........................................29

  VI.  Assuming Arguendo There Is No Written Agreement, Promissory
     Estoppel Imposes The Obligation To Exercise Eminent Domain
     On The District..........................................................................30

**VII.**  **Attorney General Opinions Are Persuasive Authority That The District Is Not An Arm Of The State And The District Fails The Test Articulated In Steadfast As Well.** ..........................32

**VIII.**  **Specific Performance Is Allowable in Extraordinary Circumstances.** .................................................................................33

**CONCLUSION** ...........................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Antrim, Piper, Wenger, Inc. v. Lowe*, 37 Kan. App. 2d 932, 159 P.3d 215 (2007) ......................25

*Atkinson v. Shirley,* 532 U.S. 645 (2001) ..............................................................................22, 23

*Barten v. Turkey Creek Watershed Joint Dist. No. 32 of Dickinson & Marion Counties*,
200 Kan. 489, 438 P.2d 732 (1968) ...................................................................................... 26-27

*Brendale v. Confederated Yakima Indian Nation*, 402 U.S. 408 (1989) ...........................21, 22, 23

*Cuyahoga Metro. Housing Auth. v. United States*, 57 Fed. Cl. 751 (2003) ...................................29

*Cherokee v. Georgia*, 30 U.S. 1 (1831) ......................................................................................22

*E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406 (D.Kan.1986) .....................................1

*Estate of Pingree v. Triple T Foods, Inc.*, 430 F. Supp. 2d 1226 (D. Kan. 2006) .........................28

*Hansen v. Catsman*, 123 N.W.2d 265 (1963) .............................................................................26

*Hochard v. Deiter*, 219 Kan. 738 (1976) ...................................................................................31

*Idaho Timber Corp. of Kansas v. A.G. Spanos Constr., Inc.*, No. 93,270, 2005 WL 2665763
(Kan. App. Oct. 14, 2005) ..........................................................................................................26

*In re Jones*, 22 Jan. App. 2d 753 (1996) ....................................................................................31

*Joleewu, Ltd. V. City of Austin,* 916 F.2d 250 (5th Cir. 1990) ...............................................28, 29

*Lurch v. United States,* 719 F.2d 333 (10th Cir. 1983) ...............................................................30

*Matsuda v. City and County of Honolulu*, 512 F.3d 1148 (9th Cir. 2008) ...................................28

*Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982) ............................................................29

*Montana v. United States*, 450 U.S. 544 (1981) .........................................................................22

*Phillips & Easton Supply Co., Inc. v. Eleanor Int'l, Inc.*, 212 Kan. 730,
512 P.2d 379 (1973) ...................................................................................................................26

*Piz v. Housing Auth. of the City & County of Denver*, 132 Colo. 457, 289 P.2d 905 (1955) ........30

*Price v. Grimes,* 234 Kan. 898, 677 P.2d 969 (1984) ..................................................................25

*Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420 (1837) ........30

iii

*Ramah Navajo Chapter v. Salazar*, 644 F. Supp 3d. 1054 (10th Cir. 2011) ..........................20, 22

*Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250 (10th Cir. 2007)...........................................32

*U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977)...............................................................29

*Unified Sch. Dist. No. 207 v. Northland Nat'l Bank*, 20 Kan. App. 2d 321,
887 P.2d 1138 (1994)...................................................................................................................30

*United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975) ......................................................... 30-31

*Wheat Ridge Urban Renewal Auth. v. The Cornerstone Group L.L.C.*,
176 P.3d 737 (2007)................................................................................................................29, 31

*Young Partners, L.L.C. v. Board of Education, USD No. 214, Grant County*, 284 Kan. 397,
160 P.3d 830 (2007)......................................................................................................................29

*Willard v. City of Kansas City,* 235 Kan. 655, 681 P.2d 1067 (1984)...............................................1

## STATUTES

Kansas Watershed District Act § 24-1201 *et seq.* (1959).........................................................5, 32

Kansas Watershed District Act § 24-1209 (1959) .........................................................................5

Kansas Watershed District Act § 24-1211-12 (1959)...................................................................32

Kansas Watershed District Act § 24-1214-15 (1959)...................................................................32

Pub. L. No. 97-98, 95 Stat. 1332 (1981)........................................................................................4

Pub. L. No. 83-566 *et seq.*, 68 Stat. 666 (1954)........................................................................7, 10

## LEGISLATIVE MATERIALS

Statement of Representative Jim Ryun, *Land Between Watershed Projects:  Regarding the
Upper Delaware and Tributaries Watershed Project:  Hearing Before the Subcomm. On Water
Resources and Environment of the H. Comm. On Transporation*, 105th Cong. (1998)................13

## ADMINISTRATIVE MATERIALS

7 C.F.R. 622.10 (1975) ........................................................................................................7, 10, 20

40 Fed. Reg. 12,469 (Mar. 19, 1975)......................................................................................10, 21

40 Fed. Reg. 12,476 ......................................................................................................................21

## TREATISES AND LAW REVIEW ARTICLES

1 A.L.R. 2d 338 § 2.........................................................................................30

115 A.L.R. 152 (1938).....................................................................................30

F. Cohen, *Handbook of Federal Indian Law*, § 7.02 (2012) ........................22

## OTHER

7 Stat. 117 (1809)............................................................................................2

7 Stat. 130 (1815)............................................................................................2

7 Stat. 145 (1816)............................................................................................2

7 Stat. 200 (1819)............................................................................................2

7 Stat. 202 (1819)............................................................................................2

7 Stat. 208 (1820)............................................................................................2

7 Stat. 391 (1832)............................................................................................2

10 Stat. 1078 (1854).........................................................................................2

12 Stat. 126 (1861)...........................................................................................2

12 Stat. 1249 (1862).........................................................................................2

16 U.S.C. § 1002 (1956)..................................................................................11

35B C.J.S. Federal Civil Procedure § 1165 (2013)..........................................1

*Black's Law Dictionary* 631 (9th ed. 2009) .................................................31

Rest. Of Contract § 33 (1981).........................................................................25

## INTRODUCTION

By the time that the District filed its Reply to the Tribe's Response to the District's Motion for Summary Judgment, the Tribe had filed its Cross-Motion for Summary Judgment. The District, in its Reply, replied to all of the arguments raised by the Tribe in its Response to the District's Motion for Summary Judgment and the arguments made by the Tribe in its Cross-Motion for Summary Judgment. Therefore, the District had ample opportunity to make its case before this Court. In the interest of judicial economy, the Tribe files this brief as a Reply to the *De Facto* Response of the District to the Tribe's Cross-Motion for Summary Judgment and the Tribe feels the respective summary judgment motions are ripe for decision.

## STATEMENT OF UNCONTROVERTED FACTS

Given the argumentative nature of the proposed uncontroverted facts throughout this litigation, the Tribe has distilled all argument to the following concise recounting of the history of this case. Although the parties present opposite statements of facts in this case, that alone does not preclude summary judgment. 35B C.J.S. *Federal Civil Procedure* § 1165 (2013) (stating that "summary judgment does not become disfavored simply because a case is complex or even if there are some disputed facts..."). Courts make the final determination on the validity and/or existence of uncontroverted facts. *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D.Kan. 1986). In making this determination, courts should search the record to determine whether issues of fact exist. *Willard v. City of Kansas City,* 235 Kan. 655, 657, 681 P.2d 1067 (1984).This Court may grant summary judgment for the Tribe as long as it believes there is no *genuine* issue of *material fact* and the Tribe is entitled to judgment as a matter of law. *Id.* (emphasis added.) Therefore, based upon its extensive review of the record and each party's

1

briefing, the Tribe respectfully offers the following summary of material and uncontroverted facts:

## Tribal Water Development on the Kickapoo Reservation

1.      The United States relocated the Kickapoo Tribe at least five times, a process which resulted in ten treaties with the Tribe. (*Id.* ¶ 15 (*citing* 7 Stat. 117 (1809); 7 Stat. 130 (1815); 7 Stat. 145 (1816); 7 Stat 200 (1819); 7 Stat. 202 (1819); 7 Stat. 208 (1820); 7 Stat. 391 (1832); 10 Stat. 1078 (1854); 12 Stat. 1249 (1862).))

2.      In 1832, the Kickapoo Reservation, then containing over 650,000 acres, was established in territory that is now Kansas. (Pl. Kickapoo Tribe of Kan. Sec. Am. Compl., ¶ 15, June 22, 2012, ECF No. 199 [*hereafter* "Sec. Am. Compl."] (*citing* 1832 Treaty of Castor Hill, 12 Stat. 126 (1861)).)

