**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

KICKAPOO TRIBE OF INDIANS OF THE )
KICKAPOO RESERVATION IN KANSAS, )
)
)
          **Plaintiff,** )
)
v. )
)   Case No. 06-2248-CM
MICHAEL BLACK, et al., )
)
)
          **Defendants.** )
)

## MEMORANDUM AND ORDER

This matter is before the court on two cross motions for summary judgment. One was filed by defendant Nemaha Brown Watershed Joint District No. 7 ("District") (Doc. 247), and the other was filed by plaintiff Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas ("Tribe") (Doc. 290).[1] For the reasons stated below, the court grants the District's motion and denies the Tribe's motion.

### I. Factual Background

As is evidenced by the briefing, this case has a long and complex factual background. However, the facts material to the pending motions are few and uncontroverted. The Kickapoo Indian Reservation ("Reservation") lies almost entirely within the District's boundaries. The Tribe and the District entered into the Watershed Plan and Environmental Impact Statement for the Upper Delaware and Tributaries Watershed ("Agreement") in 1994 to serve as co-sponsors of a project aimed to carry out works of improvement for soil conservation and for other purposes, including flood prevention.

---

[1] Defendant Kansas Chief Engineer David Barfield filed a "Statement Seeking to Clarify the Record" in response to the District's summary judgment motion (Doc. 262). The District filed a reply to defendant Barfield's response (Doc. 265). Defendant Barfield's statement did not affect the court's resolution of the pending motions. Thus, the court does not address it.

-1-

The parties agreed to co-sponsor the project after failed attempts by each party to sponsor the project on its own. The parties reached the Agreement following a procedure established by the United States Department of Agriculture's Soil Conservation Service ("SCS"), now known as the National Resource Conservation Service, under what is referred to as P.L. 83-566 (the Watershed Protection and Flood Prevention Act, 16 U.S.C. § 1001 et seq.). Many years of planning and negotiation by both parties and numerous other contractors, government officials, and agencies preceded the Agreement. In addition to twenty floodwater retarding dams and other various improvements, the Agreement included plans for a multipurpose dam with recreational facilities, otherwise known as the "Plum Creek Project."

On multiple occasions, the Tribe asked the District to exercise its power of eminent domain to condemn non-Indian-owned land for the Plum Creek Project that the Tribe had been unable to acquire on its own. The District declined the Tribe's request each time. The Tribe filed this water rights action on June 14, 2006, seeking declaratory relief, injunctive relief, compensatory damages, and specific performance. In essence, the Tribe claims that the Agreement is a binding contract that obligates the District to condemn 1,200 acres of land on the Tribe's behalf to build the Plum Creek Project.

The parties agree that the issue before the court in both summary judgment motions boils down to this: Does the Agreement unambiguously require the District to exercise its eminent domain powers on the Tribe's behalf to acquire non-Indian land necessary to build the Plum Creek Project? The Tribe contends the answer is yes, and the District argues that the answer is no. The provision upon which the parties disagree states:

> Nemaha-Brown Watershed Joint District No. 7 and the Kickapoo Tribe of Kansas have the necessary authority to finance and install their portions of the planned project. This includes the right to accept contributions, levy taxes, make assessments against benefitted land, issue bonds, and exercise the right of eminent domain. They have agreed to use these powers as needed and will be financially responsible for excess investigation and design costs resulting from their delay or failure to do so.

(Doc. 248-6 at 68.)

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. Analysis

### A. Contract Interpretation

The construction of a contract is a question of law for the court.[2] *Youell v. Grimes*, 217 F. Supp. 2d 1167, 1172–73 (D. Kan. 2002) (citing *Liggatt v. Emp'rs. Mut. Cas. Co.*, 46 P.3d 1120, 1129 (Kan. 2002)). The same is true for the determination of whether a contract is ambiguous. *Id.* at 1173 (citation omitted). "'The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow.'" *Kay-Cee Enters., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999) (quoting *Ryco Packaging Corp. v. Chapelle Int'l Ltd.*, 926 P.2d 669, 674 (Kan. Ct. App. 1996) (citation omitted)).