3.      After treaty established the initial Reservation in 1832, the Tribe and the United States entered into two more treaties that first, reduced the size of the Reservation from larger than 75,000 acres to 19,200 acres, and second, opened the Reservation to allotment, and to a declaration of surplus lands and homesteading of non-allotted lands by non-Indians.  (*Id.* ¶ 16 (*citing* Treaty of 1854, 10 Stat. 1078 (1854); Treaty of 1862, 12 Stat. 1249 (1862).))

4.      Today, of the 19,200 acres within the Reservation boundaries, the Tribe owns 3,800 acres in trust; individual members of the Tribe own 3,100 acres in trust; and the Tribe owns 600 acres in fee. Non-Indians own the remaining 11,700 acres in fee. (*Compare id.* ¶ 17 *with* Def. Mem. Supp. Mot. Summ. J., ¶ 7 Jan. 13, 2013, ECF No. 248; *see also* Watershed Plan and Envtl. Impact Statement, Upper Delaware and Tributaries Watershed, Atchison, Brown, Jackson, and Nemaha Cntys., Kan., 11-12 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 30-31), Jan. 1994, ECF No. 248-6 [*hereinafter* "1994 Watershed Plan"].)

2

5.      In the 1970s, the Kickapoo Tribe first began to develop its water supply.  (Cadue Decl., ¶ 4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 4), Nov. 7, 2006, ECF No. 44-6.) Prior to that, the few tribal member homes on the Reservation depended on small, shallow wells. (*Id.*)  The Tribe's early efforts led to construction of a small water intake, treatment and delivery system that is still in use today. (*Id.* ¶ 5.)  This antiquated system continues to limit the Tribe's ability to grow economically by adding commercial and industrial ventures, by supplying water to the on-reservation school, by adding housing, and by developing a more modern fire protection system. (*Id.* ¶¶ 52-57.)

6.      Throughout the 1970s, 1980s and 1990s – the decades long planning effort that culminated in the 1994 Agreement to build the Plum Creek Project – the Tribe never asserted any regulatory or adjudicatory jurisdiction over the activities of non-Indians on Tribal fee lands within the Reservation boundaries because it never believed it has jurisdiction to do so. (*See id.* ¶ 16.)

7.      The Tribe believed, and continues to believe, that federal law deprives it of general authority to exercise its sovereignty over non-Indians on fee lands, a void which extends to any effort to condemn non-Indian fee lands both within and outside of the Kickapoo Reservation boundaries. (*Id.*; Supplemental Cadue Decl., ¶¶ 3-4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. A-1 at ¶¶ 3-4), Mar. 1, 2013, ECF No. 266-2.)

8.      In the 1970s, the engineering firm of Van Doren, Hazard and Stallings of Topeka, Kansas ("VHS") produced, and the Tribe published, a water engineering report which identified five possible sites on tributaries to the Delaware River on the Reservation for possible development as surface water storage sites. (*See* 1994 Watershed Plan, C-4.3 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 132), Jan. 1994, ECF No. 248-6.) The Plum Creek Site was chosen as the

3

most viable site after exhaustive analysis. (*Id.* at 29-34 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 47-52), ECF No. 248-6.)

9.      In the 1970s, the Tribe approached the BIA, seeking ways to secure federal financial and technical support to develop a water supply. (Cadue Decl., ¶ 4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 4), Nov. 7, 2006, ECF No. 44-6.) The BIA directed the Tribe to the USDA Soil Conservation Service ("SCS") (the SCS changed its name to the Natural Resources Conservation Service in 1994 ("NRCS")). (*Id.*)

10.      In the early 1980s, the Tribe began discussions with the SCS about developing the water supply on its Reservation. (Cadue Decl., ¶ 14 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 14), Nov. 7, 2006, ECF No. 44-6.) As part of water supply development discussions, the Tribe inquired about its eligibility for the PL-566 Program but learned that Indian tribes could not serve as project sponsors under that version of the law, and in any event, there was already a Kansas watershed district that would have to be involved in any such project. (*Id.*)

11.      After an amendment to PL-566 authorizing Indian tribes to sponsor watershed projects, *see* Watershed Protection and Flood Prevention Act, Watershed Protection and Flood Prevention Act of Dec. 22, 1981, Pub.L. 97–98, Tit. XV, § 1512, 95 Stat. 1332 (*codified at* 16 U.S.C. § 1002), the Tribe renewed its discussions with SCS, and SCS informed the Tribe that it could not serve as a sole sponsor of a PL-566 project because it did not have "control" over the entire watershed. (Cadue Decl., ¶ 14 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 14), Nov. 7, 2006, ECF No. 44-6.) SCS explained that sole sponsors of PL-566 projects must have the ability to secure all necessary land rights to install, operate and maintain works of improvement.   (*Id.*)

12.     The Tribe has always believed, and continues to believe, that federal law denies it condemnation power over fee lands owned by non-Indians. (Cadue Decl., ¶ 4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 4), Nov. 7, 2006, ECF No. 44-6; Supplemental Cadue Decl., ¶¶ 3-4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. A-1 at ¶¶ 3-4), Mar. 1, 2013, ECF No. 266-2.)

## Water Development by the Nemaha Brown Watershed Joint District Development No. 7

13.     In 1958, the Nemaha Brown Watershed Joint District No. 7 (the "District") was established pursuant to the Kansas Watershed District Act. K.S.A. § 24-1201 *et seq*. (1959).  The District's purposes include construction of works of improvement to conserve soil, prevent floods, and develop and use water for domestic, industrial, municipal, agricultural and recreational purposes.  K.S.A. § 24-1209 (1959).

14.     In 1958, the District first applied to participate in the PL-566 Small Watershed Program, but the SCS rejected their application because the District's boundaries did not conform to the hydrologic boundaries of the Delaware River watershed. (Gen. Plan Upper Del. and Tribut., Nemaha-Brown Watershed Joint Dist. No. 7, Kan., 4 (Def. Mem. Supp. Mot. Summ. J. Ex. 36 at 9), July 1978, ECF No. 248-10.)

15.     In May 1975, after amending its jurisdictional boundaries to conform to the hydrologic boundaries of the Delaware River watershed, the District re-applied to participate in the PL-566 Small Watershed Program. (*Id*.) At that time, the District lacked a General Plan, and without such a plan, participation in the PL-566 Program was not possible because watershed districts in Kansas cannot participate in state cost share or federal cost share programs without a General Plan. (*Id.*, *see also* Cadue Decl., ¶ 12 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 12), Nov. 7, 2006, ECF No. 44-6.)

16.     In 1978, the District developed and completed a General Plan under Kansas law with substantial support and input from the Tribe and tribal consultants from VHS. (Gen. Plan Upper Del. and Tribut., Nemaha-Brown Watershed Joint Dist. No. 7, Kan., 4 (Def. Mem. Supp. Mot. Summ. J. Ex. 36 at 78), July 1978, ECF No. 248-10; *see also* Cadue Decl., ¶¶ 12-13, Nov. 7, 2006, ECF No. 44-6.)

17.     In early 1983, SCS informed the District that it could not serve as a sole sponsor of a PL-566 project, because of the presence of the Kickapoo Tribe and its Reservation in the watershed.  (Memo. from Edgar H. Nelson, Director, Basin and Area Planning, United States Department of Agriculture Soil Conservation Service, to John W. Tippie, State Conservationist, United States Department of Agriculture Soil Conservation Service, 337 (Def. Mem. Supp. Mot. Summ. J. Ex. 45), Jan. 27, 1983, ECF No. 248-10.)

**Joint Watershed Board Water Development**

18.     As neither the District nor the Tribe "controlled" the watershed exclusively, and neither working alone could commit to SCS that it had the ability to secure all necessary land rights for the Project, SCS encouraged the Tribe and the District to form a partnership for the purpose of securing sponsor status together. (*Id.*; *see also* Cadue Decl., ¶ 16, Nov. 7, 2006, ECF No. 44-6.)

19.     In 1983, the parties formed the Joint Watershed Board, consisting of an equal number of Tribal and District representatives.  (Co-Sponsorship Ag. on PL566 Structures, 48 (Def. Mem. Supp. Mot. Summ. J. Ex. 50 at 15), Mar. 28, 1983 (ECF No. 248-11); Cadue Decl., ¶ 17, Nov. 7, 2006, ECF No. 44-6.)