The court must consider the purpose underlying the contract and the context in which it was written. *Prenalta Corp. v. Colo. Interstate Gas Co.*, 944 F.2d 677, 688 (10th Cir. 1991). Upon determining that a contract is unambiguous, "the court must interpret the contract solely within its four corners, and extrinsic evidence is inadmissible." *Youell*, 217 F. Supp. 2d at 1173. The court must give unambiguous language its plain and ordinary meaning. *City of Salina v. Md. Cas. Co.*, 856 F. Supp.

---

[2] The parties do not address whether Kansas law applies; however, both parties apply Kansas law in their briefs. The court assumes the parties agree that Kansas law applies.

1467, 1475 (D. Kan. 1994) (citing *Wing Mah v. U.S. Fire Ins. Co.*, 545 P.2d 366, 369 (Kan. 1976) (quoting *Bramlett v. State Farm Mut. Ins. Co.*, 468 P.2d 157, 159 (Kan. 1970))).

The court has carefully reviewed the Agreement in its entirety. As stated above, the parties agree on the following material, basic facts: the parties entered into an Agreement, the Agreement contained the quoted language cited above, the Tribe requested the District use its power of eminent domain to condemn land on behalf of the Tribe, and the District refused to do so. Because the court finds that the contract language is unambiguous, the court looks no further than the four corners of the document and applies the plain and ordinary meaning of the language at issue. *See Youell*, 217 F. Supp. 2d at 1173; *City of Salina*, 856 F. Supp. at 1475. No extrinsic evidence was necessary for this determination.

The court understands that the purpose of the Agreement was to carry out works of improvement for soil conservation and for other purposes, including flood prevention. Additional purposes stated in the Agreement are water quality improvement, water supply development, and development of water-based recreation. (Doc. 248-6 at 63.) The court also appreciates the mutual benefits to each party by acting as co-sponsors of the Agreement. And the court is familiar with the context in which the Agreement was reached. With this foundation in mind, the court analyzes the language of the Agreement, which again states:

> Nemaha-Brown Watershed Joint District No. 7 and the Kickapoo Tribe of Kansas have the necessary authority to finance and install their portions of the planned project. This includes the right to accept contributions, levy taxes, make assessments against benefitted land, issue bonds, and exercise the right of eminent domain. They have agreed to use these powers as needed and will be financially responsible for excess investigation and design costs resulting from their delay or failure to do so.

(*Id*. at 68.)

The court finds that the Agreement is unambiguous and that the plain language of the Agreement does not require the District to condemn on the Tribe's behalf.[3] The disputed provision states that the District and the Tribe "have the necessary authority to finance and install **their portions** of the planned project." Merriam-Webster's Dictionary defines "portion" as "a part of a larger amount, area, etc." or "a part of something that is shared with other people." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/portion (last visited Nov. 26, 2013). Similarly, Black's Law Dictionary defines portion as "[a] share or allotted part." Black's Law Dictionary 1280 (9th ed. 2009).

The next sentence states that "[t]his" "includes the right to . . . exercise the right of eminent domain." Applying the plain and ordinary meaning, it appears that "this" refers to "the necessary authority." And the Tribe and the District are agreeing that they have "the necessary authority"—including "the right of eminent domain"—to "finance and install" "**their portions**" of the project.

Finally, the Tribe and the District agree to use "these powers" "as needed." Considering all of these terms and phrases together, the provision states that the Tribe and the District have the necessary authority, including the right to exercise eminent domain, regarding their portions—or share—of the project, and that the parties agree to use these powers as needed as to their respective portions.