20.     Over the course of the next eleven years, led by SCS and NRCS staff, the Tribe and the District worked together extensively to develop, negotiate, and finalize the parties' joint

effort through regular meetings to select sites for smaller flood retention structures and appraisal level studies to determine the feasibility of constructing the multi-purpose project on Plum Creek.  (Nemaha-Brown Watershed Joint Dist. #7 Annual Meeting, 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 57 at 46), Mar. 21, 1985, ECF No. 248-11.; Nemaha-Brown Watershed Joint Dist. #7 Progress Report Sept. 26. 1985 - Dec. 12. 1985, 1-2 (Def. Mem. Supp. Mot. Summ. J. Ex. 59 at 52-53), Dec. 12, 1985, ECF No. 248-11; Nemaha-Brown Watershed Joint Dist. #7 Quarterly Meeting, 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 79 at 29), Dec. 6, 1990, ECF No. 248-13.; Nemaha-Brown Watershed Joint Dist. #7 Progress Report June 24. 1993 - Aug. 19. 1985, 1 (Def. Mem. Supp. Mot. Summ. J. Ex. 97 at 48), Aug. 19, 1993, ECF No. 248-14;  *see also* 1994 Watershed Plan, 41-44 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 59-62), Jan. 1994, ECF No. 248-6.))

21.    During the negotiations, both parties knew of the controlling Federal law, implementing regulations, and policy guidance documents. (*E.g.,* Letter from Gerald D. Signwill, Acting Deputy Chief for Natural Resource Projects, United States Department of Agriculture Soil Conservation Service, to John Thomas, Tribal Chairman, Kickapoo Tribe in Kansas, 1-2 (Def. Mem. Supp. Mot. Summ. J. Ex. 44 at 73-74) (Jan. 13, 1983), ECF No. 248-10. (citing Watershed Protection and Flood Prevention Act, Pub. L. No. 83-566 *et seq.*, 68 Stat. 666 (1954) (*codified as amended at* 16 U.S.C. § 1001 *et seq.*); Water Resources Program Policy and Requirements, 40 Fed. Reg. 12,469, 12,476 (Mar. 19, 1975) (*to be codified at* 16 C.F.R. § 622.10); Watershed Projects Qualifications, 7 C.F.R. § 622.10 (1975);  DEPARTMENT OF AGRICULTURE SOIL CONSERVATION SERVICE, 1992 NATIONAL WATERSHED MANUAL, pt. 501, Sponsor    Responsibilities    §    501.20    (Dec.    1992),    *available    at* http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs143_009610.pdf).)

22. The culminating 1994 Upper Delaware and Tributaries Watershed Plan contains the Watershed Agreement ("Agreement") between the Tribe, the Nemaha Brown Watershed District and other federal and state signatories, which incorporates an Environmental Impact Statement ("EIS"). (1994 Watershed Plan, 7, 41 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 27, 59), Jan. 1994, ECF No. 248-6.).

23. The Agreement (and incorporated EIS) lists the Tribe and the District as joint sponsors for the "Plum Creek Project," identified as project site 21-14. (*Id.* at iii-iv (Def. Mem. Supp. Mot. Summ. J. Ex.1 at iii, 59), *see also* Co-Sponsorship Ag. on PL566 Structures, 47-51 (Def. Mem. Supp. Mot. Summ. J. Ex. 50 at 14-18), Mar. 28, 1983 (ECF No. 248-11).)

24. The Agreement (and incorporated EIS) describes the larger multi-purpose project, 20 smaller flood retention structures, and land treatment and conservation practices as the array of projects under the Plan. (1994 Watershed Plan, at 1-2 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 21-22)). The smaller flood retention structures are connected functionally to the larger multi-purpose project; they perform soil erosion and flood control functions that benefit the larger project's life span. (*Id.*).

25. NRCS issued a Record of Decision in 1994, approving the project's compliance with the National Environmental Policy Act, and recommending authorization by the Office of Management and Budget and the Congress. (R. of Dec. Upper Del. and Trib. Watershed, Atchison, Brown, Jackson, and Nemaha Cntys., Kan., 11-16 (Def. Mem. Supp. Mot. Summ. J. Ex. 159 at 53-57), June 13, 1994, ECF No. 248-17.)

26. In the 1994 Watershed Plan, the Tribe and the District self-identify as co-sponsors of the entire Upper Delaware and Tributaries Watershed PL-566 Project, each agreeing to use all available authorities to complete their obligations "as needed," including "the exercise of the

8

right of eminent domain." (1994 Watershed Plan, 50 (Def. Mem. Supp. Mot. Summ. J. Ex. 1 at 68), Jan. 1994, ECF No. 248-6.).

27.    Neither the Tribe nor the District is the sole sponsor or the sole beneficiary of the Plum Creek Project, the parties self-identify as co-sponsors. (Co-Sponsorship Ag. on PL566 Structures, 47-51 (Def. Mem. Supp. Mot. Summ. J. Ex. 50 at 14-18), Mar. 28, 1983 (ECF No. 248-11).)

28.    The co-sponsors worked together on multiple aspects of both the entire Watershed Plan and the Plum Creek project, including the Tribe's securing of funds from the BIA to do the initial data research for the entire watershed, not just on Tribal lands or the Plum Creek project, (*See* Letter from James N. Habiger, State Conservationist, United States Department of Agriculture Soil Conservation Service, to John W. Peterson, Director, United States Department of Agriculture Soil Conservation Service, Re: PDM - Planning Authorization Request Upper Delaware and Tributaries Watershed, Kansas 457 (Def. Mem. Supp. Mot. Summ. J. Ex. 13 at 34) (May 1,1991), ECF No. 248-7), and the Watershed Board sending of letters to state legislators specifically in support of the Plum Creek Project. (Nemaha-Brown-Kickapoo Joint Watershed Meeting Minutes, 4 (Def. Mem. Supp. Mot. Summ. J. Ex. 72 at 28), Oct. 26, 1989, ECF No. 248-12.)

29.    In their co-sponsorship agreement, both the Tribe and the District indicate that each will benefit from the construction of the multi-purpose project at Plum Creek. (Co-Sponsorship Ag. on PL566 Structures, 50 ¶ D(1) (Def. Mem. Supp. Mot. Summ. J. Ex. 50 at 17 ¶ D(1)), Mar. 28, 1983 (ECF No. 248-11).) Projected benefits include flood control, soil erosion control, water supply, recreation and water quality improvement. (1994 Watershed Plan, 65 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 83), Jan. 1994, ECF No. 248-6.).

30.     In prior watershed projects, which did not come under the PL-566 Program, the District constructed water impoundments under both Federal and state cost share programs that required the District to secure an easement to the surface estate, but not the underlying fee title. (1994 Watershed Plan, C-4.4 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 133), Jan. 1994, ECF No. 248-6.). Similarly, for smaller flood retention dams (FRDs) or structures which come under the PL-566 Program, project sponsors need only acquire easements to the surface estate from private landowners. (*Id.*)

31.     As the District's records reflect, the usual practice by the District was to seek only donated easements from landowners. (Nemaha-Brown Watershed Joint Dist. #7 Annual Meeting, 4 (Def. Mem. Supp. Mot. Summ. J. Ex. 24 at 60), Mar. 24, 1983, ECF No. 248-8.) The District used this practice both to implement the Kansas Conservation Commission's cost share programs, and in planning FRDs for the Plum Creek Project.  (*See id.* at 2, 4; *see also* Nemaha-Brown Watershed Joint Dist. #7 Annual Meeting, 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 57 at 37), Mar. 21, 1985, ECF No. 248-11.)

32.     However, when a larger, multi-purpose structure is planned as part of a PL-566 project, the controlling statute, regulations and national manual dictate each sponsor's action. Watershed Protection and Flood Prevention Act, 68 Stat. 666 *et seq.*; Water Resources Program Policy and Requirements, 40 Fed. Reg. at 12,476; 7 C.F.R. § 622.10; 1992 NAT'L WATERSHED MANUAL at § 501.20, *available at* http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs143_009610.pdf.  Those documents require that sponsors, when constructing a larger, multi-purpose structure, obtain more than an easement to the surface estate; they must acquire the underlying fee title or a perpetual easement.

1992 Nat'l Watershed Manual at § 501.22(d), *available at* http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs143_009610.pdf.

33.    In such instances, the controlling statute may require a sponsor of a multi-purpose project under the PL-566 Program to initiate a condemnation action, if it should be necessary. 16 U.S.C. § 1002 (1956).