The Tribe argues that the next sentence, which states that "they"—the Tribe and the District, who are the only parties named in the provision—have agreed to use these powers (including eminent domain) "**as needed**," means that the District has agreed to use its eminent domain power on the Tribe's behalf. The Tribe argues that the "as needed" language reasonably refers to the land needed for the Plum Creek Project. The Tribe also contends that the language stating that the parties "will be

---

[3] The District contends that the Agreement requires a "separate agreement" for each reservoir, including the Plum Creek Project. Thus, the District argues that the Agreement is merely an "agreement to agree in the future" or a letter of intent. The court does not discuss this issue, because even assuming (without deciding) that the Agreement is a binding commitment between the parties, the plain language does not support the interpretation urged by the Tribe.

responsible for excess investigation and design costs resulting from their delay or failure to [exercise eminent domain]" most plausibly relates to the District's delay in exercising its eminent domain power. The Tribe argues that if the "as needed" language is not construed to require the District to exercise its eminent domain power on the Tribe's behalf, then this sentence regarding responsibility for excess investigation and design costs resulting from delay or failure to exercise eminent domain is rendered meaningless.

The court disagrees. If the provision were to be given the meaning the Tribe ascribes to it, then the "their portions" language would be meaningless. *See Stark v. Resolution Trust Corp.*, 856 F. Supp. 1509, 1513 (D. Kan. 1994) ("Where faced with a choice of finding a contract term meaningless or meaningful, a court will opt for the latter.") (citation omitted). If the parties had meant that both the Tribe and the District were required to exercise eminent domain "as needed" for all portions of the project, then they would not have used language regarding "their portions."[4] The parties could have included language to make it clear that the Tribe did not have authority (if it did not) to condemn non-Indian lands and that the District was required to condemn those lands for the Plum Creek Project. But they did not do so. The plain language, read in conjunction with the entire provision, indicates that the Tribe and the District have agreed to use their powers "as needed" for "their portions." As for the sentence regarding responsibility for costs resulting from failure to exercise eminent domain, this sentence retains its meaning—if either party does not exercise its eminent domain powers as to that party's portion of the project, then that party will be responsible for those costs.

This reading of the provision at issue is in accord with the rest of the Agreement. In multiple provisions, the Agreement allocates responsibility for dams not on the Reservation to the District and

---

[4] And, as the District notes, the Tribe's interpretation would mean that the District would also be required to "accept contributions, levy taxes, make assessments against benefitted land, [and] issue bonds" on the Tribe's behalf "as needed."

for dams on the Reservation and the multipurpose dam/Plum Creek Project to the Tribe. For example, the Agreement states that:

> **The Watershed District** will furnish legal services and obtain all land rights needed for installation of floodwater retarding dams **not on the reservation**. **The Tribe** will furnish legal services and obtain all land rights needed for installation of the floodwater retarding dams **on their reservation and the multipurpose dam**.

(Doc. 248-6 at 69).

The Agreement also contains a table showing the percentages of land rights costs to be paid by the sponsors and the SCS as follows:

| Works of Improvement | Watershed District (percent) | Tribe (percent) | SCS (percent) | Estimated Land Rights Costs (dollars) |
|---|---|---|---|---|
| 17 Floodwater Retarding Dams | 100.0 | 0 | 0 | 652,300 |
| 3 Floodwater Retarding Dams | 0 | 100.00 | 0 | 257,700 |
| Multipurpose Dam No. 21-14 [(Plum Creek Project)] | 0 | 98.3 | 1.7 | 749,200 |
| Recreational Facilities Dam No. 21-14 [(Plum Creek Project)] | 0 | 50.0 | 50.0 | 172,200 |

(*Id*. at 5, ¶1); (*see also id*. at 6, ¶¶6–7 (allocating operation, maintenance, and replacement of dams and Plum Creek Project between the District and the Tribe); *id*. at 67 ("The Tribe will be responsible for the local cost of land rights for the multipurpose dam."); *id*. at 68 (defining "land rights costs" as "direct and related costs for the right to install, operate, and maintain works of improvement" and to include "land purchases, easements, agreements, permits, and modifications of properties and utilities"); *id*. at 74 ("The multipurpose structure and water supply facilities will be operated and maintained by the Tribe."); *id*. ("Recreational facilities will be operated, maintained, and replaced by the Tribe.").).