34.    The record reflects that both the Tribe and the District, as self-identified co-sponsors of the Plum Creek Project, preferred voluntary acquisitions of land in the project area, either by willing purchase or exchange.  (*E.g.,* Gen. Plan Upper Del. and Tribut., Nemaha-Brown Watershed Joint Dist. No. 7, Kan., 1 (Def. Mem. Supp. Mot. Summ. J. Ex. 31 at 78), July 1978, ECF No. 248-10; Cadue Decl., ¶¶ 12-13 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶¶ 12-13), Nov. 7, 2006, ECF No. 44-6.)

35.    Throughout 1991, none of the landowners in the project area opposed access when technical contractors sought landowners' permission to access their land for general survey work and to conduct subsurface geological testing to determine the stability of the subsurface at the alternate multi-purpose dam sites, including Plum Creek.  (1994 Watershed Plan, 42 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 60), Jan. 1994, ECF No. 248-6.).

36.    During the entire planning process leading up to the execution of the 1994 Agreement, none of the landowners in the Plum Creek Project area expressed opposition when the multi-purpose project expanded in size to include flood control and recreational benefits. (*Id.* at 19-20, 41-44 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 38-39, 59-62).)

37.    During the entire planning process leading up to the execution of the 1994 Agreement, neither the District nor its Board expressed any opposition when the Plum Creek

Project expanded in size to include flood control and recreational benefits. (*Id.* at 19-20, 41-44 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 38-39, 59-62).)

38.     During the entire planning process leading up to the execution of the 1994 Agreement, none of the landowners in the project area ever raised objections to the Plum Creek Project, either in communications to the Tribe or to the SCS as part of the NEPA review and comment process. (*Id.* at 41-44 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 59-62).)

39.     The final EIS expresses "assur[ance] of social acceptance" and a finding that "minimal" landowner opposition is expected. (*Id.* at 34 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 52).)

40.     The final EIS acknowledges significant consultation and public outreach by SCS, the District and the Tribe in the form of individual interviews, presentations at public barbecues, and meetings providing a free meal that were advertised via local newspaper and radio releases. (*Id.* at 41-42 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 59-60).)

41.     The Fact Sheet accompanying the 1994 EIS further describes local citizens' mindset as "anxious to see the project in place." (Letter from James N. Habiger, State Conservationist, United States Department of Agriculture Soil Conservation Service, to Edward Riekert, Director, United States Department of Agriculture Soil Conservation Service, Re: PDM - Upper Delaware and Tributaries Watershed, Kansas Final Plan/Environmental Impact Statement 10 (Def. Mem. Supp. Mot. Summ. J. Ex. 148 at 56) (June 16, 1994), ECF No. 248-17.)

42.     Between 1994 and 1998, none of the Plum Creek Project landowners opposed the project when Congress approved the Project's authorization for funding, and authorized NRCS to move the project into the next phases of planning, design and construction. (Letter from James

12

N. Habiger, State Conservationist, United States Department of Agriculture Natural Resource Conservation Service, to David L. Pope, Chief Engineer, Kansas Dep't of Agriculture 205-08 (Def. Mem. Supp. Mot. Summ. J. Ex. 198 at 82-85) (Aug. 9, 2000), ECF No. 248-18.)

43.      In 1998, Congressman Ryun testified in favor of the Project, stating that "[t]he project enjoys broad-based local and state support." *Land Between Watershed Projects: Regarding the Upper Delaware and Tributaries Watershed Project: Hearing Before the Subcomm. on Water Resources and Environment of the H. Comm. on Transportation*, 105th Cong. (1998) (statement of Rep. Jim Ryun).

44.      Between 1983 and 2003, the entire 20 year planning process, the Tribe and the District believed that landowners favored the project and would willingly sell to or exchange their land with other lands owned or acquired by the Tribe.  (1994 Watershed Plan, at 19-20, 34, 41-44 (Def. Mem. Supp. Mot. Summ. J. Ex.1 at 38-39, 52, 59-62), Jan. 1994, ECF No. 248-6; Letter from James N. Habiger, Soil Conservation Service, to Edward Riekert, United States Department of Agriculture Soil Conservation Service, Re: PDM - Upper Delaware and Tributaries Watershed, Kansas Final Plan/Environmental Impact Statement 10 (Def. Mem. Supp. Mot. Summ. J. Ex. 148 at 56) (June 16, 1994), ECF No. 248-17; Letter from James N. Habiger, Natural Resource Conservation Service, to David L. Pope, Kansas Dep't of Agriculture 205-08 (Def. Mem. Supp. Mot. Summ. J. Ex. 198 at 82-85) (Aug. 9, 2000), ECF No. 248-18.)

45.      In 2002, NRCS formally renewed its support for the Project, finding it still to be a viable project. (Letter from Harold Klage, State Conservationist, United States Department of Agriculture Natural Resource Conservation Service, to Roger Bensey, Director, United States Department of Agriculture Natural Resource Conservation Service, Re: PDM - PL-566 - Upper

Delaware and Tributaries Watershed Feasibility Update, 1 (Pl. Mem. Supp. Cross-Mot. Summ. J. Ex. K-1 at 63) (Apr. 22, 2002), ECF No. 266-6.)

46.     In January 2003, Congressman Ryun visited the Kickapoo Reservation for a site visit and tour of the Plum Creek Project. (Jim Anderson, *Tribe, Ryun tour Plum Creek site*, HIAWATHA WORLD, Feb. 4, 2003, at A1 (Def. Mem. Supp. Mot. Summ. J. Ex. 207 at 103-04) (ECF No. 248-18).)

47.     On that visit, Linda Lierz, the wife of District Board member Rodney Lierz and owner of property in the Plum Creek Project area, approached the Congressman with a letter of opposition to the Project. (*Id.*)

48.     Ryun's visit to the Reservation was the first time that the Tribe learned of any landowner opposition. (*Id.*)

49.     About the same time, Rodney Lierz was elected to the District Board, having run for the Board seat primarily in opposition to the Plum Creek Project. (*Id; see also* Linda Harvey, *Watershed board takes no action on Plum Creek*, SABETHA HERALD, Jan. 28, 2004, at A1, A10 (Pl. Mem. Supp. Cross-Mot. Summ. J. Ex. Q-1 at 1-3) (ECF No. 266-21).)

50.     In response to the unexpected, sudden and unprecedented display of opposition, the Tribe requested a legal opinion from the Interior Department's Regional Solicitor's Office in Tulsa, Oklahoma, to confirm the Tribe's limited powers with respect to condemnation. (Memorandum from Field Solicitor, Tulsa, United States Department of the Interior Office of the Solicitor to Regional Director, Southern Plains Regional Office, Bureau of Indian Affairs, re: Tribal Power of Eminent Domain 1 (Mar. 10, 2003) (Def. Mem. Supp. Mot. Summ. J. Ex. 5 at 7) (ECF No. 248-7); *see also* Cadue Decl., ¶ 248 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Mot. Summ. J. Ex. ¶ 248), Nov. 7, 2006, (ECF No. 44-6); Supplemental Cadue Decl., ¶¶ 26-27 (Pl.

Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. A-1 at ¶¶ 26-27), Mar. 1, 2013, (ECF No. 266-2).)

51.     In March 2003, the Regional Solicitor issued an opinion, indicating that in the Regional Solicitor's opinion, the Tribe did not have the power to condemn fee lands owned by non-Indians.   (Mem. from Field Solicitor, Department of the Interior to Regional Director, Southern Plains, Bureau of Indian Affairs, re: Tribal Power of Eminent Domain 3 (Mar. 10, 2003) (Def. Mem. Supp. Mot. Summ. J. Ex. 5 at 9) (ECF No. 248-7).)

52.     In March 2003, based upon the Regional Solicitor's opinion, at a Board meeting, the Tribe first sought the approval of the District Board to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.   (Nemaha-Brown Watershed Joint Dist. #7 Minutes Quarterly Meeting, 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 217 at 8), Mar. 23, 2003, ECF No. 248-19.)

53.     At that meeting, the District "table[d] support…," in the process declining to bring the matter to a vote, and never denying its obligation to use eminent domain. (*Id.*)

54.     In the Spring of 2003, in another attempt to obtain the land required for the Plum Creek Project, the Tribe opened a Land Office, and made its first formal offers to purchase Plum Creek Project lands. (Nellie Cadue Decl., ¶ 3 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1), Mar. 1, 2013, ECF No. 266-7.)

55.     During that time, the Director of the Tribe's Land Office, Nellie Cadue, sent a form letter to all land owners in the project area soliciting negotiations and meetings to discuss land sales. (*Id.*., ¶¶ 1-4 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1), ECF No. 266-7; *see also id.* attach. 1 at 1-2 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot.