Because the Agreement is unambiguous, the court need not rely on the plethora of extrinsic evidence offered by the parties. The plain language of the Agreement does not require the District to condemn land on the Tribe's behalf. The District is entitled to summary judgment on this issue.

**B. Promissory Estoppel**

The Tribe argues that if the Agreement is not found to require the District to exercise eminent domain on the Tribe's behalf, then promissory estoppel imposes that obligation on the District. The District argues that promissory estoppel is not available against public entities, and that even if it were, the Tribe has not shown that it should apply. The court need not discuss in detail whether promissory estoppel would be available against the District, because the Tribe has not shown that an essential element required for promissory estoppel has been met—that a promise was made by the District. Promissory estoppel requires the Tribe to prove that the District made a promise, that the District reasonably expected the Tribe to rely on the promise, that the Tribe relied on the promise and acted reasonably in doing so, and that fraud or injustice would result if the promise is not enforced. *See Warkentine v. Salina Pub. Schs., Unif. Sch. Dist. No. 305*, 921 F. Supp. 2d 1127, 1132–33 (D. Kan. 2013) (listing promissory estoppel elements) (citation omitted).

The Tribe's contention that the District promised to condemn for the Tribe if the Tribe made further efforts to obtain the land and gather more information is unsupported by the record. Instead, the record shows that the District consistently tabled the decision, indicating that it had not decided whether or not it would condemn on the Tribe's behalf. Although the District did appear to be considering acting on the Tribe's behalf, and asked for more information, there is no indication that a promise was made to do so. To the extent the Tribe argues that the Agreement contained a promise by the District to condemn on the Tribe's behalf, this argument fails as explained above. Because the

Tribe cannot show that the District made a promise to condemn on its behalf, the court awards summary judgment on this issue in the District's favor and against the Tribe.

## IV. Counts Affected by the Ruling

Neither party explicitly states upon which counts it moves for summary judgment; instead, both parties ask generally for summary judgment to be granted in their favor. In Count III of its amended complaint, the Tribe seeks a declaration that the District and other defendants breached the Agreement by failing to condemn on behalf of the tribe. Count III also seeks specific performance. Count IV asks for damages against the District and other defendants for failure to perform under the Agreement. Thus, it appears that both parties move on Counts III and IV as against the Watershed District, as those counts clearly deal with the Agreement between the parties. As a result, the District is granted summary judgment on Counts III and IV and the Tribe is denied summary judgment on those same counts.

However, Counts V and VI also appear to be related to the Agreement. Count V brings a claim for damages and equitable relief under 42 U.S.C. § 1983, alleging that the District and other defendants have adopted an illegal policy under color of state law and have impaired the contract rights of the Tribe and its members in violation of the Contracts Clause of the Constitution. This count is based on the Tribe's allegations that the District and the other defendants' failed to act under the Agreement. Count VI seeks damages and equitable relief, claiming that the District and other defendants adopted an illegal and discriminatory policy motivated by racial animus under color of state law. Count VI alleges that the District and other defendants have impaired the rights of the Tribe and its members under 42 U.S.C. § 1981 to make and enforce contracts and to "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

To the extent that Counts V and VI against the District are based on the Tribe's allegation that the Agreement obligates the District to condemn on the Tribe's behalf, Counts V and VI against the District must necessarily fail based on the court's decision above. The court grants summary judgment in the District's favor and against the Tribe based on its determination as a matter of law that the Agreement does not obligate the District to condemn on the Tribe's behalf.

**IT IS THEREFORE ORDERED** that Defendant Nemaha Brown Watershed Joint District No. 7's Motion for Summary Judgment (Doc. 247) is granted.

**IT IS FURTHER ORDERED** that Plaintiff Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas's Motion for Summary Judgment (Doc. 290) is denied.

Dated this 20th day of December, 2013, at Kansas City, Kansas.

        s/ Carlos Murguia
        **CARLOS MURGUIA**
        **United States District Judge**