Summ. J. Ex. C-1, Ex. 1 at 7-9), ECF No. 266-7).  As part of the Tribe's effort to obtain the land, Land Office Director Cadue also sent numerous letters to individual land owners. (*E.g., id.* attach. 8 at 1-22 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1, Ex. 8 at 27-49), ECF No. 266-7; *id.* attach. 8 at 1-2 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1, Ex. 7 at 24-26), ECF No. 266-7). As further evidence of the Tribe's effort to obtain the land, Land Office Director Cadue met with land owners at least 21 times to discuss land transactions, conducted numerous calls, made public presentations, and attended land auctions. (*Id.* at 1-3 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1, at 1-6), ECF No. 266-7.)

56.     The Tribe was successful in acquiring one tract of land in the Plum Creek project area. (*Id.* at 3 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1, at 5), ECF No. 266-7.)

57.     In July 2003, for the second time, the Tribe sought the approval of the District Board at a Board meeting to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.   (Nemaha-Brown Watershed Joint Dist. #7 Minutes Special Meeting, 1-2 (Def. Mem. Supp. Mot. Summ. J. Ex. 225 at 23-24), July 24, 2003, ECF No. 248-19.)

58.     At that meeting, the District "motion[ed] not to proceed with condemnation at this time [and] to revisit the issue once the tribe has made an effort with negotiating with landowners," but never denying its obligation to use eminent domain. (*Id.* at 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 225 at 24).)

59.     In October 2003, for the third time, the Tribe sought the approval of the District Board at a Board meeting to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.   (Nemaha-Brown Watershed Joint Dist. #7 Minutes Special Meeting, 3 (Def. Mem. Supp. Mot. Summ. J. Ex. 232 at 44), Oct. 28, 2003, ECF No. 248-19.)

60.     At that meeting, the District took no action on the tribe's request, declining to bring the matter to a vote, but never denying its obligation to use eminent domain. (*Id.)*

61.     In late 2003, NRCS offered the Tribe a Project Agreement to commence next steps in the PL-566 process. (Letter from Grace N. McGrath, State Administrative Officer, United States Department of Agriculture, Natural Resource Conservation Service, to Steve Cadue, Chairperson, Kickapoo Tribe of Kansas, re: Project Agreement 69-6215-3-03001, Multi-purpose Dam at Site 21-14, Upper Delaware and Tributaries 1016-17 (Def. Mem. Supp. Mot. Summ. J. Ex. 161 at 59-60) (ECF No. 248-17.)

62.     Because the Tribe lacked condemnation powers over non-Indian landowners, as confirmed by the Regional Solicitor, and due to the Watershed Board's decision not to exercise condemnation authority, the Tribe could not sign the 2003 Project Agreement as a project co-sponsor possessing condemnation powers over all project lands, as the 2003 Project Agreement required. (*Id.)*

63.     In January 2004, for the fourth time, the Tribe sought the approval of the District Board at a Board meeting to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.   (Nemaha-Brown Watershed Joint Dist. #7 Minutes

Annual Meeting, 2 (Def. Mem. Supp. Mot. Summ. J. Ex. 20 at 2), Oct. 28, 2003, ECF No. 248-8)

64.     At that meeting, the District stated that "no one was interested in making such a motion [to exercise eminent domain on behalf of the tribe because] [m]ore information was needed and more effort from the Kickapoos was required to convince the Board that the last resort of eminent domain had been reached," thus recognizing its obligation to use eminent domain. (*Id.*)

65.     In May 2004, for the fifth time, the Tribe sought the approval of the District Board at a Board meeting to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.  (Meeting Notes Nemaha-Brown Watershed Joint Dist. #7 Board and Kickapoo Tribal Council, 1-5 (Def. Mem. Supp. Mot. Summ. J. Ex. 236 at 61-65), May 20, 2004, ECF No. 248-19)

66.     At that meeting, the District was "not comfortable making a decision [on the use of eminent domain] before it had more information," in the process declining to bring the matter to a vote, and recognizing its obligation to use eminent domain. (*Id.* at 4 (Ex. 236 at 64).)

67.     In June 2005, for the sixth time, the Tribe requested the approval of the District Board at a Board meeting to offer the Board's condemnation powers to assist the Tribe in negotiating with the Project area landowners, and to secure the land rights should actual condemnation actions need to be filed.  (Nellie Cadue Decl., attach. 10 at 1 (Pl. Kickapoo Tribe of Kan. Mem. Supp. Cross-Mot. Summ. J. Ex. C-1, Ex. 10 at 53), ECF No. 266-7.)

68.     There is no evidence in the record that the District considered the Tribe's sixth request at any District meeting.

## ARGUMENT

**I.     The Tribe And The District Collaborated On The P.L. 83-566 Projects Because They Were Of Mutual Benefit To Both Parties.**

The District distorts its historical relationship with the Tribe related to the Plum Creek Project in an attempt to dodge its contractual commitment. The District insinuates that the Tribe and the District entered into the 1994 agreement with separate goals, falsely claiming that the District allowed the Tribe to "piggyback" on its planning efforts. (Def. Mem. Supp. Mot. Summ. J. [*hereafter* Dist. Mem.] at 254-55.) Even a cursory examination of the record demonstrates that this statement is untrue, because the Tribe and the District worked cooperatively for decades to plan a multi-purpose project that would be mutually beneficial for both parties. *See* fact ¶ 18-20, 27-29.

The Tribe has been working with the District since the late 1970s to address both parties' water needs. Fact ¶ 16. Members of both the Watershed Board and the Tribe went to Washington, D.C. prior to the formation of the Joint Watershed Board in order to better understand their obligations under the P.L. 83-566 program. District Ex. 48. As an investment in the solution of both parties' water issues, the Tribe secured funding from the BIA to do the initial data research for the entire watershed, not just on Tribal lands or solely for the Plum Creek project. Fact ¶ 28. Demonstrative of its collaborative goal, the Watershed Board sent letters in support of the Plum Creek Project to Kansas federal and state legislators. Fact ¶ 28. Both parties took actions to further the Plum Creek Project because it is a "multi-purpose" project, which would result in multiple benefits for both the Tribe and the District. Facts ¶¶ 27-29.  Considered together, these actions demonstrate that the District and the Tribe collaborated to lay the foundation for construction of the P.L. 83-566 projects.

Further, The District cites its 1975 application to claim that it alone resisted the use of eminent domain. Dist. Mem. at 254. However, both the Tribe and the District believed there was no significant landowner opposition to the project until 2003, when the membership of the Watershed Board changed and Linda Lierz first raised landowner objections. Fact ¶¶ 34-44. The record clearly demonstrates that the Tribe had no reason to believe there would be resistance to purchasing land rights for the project. Fact ¶¶ 34-47. As the parties foresaw no opposition to the Plum Creek Project, and had no reason to believe the exercise of that eminent domain power would be necessary, they contracted to exercise their respective eminent domain powers "as needed".

## II.   Federal Law Mandates The Tribe's Construction Of The Contract.

The legal context within which the parties formed this contract is crucial to its interpretation because "parties are presumed to contract with knowledge of existing law." *Ramah Navajo Chapter v. Salazar*, 644 F. Supp 3d. 1054, 1075 (10th Cir. 2011); *see also* Tribe's Response/Cross-Motion at 86-89. Federal law mandates that all sponsors, either individually or collectively, have the power of eminent domain, and the District's argument contradicts the plain language of the regulations. *Compare* Watershed Project Qualifications, 7 C.F.R. § 622.10 (1975); DEPARTMENT OF AGRICULTURE SOIL CONSERVATION SERVICE, 1992 NATIONAL WATERSHED MANUAL, pt. 501, Sponsor Responsibilities § 501.20 (Dec. 1992), *available at* http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs143_009610.pdf; *with* Dist. Mem. at 260.

Had the Tribe thought it could exercise eminent domain over the entire project area, it would not have needed to enter into an agreement with the Watershed District to exercise that same power. The only incentive for the Tribe to enter into the Agreement was its lack of

"control" over the entire project area, as both NRCS and the Tribe recognized in 1983. Fact ¶ 18.

The Tribe never had condemnation authority over non-Indian fee lands; if it had thought that it

had such authority it would have simply initiated condemnation actions against the landowners

in Tribal Court. *E.g., Brendale v. Confederated Yakima Indian Nation*, 402 U.S. 408 (1989).

Both parties *should* have been aware of the program requirements as the Tribe was,

because the requirements have been functionally identical since the District applied for the P.L.

83-566 program in 1975. In an attempt to avoid unfavorable federal law, the District points to the

Tribe's citation to the 2009 Edition of the NRCS *Watershed Manual,* claiming that version

cannot control the 1994 Agreement. Dist. Mem. at 260.  The District intimates that in 1975,

when it applied for the P.L. 83-566 program, there was no requirement that sponsors

exercise eminent domain if necessary. *Id*. (citing the Application itself). But the requirement did

exist at the time the District filed its application.  Although the Tribe could not locate a NRCS

Manual from 1975, the regulations passed in March 1975, two months before the District

applied, state that "sponsors must severally or collectively have the power of eminent domain so

they may acquire land …rights needed for the project."  Water Resources Program Policy and

Requirements, 40 Fed. Reg. 12,469, 12,476 (Mar. 19, 1975) (*codified at* 16 C.F.R. § 622.10).

The *Watershed Manual* is just an elaboration of the underlying regulations, which have always

contained the same eminent domain requirement.

Additionally, the NRCS Manual published in 1992, two years before the Watershed

Agreement was signed, includes almost identical language to the 2009 Watershed Manual

addressing the responsibilities of sponsoring organizations, under the regulations. 1992 NAT'L

WATERSHED          MANUAL          at          §          501.20,          *available          at*

http://www.nrcs.usda.gov/Internet/FSE_DOCUMENTS/nrcs143_009610.pdf.          Given          this

background the District should have understood, and by law is charged with understanding, its obligations at the time it applied for the program and when the Agreement was made.

The principle that parties' knowledge of the law is presumed when contracting also explains why the District's argument about the Tribe's 1854 "constitutional boundaries" is irrelevant. *Ramah*, 644 F.Supp. 3d at at 1075.   The Tribe's subject matter jurisdiction, (as opposed to its territorial jurisdiction) and therefore its ability to exercise eminent domain, is defined by federal law. F. Cohen, *Handbook Of Federal Indian Law*, § 7.02, 599 (2012). Well before the contract was signed, federal law clearly restricted tribal jurisdiction over non-Indians on fee lands. *Montana v. United States*, 450 U.S. 544 (1981) (explicitly restricting tribal jurisdiction over non-Indians in regulatory matters); *see Atkinson v. Shirley,* 532 U.S. 645 (2001) (restricting tribal jurisdiction over non-Indian fee-lands); *Brendale*, 402 U.S. 408*; see also Cherokee v. Georgia*, 30 U.S. 1 (1831) (first espousing the principle that tribes lack authority over matters where it is inconsistent with their dependent status; the rationale for decisions such as *Montana*).   If the Tribe had believed that it had eminent domain power over non-Indian land, it would have initiated eminent domain proceedings against landowners in its Tribal Court; the Tribe's knowledge of the foundational tenets of Federal Indian Law made it clear that the Tribe did not have that authority. Therefore, the 1854 constitutional territorial boundaries provision could not possibly have conferred eminent domain powers on the Tribe. Although the District presumably entered the contract "with knowledge of existing law," *Ramah Navajo* Chapter, 644 F.Supp. 3d at 1075, the District's arguments now ignore these central tenets of Indian law.

This same law also demonstrates why the section regarding eminent domain must apply to the District. The District claims that the following language from the 1994 Agreement cannot possibly obligate it to exercise eminent domain "as needed":

22

> The [Watershed District] and the [Tribe] have the necessary authority to finance and install **their portions** of the planned project. This includes the right to accept contributions, levy taxes, make assessments against benefited land, issue bonds, and exercise eminent domain. They have agreed to uses these powers as needed and will be financially responsible for excess investigation and design costs resulting from their failure to do so. District Ex. 1 at p. 50.  (emphasis added); District Mem. at 268.

The District claims that because "portions" here is plural it has no responsibility for the Plum Creek Project whatsoever, and it is only responsible for its own portion of the plan. Dist. Mem. at 268. Further, the Distrcit argues that the Agreement cannot possibly stand for the proposition that the District would have to exercise the other listed powers if the Tribe were unable to "finance and install" the project. *Id.* However, if the Tribe's inability related to its lack of authority over non-Indian fee lands then the District would have to exercise those listed powers over non-Indian fee lands, because the Tribe would not have been able to issue bonds or levy taxes against non- Indian fee lands. *See Brendale*, 402 U.S. 408*; Atkinson,* 532 U.S. 645. Therefore, the term "portions" in the Agreement can only refer to the portions of the planned project over which the parties could legally exercise these powers, including the power of eminent domain.

In other words, the Tribe pledged its authority over Tribal lands and the District pledged its authority over non-Indian fee lands. Again, if the District did not have to pledge its authority in the Agreement, because the Tribe possessed all the necessary authority over non-Indian fee lands, there would have been no reason for the Tribe to enter the Agreement in the first place. *See infra*.The parties are imputed to have knowledge of the law when contracting, and the contract simply could not refer to the Tribe's non-existant ability to exercise these powers over non-Indian fee lands.

### III.     The Record Supports The Tribe's Construction Of The Contract.

None of the documents the District cites for the proposition that the Tribe has the power of eminent domain over non-Indian fee lands outside the reservation actually state that fact, Dist. Mem. at 257, and the District cites no case law holding that the Tribe has such authority.  Rather, the law and the record support the Tribe's position. The District claims there is no evidence in the record to support the Tribe's claims that it knew it had no condemnation authority over non-Indian Fee lands but pre-2003 documents indicate that the Tribe did not have any such condemnation authority. Fact ¶¶ 17-18.   Furthermore, Steve Cadue's Declaration clearly articulates the Tribe's belief that it did not have such authority, and this Court should admit the facts contained in his Declaration because the Declaration was made based upon his personal knowledge. Fact ¶¶ 6-7; Cadue Declaration ¶16; FED. R. CIV. P. 56 (c)(1)(A).

Chairman Cadue's Declaration that the Watershed District explicitly agreed to exercise its powers of eminent domain, finds support throughout the Record. *See* Response/Cross-Motion at 91-93. The Watershed Agreement explicitly describes the District's obligation to exercise its eminent domain power "as needed." Fact ¶ 26. Further, the Watershed Board's statements and actions demonstrate that the Board understood its obligation, and affirmatively chose, repeatedly, to force the Tribe to take further steps before they would exercise their power. Facts ¶¶ 52-66.

The District attempts to portray the 2003 Field Solicitor's opinion as a turning point in the Tribe's belief about its condemnation authority, Dist. Mem. at 256, 263. In fact the Tribe's request confirmed that the Tribe's belief that it did not have condemnation authority. Fact ¶ 50-51. The Tribe only requested confirmation of its lack of authority after landowners in the project area suddenly expressed opposition to the project. *Id*. Rather than a "clear statement" that the parties always believed the Tribe had the power of eminent domain over the project area, Dist.

Mem. at 263, Chairman Cadue's letter requesting confirmation of the Tribe's lack of authority provided the District with something other than the Tribe's opinion that the District would have to use its eminent domain power. Fact ¶¶ 50-52.  Further, the District's actions after it received the letter indicate the District understood its obligation but was looking for any way to avoid using its condemnation authority to benefit its project partner. Facts ¶¶ 52-66.

The District correctly states that this Court must resolve all "reasonable inferences" in the Tribe's favor when deciding the District's Motion for Summary Judgment. District Mem. at 256. However, the District claims, that any inference drawn from the record that the Tribe knew it did not have condemnation power would be "unreasonable," *Id.*  Rather, based on the record, long-standing, applicable federal law and the parties' actions, it would have been unreasonable for the Tribe, or anyone else to believe the Tribe had condemnation power over non-Indian fee lands.

IV.    **The Agreement Contains All Essential Terms.**

A.    **The "As Needed" Language Is Not Vague.**

The Tribe clearly demonstrates that all the essential terms of the contract are present in the 1994 Agreement, and that these terms are unambiguous. Tribe's Response/Cross-Motion 95-96. Just because the parties disagree about the meaning of the eminent domain provision does not make it ambiguous. *Antrim, Piper, Wenger, Inc. v. Lowe*, 37 Kan. App. 2d 932, 938, 159 P.3d 215, 220 (2007).  The Tribe cited multiple cases where "as need[ed]" language was sufficiently definitive to form a contract. Tribe's Response/Cross-Motion 95-96.  In order for a court to find no contract, the essential terms of the agreement must be "so uncertain that there is no basis for deciding whether the agreement has been kept or broken." Rest. of Contracts § 33 (1981).

Furthermore, the parties' later actions can prove the existence of a particular agreement. *Price v. Grimes,* 234 Kan. 898, 904, 677 P.2d 969, 974 (1984) (*citing* Rest. of Contracts § 33

(1981)). The District's five explicit demands that the Tribe meet new requirements before the District would exercise its eminent domain authority, is clear evidence that it knew it had such an obligation. Fact ¶¶ 52-68.

### B.   The Future Project Implementation Agreement Does Not Affect The Validity Of The 1994 Agreement.

The purpose of requiring all essential terms is to ensure that no arrangements between the parties are left to future negotiations. *Phillips & Easton Supply Co., Inc. v. Eleanor Int'l, Inc.*, 212 Kan. 730, 734, 512 P.2d 379, 383 (1973). The District baldly claims that the contract falls short of the allowance for a separate later agreement articulated in *Hansen v. Catsman*, 123 N.W.2d 265 (1963), because the contract does not contain all essential terms, Dist. Mem. at 265, but the District does not cite any case supporting its position. *See id.* The contract contains all essential terms. A later document whose existence is already certain as to the result of negotiations, such as a "future project implementing agreement[]," Dist. Fact ¶ 201, is not a new requirement under the contact. The parties expressly outlined the future document, as necessary to implement the project and perform the contract. *Idaho Timber Corp. of Kansas v. A.G. Spanos Constr., Inc.*, No. 93,270, 2005 WL 2665763 at *5 (Kan. App. Oct. 14, 2005) (stating that where "certain matters are expressly left to be agreed upon in the future, such an expectation will not prevent an agreement already made from being an enforceable contract."). Therefore, the future project implementing agreement, as required by the 1994 Agreement, is not a new requirement under the project. *Id.*

Finally, the Watershed District persists in misreading *Barten*. *See* Response/Cross-Motion at 940-45. The *Barten* court merely asked whether the work plan agreement in that case created binding funding obligations under the Cash Basis law, *Barten v. Turkey Creek Watershed Joint Dist. No. 32 of Dickinson & Marion Counties*, 200 Kan. 489, 506, 438 P.2d 732, 746 (1968)

("Does the method of financing adopted by the resolution of the District's board violate the Cash-Basis Law or the Budget Law?"), and held that it did not create presently binding funding obligations. *Id.* at 507 ("At the time this matter was heard in the district court there was no showing that the District or its board of directors had incurred any indebtedness or obligation in excess of funds on hand, or in excess of budgeted funds, nor was there any showing that the District had become obligated or indebted in any sum for any purpose."). Furthermore, the *Barten* court found that the work plan agreement was a contract between the Soil Conservation Service and the Watershed District under that law. *Id.* ("…a careful reading of the Work Plan Agreement discloses that it is only a part of a projected program or General Plan, and that by the very terms of the *contract* between the Soil Conservation Service of the United States Department of Agriculture and the District a separate agreement in connection with each construction project specifying the financial and working arrangements and other conditions applicable to the specific works of improvement was a prerequisite to any binding obligation as to that project") (citations omitted) (emphasis added). The contract referred to is the same work plan agreement which the District incorrectly argues was not a contract.

## V. The Contract Does Not Violate Either The Reserved Powers Or The Unmistakability Doctrines.

### A. The Agreement By The District To Exercise Eminent Domain Is Not A Contract *Surrendering* A Core Governmental Function, Rather It Is A Contract To *Exercise* That Function And As Such Does Not Run Afoul Of The Reserved Powers Doctrine.

In its Response, the District argues that the reserved powers doctrine voids any contract with the Tribe requiring the District to exercise eminent domain because there is no meaningful difference between contracting to forego the use of eminent domain and contracting to exercise it as needed. Dist. Mem. at 270. The District cannot cite any precedent to support this contention,

because the law makes clear that while contracting away a core governmental power is not allowed, contracting to exercise a power is allowed. Tribe's Response/Cross-Motion at 96-98. *See also Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1154 (9th Cir. 2008). In *Matsuda*, the City of Honolulu repealed an ordinance "which created a mechanism allowing owners of leasehold interests in condominium units to convert their leasehold interests into fee interests by using the City's power of eminent domain," after the City had entered into individual written contracts with a group of lessees that the City would use their condemnation authority to convey a fee simple interest to each lessee. *Id.* at 1150-51. The court found these contracts valid, because they "do not purport to require the City to refrain from the exercise of any sovereign power, including the power of eminent domain." *Id.* at 1154.

Like the City of Honolulu in *Matsuda*, the District did not forgo or surrender any core governmental function when it agreed to exercise eminent domain as needed in the construction of Plum Creek, but rather exercised its authority in order to contract to use of eminent domain for the public benefit. Tribe's Response/Cross-Motion at 96.

The District cites *Joleewu, Ltd. V. City of Austin,* 916 F.2d 250 (5th Cir. 1990), to argue that the District's agreement to enact eminent domain, *as needed*, restricted the District's decisions about the timing of the acquisition so much that the agreement constitutes a surrender of a core governmental function and thus violates the reserved powers doctrine. The Tribe has already cited authority that "as needed" is sufficiently definitive. See Tribe's Response/Corss-Motion at 95-96 (citing *Estate of Pingree v. Triple T Foods, Inc.*, 430 F. Supp. 2d 1226, 1236 (D. Kan. 2006)). The District's argument is not supported by *Joleewu*. In *Joleewu* the City exercised eminent domain pursuant to its contract to do so with the plaintiff. *Joleewu* at 251. The plaintiff only asserted its breach of contract claims to collect the lost rental income during the four month

delay it took the City to condemn and compensate plaintiff after it had vacated the premises. *Id.*

In the instant case, the District *refuses* to enact eminent domain pursuant to its contract.

> **B.      The Umistakability Doctrine Does Not Apply To An Exercise Of Authority And At Any Rate The District Unmistakably Agreed To Exercise Its Eminent Domain Authority.**

As noted, the District has not surrendered, conveyed, forgone, derogated, or otherwise

contracted away any sovereign power, and therefore, the unmistakability doctrine does not apply.

*Cuyahoga Metro. Housing Auth. v. United States*, 57 Fed. Cl. 751, 764-77 (2003) (stating that

the unmistakability doctrine does not apply for contracts to *exercise* eminent domain). *See also*

*Matsuda*, 512 F.3d (9th Cir. 2008); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), *see*

*also Wheat Ridge Urban Renewal Auth. v. The Cornerstone Group L.L.C.*, 176 P.3d 737 (2007);

*U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1 (1977); *Young Partners, L.L.C. v. Board of*

*Education, USD No. 214, Grant County*, 284 Kan. 397, 160 P.3d 830 (2007) (state or local

government with delegated state power cannot enter into contracts that *limit or surrender*

condemnation authority).

Assuming *arguendo* the doctrine does apply; the first 14 pages of the Tribe's Response

demonstrate that the District agreed to exercise its condemnation authority in "unmistakable

terms." Tribe's Response/Cross-Motion at 84-98. The exact language of the 1994 Agreement

states, the parties:

> have the necessary authority to finance and install their portions of the planned
> project. This includes the … exercise [of] the right of eminent domain. They have
> agreed to use these powers as needed and will be responsible for excess
> investigation and design costs resulting from their delay or failure to do so.

District Ex. 1 at p. 50.  This express requirement for the exercise of condemnation authority in

the 1994 Agreement is further supported by the legal requirement that any sponsor have the

authority to enact eminent domain, and "must commit themselves to use their powers and

authority to carry out and maintain the project as planned." 7 C.F.R. § 622.10. The District expressly and unmistakably contracted to exercise eminent domain as needed.

Furthermore. the language in the 1994 Agreement is express and unmistakable, and did not "disarm" the District "of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform" by any "implications" or "presumptions." *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 548 (1837). Therefore, the unmistakability doctrine does not apply.

### VI.    Assuming Arguendo There Is No Written Agreement, Promissory Estoppel Imposes The Obligation To Exercise Eminent Domain On The District.

The Tribe detrimentally relied on the District's promise and subsequent actions indicating that it would exercise its condemnation authority for the construction of Plum Creek, thereby creating an obligation for the District to do so whether or not the written agreement imposes such an obligation. Tribe's Response/Cross Motion at 103-106. The District oddly responded to this promissory estoppel argument by citing a series of inapposite cases discussing equitable estoppel, 115 A.L.R. 152 (Originally published in 1938); *see also,* District. Mem. at 274-75*;* 1 A.L.R. 2d 338 § 2; *Unified Sch. Dist. No. 207 v. Northland Nat'l Bank*, 20 Kan. App. 2d 321, 887 P.2d 1138 (1994); *Lurch v. United States.* 719 F.2d 333, 341 n.12 (10th Cir. 1983), which stand for the proposition that equitable estoppel could not be used to gain a benefit from an illegal contract, and that the government cannot be estopped from disavowing the actions and statements of unauthorized agents absent extraordinary circumstances. *Id.* These cases are not relevant here.[1] Promissory estoppel and equitable estoppel are intrinsically different because equitable

---

[1]Assuming arguendo that equitable estoppel is relevant, equitable estoppel is available against the government in appropriate cases, like the present one. *Piz v. Housing Auth. of the City & County of Denver*, 132 Colo. 457, 463, 289 P.2d 905, 908–909 (1955). *See also United States*

estoppel is based on a misrepresentation of fact and promissory estoppel is a "quasi-contract claim." *Wheat Ridge,* 176 P.3d at 741; *see also Black's Law Dictionary* 631 (9th ed. 2009) (stating promissory and equitable estoppel are different). Promissory estoppel is available against the government and it can create an actionable contract. *Id.* at 745-46.

When measured against the four requirements of promissory estoppel, it is clear the actions of the District created contractual obligations. *See* Tribe's Response/Cross-motion at 103-106. In summary, The Tribe met with the District on six different occasions, and on each occasion the District sent the Tribe to collect more information, expend more effort, and spend more money attempting to purchase the land. Fact ¶¶ 52-65 .  In April 2003, the Tribe opened a Land Office for the sole purpose of purchasing land for the project. Fact ¶ 54.  The Tribe's extensive efforts were met with the District's repeated prodding to do more. Fact ¶¶ 57-65. In fact, in 2004, the District indicated that it would exercise its condemnation authority if the Tribe made further efforts to acquire land for the project stating, "more information was needed and more effort from the Kickapoos was required to convince the Board that the last resort of

---

*v. Wharton*, 514 F.2d 406, 410 (9th Cir. 1975) ("Estoppel may be applied against the government, even when it acts in its sovereign rather than a merely proprietary capacity.") Further, even under the inapposite cases the District cites, the Tribe can show "extraordinary circumstances" and even affirmative government misconduct. *Lurch* at 341. Contract disputes involving particular lands are often considered extraordinary, *see e.g. Hochard v. Deiter*, 219 Kan. 738 (1976) and this particular land is necessary to provide a sustained supply of water for the Tribe. The District misrepresented its intentions to the Tribe, implying that it would exercise its power of eminent domain if the Tribe documented specific efforts to acquire the necessary land, but then refused to act. Fact ¶¶ 58, 64, 66. The Tribe never misrepresented its intentions and has not "been guilty of inequitable conduct" barring equitable relief.  *See In re Jones*, 22 Jan. App. 2d 753, 759 (1996). If the Tribe represented that the landowners supported project, *see* District Mem. at 277, it did so out of an honest belief that they did.  Fact ¶¶ 35-44. No landowners in the Plum Creek Project area expressed opposition to the project, throughout the entire planning phase until Congressman Jim Ryun visited the Kickapoo Reservation and Linda Lierz, first raised objections to the project. Fact ¶¶ 35-49.

eminent domain had been reached." Fact ¶ 64. The Board expected the Tribe to rely its the representations, and the Tribe did so, to its detriment.

The District led the Tribe down the primrose path, costing the Tribe time, money, and resources in reliance on the District's agreement to exercise condemnation authority as needed. This is an extraordinary circumstance involving particular land necessary to provide water to the Kickapoo people, and it would work manifest injustice for the Tribe to be denied that promise.

### VII. Attorney General Opinions Are Persuasive Authority That The District Is Not An Arm Of The State And The District Fails The Test Articulated In *Steadfast* As Well.

Attorney general opinions are persuasive authority, as the District admits, and these opinions strongly support the Tribe's argument that the District is not an arm of the state. District Mem, at 278. This conclusion is cemented by the Tribe's evaluation of the District's authority under *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250 (10th Cir. 2007); *See* Tribe's Response/Cross-Motion at 109. The District's interpretation of its authority under Kansas law requires a tortured reading of the Kansas Watershed District Act, K.S.A. §24-1201 *et seq* (1959). *See* District mem, at 279-80. The District claims it has auditing authority, District. Mem. at 279, but it's supposed "auditing authority" comes from the requirement that the District file a financial report with the Kansas Dept. of Agriculture, hardly the kind of public auditing provision highlighted in *Steadfast*. K.S.A.. 24-1211-12. Further, while the District does have the authority to issue bonds, all bond proposals must be voted on by the residents of the district, before any bonds can be issued. K.S.A. 24-1214-15. Therefore final authority rests with the District's voting public, which hardly supports the conclusion that the District acts in the interest of the State of Kansas as a whole; it instead supports the interpretation that it is a local or

municipal organization serving the interests of its members. The District is not an arm of the State and is not entitled to sovereign immunity.

### VIII.   Specific Performance Is Allowable In Extraordinary Circumstances.

The Tribe acknowledged the need for extraordinary circumstances to justify specific performance and set forth such circumstances and authority for obtaining specific performance in such extraordinary circumstances. Tribe's Response/Cross-Motion at 109-11. The District cites two documents it says controvert the Tribe's claim that it demonstrates extraordinary circumstances here. Dist. Mem. at 281 n. 19. The first is a statement in the minutes from a January 21, 2004 meeting at the District, by Jeff Gross. Dist. Ex. 20 at 2. Mr. Gross' statement, assuming it was accurately recorded, (Mr. Gross has not been deposed to verify the accuracy of the statement), is contradicted by official SCS/NRCS documentary evidence—the 1994 Agreement as well as the 1994 Record of decision. Both Documents conclude, after exhaustive analysis, that the Plum Creek site is the most viable water storage site on the Kickapoo Reservation. Fact ¶ 8. The District also cites the Kansas Farm Bureau Report, Dist. Ex. 237, and a map of nearby public water suppliers, Dist. Ex 239. The Tribe previously responded to this claim: it owns federal reserved water rights to adequate water from sources that flow over, across, and through its Reservation. The District acknowledges the existence of the Tribe's *Winters* water rights. District Mot. for Summary Judgment Stat. of Uncontroverted Facts at 17 n.6. The Tribe is not required to seek out off-Reservation water supply sources to stisfy its Reservation water rights, solely for the convenience of non-Indian residents of the watershed. Tribes Statement of Uncontroverted Facts ¶¶ 300-305.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Tribe's Cross-Motion for Summary

Judgment.

Respectfully submitted this 10th day of May, 2013.


                                        /s/ *Steven Carl Moore*_____
                                        Steven Carl Moore, Esq.
                                        K. Jerome Gottschalk, Esq.
                                        **NATIVE AMERICAN RIGHTS FUND**
                                        1506 Broadway
                                        Boulder, Colorado 80302-6296
                                        smoore@narf.org
                                        jeronimo@narf.org

                                        s/ *Amelia C. Holmes*_____
                                        Amelia C. Holmes, Esq.
                                        **KICKAPOO TRIBE IN KANSAS**
                                        Post Office Box 110
                                        1107 Goldfinch Road
                                        Horton, Kansas 66439
                                        holmesameliac@yahoo.com

                                        *Attorneys for the Kickapoo Tribe in Kansas*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2013, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to the following:

*Attorneys for Plaintiff:*
Steven C. Moore smoore@narf.org
Kim J. Gottschalk jeronimo@narf.org
Native American Rights Fund
1506 Broadway
Boulder, CO 80302

*Attorneys for Defendant, Michael Black:*
Daniel G. Steele daniel.steele@usdoj.gov
U.S. Department of Justice
P. O. Box 663
Washington, DC 20044-0663
and
Robin Barkett Moore robin.moore@usdoj.gov
Office of the United States Attorney
301 N. Main Street, Suite 1200
Wichita, KS 67202-4812

*Attorney for Defendant, David Barfield:*
Christopher M. Grunewald chris.grunewald@ksag.org
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, KS 66612-1597

*Attorneys for Defendant Nemaha Brown Watershed Joint District #7:*
David M. Traster dtraster@foulston.com
Jay Fowler jfowler@foulston.com
Timothy B. Mustaine tmustaine@foulston.com
Daniel Bullard dbullard@foulston.com
FOULSTON SIEFKIN LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Telephone: 316-291-9725
Fax: 866-347-3138

/s/ *Amelia C. Holmes*
Amelia C. Holmes, Esq.
Kansas Bar #20346